**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 5:20CR262 |
| | : | |
| Plaintiff, | : | JUDGE SOLOMON OLIVER, JR. |
| | : | |
| -vs- | : | |
| | : | **DEFENDANT'S MOTION TO** |
| CHRISTIAN FERGUSON, | : | **REOPEN DETENTION PROCEEDINGS** |
| | : | **AND PERMIT TEMPORARY RELEASE** |
| Defendant. | : | |

Christian Ferguson, through counsel, requests this Court reopen detention proceedings and order his release on bond as a temporary release, pursuant to 18 U.S.C. § 3142(f)(2) and § 3142(i)(4). The current COVID-19 pandemic and conditions at CCA present "a change of circumstances" why Mr. Ferguson's detention is no longer appropriate and Mr. Ferguson poses no serious risk of flight, or serious risk that he will obstruct justice or threaten, injure, or intimidate a prospective witness or juror.

**I.   Procedural History**

Mr. Ferguson was arrested in connection with the instant case on May 8, 2020. A complaint was filed in federal court on May 12, 2020. (Dkt. 1). The matter was set for both a preliminary and detention hearing on May 15, 2020. (Dkt. 9). The preliminary hearing was conducted and probable cause was found. At the time, Mr. Ferguson waived his right to a detention hearing, while reserving the right to "revisit the issue of detention at a later date should circumstances change."[1] An indictment was returned was May 20, 2020. (Dkt. 10). Mr. Ferguson was indicted on two

---

[1] This was specifically discussed with the government as Mr. Ferguson's father was facing eviction and counsel was attempting to locate an alternative residence.

counts of attempted kidnapping in violation of title 18 U.S.C. 1201(a)(2)(5) and (d). These are not considered crimes of violence. See *Knight v. United States*, 936 F3d 495 where the government conceded a conviction under 18 U.S.C. 1201(a) is not a crime of violence.

The case has remained pending and counsel is awaiting production of discovery. Mr. Ferguson has remained in pretrial detention since May 8, 2020, over two months. When Mr. Ferguson was first brought to CCA, the only reported COVID-19 cases were staff members, since that time, COVID-19 has been spreading to inmates. Currently, NEOCC-CCA is in full quarantine mode with a number inmates testing positive for Covid-19 and a number of tests awaiting return.[2]

Because of the COVID-19 pandemic, Mr. Ferguson's risk of contracting COVID-19 and other conditions he is encountering at NEOCC-CCA, he now requests this Court release him on bond. Specifically, Mr. Ferguson is an African American male and has asthma and a peanut allergy.[3] See Exhibit A. Over the last few weeks, Mr. Ferguson has had an allergic reaction to nuts as NEOCC-CCA has not placed him on a restricted diet.[4] On one instance, his throat began to swell and medical personnel were slow to respond. He has also been served "rotten" and undercooked food. Mr. Ferguson worries for his health as the conditions in NEOCC-CCA worsen daily.[5] Mr. Ferguson has been exposed to COVID-19 as it is continuing to spread at NEOCC-CCA. The CDC advises that people take extra precautions, like social distancing.[6] Being at NEOCC-CCA, Mr. Ferguson cannot take these extra precautions. Social distancing at NEOCC-

---

[2] https://coronavirus.ohio.gov/static/reports/DRCCOVID-19Information.pdf. CCA is not testing all inmates, even the ones showing symptoms.
[3] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html
[4] Staff claims he denied a restricted diet. Mr. Ferguson disputes this claim.
[5] Staff continue to test positive and now inmates have as well. It is hard to get a true picture of the numbers as CCA is not actively testing inmates and the state website only reports state staff and inmates held at CCA who are positive.
[6] https://www.wrcbtv.com/story/41971838/what-patients-need-to-know-about-covid19-and-asthma

CCA is a myth; inmates are crowded into living pods with no restrictions, and a very relaxed attitude towards social distancing and sanitation.

Further, over the last month, Northeast Ohio Correctional Center (NEOCC-CCA) reported its first positive cases of COVID-19 among inmates. Mr. Ferguson fears for his safety and well-being with his continued detention. Mr. Ferguson requests the opportunity to be granted a temporary release on bond so he can return to the community.

## II.    Relevant Legal Standards

"When reviewing a pretrial detention order of a magistrate judge, the Court acts de novo and must make an independent determination of the proper pretrial detention or conditions for release." *See United States v. Amir*, No. 1:10-CR-439, 2011 U.S. Dist. LEXIS 75640, *9 (N.D. Ohio Jul. 13, 2011) (internal quotation marks omitted); *United States v. Pritchard*, No. 5:08-MJ-5017, 2008 WL 920434 (N.D. Ohio Apr. 3, 2008) (citing *United States v. Rueben*, 974 F.2d 580, 585 (5th Cir. 1992)). "[M]eaningful de novo review means that the district court should engage in the same analysis, with the same options, under § 3142 as the magistrate judge." *United States v. Yamini*, 91 F. Supp.2d 1125, 1129 (S.D. Ohio 2000).

Mr. Ferguson is charged in a two-count indictment for attempted kidnapping under 18 U.S.C. § 1201 (a)(2)(d) and (a)(5)(d). This case does not carry a presumption of detention. *See* 18 U.S.C. § 3142(f).

"The default position of the law . . . is that a defendant should be released pending trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). "A defendant may be detained pending trial only if a judicial officer 'finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]'" *Id.* (quoting 18 U.S.C. § 3142(e)(1)) (alteration in *Stone*).

The Court must impose the least restrictive conditions necessary to reasonably assure the person's appearance as required and the community's safety. *See* 18 U.S.C. § 3142(c). The statute lists thirteen specific conditions that the Court may impose, 18 U.S.C. § 3142(c)(1)(B)(i) - (xiii), plus "any other condition that is reasonably necessary to assure the appearance of the defendant as required and the safety of any other person and the community," 18 U.S.C. § 3142(c)(1)(B)(xiv).

### III. COVID-19 and the Change of Circumstances

While Mr. Ferguson waived his right to a detention hearing in May, Dkt. 9, he did so with the government's understanding it was due to a lack of residence as his father was being evicted. A change of circumstances has arisen which warrant reconsideration of Mr. Ferguson's detention, that being the COVID-19 pandemic, the spread of the virus at CCA since the initial hearing, and a residence Mr. Ferguson has secured. The statute on bail, 18 U.S.C. § 3142(f)(2) holds that even after a detention has been ordered detained:

> The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

Other district courts have held that the circumstances of COVID-19, in the context of the § 3142(f) factors, can constitute a change of circumstances to reopen bond proceedings.[7] As the district court found in *United States v. Martin*, 2020 WL 1274857, at *20 (D. Md. Mar. 17, 2020), COVID-19 "can indeed constitute new information having a material bearing on whether there are conditions of release that will reasonably assure the appearance of detained defendants and secure the safety of the community." *See also United States v. Dodd*, 2020 WL 1547419 (D. Minn. April 1, 2020).

---

[7] In addition, a residence that can be checked by pretrial services is also another change of circumstance.

4

Further, the Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense *or for another compelling reason*." 18 U.S.C. § 3142(i) (emphasis added). The health risk to Mr. Ferguson due to his asthma, coupled with the conditions at NEOCC, and a residence qualify as "compelling reason[s]" within 18 U.S.C. § 3142(i). Other federal courts granted a temporary release under § 3142(i) due to COVID-19. *See United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (temporarily releasing defendant under § 3142(i) due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__, at *3 (S.D.N.Y. Mar. 19, 2020) ("the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason under 18 U.S.C. § 3142(i)."); *United States v. Selna*, 8:16-CR-76-JVS (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the COVID-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i)).

As of July 15, 2020, the new strain of coronavirus (COVID-19), has infected over 3 million people globally, leading to 577,954 deaths worldwide.[8] Governor DeWine declared a State of Emergency on March 9, 2020,[9] and on March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[10] Governor DeWine issued a "stay at home" order to prevent

---

[8] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (July 15, 2020), at https://nyti.ms/2U4kmud (updating daily).

[9] https://ema.ohio.gov/Documents/pdfs/DeWine_Signs_Emergency_Order_Regarding_Coronavirus_Response_0309.pdf

[10] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) at https://bit.ly/2W8dwpS.

5

further spread of the virus. As of July 15, 2020, there have been 67,995 confirmed cases of the virus in Ohio and 3069 have died.[11] The COVID-19 pandemic is "clearly out of the ordinary, uncommon, or rare" as "COVID-19 is twice as contagious as the flu, and 20 times more deadly."[12] The virus is "highly infectious," and can be spread "easily and sustainably" from person-to-person.[13] The virus can live on plastic and steel surfaces for up to 72 hours[14], and, powered by a single cough or sneeze, can be propelled in a gas cloud that extends up to 27 feet in length.[15]

### A. Conditions of Confinement and Spread of Coronavirus

The CDC has issued guidance that individuals at higher risk of contracting COVID-19 take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[16] The conditions in jails do not allow for an inmate to take the recommended preventive actions and create an ideal environment for the transmission of contagious disease.[17] Inmates cycle in and out of jails from all over, and people who work in the facilities leave and return daily, without effective screening. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in

---

[11] *https://coronavirus.ohio.gov/wps/portal/gov/covid-19/*
[12] Governor Mike DeWine (@GovMikeDeWine), Twitter (Mar. 14, 2020, 2:19PM), *https://twitter.com/GovMikeDeWine/status/1238892579262992384?s=20*

[13] *See* Centers for Disease Control and Prevention, *How COVID-19 Spreads* (accessed Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html

[14] Neeltje van Doremalen et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, NEW ENG. J. MED., 2 (2020), available at *https://doi.org/10.1056/NEJMc2004973* (accessed Apr 2, 2020).
[15] Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions: Potential Implications for Reducing Transmission of COVID-19*, JAMA (2020), *https://jamanetwork.com/journals/jama/fullarticle/2763852* (accessed Apr 2, 2020)

[16] *https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/asthma.html*
[17] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at *https://doi.org/10.1086/521910*

proactive measures to keep themselves safe;" "infection control is challenging in these settings."[18]

Given these circumstances and high risk of infection in jails and prisons, federal circuit and district courts across the country have released defendants from pretrial detention, due to COVID-19. *See Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (sua sponte releasing detainee from immigration detention "[I]n light of the rapidly escalating public health crisis"); *United States v. Meekins*, Case No. 1:18-cr-222-APM, Dkt. No. 75 (D.D.C. Mar. 31, 2020) (post-plea, pre-sentence release order releasing defendant with three pending assault charges due to extraordinary danger COVID-19 poses to folks in detention); *United States v. Davis*, No. 1:20-CR-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) (releasing defendant due to the "urgent priority" of decarcerating, to protect both the defendant and the community, and to preserve Sixth Amendment rights in this perilous time); *United States v. Bolston*, Case No. 1:18-cr-382-MLB, Dkt. No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justif[y] his immediate release from custody"); *United States v. Hector*, Case No. 2:18-cr-3-002, Dkt. No. 748 (W.D. Va. Mar. 27, 2020) (granting release pending sentencing after Fourth Circuit remanded detention decision requiring court to specifically consider extraordinary danger posed by COVID-19 to folks in prison); *United States v. Kennedy*, No. 5:18-cr-20315, Dkt. No. 77 (E.D. Mich. Mar. 27, 2020) (post-plea presentence release of defendant whose pretrial release was revoked because "the COVID-19 pandemic constitutes an independent compelling reason" for temporary release and "is necessary for Defendant to prepare his pre-sentence defense");

---

[18] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at https://bit.ly/2W9V6oS*.

*United States v. Mclean*, No. 19-cr-380, Dkt. No. (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, see 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun and drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions.").

      **B.**      **Mr. Ferguson's health issues and the conditions at NEOCC-CCA**

The government will likely file a response in opposition to this motion, which is similar to the response they have made to other motions requesting bond due to COVID-19. This response is likely to be a list of precautions and measures that NEOCC-CCA has put into place to combat the spread of COVID-19. While the government claims measures have been put in place, and inmates at NEOCC are adequately protected, we need not look far to understand how quickly things can unravel. If we look at an institution only a few miles from NEOCC, FCI Elkton, we can see evidence of a federal institution's inability to contain the spread of a virus. This contradicts the any claims about the effective of measures to curb COVID-19's spread in the Bureau of Prisons.

8

FCI Elkton is on total lockdown due to the pandemic and quarantine procedures. As of July 15, 2020, 9 inmates have died at Elkton and 347 remain positive. It is clear the situation at FCI Elkton has continued to worsen.[19]

Once contracted, COVID-19 can cause severe damage to lung tissue, including a permanent loss of respiratory capacity, and it can damage tissues in other vital organs including the heart and liver.[20] People like, Mr. Ferguson, who suffer from pre-existing health issues like asthma are at a heightened risk. *See supra* footnotes 1 and 2. Even if a person survives COVID-19, the virus can permanently damage lungs, heart, and other organs.[21] Approximately 1 out of 5 people who are infected with COVID-19 will need to be hospitalized, and many of those will need intensive care.[22] Such intensive care often requires highly specialized equipment like ventilators that are in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse-to-patient ratios, respiratory therapists, and intensive care physicians.[23]

---

[19] https://www.bop.gov/coronavirus/

[20] Centers for Disease Control and Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://cutt.ly/etRPVRl.

[21] Melissa Healy, *Coronavirus infection may cause lasting damage throughout the body, doctors fear*, LA TIMES (Apr. 10, 2020), available at https://cutt.ly/htNrJ77; *see also* Di Wu et al., *Plasma Metabolomic and Lipidomic Alterations Associated with COVID-19*, MEDRXIV 2020.04.05.20053819 (2020). For high-risk patients who survive, the effect of contracting this virus can be permanent and debilitating, and can include "profound deconditioning, loss of digits, neurologic damage, and loss of respiratory capacity." Declaration of Dr. Jonathan Golob, *Dawson v. Asher*, No. 2:20-cv-00409-JLR-MAT at ¶ 4 (W.D. Wash., Mar. 16, 2020), available at https://cutt.ly/AtNrFOl.

[22] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Brandon Hogan, Gov. of Maryland (Mar. 25, 2020) available at https://cutt.ly/stERiXk

[23] Kevin McCoy and Katie Wedell, *'On-the-job emergency training': Hospitals may run low on staff to run ventilators for coronavirus patients*, USA TODAY (Mar. 27, 2020), available at https://bit.ly/2V7rLsS.

Dr. Novisky, an expert on prisons and prisoner health, notes in her declaration, "prisons, by their very nature, are high risk sites for the spread of infectious disease." Ex. B, p. 1. Dr. Goldenson, a physician with decades of experience in correctional health, agrees: "The risk of exposure to and transmission of infectious diseases, as well as the risk of harm from developing severe complications or death if infected, is significantly higher in jails, prisons, and detention centers than in the community." Ex. C, p. 5.

Because inmates are forced to exist in close, shared spaces for eating, sleeping, and bathing, it is impossible for people who are confined in prisons, jails, and detention centers to engage in the necessary social distancing required to mitigate the risk of transmission. Ex. B, ¶ 10; Ex. C, ¶ 20 ("it is "extremely difficult, if not impossible" to implement recommended social distancing and hygiene procedures in detention settings). Places like FCI Elkton contain high numbers of shared contact surfaces, limited access to medical care, and high numbers of people with chronic – often untreated – illnesses living in close proximity with each other exacerbate the dangers in detention settings. Ex. B, ¶ 4; Ex. C, ¶ 24.

Other public health experts have publicly warned that people held in correctional facilities are likely to face serious, even grave, harm due to the outbreak of COVID-19, including:

- Dr. Gregg Gonsalves, a professor at Yale School of Public Health;
- Dr. Ross MacDonald, Chief Medical Officer for Correctional Health Services;
- Dr. Marc Stern, an affiliate faculty member at the University of Washington School of Public Health and a correctional health care consultant,
- Dr. Oluwadamilola T. Oladeru, a resident physician in the Harvard Radiation Oncology Program at Massachusetts General Hospital, and Adam Beckman, a student at Harvard Medical School,
- Dr. Homer Venters, former chief medical officer of the New York;
- the faculty at Johns Hopkins schools of nursing, medicine, and public health; and
- Dr. Josiah Rich, a Professor of Medicine and Epidemiology at Brown University.

*See Wilson*, Case No. 4:20-CV-794, Dkt. 1, PageID 12-13 (footnotes included full citations and hyperlinks).

As Dr. Novisky writes: "Given the structure, operations, and current conditions at Elkton, there is no realistic set of internal conditions or practices that FBOP can use that will prevent additional infection of prisoners and staff given the current number of prisoners living at Elkton." Ex. B, ¶ 16. As detailed in the complaint in *Wilson*, inmates at Elkton live in crowded quarters; sleep in beds within a few feet of each other; the entire prison is "overcrowded, and every bed is taken up." *Wilson*, Case No. 4:20-CV-794, Dkt. 1, PageID 16. Each unit contains only a few sinks and showers, shared by more than a hundred people, and these showers and sinks are close together; also the limited televisions, phones, and computers are shared, in constant use, and close to each other, all of which greatly increase the risk of transmission. *Id.* Resident eat together, and do not have adequate hygiene products. *Id.* at PageID 17.

The growing numbers of ill and dead at Elkton "make it clear that current measures being taken by the Bureau of Prisons are not sufficient in strength nor impact to adequately protect its staff, its prisoners, or the public." Ex. B, ¶ 6. "The death rate [at Elkton] will increase substantially before it starts to diminish without major interventions." Ex. C, ¶ 32. 59.

The lessons from FCI Elkton must apply to NEOCC-CCA as well; adequate procedures have not been put into place, and cannot unless drastic changes are made. CCA has failed to make the necessary changes, and have put Mr. Ferguson at risk.

Given this, COVID-19 and a new residence address present a change of circumstances warranting this Court to reopen bond proceedings and grant Mr. Ferguson a temporary release under 18 U.S.C. § 3142(f)(2) and § 3143(i)(4). He requests this Court place him on house arrest with GPS monitoring so that he can go home and obtain adequate health treatment in the

community. In the alternative, Mr. Ferguson requests placement in a halfway house. Mr. Ferguson has the opportunity to become immediately employable as a mechanic with Chuck's Auto Shop in Cleveland.

          Respectfully submitted,

          STEPHEN C. NEWMAN
          Federal Public Defender
          Ohio Bar: 0051928

          */s/ Carolyn M. Kucharski*
          CAROLYN M. KUCHARSKI
          Assistant Federal Public Defender
          Ohio Bar: 0062119
          1660 West Second Street, Suite 750
          Cleveland, Ohio 44113
          (216) 522-4856 Fax: (216) 522-4321
          e-mail address: carolyn_kucharski@fd.org