## Declaration of Meghan Novisky, PhD

1. I am an Assistant Professor in the Department of Criminology, Anthropology, and Sociology at Cleveland State University.

2. My research investigates the consequences of carceral contact on health, factors related to the conditions of confinement, and the collateral consequences of criminal justice policy. I have worked since 2009 with the University of Cincinnati's Corrections Institute (UCCI) as an evidence based programming consultant and trainer. In this role I have worked with correctional staff in 17 U.S. states and trained them on the implementation of research-informed programs and policies to help reduce their recidivism rates. I received my PhD in Sociology from Kent State University, where the focus of my dissertation involved identifying the barriers to health care access that exist in prisons, specifically among older adults.

3. My publications on health and incarcerated people have appeared in numerous peer-reviewed journals, including *Criminology*, *Justice Quarterly, and Victims & Offenders*. In 2020, I received the Early Career Investigator Award from the Academic Consortium on Criminal Justice Health (ACCJH), and I serve on the Executive Board of the Academy of Criminal Justice Sciences (Section on Corrections), and as Chair of the Annual Awards Committee of the American Society of Criminology, Division of Corrections and Sentencing.

4. One of the greatest challenges facing prisons regarding the provision of health services is that prisons, by their very nature, are high risk sites for the spread of infectious disease. Close proximity of many people (made worse by overcrowding), shared equipment tied to risky health behaviors such as tattooing, compromised abilities

to maintain general hygiene, substandard health care services, and lack of awareness about infection status combine to aggravate risk factors associated with the spread of infectious disease.[1]

5.       High levels of stress exposure can also weaken the immune system,[2] thereby increasing the susceptibility of exposure among incarcerated persons as well as recovery prognosis. Of course, these factors are all greatly exacerbated in the event of a global pandemic such as COVID-19 given that prisons in the U.S. are already under-resourced, understaffed, and chronically overcrowded.

6.       On Tuesday, March 24th, the Federal Bureau of Prisons (FBOP) issued a press release stating the Bureau was "taking aggressive steps to protect the safety and security of all staff and inmates, as well as visitors and members of the public."[3] The memo further stated "this response is the Bureau's top priority." Yet, the measures outlined in the memo lacked the vision necessary to adequately contain and minimize spread of COVID-19. For example, the memo stated "facilities have been directed to designate available space for isolation and quarantine for inmates who have been exposed to or have symptoms of the virus." Given that asymptomatic people can still be contagious, it would be impossible for institutions to definitively identify those exposed. Further, isolation of symptomatic prisoners does nothing to address those who are contagious but not symptomatic, nor does it address the threats contagious staff members pose to the incarcerated. As of the time of this filing, there now exist 541 confirmed cases

---

[1] https://www.ecdc.europa.eu/sites/default/files/documents/Active-case-finding-communicable-diseases-in-prisons.pdf
[2] Fali, T., Vallet, H., and Sauce, D. (2018). "Impact of stress on aged immune system compartments: overview from fundamental to clinical data. *Experimental Gerontology* 105, 19-26.
[3] https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf

<u>Exhibit B, p. 2</u>

of COVID-19 across 40 FBOP facilities, including 352 prisoner and 189 staff diagnoses.[4] Nine prisoners confined to FBOP institutions have died due to COVID-19. These statistics make it clear that current measures being taken by the FBOP are not sufficient in strength nor impact to adequately protect its staff, its prisoners, or the public.

7. On Monday March 30th prisoners at FCI Elkton, a low security male prison, began testing positive for COVID-19. As of April 12, 2020, Elkton has 35 confirmed cases of COVID-19, including 24 prisoner and 11 staff diagnoses. [5]The FBOP released consecutive memos on 4/2/20,[6] 4/3/20,[7] and 4/4/20,[8] announcing the deaths of Elkton prisoners Woodrow Taylor (53 y/o), Margarito Garcia-Fragoso (65 y/o), and Frank McCoy (76 y/o), respectively. The medically established progression of COVID-19, combined with the pre-existing health conditions of all 3 men, makes it likely these individuals suffered tremendously leading up to their deaths.

8. Based on my expertise on the health related risks associated with incarceration, it is my belief that if serious action is not taken swiftly, prisons under the jurisdiction of the FBOP, including Elkton, will escalate further, serving as hotspots for COVID-19 much like would be the case if people were forced to live on a crowded cruise ship during a pandemic. To be clear, without drastic intervention, many more incarcerated individuals and staff will become infected and will face elevated risks for medical complications and morality. This is due to the presence of factors that aggravate the spread of COVID-19, including lack of social distancing, concentrations of

---

[4] https://www.bop.gov/coronavirus/
[5] https://www.bop.gov/coronavirus/
[6] https://www.bop.gov/resources/news/pdfs/20200402_press_release_elk.pdf
[7] https://www.bop.gov/resources/news/pdfs/20200403_press_release_elk.pdf
[8] https://www.bop.gov/resources/news/pdfs/20200404_press_release_elk.pdf

Exhibit B, p. 3

immunocompromised, vulnerable adults, and lack of access to proper sanitation. All of these risk factors are important in assessing Elkton's practical capacity to properly address risks for COVID-19.

9. The volume of prisoners incarcerated at Elkton alone severely limits its capabilities to implement social distancing practices. Elkton maintains a current population of 2,417 male prisoners; 1,999 at the low security FCI/Federal Correctional Institution, and 418 at the FSL/adjacent low security satellite prison.[9] To keep all 2,417 prisoners (plus their population of staff) a minimum of 6 feet apart at all times is incredibly impractical.

10. It is my understanding that many prisoners in custody at Elkton share cells, sleeping areas, supplies, bathing areas, and other living spaces, compromising Elkton's abilities to follow CDC physical distancing guidelines. Like most low security prisons, it is likely that Elkton has only a limited percentage of its cell capacity devoted to administering solitary living conditions (i.e., one person per cell with no shared living space), as low security prisons are not intended to function like maximum or super-maximum security prisons with high capacities for solitary confinement. With continued functioning of shared spaces for bathing, eating, and sleeping, quarantine and social distancing would be impossible to implement at Elkton.[10] These factors, in combination with the high stress environment of incarceration in general, increase risks of infectious disease exposure in this institution dramatically.[11]

---

[9] https://www.bop.gov/locations/institutions/elk/
[10] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html
[11] Massoglia, M. (2008). Incarceration as exposure: the prison, infectious disease, and other stress-related illnesses. *Journal of Health and Social Behavior*, 49, 56-71.

Exhibit B, p. 4

11. Even if attempts were made to increase physical distance between prisoners at Elkton, this would fail to adequately address the regular contact that exists between Elkton staff and prisoners. Correctional staff must be in close contact with prisoners in the course of their regular jobs to enforce security protocols, escort prisoners across cell blocks and units, administer medications, and supervise meal distribution, for example.

12. Further, it is difficult (if not impossible) for prisoners to follow recommended sanitation procedures. While each Elkton prisoner is likely to have access to a rationed supply of soap, for example, disinfectant cleaning supplies and hand sanitizers would not typically be provided to each incarcerated person, at least not in the quantities necessary, as such supplies are likely to be considered contraband due to their alcohol content.

13. While Elkton has halted prisoner visitations, this will not stop the transmission of the virus between the prisoner population and the community. With institutional staff filtering in and out of Elkton on a daily basis, staff can easily carry the infection from the community to the prison and vice versa. Thus, unless Elkton staff are quarantined and prevented from continuing to cycle in and out of the prison to return to the community following each shift, this risk remains.

14. Further exacerbating the risk of infection to the surrounding community is that medical facilities in prisons are typically inadequate to provide the intensive care needed to handle serious cases of COVID19. Prisoners therefore require transport to community hospitals for care, increasing risks of infection and reducing the capacity of local hospitals to respond to other members of the community. These circumstances also

increase risks for the correctional officers who must not only transport sick, incarcerated individuals to the hospital, but supervise them while they are hospitalized.

15. The FBOP population also includes a significant number of older adults. Over nineteen percent of the prison population (n = 33,817) is over the age of 50, making this group particularly vulnerable to COVID-19 based on age alone.[12] Assuming Elkton's population is representative of the national FBOP demographic data, roughly 1 in 5 prisoners at Elkton would be especially vulnerable to COVID-19 based on age. Furthermore, older incarcerated adults suffer from disproportionately more chronic health conditions than the general population of adults,[13,14] including respiratory problems, making it likely this group will face medical complications should they continue to become infected. In fact, all 3 deaths at Elkton thus far have been prisoners that meet these categorical criteria: older than 50 years of age with pre-existing chronic health problems.

16. Given the structure, operations, and current conditions at Elkton, there is no realistic set of internal conditions or practices that FBOP can use that will prevent additional infection of prisoners and staff given the current number of prisoners living at Elkton.

17. Significantly reducing the prison population at Elkton as rapidly as possible is the best line of defense to maintain the public health interests of persons incarcerated at Elkton, correctional staff who work at Elkton, and the Ohio community. It

---

[12] https://www.bop.gov/about/statistics/statistics_inmate_age.jsp
[13] Loeb, S.J. and AbuDagga, A. (2006). Health-Related Research on Older Inmates: An Integrative Review. *Research in Nursing and Health*, 29, 556-565.
[14] Bedard, R., Metzger, L., & Williams, B. (2016). Ageing prisoners: An introduction to geriatric health-care challenges in correctional facilities. *International Review of the Red Cross*, 98, 917–939.

is my recommendation that all prisons under the jurisdiction of the FBOP should do the same. Based on the existing evidence about COVID-19, failing to do so will have grave consequences and long-term traumatic impacts for many.

18. There are several measures that can be taken to safely reduce the prison population at Elkton. Most important among them is to release as many older incarcerated adults from the prison as possible. Doing so will not only help to significantly reduce the prison population, but will remove the individuals most at risk for infection and complications likely to elevate mortality risks. Older adults have significantly reduced risks for recidivism compared with younger adults, so doing this is unlikely to come at the expense of public safety. The most common convicting offenses among people incarcerated in FBOP jurisdiction are in fact drug offenses (n =73,759).[15] Of course, aggravated cases where public safety is a concern need to be considered.

19. Efforts should also be made to release those at the prison with pre-existing chronic health conditions, most importantly those with respiratory conditions, cancer, heart disease, diabetes, kidney disease, HIV, and blood disorders. Because of their pre-existing immunocompromised statuses, failing to do so will leave these individuals not only especially vulnerable to COVID-19, but less likely to recover from it should they become infected.

20. Notably, the FBOP has the option to implement these measures while still maintaining correctional custody. The FBOP could do so by increasing existing efforts to transfer supervision from institutions like Elkton to home confinement in the community.

---

[15] https://www.bop.gov/about/statistics/statistics_inmate_offenses.jsp

In fact, they have been encouraged to do so by the Attorney General of the U.S. as of March 26, 2020.[16]

21. Specifically, the Attorney General recommended consideration of the following factors for home release: age and vulnerability of the prisoner to COVID-19; the security level of the facility, "with priority given to inmates residing in low and minimum security facilities," and convicting offense/danger posed to the community. Elkton's status as a low security prison confirms it is a prime candidate for rapidly downsizing its population in order to best protect the health of the prison population, its staff, and the Ohio community.

22. These actions are both meaningful and necessary. They would enable Elkton to free up needed space, thereby increasing competencies to develop and implement social distancing options not currently available. Doing so would also help to ensure already limited medical supplies and resources at Elkton do not become overwhelmed and that mortality risks are kept as low as possible.

23. Although the FBOP delay has already meant numerous prisoners and staff at Elkton have been infected (some of whom have died), it is not too late to take these steps, which can help prevent the situation from further deteriorating and causing unnecessary suffering to those who remain.

24. I have read the descriptions of the living conditions at Elkton contained in declarations from Elkton prisoners. The descriptions I read are consistent with my understanding of what the conditions of the prison are likely to be at this time based on the resources Elkton has, the structure of the facility itself, the currently limited actions

---

[16] https://www.bop.gov/resources/news/pdfs/20200405_covid-19_home_confinement.pdf

8

Exhibit B, p. 8

taken at Elkton to address the risks presented by COVID-19, and the current number of confirmed cases (n = 35) and mortalities (n = 3) attributed to Elkton custody.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

*M. Novisky*

_____
Meghan Novisky, PhD

Date: 4/13/2020