IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:20-CR-224 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| CHRISTIAN FERGUSON, | ) | |
| | ) | |
| | ) | UNITED STATES'TRIAL BRIEF |
| Defendant. | ) | |
| | ) | |

## TRIAL BRIEF

Now comes the United States of America, by its counsel, Bridget M. Brennan, Acting

United States Attorney, Duncan T. Brown and Jerome J. Teresinski, Assistant United States

Attorneys ("the United States"), and hereby submits this Trial Brief pursuant to the Court's pretrial

order.

## I.    JURY INSTRUCTIONS

The United States will provide its proposed jury instructions in a separate filing and will

provide opposing counsel a copy via email as well.

## II.    OUTSTANDING DISCOVERY CLAIMS

Counsel for the United States and Mr. Ferguson have met regularly throughout the three

weeks leading up to the trial date of May 3, 2021.  The production of any outstanding discovery

has been ongoing and part of an open and frank conversation about what documents, videos, and

other material is in the government's possession.  Counsel for the United States has met with

counsel for Mr. Ferguson on more than one occasion, and has made an extraordinary effort to also

meet with Mr. Ferguson (with his counsel present) in order to review a significant portion of the

videotaped evidence that the United States intends to present against Defendant at trial.  The

discovery process has consistently included productions to defense counsel in a manner that combined physical production along with access to agents to describe, explain, and guide counsel through the materials.  While there are transcriptions of certain videotapes, and they have been provided to defense counsel, it is the position of the United States that because those transcriptions are in the English language, the most efficient way to question their accuracy is via cross-examination of a witness about their understanding of an excerpt from a videotape.

The United States will continue to make trial exhibits and underlying sources available for counsel to review up until the final weekend before trial.

## III.    <u>STIPULATIONS</u>

The United States has not proposed any stipulations and does not plan to do so.  Although stipulations concerning the ownership of 500 Truxell Road, Peninsula, Ohio as a federally controlled property could be sought, the United States  believes that testimony from a live witness about that fact, and related subjects, would provide the trier-of-fact with a complete picture of the evidence.  Moreover, given the small number of witnesses and anticipated short duration of this trial, there is no prejudice to Defendant, or undue burden on the Court, to allow for live testimony on this material fact.

## IV.    <u>LENGTH OF TRIAL</u>

The United States estimates that its portion of the trial will be approximately three court days.

## V.    <u>*VOIR DIRE* QUESTIONS</u>

The United States will submit suggested *voir dire* questions for the jurors separately to the Court and to defense counsel.

## VI.    NOTICE TO DEFENSE

The United States hereby provides the defense with notice that it plans to introduce summary and demonstrative exhibits pursuant Federal Rules of Evidence 1006 and/or 611(a).  *See* **Exhibit B**.    These exhibits, and their underlying source material, have already been produced to defense in pretrial discovery, and they continue to be available for the defense to review at the FBI or the U.S. Attorney's Office at the U.S. Federal Courthouse.  Most of the exhibits listed in Exhibit B are more accurately described as "excerpts" (or "clips") from larger audio or videotaped recordings, rather than summaries, and thus, the United States  will seek to admit these documents as ordinary evidence.  They are simply noticed here in an abundance of caution, and we do not expect objections from defense counsel concerning our use of them during the trial.

## VII.    EVIDENTIARY ISSUES

### A.    Audio/Videotaped Recordings

The United States anticipates calling in its case-in-chief, a Confidential Human Source-2 ("CHS-2"), known to the Defendant only as an individual named "Steve."  We anticipate that CHS-2 will be able to testify about and sponsor the audio and videotaped recordings of the Defendant that he had with CHS-2 and another CHS, CHS-1, on or about[1] May 2, 2020.  On May 2, 2020, Defendant engaged in a training exercise with CHS-1 and CHS-2 where Defendant made many inculpatory statements about his intent and his plan to commit the kidnapping of police/law enforcement agents.  On or about May 8, 2020, other inculpatory recordings of the Defendant

---

[1] The United States does not anticipate calling CHS-1.  CHS-1 is an active source for the FBI whose identity is protected, and because he will not testify, will not be revealed.  CHS-1, known as "Guinness," online and in person to the Defendant, has the same safety concerns as CHS-2, and therefore is included in the proposed order of protection.

with CHS-1 and CHS-2 were also made during a dry-run of the Defendant's planned attack, and the date of his subsequent arrest for Attempted Kidnapping.  In addition to the testimony of CHS-2 concerning the conversations that he had with the Defendant, the United States will also present FBI Special Agents ("SA") Kurt Dirker and SA Ryan Taylor, who will also be able to identify the voice and images of the Defendant on all video recordings.  Both SA's directly reviewed the audio/videotaped actions of Defendant with CHS-1 and CHS-2 on or about both May 2, 2020 and May 8, 2020.  Additionally, on or about May 8, 2020, both SA's interviewed Defendant for approximately two hours as he confessed to the commission of his crimes. Based on that interview, both SA's are well-familiar with the Defendant's voice and can identify it when it appears on a video/audiotaped conversation to which the Defendant is a party.

Additionally, Lieutenant Jerame Simpson of the Valparaiso Indiana Police Department will also be able  to testify about the authenticity of his body camera, and his interactions with Defendant on the evening of July XX 2019.  SA's Dirker and Taylor will also be able to testify about the actual audio/videotaped interaction that Defendant had with Cleveland Police Officers on or about May 3, 2020, as they calmly responded to a domestic dispute call at the house that Defendant admittedly shared with his father during this interaction with the police.

B.    Evidence from Defendants' Cell Phone and Chat Log and Home

The United States anticipates presenting evidence of conversations engaged in, and content created by, the Defendant that was recovered from his cellular phone and from online chat logs.  On or about May 8, 2020, Defendant knowingly, willingly and in writing, provided consent to SA's Dirker and Taylor of the FBI, to search these devices.   Defense counsel was provided with copies of these signed consent forms, and the videotape of the signing of them.  The United States avers that the evidence from the phone and chat logs is admissible through testimony of the

4

two SA's who obtained the consent and reviewed the items.  It should be noted that the Defendant attempted to sign his forms using the *nom de guerre* or alias of "Christian Mactavish," a name he used in addition to his given name.  It is anticipated that there will be evidence that he is trying to create the impression that he changed his name to "Mactavish" (vice "Ferguson").  Regardless of the name Defendant chose to place on the forms, Defendant's consent was knowingly and voluntarily given to the SA's, in person, when he acknowledged the forms and consented  to answering questions.  In *Berghuis v. Thompkins*, 130 S.Ct. 2250 (2010), the United States Supreme Court held that defendants who have been informed of their rights and speak voluntarily with the police during an interview impliedly waive their right to remain silent, and that, should they wish to invoke this right thereafter, they must explicitly express their desire to do so. Defendant made no such invocation in this case.

Likewise, evidence that was recovered from the Defendant's house was obtained pursuant to legally obtained search and seizure warrant.  A search warrant was also obtained for Defendant's vehicle. At this time, the United States does not expect to seek to admit any items seized from the Defendant's vehicle. The United States does plan to present at least two SA's from the FBI to testify about the items seized during the execution of the search warrant of Defendant's residence, and make reference to the fact that a search warrant was also lawfully issued to search Defendant's vehicle, even if no evidence from that vehicle will be presented.

C.    Federal Jurisdictional Boundaries

The United States will provide testimony from Supervisory officers with the National Park Service to establish jurisdiction based on ownership and jurisdiction based on potential victims being Federal law enforcement officers.

D.     Admissible Evidence Under Federal Rule of Evidence 404(b)

On April 22, 2021, the United States filed a *Supplemental Notice of Intent to Use Evidence*

Pursuant to Federal Rule of Evidence 404(b).

1. Audio/Videotaped Footage of Defendant's Prior Contact with Police and Law
   Enforcement on Two Occasions is Admissible as Direct Evidence of his Hatred of
   Law Enforcement – Facts Directly in Issue to his Motive and Intent for Committing
   the Crimes in this Case.

The allegations in the criminal case before this Court involve the United States asserting

that Defendant attempted to kidnap and kill police, and law enforcement, due to his intense hatred

and animus toward them, allegedly, by his own admission because he was "mistreated by them"

on previous occasions.   In essence, Defendant wanted retribution for his perceived unfair

treatment.  Nothing could be further from the truth.  The United States seeks to admit the following

direct evidence of Defendant's hatred and animus as it serves as the actual motive for the

commission of the attempted kidnapping.

a. Traffic Stop with Valparaiso Police in July 2019 Depicts Defendant's Hatred
   toward Law Enforcement Despite the Appropriate Police Response

On or about July 16, 2019, at approximately 10:42 pm, the Valparaiso, Indiana, Police

Department conducted a traffic stop of a blue, 2014 Ford Mustang (the "Mustang").  In a location

on the Mustang's rear bumper where a validly issued license plate should have been affixed,

instead, a vanity-style license plate appeared depicting the words, "Grinch 75R."  The moniker

"Grinch 75R" is identical to the electronic screenname used by Defendant when he communicated

on-line.

During the July 2019 traffic stop, the body camera videotaped evidence of the uniformed

Valparaiso Police Officer who pulled Defendant over for a traffic violation depicts Defendant in

the driver's seat of the Mustang. The body camera evidence also depicts the uniformed Officer

6

approaching the passenger side of the Mustang, identifying himself to Defendant, and asking him to produce his driver's license and vehicle registration identification because the actual license plate for the Mustang was not lawfully displayed. The videotape depicted the Defendant refusing to comply with the Officers' simple requests, and then escalating matters and becoming angry with the Officer as he simply sought to execute his lawful duties.  Suddenly, unexpectedly, and quite aggressively, Defendant then gunned the gas pedal of the Mustang and fled from the traffic stop, and the Police Officer.  At that point, Defendant then engaged the Police in a high-speed pursuit (i.e., at some points hitting an estimated speed more than 100 MPH), that only ended when Defendant crashed the Mustang into an open field.  Thereafter, Defendant was taken to the hospital for treatment and arrested by other Valparaiso Police Officers who assisted in the pursuit of Defendant.[2]  Subsequent videotapes depicted the bumper of the Mustang displaying the above-described vanity-plate.  Another videotape depicts the Defendant at the hospital, during the aftermath of the crash.

> b. Defendant Engaged in a Verbally Abusive Interaction with Cleveland Police Officers as they Responded to being called to Investigate a Domestic Dispute

In addition to the above-described violent interaction caused by Defendant with law enforcement, a similar interaction with law enforcement occurred, again caused by the Defendant's unreasonable actions, this time, at or near the time of the alleged attempted kidnapping of police in this case.

---

[2] Defendant's identity as the driver is not in doubt.  After the crash, Defendant was charged with a felony for resisting law enforcement and other traffic related charges.  Police reports and video evidence confirms that the person driving the car with the vanity license plate and using the CF-Discord screenname (Grinch 75R) was, in fact, the Defendant.

On or about May 3, 2020 – just a day after Defendant is alleged to have begun to seek out others to design an ambush plan of the police – Police Officers with the Cleveland Police Department were called to a residence (i.e., 13517 Sherry Ave, Cleveland, OH 44135), that Defendant appeared to be sharing at the time with his father. The police videotape body cam of the response by Cleveland Police accurately depicts that the Defendant, and only the Defendant, had been the aggressor of the situation with responding police.

After the call for assistance in a domestic abuse situation was made by Defendant's father, Cleveland Police are seen arriving at the scene and trying to determine what was happening. Almost immediately, Defendant became verbally abusive, threatening, and loud, not only with the police but also with his own father. The police calmly talked with both the father and the Defendant, to determine if Defendant's father was in any danger from harm by Defendant. After attempting to investigate, and being angrily put-off by Defendant, the police decided to take no further action at that time, leave the scene, and advise the Defendant's father to call again if there were any further problems. Defendant's angry escalation of the situation was "de-escalated" by police on this date.

2. Videotapes of Both Prior Interactions between Defendant and Law Enforcement are Admissible to Prove Identity and/or Motive to Commit the Crimes Charged

The United States anticipates calling at least one Valparaiso Police Officer present at the July 2019 traffic stop to testify about the authenticity of the videotape. The United States will also provide witnesses familiar with the Defendant's on-line identity. Testimony concerning the Defendant's on-line identity, as argued below, will be admissible under the theory of "Res Gestae," as the Defendant's comments on-line are inextricably intertwined with his charged behavior on May 2nd and May 8th of 2020. Because the Defendant's identity is relevant to the alleged conduct, and live witnesses will testify to multiple uses of the otherwise unique nickname or "moniker"

(Grinch75R), and its obvious use by Defendant on the vanity tag of the Mustang that he drove in July 2019, this evidence satisfies the two-prong analysis required by the Sixth Circuit.

The Sixth Circuit has set forth a two-step analysis to determine the admissibility of evidence offered under FRE Rule 404(b):

> First, the trial court must ascertain whether the proffered evidence is relevant and admissible for a proper purpose. To be relevant, `the evidence must relate to a matter which is "in issue," and must deal with conduct substantially similar and reasonably near in time to the offenses for which the defendant is being tried. To determine whether the evidence is admissible for a proper purpose, the trial court must decide, 'whether the evidence is probative of a material issue other than character.
>
> Second, "the court must determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice." United States v Feinman, 930 F.2d 495 (6th Cir. 1991.

Additionally, the evidence must be relevant to a limited number of issues, namely in this case, identity, and motive.

a. Evidence of Identity

Specific to the traffic stop footage, the use of "Grinch 75R" fits squarely in the "identity" category of permissible evidence. See United States v. Bowers, 834 F.2d 607, 611 (6th Cir. 1987). The Defendant used the nickname on the Mustang he drove in July 2019, and also as his identity moniker for a chat server in which he created both public and private chat rooms to recruit like-minded individuals, as well as with those he discussed plans to rob, maim and kill law enforcement. The key to the Defendant's recruitment and planning was that the chat rooms were populated by people using monikers to shield their true identities.  This anonymity allowed the Defendant to post statements crystalizing the violent plans he attempted to carry out on May 8th against the

police. Thus, the relevance and probative value of the use of this videotape depicting the Defendant using this unique moniker far outweighs the danger of any unfair prejudice.[3]

    b.  Evidence of Motive

Throughout the United States' evidence that it intends to present to the jury, it is abundantly also clear that the motive for Defendant's illegal actions centers on his intense hatred or animus toward police and law enforcement officers.

As actual direct evidence of that hatred, and to complete the story and explain the genesis of that hatred or animus to the fact-finder (the jury), the United States seeks to affirmatively admit in evidence, in its' case-in-chief, the following: (1) the videotape of the violent July 2019 confrontation that the Defendant caused with Valparaiso Police Officers (i.e., endangering their lives by engaging in a high-speed chase with them in excess of over 100 MPH (with his Ford Mustang, Vanity Plate: Grinch 75R) when he was stopped by police for a routine traffic stop concerning an improperly displayed vehicle tag; and (2) the videotape depicting the defendant's angry escalation with Cleveland Police Officers as they responded to a call to assist Defendant's father during a domestic dispute that the father had with Defendant.

Moreover, the videos are consistent with statements Defendant made on videotapes the United States plans to introduce in evidence through a Confidential Human Source ("CHS") and statements made to federal agents at the time of his arrest, where Defendant repeatedly and explicitly expresses a desire to kill police officers because of his hatred of them and his belief that police have allegedly harmed him in the past.  Specifically, the Defendant made statements that fit

---

[3] Indeed, even if the Court finds that prejudice to the Defendant (there is none) outweighs the United States' use of these videotapes for this evidentiary purpose, depending upon the development of evidence during trial, the United asks this Court for the ability to revisit this issue.

10

clearly in the evidence as "res gestae," and they are inextricably tied to the criminal episode in which he stated he would "shoot to kill" and let the police know that he, and his militia group is "hunting them."

Likewise, on or about May 8, 2020, the day of his reconnaissance to execute his ambush plan against the police, the Defendant paid particular attention to the response of National Park Police to the fraudulent call for help.  During that day, the Defendant discussed how the police interfered with him for "slapping around" his father.  He further stated to law enforcement at the time of his arrest that the Cleveland Police were harassing him for having a dog.  These statements are in stark contrast, and directly contradictory of the images captured on the videotapes of the domestic event from May 3, 2020, which occurred one day after plotting out his planned ambush, and just days before his arrest for his crimes of attempted kidnapping.  In the videotape of the May 3, 2020 domestic dispute call, the Defendant is seen and heard yelling and attempting to verbally escalate the response by the two Cleveland Police Officers, but the responding officers remained calm, professional, and unfazed by Defendant's increasingly hostile behavior.

Moreover, as soon as May 4, 2020, the very next day, the Defendant made statements about getting his gun and shooting police during a direct on-line chat on the platform, Discord. The gun Defendant references is the same gun that he told agents was always locked in a safe and kept unloaded.  As with the Defendant's irrational and aggressive verbal responses to the officers in Valparaiso, the videotape with the Cleveland Police is direct evidence for his motives for seeking to kidnap, restrain, rob, and ultimately injure and kill police officers.

Thus, based on the pervasive amount of hatred, animus, and anti-law enforcement comments made by Defendant throughout the existing videotaped evidence, his attitude towards law enforcement when committing the crimes that he is charged with will be an important

11

evidentiary issue in this trial.  Under these circumstances, the probative value of the video to show Defendant's motive for wanting to rob, assault and kill law enforcement, outweighs any possibility that the evidence will unfairly prejudice the jury, while providing the most accurate context, for the fact-finder, to consider those motives.  *See* United States v. Garcia-Meza, 403 F.3d 364 (6th Cir. 2005).  If the above-referenced evidence is admitted, this Court can properly instruct the jury concerning the admissibility of this evidence to ensure that the jury considers it for the purposes the United States seeks to present it to them.

3. If the United States' Witnesses are Challenged on Cross-examination about the Defendant's Lack of Knowledge about the Ambush Plan, his Unwillingness to Participate in the Charged Crimes, or Suggest that Defendant was Coerced or Entrapped by the United States' Witnesses, the Videotapes of Both Interactions with the Police are Admissible.

The United States alternatively argues that if the Defendant, during his cross-examination of the United States' witnesses, attempts to create an affirmative defense based on a theory that he was entrapped, coerced, or that his will was "over-borne" by the words or actions of the Confidential Human Sources, the United States should be permitted to introduce video, testimony or other evidence, including the videos from the Valparaiso Police Department and the Cleveland Police Department in its case-in-chief.

Entrapment is a well-established theory that requires two conditions be met: (1) that the government induced the crime; and (2) that the Defendant lacked any predisposition to engage in the criminal activity; the court also reviews relevant factors for predisposition.  United States v. Al-Cholan, 610 F.3d 945 (6th Cir. 2010).  An entrapment defense rests on the argument that the Defendant was somehow coerced or overwhelmed by the urging of the government's agent(s), and as a result, took action that he otherwise would not have taken, "but for" the actions of the

12

agent.  By arguing that he was otherwise coerced into doing something, the Defendant squarely puts his intent and alleged compulsion directly at issue in this case.

Indeed, in United States v. Tutino, 883 F.2d 1123 (2nd Cir. 1989), the Court held that the absence of compulsion, but for the Government agent, is at issue in any entrapment defense, and it would be the central issue in the Defendant's theory.  Therefore, the United States argues, that if an entrapment or coercion argument is pursued, or even suggested by the Defendant during opening argument, or by questions of the United States' witnesses on cross-examination, the videotapes and evidence demonstrating Defendant's pre-existing hatred and animus of the police/law enforcement should be permitted to be admitted as evidence of Defendant's predisposition and motive to rebut that argument – this is true whether these allusions and inferences are raised through opening statement, and/or during the direct and re-direct examinations of the United States' witnesses.

E.    Photographs

The United States plans to admit photographs, listed in **Exhibit B**, with witnesses including, but not limited to: CHS-2; FBI SA's Ryan Taylor, Peter Mauro, Kevin Brown and Kurt Dirker, who we expect will provide testimony that the photographs fairly and accurately depict the condition of the subject of the photograph as it existed on or about May 2, 2020 and/or May 8, 2020.

The Confrontation Clause of the Sixth Amendment to the U.S. Constitution is not implicated as most of the "statements" to be offered by the United States will constitute statements of a party opponent in furtherance of the criminal scheme. They include as outlined above, statements Defendant made on-line, to relevant CHS's, and/or to SA's of the FBI during his

confession.  The Confrontation Clause is not implicated with the admission of this type of evidence.  *Id.*

## VIII.  **WITNESS LIST**

A.  <u>Lt. Jarome Simpson, Valparaiso Police Department</u>.  Lt. Simpson will testify as to the authenticity of the traffic stop he performed of the Defendant for not displaying a legal license plate.  This testimony is relevant and material because the illegal plate read "Grinch 75R."  Testimony from other witnesses will establish that "Grinch 75R," "Grinch 75, "Grinch" and "75th Spartans" are all online monikers and identifiers used by the Defendant.

B.  <u>Supervisory Ranger Patrick Chassie</u>.  Ranger Chassie will testify about the ownership of the houses at 500 Truxell Road, Peninsula, Ohio, where the Defendant was arrested.  It is anticipated that he will testify that the land is owned by the National Park Service and the intended victims were federal employees.

C.  <u>SA Ryan Taylor</u>.  SA Taylor will testify about how the case was opened by the FBI and how the Defendant was identified.  SA Taylor will testify about the opening of the case from a complaint to a full investigation.

D.  <u>SA Kurt Dirker</u>.  SA Dirker will testify about the arrest of the Defendant on May 8, 2020 and the Defendant's confession.

E.  <u>SA Kevin Brown</u>.  SA Brown will testify about recovering an operational AR-15 from the Defendant's house pursuant to a search warrant on May 8, 2020.

F.  <u>SA Peter Mauro</u>.  SA Mauro will testify about the search of the Defendant's house on May 8, 2020.

G. <u>CHS-2</u>.  CHS-2 will testify about the recordings of the Defendant on May 2, 2020 and May 8, 2020, during which the Defendant explained in detail his plan to kidnap, detain, rob, and potentially kill law enforcement officers in order to steal their equipment.

## IX.  <u>WITNESS NAME REDACTION</u>

On April 26, 2021, the United States filed a Motion *In Limine* and request for a protective order concerning the in-court use of the full name and identifiers of CHS-2 (and CHS-1 who will not be called as a witness). As argued in its brief, the ability to publicly identify a witness is not an absolute right, indeed, the safety of the witness is a factor that must be considered, especially when there are measures, as they exist here, that allow the witness to be fully confronted in court while maintaining his or her confidentiality.

This balance between confrontation and witness safety is recognized by the Supreme Court, *Smith v. Illinois*, 390 U.S. 129 (1968), holds that the right of confrontation necessarily includes the right to "ask the witness who he is and where he lives" because this is "the very starting point in exposing falsehood and bringing out the truth through cross-examination" when "the credibility of a witness is in issue." *Id.*  This does not necessarily include "inquiries which tend to endanger the personal safety of the witness." *Id.* at 133-34 (White, J., concurring).

Circuit courts since *Smith* have "evaluate[d] Confrontation Clause claims based on anonymous testimony by asking (i) whether the government has demonstrated a threat and if so, (ii) whether anonymous testimony deprived the defendant of an opportunity for effective cross-examination." *United States v. de Lopez*, 2014 WL 3765720 (10th Cir. Aug. 01, 2014). The threat does not have to come from the defendant. *Id.*  In some cases, the issue may be resolved by disclosing the name to defense counsel (with a protective order), but having the witnesses testify under an alias.  However, "if the government provides defense counsel with sufficient background

information on the anonymous witness (e.g., criminal history, nationality, etc.), then withholding the witness's name or address does not necessarily deprive the defendant of an opportunity for effective cross-examination, which is the touchstone of a Confrontation Clause inquiry." *Id.*  In *de Lopez* the government "failed to make an adequate showing to justify secrecy."  Cursory generalized statements are not enough. However, it was harmless error because the government gave the defense enough background information to support effective cross-examination. *See also United States v. Mohamed*,  2013 WL 4259495  (8th Cir.  Aug. 16, 2013)  (FBI  linguist authenticating a transcript; pseudonym did not violate confrontation where real name disclosed to defense counsel, qualifications and experience disclosed, and counsel able to fully cross-examine on the issue; collecting cases); *United States v. Alaniz*, 2013 WL 3879878 (5th Cir. July 29, 2013) (witnesses permitted to testify under aliases without disclosing their dates of birth or social security numbers).

In anticipation that this Court will grant the attached proposed Protective Order, the government has prepared a letter it will provide to defense counsel with the full name, address, personal identifiers and relevant information about CHS-2.  The letter will detail his status as a source, payments or benefits received as a source, criminal history, derogatory information, and information material to satisfying the Confrontation Clause.  The government believes this letter will satisfy *Illinois v. Smith* and allow for defense counsel to adequately prepare for trial, while protecting CHS-2's identity.  The government further avers that since the Defendant only knew CHS-2 as "Steve," there is no prejudice for him continuing to refer to him as the only name he ever used.

## X.    <u>WITNESS SEQUESTRATION</u>

Pursuant to Federal Rule of Criminal Procedure 615, "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony."  FRCP 615.  The rule, however, "does not authorize excluding . . . (1) a party who is a natural person, or (2) *an officer or employee of a party which is not a natural person designated as its representative* by its attorney, or (3) *a person whose presence is shown by a party to be essential to the presentation of the party's cause*."  *Id.* (emphasis added).  Pursuant to Rule 615(2), the prosecution plans to designate FBI Special Agent Kurt Dirker as its representative at trial.  *See United States v. Phibbs*, 999 F.2d 1053 (6th Cir. 1993) ("Rule 615(2) allows the government to have any law enforcement officer it wants at its counsel table.")

Finally, particularly given that some witnesses are traveling great lengths to testify at this trial, the United States requests that all witnesses be permitted to remain in the courtroom after they have testified.

## XI.    <u>ABSENCE OF CO-DEFENDANTS AT TRIAL</u>

An argument that other individuals should be prosecuted but have not been charged is contrary to law, is highly prejudicial, and should be precluded under Federal Rules of Evidence 401 and 403.  Even assuming *arguendo* that other individuals have criminal liability, there is no requirement that the United States charge every conspirator at the same time, and in the same charging document.

Respectfully submitted,

BRIDGET M. BRENNAN
Acting United States Attorney

By:    /s/ Duncan T. Brown
                  Duncan T. Brown (NY: 3982931)
                  Jerome Teresinski (PA: 66235)

17

Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3933/3658
(216) 522-8355 (facsimile)
Duncan.Brown@usdoj.gov
Jerome.Teresinski2@usdoj.gov