1
2

                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF OHIO
                          EASTERN DIVISION

3
4

UNITED STATES OF AMERICA,          Case No. 20-cr-262

              Plaintiff,
5                                        August 27, 2021
          vs.                            11:02 a.m.
6

CHRISTIAN FERGUSON,
7
              Defendant.
8

9
                  TRANSCRIPT OF SENTENCING PROCEEDINGS
10        BEFORE THE HONORABLE SOLOMON OLIVER, JR.
                  UNITED STATES DISTRICT JUDGE
11

12

APPEARANCES:
13

For the Government:        Duncan Brown, AUSA
14                         Jerome Teresinski, AUSA
                           Office of the U.S. Attorney
15                         Northern District of Ohio
                           801 West Superior Avenue
16                         400 U.S. Court House
                           Cleveland, Ohio   44113
17                         (216) 622-3600

18   For the Defendant:        John Ricotta, Esq.

19

20   Official Court Reporter:  Susan Trischan,RMR,CRR,FCRR,CRC
                               7-189 U.S. Court House
21                             801 West Superior Avenue
                               Cleveland, Ohio   44113
22                             (216) 357-7087

23   Proceedings recorded by mechanical stenography.
     Transcript produced by computer-aided transcription.
24

25

<u>FRIDAY, AUGUST 27, 2021, 11:02 A.M.</u>

1

2          THE COURT:  You may be seated.

3          THE CLERK:  Your Honor, the case before the

4    Court carries Case Number 5:20-cr-262, United States of

5    America versus Christian Ferguson.

6          THE COURT:  Good morning.

7          MR. RICOTTA:  Good morning, Your Honor.

8          MR. BROWN:  Good morning, Your Honor.

9          THE COURT:  I'm going to take off the mask

10   so I can talk, but we still do require masks throughout

11   the facility.

12          We are trying to control, you know, the

13   Coronavirus as much as possible and trying to ensure it

14   doesn't spread here, and so that's what we do require.

15          The lawyers are allowed to have their masks

16   off if they are presenting, and if the defendant has to

17   speak he can do the same, but otherwise there is a

18   requirement.  But I should also be clear that I've had my

19   two shots, so to the extent that makes any difference, I

20   would want you to know that.

21          Mr. Ferguson, have you had your

22   vaccination?

23          THE DEFENDANT:  I beg your pardon?

24          THE COURT:  I say have you had your

25   vaccinations?

1          MR. RICOTTA:  Were you vaccinated?

2          THE DEFENDANT:  Oh.  No, sir.

3          THE COURT:  Okay.  I just wanted to know.

4          And I ask defendants that and I ask

11:04:10  5  witnesses that because if not, and it comes your time to

6  talk, if you can speak with that on, I would allow you to

7  keep it on.

8          All right?

9          THE DEFENDANT:  Yes, sir.

11:04:22 10          THE COURT:  Okay.  All right.  This is the

11  sentencing hearing in Mr. Ferguson's case.

12          Let me have counsel for the United States

13  introduce themselves for the record.

14          MR. BROWN:  Thank you, Your Honor.

11:04:38 15          I'm taking my mask off briefly.  I am fully

16  vaccinated.

17          For the United States of America, Duncan

18  Brown joined with Jerome Teresinski.

19          MR. TERESINSKI:  Good morning, Your Honor.

11:04:51 20          MR. BROWN:  And also Kurt Durker of the

21  FBI.

22          THE COURT:  Good morning.

23          Let me have counsel for Mr. Ferguson

24  introduce himself for the record.

11:04:58 25          MR. RICOTTA:  Yes, Your Honor.

1           John Ricotta for Christian Ferguson.

2           THE COURT:  All right.

3           MR. RICOTTA:  Good morning, everyone.

4           THE COURT:  Good morning.

11:05:03  5           And Mr. Ferguson is seated to your right?

6           MR. RICOTTA:  Yes, sir.

7           THE DEFENDANT:  Yes, sir.

8           THE COURT:  All right.

9           MR. RICOTTA:  Say good morning.

11:05:11 10           THE DEFENDANT:  Good morning.

11           THE COURT:  All right.  Mr. Ricotta, did

12   you go over the presentence investigation report with

13   Mr. Ferguson?

14           MR. RICOTTA:  Yes, we've gone over it

11:05:21 15   several times, Your Honor.

16           THE COURT:  All right.  Mr. Ferguson, you

17   heard your counsel say he went over the report with you.

18           Is that correct?

19           THE DEFENDANT:  Yes, Your Honor.

11:05:27 20           THE COURT:  And, Mr. Brown, did you review

21   the report?

22           MR. BROWN:  Yes.  Yes, Your Honor, the

23   Government has reviewed the report.

24           THE COURT:  All right.  So Mr. Ricotta

11:05:38 25   filed several objections on behalf of the defendant that

1    I have to resolve, and Mr. Brown, I think, also filed at

2    least one, one objection.

3              So, Mr. Ferguson, let me just start out by

4    saying that we have Sentencing Guidelines in the Federal

5    Court.  They are advisory, they're not mandatory, but I

6    still have to seriously consider the Guidelines as well

7    as other factors.

8              And so in order for me to determine the

9    Guideline range, which is what we start with before we

10   determine other things, I have to determine two things.

11   One is called the offense level.  That's the number that

12   gets associated with the crime that you've been convicted

13   of.

14             The higher the number associated with the

15   crime, the more time a person faces, all things being

16   equal.

17             Do you understand that?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  So I have to come to some

20   conclusion about what is that number.  It's as if crimes

21   are ranked, and so -- thank you -- it's as if crimes are

22   ranked, so the higher the number, the more time a person

23   faces.

24             The other thing I have to look at is your

25   background to determine your criminal history category.

1          All defendants are placed in one of six

2     categories.  One is the best category to be in if you're

3     going to be sentenced.  Six is the worst category.  And

4     so if two people came to Court and had committed the same

11:07:05   5     crime, the person with the higher criminal history

6     category is likely to face more time than the person in

7     the lower category, all things being equal.

8               Do you understand that?

9               THE DEFENDANT:  Yes, Your Honor.

11:07:12   10               THE COURT:  And the categories are based on

11     prior criminal convictions of defendants that count.

12               And so obviously the person who's had a

13     very substantial number of criminal convictions that will

14     count under the Guidelines will be in a higher category

11:07:30   15     than a person who didn't have any or, you know, fewer.

16               You understand that?

17               THE DEFENDANT:  Yes, Your Honor.

18               THE COURT:  So that's -- that's how we go

19     about doing it.

11:07:38   20               So eventually, I've got to get to that

21     number, and I've got to get to your criminal history

22     category.  Then I'll announce the Guideline range, and

23     then your counsel will get a chance to make arguments,

24     some of which he's already put in a memorandum on your

11:07:53   25     behalf.

1          And then if you wish to speak, you'll have

2     a right to speak yourself, but you're not required to say

3     anything.

4          And then the Assistant United States

11:08:03  5     Attorney, Mr. Duncan Brown or Mr. Teresinski, will speak

6     on behalf of the United States before I make a decision.

7          Do you understand that?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  And let me have the

11:08:12 10    Pretrial/Probation Officer introduce herself for the

11    record.

12          THE PROBATION OFFICER:  Good morning, Your

13    Honor.

14          Kristin Merrill for the U.S. Pretrial

11:08:21 15    Services and Probation Office, and then my supervisor

16    David Abraham is also here with me.

17          THE COURT:  All right.  And then I'll have

18    some questions for them, I'm sure -- probably not many --

19    as we go because of the nature of the case and

11:08:32 20    circumstances.

21          So that's how we're going to proceed.

22          Now, turning to the presentence

23    investigation report in this case -- by the way, before

24    we start, Mr. Abraham, I just want you to be thinking

11:08:51 25    about this, and Ms. Merrill, what prison facilities are

1    there that are available to assess mental health or to

2    house a person who might have some mental health-related

3    issues?

4                    Have you thought about that?

11:09:10  5                    THE PROBATION OFFICER:  Well, Your Honor,

6    they typically -- they initially would go to Butner which

7    is -- typically they'll initially go to Butner where

8    they're assessed at that time, and then they will be

9    shipped to a facility after the evaluation period that

11:09:27 10    can handle the mental health needs specifically of the

11    defendant.

12                    But we would have to look into which

13    facility would be available for that, but the BOP makes

14    that determination.

11:09:37 15                    THE COURT:  Okay.  I just ask that.

16                    I want all the information that I can get

17    in front of me --

18                    THE PROBATION OFFICER:  Yes.

19                    THE COURT:  -- here.

11:09:48 20                    So, all right, let's go to the

21    determination of offense level.

22                    And the base offense level here, the number

23    we start out with, is 32, and I don't think there's any

24    disagreement at this point by the counsel over that.

11:10:20 25                    Is that correct?

1              MR. BROWN:  No objection from the

2   Government, that's correct, Your Honor.

3              THE COURT:  Mr. Ricotta.

4              MR. RICOTTA:  That's accurate, Your Honor.

5              THE COURT:  All right.  Now, let's work our

6   way through the rest of it.

7              The Pretrial/Probation Officer recommended

8   that I apply a two-level increase because a dangerous

9   weapon was used, and the reasoning of the officer was

10   that in preparation of the offense, that the defendant

11   possessed an AR-style rifle and that his expressed

12   intention was to harm or kill law enforcement officers.

13              And the Pretrial/Probation Officer

14   indicates that on a certain date, May 2nd, that he

15   brought the weapon to a planning meeting.

16              So the Pretrial/Probation Officer responded

17   to the objection by Mr. Ricotta on behalf of the

18   defendant, and Mr. Ricotta points to United States

19   Sentencing Guideline 2A4.1, Application Note 2, which

20   says, "'A dangerous weapon used' means that a firearm was

21   discharged, or a firearm or dangerous weapon was

22   otherwise -- was otherwise used."

23              And the officer goes to the section,

24   Sentencing Guideline 1B1.1, Application Note J, for the

25   definition of "Otherwise used" in respect to a dangerous

1    weapon.  And it says, "The conduct did not amount to the

2    discharge of a firearm but was more than brandishing,

3    displaying or possessing a firearm or other dangerous

4    weapon."

5            And the Pretrial/Probation Officer

6    indicates that during the planning stages of the offense,

7    that he brought the firearm to the meeting on May 2nd,

8    2020, and he showed the weapon to the confidential

9    source.

10           And that it was a firearm that could be

11   physically manipulated and it was confirmed it was a

12   firearm, and then they were aware that he continued to

13   possess the firearm; that is the Government agents, and

14   that he would have brought the rifle to the dry run on

15   May 8th, 2020.

16           He didn't -- he didn't bring it because it

17   was a controlled meeting, and then so the -- the

18   officer's conclusion is that defendant's actions

19   demonstrated intent to use the firearm; therefore, the

20   report remains unchanged in this regard.

21           So I've, of course, reviewed the relevant

22   sections starting with the 2A4.1, and this has to do with

23   the kidnapping, abduction, unlawful restraint Guideline,

24   and at A3 it says, "If a dangerous weapon was used,

25   increase by two levels."

1    And then looking at Application Note 2, it

2    says, "'A dangerous weapon was used' means that a firearm

3    was discharged, or a firearm or dangerous weapon was

4    otherwise used."

5    And so there's no question it wasn't

6    discharged, and so the question goes to that "Otherwise

7    used" section that the Pretrial/Probation Officer talked

8    about.

9    The "Otherwise used" language, as I

10   mentioned, says that the conduct does not amount to the

11   discharge but was more than brandishing, displaying or

12   possessing a firearm or other dangerous weapon.

13   I'm prepared to rule on the papers here,

14   but if -- if you want to say anything further,

15   Mr. Ricotta, you may, or Mr. Brown.  But I'm prepared to

16   rule on this otherwise.

17   MR. RICOTTA:  Well, I would simply say,

18   Your Honor, I mean, it seems clear from the language

19   itself that it shouldn't be difficult to make that

20   assessment.

21   It's certainly he didn't have a weapon on

22   May 7th, that's clear.  So the only other date that we

23   could be concerned about is this May 2nd date when he

24   apparently brought the --

25   THE COURT:  Right.

1    MR. RICOTTA:  -- AR to this, to the camp

2    and showed it to the confidential informant.

3    So even if we looked at Ms. Merrill's

4    argument under the 1B1.1, he didn't do anything more than

11:16:06  5    brandish or show or display it.  It simply doesn't equate

6    to discharge.

7    And so I think under either argument, under

8    the May 7th or -- May 7th or May 2nd, a weapon should not

9    be an enhancement here.

11:16:21  10    And I'd be concerned because the Bureau of

11    Prisons looks upon a weapon as a -- it could preclude him

12    from a lot of programs, and I don't want to have any

13    weapons involved in this particular matter.

14    So I'd be strenuously objecting to this

11:16:37  15    enhancement, Your Honor.

16    THE COURT:  Okay.  And you are reserving

17    that and I'm just ready to rule, but I decided I'd

18    better, if counsel had anything to say, they could say it

19    quickly and then I'm ready to rule on that.

11:16:48  20    MR. BROWN:  Your Honor, I'll be very brief.

21    The Government argues that, like

22    Mr. Ricotta said, it's very clear, given the facts of the

23    case, that it was -- however, we take the different

24    conclusion that it was more than mere brandishing or

11:17:00  25    possessing.

1    He showed up with a loaded firearm and that

2    was a show of his commitment to carry through with the

3    plot.

4    He then also described in great detail sort

5    of the placement of people in the plot.

6    So the gun was more than just a mere

7    brandishing or possession, it was a display or commitment

8    to further the attempt.

9    Thank you.

10    THE COURT:  All right.  I'm going to

11    sustain the objection of the defendant on this one.

12    Of course, the facts here are relatively

13    unique in terms of the kinds of cases that I've seen, and

14    this is where the defendant was charged with attempted

15    kidnapping where actually it never really got to the

16    stage that one normally thinks of a kidnapping because

17    the plot was called off.

18    The day that he went and did the dry run,

19    there was no weapon available.  He had no weapon with him

20    at all.

21    And brandishing is pretty serious in the

22    law when we talk about, you know, particular crimes.  It

23    generally contemplates when someone's robbing a bank or

24    doing something else that's really pretty concrete, and

25    the question is they've got a firearm; are they

1    brandishing it, displaying it or possessing it.

2                    And this, this Application Note 1B1.1

3    says -- let me just -- (j), he didn't discharge the

4    firearm.  We said that already.  But it was more, more

11:18:48  5    than brandishing the firearm in the context of an

6    attempted kidnapping, one, which is not -- we don't have

7    the typical scenario.  That would be someone who has a

8    gun out but doesn't shoot it, someone who displays a gun

9    but doesn't shoot it, and at a minimum, possessing that

11:19:12 10    weapon in the context of when that's being carried out.

11                    So the earlier session where they're

12    talking about a firearm, he's got one, we're not even to

13    the dry run.  And so I don't -- I think it would be a

14    stretch to say that he should get that, that enhancement

11:19:32 15    under these circumstances.

16                    So I will -- I will sustain the objection

17    on that.

18                    Mr. Ricotta, you had an objection relative

19    to acceptance of responsibility.

11:20:11 20                    Right?

21                    MR. RICOTTA:  Yes, Your Honor.

22                    THE COURT:  And did you have anything other

23    than that that's left to be decided?

24                    MR. RICOTTA:  Other than, Your Honor, my

11:20:23 25    understanding of the 3E1.1 is that anytime up until prior

1    to sentencing, the defendant can make his acceptance of

2    responsibility statement.

3                    THE COURT:  I understand.  I'm getting

4    ready to deal with that one.

11:20:38  5                    That's the last one you have relative to

6    offense level, is that right?

7                    MR. RICOTTA:  That's correct.

8                    THE COURT:  Okay.

9                    MR. RICOTTA:  I'm sorry.

11:20:44 10                    THE COURT:  No, that's okay.

11                    So ordinarily, defendants are not given

12    credit for acceptance of responsibility when they've gone

13    to trial and put the Government to proof, but the

14    Guideline does say that there are occasional exceptions,

11:21:10 15    and so let me just turn to that.

16                    So we're looking at 3E1.1 of the

17    Guidelines, and (a) says if defendant clearly

18    demonstrates acceptance of responsibility, decrease the

19    offense level by two.

11:22:03 20                    And then we also know, at least as counsel

21    and the Court, that it can be three if a person pleads --

22    and this is normally pretrial -- and the Government

23    attests that the person has met the requirements of (b).

24                    Then 2 says, "This adjustment is not

11:22:25 25    intended to apply to a defendant who puts the Government

1    to its burden of proof at trial by denying the essential

2    factual elements of guilt, is convicted, and only then

3    admits guilt and expresses remorse.  Conviction by trial,

4    however, does not automatically preclude a defendant from

11:22:42  5    consideration for such a reduction.  In rare situations,

6    a defendant may exercise his constitutional right to a

7    trial.  This may occur, for example, where a defendant

8    goes to trial to assert and preserve issues that do not

9    relate to factual guilt, e.g., to make a constitutional

11:23:07 10    challenge to a statute or a challenge to the

11    applicability of a statute to his conduct.  In each such

12    instance, however, a determination that the defendant has

13    accepted responsibility would be based primarily upon

14    pretrial statements and conduct."

11:23:23 15              And so I think that defines the parameters

16    of when, under rare circumstances, when a defendant might

17    actually get acceptance.

18              The Probation Officer disagreed with

19    defendant and she cited the statute that it's not

11:23:54 20    intended to apply to a defendant who puts the Government

21    to its burden of proof.

22              And she indicated, "The defendant has not

23    provided a statement to the Probation Officer wherein he

24    accepted responsibility.  Therefore, no reduction for

11:24:13 25    acceptance was applied and the report remains unchanged."

1    And Mr. Brown wrote to, and especially in

2  his sentencing memorandum, to address the issue as well.

3  He -- Mr. Brown, you talked about remorse and the fact

4  that he hasn't shown remorse, and you talked about the

11:24:43  5  ways in which he's acted out and been difficult with law

6  enforcement people and so forth since that time and that

7  was not indicative of remorse.

8    I guess my question is is that relevant, or

9  should we be looking at whether he admitted the crime

11:25:03 10  that he was charged with, and whether he was going to

11  trial because arguably he didn't feel that the law made

12  what he did -- didn't consider it to be a crime of the

13  type that he was charged with?

14    I don't know, but those are the kind of

11:25:25 15  issues I have.

16    So when it gets to your turn -- I'm going

17  to Mr. Ricotta, and when it gets to your turn, of course,

18  you may say anything you wish, but I just raise that

19  question.

11:25:35 20    Yeah.

21    MR. RICOTTA:  You want me, Your Honor?

22    THE COURT:  You go first.

23    MR. RICOTTA:  Yes, Your Honor.

24    I mean, I think this case fits in perfectly

11:25:42 25  to that Note because the situation that we have here is

1    it has always been the contention of counsel on behalf of

2    the defendant that this case factually never really

3    developed as an attempted kidnapping; that all the events

4    that actually transpired were merely preparation for the

5    ultimate event of kidnapping.

6                And when you look at the facts, it appears

7    that with the proper charge -- and I don't tell the

8    Government how to charge their cases -- but with the

9    proper charge, if one was going to take property from

10   another, i.e. the Government, and try and steal their

11   weapons, it would have been attempted robbery, which

12   would have fit the factual pattern.

13               So I've always maintained and part of the

14   Rule 29 was that mere preparation, as the instructions of

15   attempted kidnapping, was not sufficient to take this

16   case to the jury, and that there was not enough

17   substantial steps maintained or proof by the Government

18   that this actually transpired.

19               So we have a legal argument for the Sixth

20   Circuit.  Whether I prevail or not, it was my estimation

21   that the legal argument was a proper argument to make and

22   that that was one of the reasons that he didn't accept

23   responsibility and plead guilty in this particular

24   matter.

25               Now, I don't think what the Probation

1    Department has indicated, that it's necessary for him to

2    formally make a statement, because you get into that

3    question of whether I'm jeopardizing his appellate

4    rights, but I would indicate to the Court that, at least

11:27:32  5    at this juncture, if the Court feels it's necessary to

6    show some kind of remorse, he's prepared to make -- make

7    a simple statement that he's sorry for the events that

8    transpired and he's ready to move on and those kinds of

9    things that we normally say in an acceptance of

11:27:50  10   responsibility statement.

11              And I think anytime prior to the sentencing

12   this can be accomplished.

13              So I would also indicate that, well, I

14   think that that would be -- that would suffice, and I

11:28:07  15   guess I would move to the Court.

16              If you want to hear from Mr. Ferguson, then

17   I certainly --

18              THE COURT:  Well, no, right now not.

19              Mr. Brown, before I hear from you, I want

11:28:17  20   to ask the Pretrial/Probation Officer something

21   since -- and generally, I'm not trying to put

22   Pretrial/Probation on the spot, and most cases don't

23   require me to ask them anything.  They understand that

24   this is -- this case has really more -- in some ways more

11:28:39  25   complexity, I don't mean factual complexity, but it has a

1    lot of nuance to it, and so it's not the kind of thing we

2    see every day.

3              Ms. Merrill, you had indicated that, I

4    think, the basis or primary basis was that he had not

11:28:56  5    made a statement to you during the course of the

6    proceeding, and I just wanted to ask you, I would really

7    go through the report and read what he said and what he

8    didn't say and all that because of what the Guideline

9    says about, you know, pretrial and look at what he says

11:29:15 10    and so forth.

11              And so you've got a pretty thorough report

12    on -- Mr. Duncan Brown has addressed it and Mr. Ricotta,

13    too, but you have a pretty thorough report on his

14    interviews with the agents, what he ultimately said, and

11:29:32 15    so forth, and what he admitted to and so forth.

16              So was the reason that you felt he

17    shouldn't get it is because he didn't give you an

18    additional statement?  And if he had, that given all he

19    said before, that that might have qualified him?

11:29:53 20              THE PROBATION OFFICER:  Your Honor, the

21    reason why the Probation Office did not give him the

22    acceptance of responsibility was kind of a two prong

23    approach.

24              It is the position of our office or the

11:30:03 25    policy of our office that they must submit a statement to

1    our office, which the defendant did not do.

2              In addition, when we're looking at if he

3    truthfully admitted the conduct that complies with the

4    offense of conviction, he has not done that either.

5              During his interview with the agent, at the

6    end of the interview he did admit guilt at that time, but

7    as we are also looking at his pretrial conduct, that was

8    the pretrial officer's opinion that that was during the

9    investigative stage and not necessarily part of the

10   pretrial stage, and that is why we did not give him the

11   acceptance of responsibility.

12             THE COURT:  Okay.  So what -- an

13   investigative stage versus pretrial stage, what would

14   be -- what would be the -- what would be the context in

15   pretrial where you -- where you would admit your --

16             THE PROBATION OFFICER:  So what we would

17   think is after he was officially charged with the

18   offenses is what we would consider as a pretrial stage.

19             And then when you do look at him in the

20   pretrial stage, he's had two incidents with the U.S.

21   Marshals, and in one of the statements he made a

22   threatening statement.

23             And then also according to the United

24   States Sentencing Guidelines, Application Note 1(B) it

25   talks about voluntary termination from criminal conduct,

1    which he was still engaging in during the pretrial stage.

2             THE COURT:  Okay.  But I respect the

3    Marshals a lot, you know I do, and they are responsible

4    for protecting all of us, including me, and so I -- you

11:31:39 5    know, but does that relate, the fact that he acted up

6    while he was in their custody, relate to this issue of

7    whether he admitted the crime to which he -- the facts of

8    the crime to which he -- to which he was convicted?

9             THE PROBATION OFFICER:  It's more so the

11:32:01 10    policy of our office that since he did not submit a

11    statement to us I would say would be the primary reason

12    as to why we did not give him the reduction for

13    acceptance of responsibility.

14             THE PROBATION OFFICER:  Your Honor, could I

11:32:13 15    add one thing?

16             THE COURT:  You may.

17             THE PROBATION OFFICER:  It does indicate

18    under acceptance of responsibility under the Guidelines

19    that in determining whether a defendant qualifies for

11:32:23 20    acceptance of responsibility under Section A, the Court

21    should also consider his voluntary termination or

22    withdrawal from criminal conduct during his pretrial

23    stages.

24             So that is something that you also should

11:32:36 25    consider; not just whether he actually accepted

1    responsibility, but his conduct during the pretrial

2    stages, which was he threatened his grandmother over the

3    phone and the other incidents he had while he was in

4    custody.

5                    THE COURT:  And you're referring to 3E1.1.

6                    THE PROBATION OFFICER:  Application

7    Note 1(B), Your Honor.

8                    THE COURT:  And you think that that's

9    criminal conduct generally; it's not conduct

10   for -- because every factual context is different but,

11   you know, when we're talking about drug cases, we're

12   talking about whether a person is still associating with

13   known criminals or drug dealers, that would be a clear

14   context.

15                   But here, you think if he makes a threat on

16   a family member, that that would be sufficient under (B)

17   to deny him acceptance?

18                   THE PROBATION OFFICER:  I think that's a

19   consideration that you should at least take into

20   consideration.  Behavior is usually at least taken into

21   consideration, among the other factors.

22                   THE COURT:  All right.  And so would you

23   take that into consideration if a person, if a person

24   gave you a statement and saying they have accepted

25   responsibility for the crime they've committed -- that's

1   not our case, but I'm just trying to -- and they agreed

2   that they did everything that happened and that they are

3   sorry for it, and then -- and then they start a fracas in

4   the jail cell where they call their aunt or uncle or

11:34:43  5   somebody and threaten them, that takes away their

6   acceptance of responsibility, do you think?

7   THE PROBATION OFFICER:  I believe it can,

8   Your Honor.

9   There is actually Sixth Circuit case law

11:34:53  10  where, say, you have a drug trafficking case and the

11  defendant is out on bond and he continues to -- he's

12  caught with drugs at a traffic stop, that would be a

13  similar situation where that conduct shows that he has

14  not taken his offense seriously and is not really

11:35:14  15  accepting responsibility for what he's done because he

16  has continued to engage in criminal conduct.

17  THE COURT:  Okay.  So now (A) says if the

18  defendant clearly demonstrates acceptance of

19  responsibility for his offense, and you're saying that if

11:35:31  20  he does other bad things, you can conclude that he hasn't

21  demonstrated acceptance for the particular crime that

22  he's committed?

23  THE PROBATION OFFICER:  Correct, Your

24  Honor, because they are telling you appropriate

11:35:46  25  considerations for determining whether a defendant has

1    accepted responsibility are -- include the following and

2    but are not limited to the following, and then they list

3    (A) through (H) for the Court's consideration.

4                    THE COURT:  And the threats he's making

11:36:17  5    perhaps on the grandmother, the ruckus he allegedly

6    created with -- while he was in custody, those would be

7    viewed as criminal conduct.

8                    THE PROBATION OFFICER:  That's correct,

9    Your Honor.

11:36:34 10                    He doesn't have to be charged in order to

11    view them as criminal conduct.

12                    THE COURT:  All right.  Thanks.

13                    Let me go to Mr. Brown.

14                    MR. BROWN:  Thank you, Your Honor.

11:36:44 15                    Just on two points.

16                    First, the Government would submit that the

17    threats to the Marshals are relevant and pertinent to his

18    acceptance of responsibility because this crime involved

19    an attempted kidnap of a federal agent.

11:37:00 20                    So there is -- and throughout his

21    psychological report submitted by the defendant -- a

22    history of sort of what he had called at least as a

23    juvenile oppositional thinking towards authority.  So

24    this is again an ongoing manifestation against the

11:37:16 25    Marshals, and we would say that that is very relevant and

1    should be taken into consideration.

2                    The Government would also argue, yeah, also

3    within that report the doctor himself said that the

4    defendant repeatedly denied things, he denied both mental

11:37:34  5    health history --

6                    THE COURT:  What about this offense,

7    though?

8                    MR. BROWN:  Well, now, yeah, getting to

9    that, Your Honor.

11:37:39 10                    THE COURT:  That's what I want to know

11    about.

12                    MR. BROWN:  Absolutely, Your Honor.  I

13    saved that for the last because attached -- and we filed

14    this under seal out of respect for the -- for the parties

11:37:47 15    in this case -- but in the handwritten report filed by

16    the defendant's grandmother -- and again in the

17    typewritten report, it was refuted -- the offense was not

18    about an ongoing family dispute, it was not about

19    something that came up, I think, unrelated to the case.

11:38:08 20                    The defendant was on the phone twice and he

21    said, "If you do not get me out of jail I will scalp you

22    like an Indian."

23                    THE COURT:  Okay.

24                    MR. BROWN:  And he ties the "If you do not

11:38:18 25    get me out of jail" to the threat of violence.  And I

1    think the grandmother even wrote "He will rip out my

2    scalp."

3                      And that is tied to the jail, that's tied

4    to why he's in court.

11:38:28  5                      THE COURT:  I think --

6                      MR. BROWN:  And it happened after trial.

7    You know, it was not pretrial conduct.  It was, in fact,

8    post-trial conduct.

9                      THE COURT:  Okay.  And I didn't mean to

11:38:37 10   interrupt you.

11                      I know the grandmother was hopeful not to

12   be -- but you can't help it -- to be not as

13   confrontational as possible because she was concerned and

14   so --

11:38:51 15                      MR. BROWN:  Which is why we filed it under

16   seal.

17                      THE COURT:  No, she had other concerns,

18   too, but you have to make the arguments you have to make.

19                      MR. BROWN:  Right.

11:38:58 20                      THE COURT:  But and so your argument would

21   be in tandem with the Pretrial/Probation Officer.

22                      Let me ask, refresh my recollection,

23   Ms. Merrill, did you put in -- you put in the information

24   about the Marshal in your report.

11:39:15 25                      THE PROBATION OFFICER:  Yes, I did, Your

1  Honor.

2  THE COURT:  Okay.  And that was part of the

3  record.

4  THE PROBATION OFFICER:  Yes.  That's

11:39:19 5  correct.

6  It's under the pretrial adjustment section,

7  all the incidents that were reported to our office are

8  included in that section.

9  THE COURT:  All right.  Okay.

11:39:33 10  Okay.  Based on the totality of the

11  circumstances and the information that's in front of me,

12  I'm going to deny the acceptance of responsibility.

13  There are some things he did say early on

14  with the Marshals when they pressed him.  Some he denied,

11:39:49 15  and then eventually he admitted more.  And so he had

16  admitted a good portion of what he had done, but even

17  though there was a possibility that he could raise at

18  trial that the offense that he was charged with was not

19  the correct one or that it didn't amount to an offense,

11:40:14 20  he still hasn't shown the requisite orientation relative

21  to his prior conduct as evidenced by the things that have

22  been pointed out by the Pretrial/Probation Officer and,

23  to some extent, by Mr. Brown.

24  I would say, too, that the rule does say

11:40:36 25  that it's a rare circumstance, and in my experience it

1    has -- I'm not sure that it's never occurred, but if

2    it -- I'm not saying it shouldn't ever occur.  The Rule

3    makes clear it can.  But I don't find that this would be

4    such a rare case that he should get those levels of

11:40:59  5    acceptance.

6                    So that's my ruling.

7                    And so with that ruling, we would start out

8    at a 32.  We would decrease the 32 because it's an

9    attempt, and that would get to 29.

11:41:31 10                    So that, it would be 29, offense level 29.

11                   Am I calculating that right, Ms. Merrill?

12                   THE PROBATION OFFICER:  Yes, Your Honor.

13   That is correct.

14                   THE COURT:  Okay.  And then the criminal

11:41:46 15   history category is one.

16                   So I will give the parties a chance to

17   object.

18                   Any objection to the determination, the

19   rulings I've made and the determination of 29?

11:42:01 20                  Mr. Ricotta?

21                   MR. RICOTTA:  Why, I would just continue to

22   object to the acceptance, Your Honor, but other than

23   that, I think that calculation is correct.

24                   THE COURT:  All right.  Mr. Brown.

11:42:12 25                  MR. BROWN:  Your Honor, the Government

1    would object, as it did in its written response, that the

2    3A enhancement for official victim should apply, which is

3    a three-level increase.

4                    THE COURT:  Okay.

11:42:26  5          MR. BROWN:  Because it's not inconsistent

6    with reading 3A -- or 2A4.1.

7                    THE COURT:  Okay.  I read -- I read the

8    Pretrial/Probation Officer's response, and I agree with

9    her response, so I'll adopt -- I'll overrule your

11:42:47 10   objection for the reasons she stated in her papers, and

11   so I can allow you to maintain your objection, Mr. Brown.

12                   MR. BROWN:  Thank you, Your Honor.

13                   THE COURT:  All right.  So it's a 29,

14   criminal history category one.

11:43:02 15          There's no objection to that determination,

16   is that right?

17                   MR. RICOTTA:  That's correct, Your Honor.

18                   THE COURT:  All right.  And so 29-1 is 87

19   to 108.  That's the Guideline range that we start with.

11:43:16 20          And then I'll hear from the lawyers now and

21   the parties.

22                   Mr. Ricotta, I read your memorandum that

23   you filed on behalf of Mr. Ferguson.  I've also read the

24   report that you provided from Dr. Jeff Rindsberg, a Board

11:43:45 25   Certified Forensic Psychologist who works with The

1    Forensic Group.

2                    So I've obviously read Mr. Brown's and

3    Mr. Teresinski's memo on behalf of the United States as

4    well, and I've read a number of letters which I had

11:44:05  5    made -- which I made sure the parties had received, if

6    they had not, from various persons, including ministers

7    and very close relatives.

8                    So that's the background.  I just wanted to

9    be clear that I'm not starting from scratch, but with

11:44:24 10    that in mind, then, Mr. Ricotta, you may make any

11    comments you wish.

12                    MR. RICOTTA:  Thank you, Your Honor.

13                    Just for purposes of the record, I have

14    marked and would like to introduce at some point at the

11:44:37 15    end of the sentencing hearing the report of

16    Dr. Rindsberg.  I've marked that as Defendant's Exhibit

17    1.  It's titled The Forensic Group, and it's authored by

18    a psychologist Jeffrey Rindsberg.

19                    I provided it earlier to the Court and to

11:44:55 20    the Government, and also to Probation Department.  And

21    just as an aside, Your Honor, I was hoping, although it

22    came in after the second disclosure of the PSR, that we

23    could, with the order of the Court, maybe make this part

24    of the probation report itself so that the Bureau of

11:45:16 25    Prisons would have this also to go down with him in

1    addition to the presentence investigation.

2              So I just wanted to put that on the record.

3              I have marked also the letters that you

4    gave recommending that -- different family members and

11:45:37  5    ministers and things on behalf of Mr. Ferguson, I've

6    marked that as Defendant's Sentencing Exhibit 2.

7              I also had a letter that was sent to me

8    from his grandmother Betty Heinz, and I see that Betty

9    Heinz was one that wrote to you indicating on the record

11:45:57 10    that she didn't want to attend the sentencing but she

11    "Remains hopeful that my grandson can get the treatment

12    that is necessary."

13              She indicated the same thing to me, and

14    I've marked that as Defendant's Sentencing Exhibit Number

11:46:15 15    4, and I'll provide a copy to the Court and to the

16    Government.

17              And I've been in close contact with her.

18    You know, even though there is this police report, she's

19    been very supportive of him over the course of this

11:46:29 20    particular matter.  In fact, provided him with his

21    clothing during the course of the trial and has almost

22    been in constant contact with me throughout this

23    particular matter.

24              And finally, the last exhibit that I had

11:46:42 25    marked for purposes of sentencing I found interesting,

1     Your Honor, is Defendant's Exhibit 3.  It was provided to

2     me by your Deputy Clerk Sharon Romito after the jury

3     returned its verdict.

4               It was a letter that the jury wrote, and in

5     my 41 years of practice I never had this, but it says,

6     for purposes of the record, "From the members of the

7     jury:  We think you are a good young man with so much

8     potential and we are confident you will be -- you will do

9     good things.  Take this time to do better yourself and

10    become the best person you can be.  We wish you all the

11    best in the future.  And don't let this define you."

12              THE COURT:  Let me, before you go on, just

13    so the record is clear, I did provide that to the

14    Government as well after --

15              MR. BROWN:  Yes.  So received, Your Honor.

16    Yes.

17              THE COURT:  Okay.

18              MR. RICOTTA:  We all had that, Your Honor.

19              But I just found it interesting, and I kind

20    of, as I look at the 18, 3553 factors, you know, I

21    haven't had a case where the jury had that kind of input

22    about a defendant.

23              And what I'd like to indicate to the Court,

24    you know, he's at, I guess, 87 to 108, I'd be asking the

25    Court to move off that and variance under 3553.  I think

1    if you look at the nature and circumstances of the case,

2    this was, as the Court has characterized it by all -- by

3    all accounts, an unusual factual pattern.

4              You have a young man who was 19 at the time

5    gets involved in this Internet discord and he's

6    contacting these people and making -- making what ended

7    up to be the bulk of the case against him as presented by

8    the Government is all these outrageous statements and so

9    on and so forth, but come to find out that most of the

10   members of the Spartan 75, as the Court will recollect

11   from hearing the case, were all these young kids all over

12   the country that were in this chat room making the same

13   kind of comments back and forth.

14             And I'm not condoning their actions, but I

15   certainly don't think, when we start characterizing 19

16   and 20-year-olds, that sometimes they make decisions that

17   are poor judgment.  And I think that was the case here.

18             And we have a kid or young man -- I

19   shouldn't say "a kid" -- a young man that, as

20   Dr. Rindsberg has indicated, has an underlying mental

21   health problem, and I think that's one of the 3553

22   factors that the Court should take into consideration.

23             Can we -- can you blend the kind of

24   sentence that somehow would not demean the seriousness of

25   this case, protect the safety of the community, but also

1    in the same vein give him the opportunity to turn his

2    life around?

3                    And often people with mental health illness

4    are in denial, and I think that's the case, as Rindsberg,

11:49:57 5    Dr. Rindsberg indicates, that Mr. Ferguson still does not

6    want to admit that there's an underlying problem here,

7    that I think that all the folks that I've talked to, his

8    family and relatives, that he has a bipolar problem.

9                    And I can say, indicate proper to the Court

11:50:16 10   but even my involvement over this period of months, that

11   some phone calls I get he's happy and he's encouraged and

12   we're getting along fine, and the next time I talk to him

13   he's depressed and he's angry and he's frustrated.  That

14   seems to be the up and down of the bipolar disease.

11:50:34 15                   And I'm not sure, but I think if we could

16   get him medicated, you know, that could even out his

17   problems.

18                   So, you know, there's a lot of good things

19   to say about this young man.  I don't see where sending

11:50:53 20   him to jail for 10 years would be an appropriate

21   sentence, or thereabouts.  I think I indicated to the

22   Court that -- and I don't even remember exactly what my

23   range was, but I believe that 46 to 57 months would be an

24   appropriate sentence in this particular matter.

11:51:14 25                   And one of the reasons I said that is

1    because, as I indicated earlier on the record, I've

2    always viewed this case as a robbery where we wouldn't

3    need to necessitate the attempt statute because the

4    attempt statute is right in the robbery section of the

11:51:38  5    Code, and that if he had been charged with that way in

6    that manner and been found guilty, the base offense level

7    would have been 17.

8                    And 17 with a criminal history of one would

9    be 24 to 30 months.

11:51:51 10                    So actually what I'm asking for is more of

11    what I think the actual crime is.  And having said that,

12    I'll defer to the Court.

13                    And as I indicated earlier, I indicated to

14    Mr. Ferguson that I didn't want him to say too much about

11:52:15 15    the case, but he's ready at some point to make a

16    statement to the Court regarding his involvement to a

17    certain extent.

18                    THE COURT:  All right.  Thank you.

19                    Mr. Ferguson?

11:52:24 20                    THE DEFENDANT:  Yes, Your Honor.

21                    THE COURT:  As I said before, you don't

22    have to speak.  You have a right to speak.  But it's up

23    to you whether there's something you want to say?

24                    THE DEFENDANT:  Yes.

11:52:37 25                    Is it okay, can I remove my mask?  It's a

1    little bit easier to talk without it.

2                  THE COURT:  Well, I'm a little worried

3    about you.  You told me you weren't -- you didn't

4    take --

11:52:47  5                  THE DEFENDANT:  All right.  Yeah, I get

6    what they're saying about what they're trying, like, to

7    frame -- the frame of the context of the situation.

8                  I understand what I said was wrong back

9    then.  I do take back what I said.  But then I understand

11:53:01 10   I was frustrated, I got a lot of things going on in my

11   life and mainly I went about it the wrong way.

12                  I'm not going to fake and act like it

13   didn't happen because obviously we already seen the

14   recordings, and I did say the things and I do regret

11:53:16 15   saying them.

16                  But I'm coming to you, I'm not going to

17   hide behind lies.  I got to face the music eventually and

18   this is the music I have to face.

19                  MR. RICOTTA:  You've got to slow down for

20   the court reporter.

21                  THE DEFENDANT:  And mainly what I'm trying

22   to say is, like, mainly I'm going about what I'm trying

23   to, like, deal with with my mother passing back in 2016,

24   I've been going about it the wrong way, I acknowledge

11:53:33 25   that.

1     I've been on a -- sometimes I be on a good

2 course and next thing I take a stupid turn, and mainly

3 it's caught up to me at this point.

4     I'm mainly trying to say is I understand

11:53:44 5 that I committed -- I understand there's Guidelines that

6 the Government has to do.  I understand that you have to

7 come up to a sentence that's your opinion.

8     It's just personally I just feel like,

9 like, this entire time, like, it's not like I was out on

11:53:56 10 bond and, like, this is, like, whatever.

11     I've been -- for the entire time I been

12 incarcerated.  All I had to do was think about this

13 day-in, day-out, stare in a mirror and realize what my

14 actions are costing me.

11:54:08 15     And mainly, I don't want this little slip

16 of me acting stupid to cost me the rest of my youth, and

17 I want to still get out and live my life.

18     I still have aspirations.  I know this may

19 be farfetched but I still have aspirations for the

11:54:24 20 military to this day.

21     It's just knowing that what I did, it's not

22 even a joke any more.  I'm living in here in this setting

23 with grown men, some who are facing life sentences upon

24 life upon life.  I realize this is real and you have to

11:54:37 25 take accountability for what you have to say, and I

1    understand that.  It's just I don't want to lose the rest

2    of my life for this one little mistake that I made.

3                     I understand all the statements, all the

4    time that I already said, like, all things dealing, like,

11:54:50  5    trying to ambush and all that, I understand all that

6    stuff is behind me.  I try to put that behind me.

7                     While in jail, I been reading more about,

8    like, what's going on in the country today.  I listen to

9    Fox News all the time.

11:55:06 10                     I understand that mainly I'm just -- sorry.

11   Sorry, I'm like kind of cold.

12                     It's -- I understand that mainly that there

13   is issues that need to be fixed, but you can't fix

14   everything with a hammer.  And mainly, I was going about

11:55:20 15   it and talking about fixing everything with a hammer, and

16   really I'm the nail that got hammered, really.

17                     So what I'm trying to say is is that I

18   understand that, you know, you have to give appropriate

19   Guidelines and have to give me a proper sentence.  I'm

11:55:36 20   just hoping that it's something I can do that I can still

21   be able to keep my youth and get out and use what I

22   learned in jail to better myself and the community around

23   me.

24                     THE COURT:  All right.  Thank you.

11:55:44 25                     Mr. Brown.

1          MR. BROWN:  Thank you, Your Honor.

2          Your Honor, I think after hearing what

3     Mr. Ferguson said, the Government needs to just reassert

4     because, you know, the lack of a firearm had been

5     discussed here today, why there wasn't one on May 8th.

6          Throughout the investigation, I know

7     Mr. Ricotta likes to think of this as a robbery, and as

8     someone who had been involved in the evolution of this

9     investigation it is very lucky it did not turn into a

10    homicide.

11         Your Honor, throughout the investigation

12    the agents worked very hard to mitigate the potential

13    threat that the defendant kept trying to increase.

14         He was the one who created the discord

15    chats.  He was the one who made them secret.  He was the

16    one who came up with the plans.  He was the one who came

17    on May 2nd with a loaded firearm.  He was the one who,

18    when they tried to remove the firearm with him so to

19    mitigate that threat, he wouldn't give up the gun, so

20    they came up with the dry run idea on May 8th because in

21    the investigative point of view, based on his words --

22    and they're not just mere words, they're not just, as he

23    described them, little slip-ups and stupid turns, they

24    were words that he followed up with with action.

25         Based on those words and based on those

1    actions, the FBI, thankfully, in their investigative

2    steps, took the steps to mitigate continued and greater

3    harm by doing a dry run.

4              It was not because we were blowing up a

5    robbery into something more.  It was because the FBI and

6    our office was trying to mitigate a much more serious

7    crime from happening.  And it was a serious crime that

8    the defendant, through the dry run, proved that he wanted

9    to carry out and past the dry run.

10             His own psychological report notes three

11   incidents at NEOCC.  There are two threats against the

12   Marshals, which again the Government thinks is very

13   consistent, but then also very telling of the defendant's

14   continued state of mind and his not just opposition, but

15   his willingness to openly defy and confront law

16   enforcement and federal agents, and then the -- and the

17   truly horrific things he says to his grandmother, who is

18   by all accounts from the letters, from the reports, a

19   woman who has the patience of Job and a woman who only

20   wants to try and help the defendant.

21             And the Government is not bringing her back

22   into this or would not -- and we could talk about the

23   conflicts he's had with his father, not to say that he's

24   a bad person, but to reinforce the idea that this is a

25   person who is surrounded by people who have wanted to

1        help him and have done everything in their power to help

2        him, and he meets that help and he meets that attempt to

3        do the right thing for him with anger and threats of

4        violence, be it his family, be it the Marshals who are

11:58:45  5        just doing their job.

6                    He says he was the nail that got hammered.

7        He wanted to be the hammer, and he still wants to.  He

8        still thinks he can join the military.  He still has that

9        same fundamental desire to be in a position where

11:58:59 10        physical violence is his primary recourse for solving a

11        problem.

12                    Your Honor, based on his acts, based on his

13        acts up to May 8th and then after May 8th and then this,

14        frankly, I -- we do not object to this psychological

11:59:17 15        report coming in because it has some very, very troubling

16        conclusions.

17                    And the Government would argue that this

18        was done in mitigation, it's in fact titled "Mitigation

19        Report."  This is not a full psychological workup.  This

11:59:31 20        is not a diagnosis.  This is just pointing out third

21        rails or things that might be good about this young man.

22                    But what he shares is "Mr. Ferguson

23        significantly has significantly more pathology than he

24        reports.  He has a lack of insight or pure denial about

11:59:49 25        underlying emotional and psychological problems."

1        He has -- and they say that the conclusion

2    is, "Either way, his record and history suggests

3    significantly more mental illness than he reported."

4        Your Honor, the sentence -- the Guidelines

12:00:06  5    here are 87 to 108.  The Government would argue that 108

6    is appropriate, 108 months is appropriate for two

7    reasons.

8        One, because of the seriousness of this

9    crime.  It was not a robbery.  It was much, much more

12:00:18 10    than that, where people could have potentially been in

11    very, very serious danger, had not proper investigative

12    steps been taken.

13        But it also -- 108 months, I think nobody

14    in this Court here, nobody would argue that going to

12:00:34 15    Butner for evaluation and intake and then going to one of

16    the other facilities is the appropriate mode of

17    incarceration for this young man.

18        And for the last six years, eight years, 10

19    years of his life, unfortunately, everybody around him

12:00:49 20    had tried to help.  His schools, his family, everybody

21    has tried to help him, and at every turn he has denied

22    that help, and that led to not a slip-up, not a mistake,

23    not "My words being twisted or taken out," certainly not

24    a joke.  As he said, he realizes it's not a joke any

12:01:07 25    more.

1        This is the, unfortunately, for society and

2   for the agents who were potentially in harm with this,

3   this is the last attempt, but for him it's a very good

4   attempt.  This is the attempt where he could have nine

12:01:22  5   years of mental health treatment; nine years of mental

6   health treatment that he himself is unwilling to seek out

7   for himself.

8        Unfortunately, the defendant cannot be

9   trusted to take care of himself.  This is an opportunity

12:01:35 10   where incarceration, nine years, 108 months, is a long

11   period of time, but it's a period of time where with

12   proper psychiatric care maybe some of the good things in

13   the psychological report can be realized.

14        But to release him to say, "Okay, fine,

12:01:50 15   figure it out yourself," or, unfortunately, turn him back

16   to sincerely well-meaning people, family members who are

17   just not, unfortunately, equipped to do what needs to be

18   done, would be condemning him to even greater failure and

19   condemning society to potential greater harm, Your Honor.

12:02:10 20        That is why the Government is asking for

21   108 months.

22        Thank you.

23        THE COURT:  Thank you, counsel.

24        Mr. Ferguson, my responsibility is to

12:02:22 25   impose a sentence that's sufficient but not greater than

1    necessary to comply with the purposes of the statute.

2                   And in doing that, I look at a statute 18,

3    United States Code, Section 3553(a) and I get to look at

4    the Guideline range, but I get to look at things beyond

12:02:53 5    that, and that's why I've been hearing from your counsel,

6    from you, counsel for the United States.

7                   I have to look at the nature and

8    circumstances of the offense, I have to look at your

9    history and characteristics, then I have to look at the

12:03:09 10   need for the sentence imposed which should reflect the

11   seriousness of the crime which is also meant to promote

12   respect for the law and is a just punishment at the same

13   time.

14                  And the sentence is also meant to afford

12:03:23 15   adequate deterrence to criminal conduct, to protect the

16   public from further crimes by you and, to the extent

17   possible, to provide you with needed

18   educational/vocational training, medical care and other

19   correctional treatment in the most effective manner.  And

12:03:38 20   I have to look at the kinds of sentences available.

21                  And this is not -- this is not an easy

22   sentencing decision for me because of the facts and

23   circumstances and because of the history and

24   characteristics of the defendant; also trying to figure

12:03:58 25   out what's going to help to deter.

1            But in terms of the nature and

2    circumstances of the offense, I was here when the case

3    was tried, I read the report and so forth.  It's a

4    serious crime, there's no question about it.

12:04:18  5            There are some things about the crime which

6    are a bit different than most cases, but this is what, of

7    course, the agents are there to do is to work up cases,

8    to work in cases and so forth.

9            But what I -- what was involved here was

12:04:38  10   you clearly got into some, Mr. Brown, some -- I'm

11   sorry -- Mr. Ferguson, some serious conduct during your

12   chat and with the other people on that network that

13   you -- people you were talking to.

14           Turns out most of them were teenagers, they

12:05:02  15   weren't adults, they weren't people that's been shown

16   were really prepared, ready to move ahead and become part

17   of a group that could carry out what was being planned.

18           I didn't see anything that suggested that.

19   And, of course, they didn't have to be witnesses, none of

12:05:24  20   them were witnesses, and so what I saw were the law

21   enforcement agents saw you engaging in this violent

22   oratory, this chat, about, you know, carrying out some

23   stealing property from law enforcement and perhaps

24   harming them or killing some of them or all, and that's

12:05:43  25   part of your language and rhetoric.

1           And they said, well, you know, we can't

2      allow that to happen, we can't have that to go on, so

3      they got in it.

4           And candidly, even though I concluded both,

12:05:55  5      you know -- I mean the jury concluded that you committed

6      this crime of attempted kidnapping, and I overruled your

7      counsel's motion post-trial, you know, based on the

8      reasons he raised, the agents were dead in the middle of

9      this and they were helping you facilitate the possibility

12:06:23 10      of carrying out the crime.

11           Now, don't raise your hand because there's

12      nothing for you to say now.  I'm speaking.

13           If you disagreed with what I said, which I

14      would find very strange anyway, but I said they were very

12:06:41 15      involved in helping you prepare what you indicated that

16      you wanted to do.  And it's not that you weren't involved

17      to the extent that you were culpable.  I'm not saying

18      that you didn't mean to do what you claimed you were

19      going to do.

12:06:59 20           I'm saying that the context was that it's

21      not clear as to what you might have done.  Maybe you

22      would have done something like this if they had not

23      interfered, or maybe you would have been too inept to

24      carry it out, but we can't worry about that because you

12:07:15 25      can't -- you can't sit there and make plans like this

1    relative to law enforcement.

2              And so they got in, and I'm not criticizing

3    their getting in, but it is part of the context of this

4    case, it's part of the context of the case.

5              They were -- they were ahead of you.  I

6    mean, they knew more, they knew what they were doing,

7    they knew it wasn't going to come off, and so they could

8    work with you and you worked right along with them.  And

9    so you're responsible for that.

10             But that's still part of the nature and

11   circumstances of the offense.  It wasn't -- you weren't

12   out there by yourself knowing exactly what to do, but you

13   had a gun.  You talked about using it.  You never got to

14   the stage really of grabbing anyone or trying to take one

15   into possession.  That thing got called off.

16             But that's part of the nature and

17   circumstances of the offense.  It's not the worst, it's

18   not the worst set of circumstances I've seen.  It's a

19   serious set of circumstances, and so that's part of that.

20             The other -- and the record will reflect

21   that, that they were talking to you about it and so forth

22   and they said they were giving you opportunities to say

23   no, but, meanwhile, they're supposed to be your soldiers,

24   but they were your soldiers, but they were asking you

25   questions about whether you wanted to back off or "Maybe

1    we shouldn't go forward" and so forth and helping you

2    facilitate practice runs and so forth.

3                And where are your other soldiers?  I don't

4    see them.  And those are people in the chat.  I mean,

12:08:44  5    very minimal.  I'm not saying you had no, no backing

6    other than them.  You did, but not much.

7                History and characteristics of the

8    defendant.  This is -- this is another hard part.  I can

9    look at your background and circumstances.  I can take

12:09:01  10    those into consideration.  Not everyone has the same

11    upbringing.  Some people have it rougher than others.

12    Some people have rougher mountains to climb, so to speak,

13    and you don't get off doing crimes because you had a

14    rough upbringing, but at the same time the Court can

12:09:20  15    consider those kinds of factors.

16                And one thing I do, one constant I do see

17    in your case is that you've got mental health issues, and

18    they are mental health issues that are serious that have

19    not -- are not being resolved.  And the cry of all your

12:09:43  20    family members and people that write for you is -- it's

21    not even about the sentence, it's about try to get him

22    something that will address these mental health issues;

23    that they are paramount.

24                And from my view of you and just -- and

12:10:03  25    reading your reports and so forth, I think you do have

1    serious mental health issues that, as the report said,

2    that defendant proffered, put forward, that you are not

3    recognizing, that you are not acknowledging to a

4    significant extent.

12:10:29  5        Now, the record supports that you had

6    mental health issues.  Some of the relatives talk about

7    bipolar disorders -- disorder diagnosed when you were

8    ten.  There were certainly two hospitalizations, as I

9    recall it, that related to mental health issues.

12:10:52  10       One was Belmont Pines hospital record.  And

11   let me find the other.  The other one was at Windsor

12   Laurelwood.

13        And both of them really describe -- you're

14   a very young man now, but describe the mental health

12:11:23  15   issues that you had from the period when you were, I

16   would say, 14 up until, you know, not too long ago.

17        And so you've had those kinds of problems.

18   Bipolar disorder is one thing, but there are other, other

19   problems which have manifested themselves throughout most

12:11:52  20   of your life.

21        Now, some of that may have been brought on

22   by the death of your mother.  I don't know, and I'm not

23   trying to tie those two together, but it certainly didn't

24   help that when you lost her, that -- because you lost a

12:12:10  25   very significant person in your life.

1          And I'm sure that affected you.  It may

2     have exacerbated some of the mental health issues.

3          Grandmother, regardless -- and one thing

4     that tells me that you've got mental health issues, not

12:12:30  5     because you say things about your grandmother the way you

6     do, but because it's just -- I don't -- it's not based on

7     anything real or any basis for you to be upset with her

8     based on everything I said on the record.

9          It partakes of someone who has some mental

12:12:48 10     health issues.

11          That's the very statement that has been

12     attributed to you relative to her suggests that to me and

13     further confirms that that's -- that's a big issue.

14          Your grandmother does not want any

12:13:07 15     confrontation.  She cares deeply about you.  She doesn't

16     want to say anything that sets you off.  That's a concern

17     of hers.  But she wants the best for you.  She wants the

18     best for you, but she is deeply concerned.  She doesn't

19     want to upset you.  Why?  Because you have the conclusion

12:13:33 20     from all the people around is that there are mental

21     health issues that need to be addressed.

22          Now, this is not a put-down, Mr. Ferguson.

23     It's not a put-down.  When a person has mental health

24     issues to address, doesn't mean that they are not a

12:13:49 25     normal -- not a human being like anybody else.

1          But when you realize that there are things

2    that you have to address, if you don't address them, then

3    they're going to be bigger problems.

4          And so what I'm trying to balance in my

5    sentencing is what's appropriate in terms of punishment,

6    and what can we offer in this system that addresses

7    mental health issues because we could throw the book at

8    you and have you come out and then do -- and then act on

9    your mental health issues or have them exacerbated in

10   prison.  And that could definitely happen.

11         So I don't know if we have a good mix in

12   our system for dealing with serious crimes and

13   understanding that, but also accounting for the mental

14   health role that's involved and trying to address that so

15   that that won't be part of the deterrent effect going

16   forward.

17         And that's what I'm facing in your case.

18         You don't have any criminal history.

19   You've done some things, acted up, you've done some bad

20   things, but you don't have any criminal history in terms

21   of -- in terms of the criminal history category.  You're

22   a category one.

23         Now, I read the report about Indiana and I

24   read the report about being in the Marshals' custody and

25   all the other things, so don't think that I don't know

1      about them and don't think that I don't think they are

2      serious, but you didn't come here with a heavy criminal

3      history record.

4                   And so I'm struggling.  Serious crime, but

12:15:39  5      circumstances are that you were playing with fire.

6      Whether you could have pulled anything off, candidly, you

7      did sound like you were in a fantasy land.  That's what

8      it sounded like to me when I heard, in a fantasy land,

9      but a fantasy land can cause people to die, can cause

12:16:00 10      people to be hurt, but that's what you were playing,

11      games.  And you've been playing those, I read in the

12      record, all your life, and that's what you got caught up

13      in.

14                   So you were there talking to these 12 and

12:16:17 15      13-year-olds saying things that were very dangerous and

16      then the agents say, "Well, let's play it out."  And you

17      kept playing it out and here's where you are.

18                   So mental health problems.  Mother dies

19      when you were very young.  Eventually discord in the

12:16:38 20      home.  Placed in foster care.  Eventually having

21      hospitalizations for mental health issues.  It's been

22      a -- it's been a tumultuous -- and negative interactions

23      with family members in a volatile way.  It's a problem.

24                   So let me just come to a conclusion here

12:17:04 25      and go ahead and sentence you.

1    I've read the psychological report.

2  Mr. Brown mentioned that the report said that you're not

3  coming to grips with how serious the mental health issues

4  are.  I mentioned that, too.  I don't know that that cuts

12:17:29  5  against you as much as he thought, but it's a problem to

6  be addressed.

7    Let me make sure I've got what I need here.

8    Looking for my -- I'm looking for my blue

9  pages here, Sharon.  No, I don't see it.  (Pause)

12:18:43 10    I don't normally get comments from jurors

11  and the question is how much is that worth, but it was

12  their opinion after looking at everything.  I think

13  they -- they knew that you, Mr. Ferguson, were involved

14  in something very serious, but I think they felt you

12:19:04 15  were -- and probably gave you more doubt than they should

16  have -- but I think they felt that you just got caught up

17  in something and being drug along there, and that you

18  weren't really a bad person.  That's what the jury was

19  saying.

12:19:17 20    And so I shared it with the lawyers because

21  I had never -- never received anything like that.  I've

22  gotten notes before.

23    I had misplaced a sheet that I needed, and

24  my deputy is picking that up so I can finish up the

12:19:36 25  sentence.

1          (Pause).

2                    Mr. Abraham, if we refer him to Butner and

3      then if Butner decides that he needs to be placed in a

4      facility for those who have mental health issues that

12:20:14  5      need to be addressed, they have other facilities that

6      then can address those issues?

7                    THE PROBATION OFFICER:  Yes, Your Honor.

8      They have federal medical facilities all across the

9      United States.  I have a list of them here, but there's

12:20:28  10      numerous and they're --

11                    THE COURT:  Well, they will determine which

12      one to go to?

13                    THE PROBATION OFFICER:  They will, Your

14      Honor.

12:20:34  15                    THE COURT:  I want to stress in this case,

16      like I have stressed in almost any case regardless of the

17      sentence that I put on, that I think this is one where

18      the Bureau needs to take serious the notion that there

19      are problems here that need to be addressed.

12:20:51  20                    He's a very young man, and if he lives as

21      long as most of us, there's a lot of life left, but we

22      want to minimize the potential that he's going to cause

23      harm to anyone, especially based on mental health issues,

24      related issues.  And I have concerns.

12:21:10  25                    THE PROBATION OFFICER:  Yes.  Thank you,

1    Your Honor.

2                    THE COURT:  All right.  Pursuant to the

3    Sentencing Reform Act of 1984, it's the judgment of this

4    Court that defendant Christian Ferguson is hereby

12:21:35   5    committed to the custody of the Bureau of Prisons for a

6    term of 50 months on Count 1 and 50 months on Count 2, to

7    be served concurrent.

8                    Upon release from imprisonment, you shall

9    be placed on supervised release for a term of three

12:21:51  10    years.

11                    Within 72 hours of release from the custody

12    of the Bureau of Prisons, you shall report in person to

13    the U.S. Pretrial Services and Probation Office in the

14    district to which you are released.

12:22:01  15                    I've determined you're not able to pay a

16    fine and, therefore, I'm going to waive the payment of a

17    fine.

18                    You will be required to pay a special

19    assessment of $200 due immediately.

12:22:09  20                    Let me just say in terms of this 50-month

21    sentence that I think I've articulated the reasons why,

22    but I will be clear.  I think -- I think you need, at

23    this point in your life, a significant sentence.  I think

24    50 months as your first major sentence is significant.

12:22:32  25                    I think if we can get the mental health

1    issues addressed, then I think that you'll be able to

2    move forward.  And I think the mental health is a huge

3    contributing factor to the problems you're having, and

4    I've spelled that out and I've made it clear.

12:22:50  5          From all I've gotten from family members,

6    it didn't start yesterday.  From the way you interact

7    with them, things you've said to them and the

8    context -- and in that context and the report by the

9    person who did the evaluation for sentencing, and the

12:23:05  10   fact that you've been incarcerated -- not incarcerated --

11   you've been detained twice for mental health reasons at

12   facilities where you had to receive treatment, and just

13   your general demeanor and the words you use in the

14   context, there are mental health issues, and they point

12:23:24  15   to them.

16          And that's why I want to stress to the

17   Bureau that this is -- this is something I think they

18   should take seriously.

19          You're going to be required to pay a

12:23:34  20   special assessment of $200 which is due immediately.

21          When you're on supervision, you must comply

22   with the mandatory and standard conditions that have been

23   adopted by this Court and set forth in Part D of the

24   presentence investigation report.

12:23:44  25          You must comply with the following

1       additional conditions.

2                       The periodic drug testing mandated by the

3       Violent Crime Control and Law Enforcement Act of 1994 is

4       hereby suspended because I've determined that you pose a

12:23:55 5      low risk of future substance abuse.

6                       You must undergo a mental health evaluation

7       and/or participate in a mental health treatment program

8       if that's found to be warranted, and you must follow the

9       rules and regulations of the program.  The Probation

12:24:08 10     Officer, in consultation with the treatment provider,

11      will supervise your participation in the program.

12                      You must take all mental health medications

13      that are prescribed by your treating physician.

14                      If you're on supervision you must submit

12:24:19 15     your person, property, house, residence, vehicle, papers,

16      computers, other electronic communication, data storage

17      devices and media, office to a search conducted by the

18      United States Probation Officer.

19                      Failure to submit to a search may be

12:24:31 20     grounds for revocation of release.

21                      You must warn any other occupants of the

22      premises that you occupy they may be subject to a search

23      pursuant to this condition.

24                      Now, the Probation Officer may only conduct

12:24:40 25     a search if they have reasonable suspicion that you

1    violated a condition of supervision, and they must set

2    out the areas to be searched which contain evidence of

3    the violation.

4                    And any search must be conducted at a

12:24:51  5    reasonable time in a reasonable manner.

6                    You must not access the Internet except for

7    reasons approved in advance by the Probation Officer.

8    And you must allow the Probation Office to install a

9    computer monitoring software on any computer that you

12:25:05 10    use.

11                    To ensure compliance with the computer

12    monitoring condition, you must allow the Probation

13    Officer to conduct initial and periodic unannounced

14    searches of any computers subject to computer monitoring.

12:25:16 15                    These searches shall be conducted for the

16    purposes of determining whether the computer contains any

17    prohibited data prior to installation of the monitoring

18    software, to determine whether the monitoring software is

19    functioning effectively after its installation, and to

12:25:30 20    determine whether there have been attempts to circumvent

21    the monitoring software after its installation.

22                    You must warn any other people who use

23    these computers that the computers may be subject to

24    searches pursuant to this condition.

12:25:41 25                    And you must warn any other people who use

1    these computers or devices capable -- capable of

2    accessing the Internet the devices may be subject to

3    searches pursuant to this condition.

4            A Probation Officer may conduct a search

12:25:57  5    pursuant to this condition only when reasonable suspicion

6    exists that there's a violation of a condition of

7    supervision and that the computer or device contains the

8    evidence of this violation.

9            And any search will be conducted in a

12:26:09 10    reasonable time and in a reasonable manner.

11            You will be required to cooperate, as all

12    defendants are required to cooperate, in the collection

13    of DNA as directed by the Probation Officer.

14            And I'm going to recommend to the Bureau

12:26:20 15    that you be placed in an intensive substance abuse

16    program -- I'm sorry, strike that -- that you be

17    placed -- no, there's no requirement, no need for that.

18            I'm going to recommend to the Bureau that

19    you be given credit for time served.

12:26:34 20            MR. RICOTTA:  Your Honor, may I, on the

21    residential drug program?

22            THE COURT:  Sure.

23            MR. RICOTTA:  It seems apparent from that,

24    from Dr. Rindsberg's report, that there may be an

12:26:45 25    underlying substance abuse problem that he's still in

1    denial, and I think it may be good to have at least an

2    evaluation for that.

3              MR. BROWN:  Your Honor, there's nothing in

4    the case from the very beginning to suggest substance

12:26:57  5    abuse.

6              I think mental health is really the focus

7    here that should not be minimized or lost track of.

8              MR. RICOTTA:  Dr. Rindsberg indicates an

9    underlying problem that he's not addressing so.

12:27:13 10              THE COURT:  What page is that on?

11              MR. RICOTTA:  I'm sorry.

12              MR. BROWN:  Page 9.

13              Either a significant drug problem or

14    overreporting his problem, so it could go either way.

12:27:36 15              I think -- I think the mental health

16    evaluation will be the one that really determines what's

17    going on with him because --

18              THE COURT:  Okay.  Let me just back up then

19    on this one.

12:27:50 20              I had indicated -- I'm going to remove the

21    mandatory drug testing and suspend it, and I'm going to

22    require him to be tested, first one after 15 days of

23    supervision and periodic tests thereafter.

24              And then, of course, we always have

12:28:23 25    discretion, you do, the Pretrial/Probation Officer, that

1    if it turns out that he doesn't appear to have a problem,

2    you can then not test him, but to err on the side of

3    caution.

4                    And I'll recommend to the Bureau that if

5    they find it appropriate, that he be placed in a

6    substance abuse program.

7                    All right.  Then I'm going to recommend to

8    the Bureau you be given credit for time served.

9                    And I'm going to recommend that you be

10   housed at Butner initially for a mental health assessment

11   with a strong recommendation by the Court that

12   they -- they make such an assessment and place you at an

13   appropriate mental health facility and address the

14   problems that have been identified in the record and

15   by -- by the Court.

16                    So that's what I'm going to do,

17   Mr. Ferguson.  I think it's a very fair sentence.  It's a

18   just sentence.

19                    I think every person is different.  Every

20   set of circumstances are different.  And that's the

21   balance I struck based on the serious conduct that you

22   engaged in, but balancing that off against the mental

23   health issues that I see, and I think that that's going

24   to be the key as to whether you can get that kind of

25   treatment that you need.

1            And I strongly think that that's a

2     substantial portion of the problems that you have, even

3     though you've engaged in criminal conduct.

4            And it's a fantasy land for you.  You were

5     in it.  My understanding from some of the things I read

6     is that you've been on these games for years, and this

7     was just another one.  And so it's kind of between

8     fantasy and reality, and the officers helped you flesh

9     that out so it became a reality, but I think that they

10    did play a significant role in that.  And that's not to

11    criticize them at all, but they got you to a point where

12    they could get you to act out so they could then get you

13    charged.

14            And when you got charged, that helped

15    address the situation.  I think this does it enough.  I

16    think it's enough.  I think this does it, given the facts

17    and circumstances.

18            And so that's the sentence I'm going to

19    impose.

20            Mr. Ricotta, any objections or anything I

21    overlooked?

22            MR. RICOTTA:  No, Your Honor.

23            Other than I think he's got to be

24    advised -- I don't know if he wants to appeal, but he

25    should be advised.

1          THE COURT:  I'm going to advise him.

2          MR. RICOTTA:  Oh, okay.

3          THE COURT:  But I wanted to see what you

4    were going to say first about any further objection or

12:31:14  5    anything I overlooked, and then I got to ask Mr. Brown,

6    and then I'll finalize my sentence.

7          MR. RICOTTA:  The only thing I would move

8    is that my exhibits be entered in, my sentencing Exhibits

9    1 through 4 for the record.

12:31:27 10          THE COURT:  All right.

11          MR. RICOTTA:  That's all I have, Your

12    Honor.

13          THE COURT:  Okay.  Mr. Brown.

14          MR. BROWN:  Thank you, Your Honor.

12:31:31 15          The Government would preserve its

16    objections and also object to the sentence as being below

17    the Guidelines and just preserve that for the record as

18    we determine -- in the event of any appeal.

19          Thank you.

12:31:41 20          THE COURT:  All right.  I understand.

21          So I will impose the sentence that I

22    indicated I would.

23          And, Mr. Brown, you have a right to appeal

24    from the Judgment of Conviction.

12:31:50 25          When I tell you you have a right to appeal

1    I'm not saying whether you have good grounds or bad

2    grounds for appeal.  Judges don't say that and Judges

3    can't, so I don't give any opinion.  My responsibility is

4    limited, it's limited to making sure that you know if you

12:32:05  5    wanted to appeal, you have to file what's called a notice

6    of appeal within 14 days of the Judgment of Conviction.

7                    Do you understand that?

8                    (Pause).

9                    THE COURT:  You, yes.

12:32:15  10                    THE DEFENDANT:  Yes, Your Honor.

11                    THE COURT:  And if you wanted to appeal and

12    you could not afford counsel, I would appoint counsel for

13    you.

14                    Do you understand that?

12:32:20  15                    THE DEFENDANT:  Yes, Your Honor.

16                    THE COURT:  Okay.  Mr. Ricotta, would you

17    accept the responsibility, if he wanted to file an

18    appeal, of filing a notice for him?

19                    MR. RICOTTA:  Yeah, but I would prefer,

12:32:29  20    Your Honor, that you would assign somebody to do the

21    appeal to review my work, too, instead of me doing the

22    appeal.

23                    THE COURT:  But would you -- right.  But

24    could you file the notice?

12:32:38  25                    MR. RICOTTA:  Yeah, I can do the notice.

1          THE COURT:  And then what we do is we can

2    determine, we can have someone else do the appeal, but

3    I'd like you to file the notice if he wants to appeal.

4          MR. RICOTTA:  And he may not want to

12:32:49 5    appeal.

6          I don't know.  We'll discuss it, Your

7    Honor.

8          THE COURT:  All right.

9          MR. RICOTTA:  I'll take care of that.

12:32:53 10          THE COURT:  Yeah, I'm not suggesting he

11    wants to appeal, should or shouldn't.  None of that.

12          I'm just making sure he knows about his

13    rights and I want to make sure that, at least if he does,

14    that, you know, that doesn't slip through the cracks and

12:33:07 15    then, you know, from there the lawyer who gets to

16    represent him from there will take it from there.

17          MR. RICOTTA:  Not a problem.

18          Thank you.

19          THE COURT:  All right.  Okay.  Well, it's

12:33:15 20    been a long one, Mr. Ferguson, but it's required

21    sometimes.

22          I've spoken honestly to you and I've spoken

23    honestly to everybody here because we've got crimes being

24    committed, but we've got other things we shouldn't

12:33:38 25    ignore.

1          I would feel remiss if I didn't -- if I

2     ignored this mental health issue.  And I think that's

3     what everybody wants for you, all your relatives and

4     everybody I've got information from says, "It's a mental

12:33:51  5     health problem; make sure he gets the help he needs."

6          And so you're going to be punished, you're

7     going to be in prison, but hopefully you get the mental

8     health treatment you need.  And I think if so, then you

9     can move forward in life and maybe realize some of the

12:34:07  10    positive goals that you have will develop.

11              So that's all I have.

12              MR. RICOTTA:  Thank you, Your Honor.

13              THE CLERK:  All rise.

14              (Proceedings concluded at 12:34 p.m.)

12:34:48  15                   -  -  -  -

16                C E R T I F I C A T E

17          I certify that the foregoing is a correct

18    transcript from the record of proceedings in the

19    above-entitled matter.

20

21    **/s/Susan Trischan**

22    /S/ Susan Trischan, Official Court Reporter
      Certified Realtime Reporter
23
      7-189 U.S. Court House
24    801 West Superior Avenue
      Cleveland, Ohio 44113
25    (216) 357-7087