<pre>
 1                   UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
 2                         EASTERN DIVISION

 3     UNITED STATES OF AMERICA,        Case No. 5:20cr262
                                        Akron, Ohio
 4              Plaintiff,              May 15, 2020

 5          vs.

 6     CHRISTIAN FERGUSON,

 7                  Defendant.

 8
                        TRANSCRIPT OF PROCEEDINGS
 9            BEFORE THE HONORABLE KATHLEEN K. BURKE
                  UNITED STATES MAGISTRATE JUDGE
10

11                      PRELIMINARY HEARING
                            (VIA ZOOM)
12

13     APPEARANCES:

14     For the Government:        Duncan T. Brown
                                  Daniel Riedl
15                                Assistant United States Attorneys
                                  Northern District of Ohio
16                                Suite 400
                                  801 Superior Avenue, West
17                                Cleveland, Ohio  44113
                                  216/622-3933
18

19     For the Defendant:        Carolyn M. Kucharski
                                  Office of the Federal Public
20                                Defender - Cleveland
                                  Northern District of Ohio
21                                750 Skylight Office Tower
                                  1660 West Second Street
22                                Cleveland, Ohio  44113
                                  (216) 522-4856
23

24

25


              Lori A. Callahan, RMR-CRR      (330) 252-6022
</pre>

1

2

3    Court Reporter:              Lori Ann Callahan, RMR-CRR
                                  United States District Courthouse
4                                 Room 568
                                  2 South Main Street
5                                 Akron, Ohio  44308
                                  (330) 819-8676
6

7

8

9

10   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2                       -   -   -

3              COURTROOM DEPUTY CLERK:  The case before the court

4      today is Case Number 5:20mj1155, United States of America

5      versus Christian Stanley Ferguson.

6              THE COURT:  Good afternoon.

7              I am going to start by having counsel identify

8      themselves for the record starting with counsel for the

9      United States.

10             MR. BROWN:  Thank you, Your Honor.

11             For the United States, Duncan Brown.

12             THE COURT:  Good afternoon.

13             I think there's another AUSA here, but I take it

14     he is not participating in the hearing?

15             MR. RIEDL:  MR. Brown will be speaking on behalf

16     of the United States.

17             It's Dan Riedl also on behalf of the United

18     States.

19             THE COURT:  All right.  And counsel for the

20     defendant?

21             MS. KUCHARSKI:  Carolyn Kucharski on behalf of

22     Christian Ferguson.

23             THE COURT:  Good afternoon.

24             I also see that we have the defendant,

25     Mr. Ferguson.

1              Mr. Ferguson, can you see me and hear me?

2              THE DEFENDANT:  Yes, I can, ma'am.

3              THE COURT:  All right.  Very good.

4              We have our court reporter, Lori Callahan, here.

5       And we also have pretrial services officer, Officer Julie

6       Gray, who's on the telephone, but is not on the video.

7              I see we also have an agent who I believe is going

8       to be a government witness in this case.

9              So this is -- we're now proceeding as a

10      preliminary hearing.  The purposes of a preliminary hearing

11      is to determine whether probable cause exists for the charge

12      made against this defendant.

13             I will start by having the United States Attorney

14      summarize the charges made against the defendant, as well as

15      the penalties.

16             I will confirm with Mr. Ferguson that he has

17      received a copy of the complaint and attached affidavit.  I

18      will also speak with him and ask him about his right to

19      counsel and then we will talk a little bit about the

20      procedure and the rules that pertain to this hearing.

21             So let's start by having Mr. Brown state the

22      charge that has been made against Mr. Ferguson and the

23      penalties for this charge.

24             MR. BROWN:  Thank you, Your Honor.

25             The charges are 18, United States Code,

1      1201(a)(2)(5) and (d), which are attempted kidnapping on

2      federal territory or a special maritime or federal

3      jurisdiction territory of a federal officer engaged in their

4      official duties.

5              And the the statutory maximum period of

6      incarceration is 20 years with a fine of $250,000, three

7      years of post supervised release and a $100 special

8      assessment.

9              THE COURT:  All right.  Thank you, Mr. Brown.

10             I am now going to speak with Mr. Ferguson about

11     his right to counsel.

12             Mr. Ferguson, as I discussed with you the last

13     time we had a hearing in this case, you do have a right to

14     be represented by an attorney at every stage of the

15     proceedings in the case.  If you're not able to afford to

16     hire an attorney, the court will appoint one without cost to

17     you to represent you.

18             Do you understand your right to an attorney?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  And the court previously appointed the

21     office of the Federal Public Defender to represent you.

22             Ms. Carolyn Kucharski from that office is here

23     today, is on by video.

24             Do you understand that you are represented by

25     Mr. Kucharski and her office?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  All right.  Let me now talk a little

3    bit about the procedure.

4          Mr. Ferguson, at this hearing, you do -- you have

5    a right to cross-examine any witness that the government may

6    present.  You also have the right to present evidence in

7    your own behalf.

8          You have the right to testify if you choose to,

9    but you also have the right not to testify.  You may remain

10   silent.  And you do have the right to remain silent.

11          You also have the right to consult with your

12   attorney at any time during the hearing.

13          The Rules of Evidence prohibiting hearsay evidence

14   do not apply.  Both parties in the case have the right to

15   proceed in whole or in part by way of proffer.

16          The evidence of the examinations are limited to

17   the probable cause determination.  This hearing is not any

18   means to obtain discovery or to produce testimony.  They can

19   be used for subsequent impeachment at trial.

20          The court will not consider motion to suppress

21   evidence or objections to evidence allegedly obtained

22   unlawfully.

23          The order of presentation is the government will

24   proceed first with its evidentiary presentation, and that

25   will be followed by the defendant's presentation of evidence

1    and following that we will have brief argument from both

2    sides as to the probable cause determination.

3               So we will start with Mr. Brown.

4               Mr. Brown, you may proceed with your evidentiary

5    presentation.

6               MR. BROWN:  Thank you, Your Honor.  Good

7    afternoon.

8               (Unintelligible.)

9               THE COURT:  All right.  So, Mr. Brown, you may

10   proceed.

11              MR. BROWN:  Thank you, Your Honor.

12              At this time, the government would proceed

13   entirely by proffering the complaint affidavit.

14              At this time, the government's position is that

15   the charges and the theory of the case and the grounds for

16   finding no probable cause the government argues are

17   contained in the affidavit, and we will proceed without

18   calling any further witnesses at this time.

19              THE COURT:  All right.  So I'd been told that you

20   were going to have a witness, but I take it that that is not

21   the case.

22              MR. BROWN:  That's correct.

23              THE COURT:  All right.  So you are proffering the

24   complaint and the affidavit attached to the complaint or

25   proffering the affidavit, I take it?

1          MR. BROWN:  That is correct, Your Honor.

2          THE COURT:  That's why I need a copy of that

3      affidavit.  Hopefully I will have that momentarily.

4          Ms. Kucharski, you may present whatever evidence

5      you choose to present at this point.

6          MS. KUCHARSKI:  Your Honor, since the government

7      hasn't called Special Agent Dirker, and I believe he's on

8      the video call.

9          THE COURT:  I don't know that you have the correct

10     name there.

11         MS. KUCHARSKI:  The complaint says it was

12     submitted by a Kirk Dirker, D-I-R-K-E-R.

13         THE COURT:  That is correct, but the agent at

14     least that I can see on the video is not that agent but a

15     different agent.  It appears to be Agent Ryan Taylor.

16         MS. KUCHARSKI:  Well, then I would call Agent Ryan

17     Taylor if that's the agent that's available.

18         THE COURT:  Okay.  The agent needs to be sworn in

19     as a witness by the courtroom deputy.

20         COURTROOM DEPUTY CLERK:  Would you raise your

21     right hand, please?

22                          RYAN TAYLOR

23     of lawful age, a witness called by the Defendant, being

24     first duly sworn, was examined and testified as follows:

25         THE COURT:  I need to step back a moment for

1    important stuff that I omitted at the very outset, and that

2    is to confirm that Mr. Ferguson does agree to and does

3    consent to have this preliminary hearing conducted by video

4    conference.

5            So, Ms. Kucharski, did you have an opportunity to

6    discuss with your client his opportunity or his right to

7    have an in-person hearing, but that he also has a right to

8    waive the in-person hearing and to consent to having the

9    hearing conducted by video conference?

10           MS. KUCHARSKI:  Your Honor, based on the pandemic

11   situation, he's prepared to waive an in-person hearing and

12   proceed by way of video.

13           THE COURT:  And, Mr. Ferguson, can you confirm

14   that you do consent to this preliminary hearing conducted by

15   video conference?

16           THE DEFENDANT:  Yes, Your Honor.

17           THE COURT:  All right.  Very good.

18           I apologize, Ms. Kucharski.  We had Agent Taylor

19   sworn in, and you are about to begin your questions.

20           MS. KUCHARSKI:  Yes.  And I think the feed will

21   come through better if, Duncan, if you mute, and then if you

22   need to speak, you unmute.

23           Are you muted?

24           Okay.  Thanks.

25           MR. BROWN:  Muted.

1          MS. KUCHARSKI:  Thank you.

2              DIRECT EXAMINATION OF RYAN TAYLOR

3      BY MS. KUCHARSKI:

4       **Q.**  Agent Taylor, can you state your name, and tell the

5      court what your employment position is.

6       **A.**  Yes, ma'am.  My name is Ryan Taylor.  I'm a special

7      agent with the Cleveland FBI.  I have been with the FBI for

8      approximately 11 years, and I work on the domestic terrorism

9      squad, along with our special agent bomb technicians in the

10     office and also a member of the FBI SWAT team.

11      **Q.**  And are you the lead investigator in this criminal

12     complaint that was filed against Christian Ferguson?

13      **A.**  I was one of the co-case agents.

14      **Q.**  What exactly does that mean?

15      **A.**  So Special Agent Dirk Kirker was the lead investigator,

16     and I was his assistant investigator.

17      **Q.**  Are you familiar with all aspects of this investigation

18     in the criminal complaint that was prepared?

19      **A.**  Yes, I am.

20      **Q.**  Have you had an opportunity to review all of the

21     evidence and the criminal complaint prior to your testimony

22     today?

23      **A.**  I have been able to.

24      **Q.**  And is there a reason why Special Agent Dirker isn't

25     present today and you're present on his behalf?

1            MR. BROW:  I would object, Your Honor.

2            Your Honor, I would object to that question.

3            THE COURT:  All right.  We got it now.

4            Mr. Kucharski, I don't believe that's an

5     appropriate question for this witness, so I would uphold the

6     objection.

7     BY MS. KUCHARSKI:

8     **Q.**  Special Agent Taylor, do you have a copy of the

9     complaint with you today?

10    **A.**  Yes.

11    **Q.**  And going to page 3 of that criminal complaint, it's

12    not a full paragraph, the sixth line of that -- of the first

13    few sentences on page 3 of that criminal complaint, do you

14    see that last sentence that starts halfway through line 3

15    where it says, "In screen shots provided to the FBI by

16    complainant, CF-Discord, later identified as Ferguson,

17    expressed a desire to call in a false in-progress call to

18    the police in order to lure law enforcement to a remote

19    location where they could be robbed of their weapons and

20    body armor and possibly killed."

21            Do you see that sentence?

22    **A.**  Yes.

23    **Q.**  So this tip that came into the FBI came in by somebody

24    who was a participant in a group chat with Christian

25    Ferguson, correct?

1      **A.**   Yes.

2      **Q.**   And how many people were a part of that group chat?

3           What did your investigation find with respect to that?

4                MR. BROWN:  Objection.  If he knows.

5                THE COURT:  You can answer if you know, Agent.

6                THE WITNESS:  I do not know.

7      BY MS. KUCHARSKI:

8      **Q.**   You don't know how many people were involved in the

9      group chat?

10     **A.**   I don't know who else was on with the complainant at

11     that time.

12     **Q.**   Well, in the course of investigation screen shots that

13     you reviewed regarding this case, how many participants were

14     in the group chat that you reviewed with respect to this

15     participate -- criminal complaint?

16                MR. BROWN:  Again, Your Honor, I'm going to object

17     unless this is somehow tied to the actions of May 8.

18                THE COURT:  I'm going to overrule your objection.

19                The affidavit goes beyond.  It doesn't -- you

20     know, it's not limited to May 8, so I think that whatever is

21     in the affidavit, which is deemed to support the criminal

22     complaint, is fair game.

23                MR. BROWN:  Thank you, Your Honor.

24                THE COURT:  I am sorry, Ms. Kucharski, we may have

25     -- do you want to repeat the question?

1          MS. KUCHARSKI:  Sure.

2     BY MS. KUCHARSKI:

3      **Q.**  When you have been investigating the actions that are

4     detailed in this criminal complaint, how many group

5     participants were there based on what's in the criminal

6     complaint?

7      **A.**  There were several participants on the Discord chat.  I

8     do not have an exact number based on the number of channels

9     and being a social media site.  I don't have that exact

10     number for you.

11     **Q.**  Well, when you say several, are we talking more than

12     five, between five to ten, less than five, what?

13     Approximately?

14     **A.**  I believe you're correct.  More than five.

15     **Q.**  And in the course of your investigation, was it

16     determined who initiated this group chat?

17     **A.**  Yes.  Christian Ferguson explained to us that he was

18     the creator of the group chat.

19     **Q.**  And do you have any independent proof of that as far as

20     like computer evidence or anything like that?

21     **A.**  We have his messages that he posted, and through his

22     interview, he also confirmed that he created the site and

23     that they -- it was his user name and also the site that he

24     was using.

25     **Q.**  And were you aware in the course of your investigation

1  that the people who came to be part of this group chat were

2  also people who are on military gaming platforms?

3      Do you know what I mean when I say that?

4  **A.**  I don't know if I fully know what you mean.

5      I know -- I know of military gaming platforms that

6  people can log in and play different games, if that's what

7  you are referring to.

8  **Q.**  Yeah.  Like Call of Duty, or I think there's one called

9  Battlefield.  There's a bunch of military type gaming video

10 platforms.

11     You're aware of those, correct?

12 **A.**  Yes.

13 **Q.**  And are you aware in the course of your investigation

14 that these people came together through that gaming

15 platform?

16         MR. BROWN:  Objection, Your Honor.

17         This calls into facts that he has not testified he

18 has knowledge of, about other people's actions.

19         THE COURT:  I'm sorry.  I was mute.

20         I was asking Lori if you could read back the

21 question that was pending.

22     (Thereupon, the record was read back as requested.)

23         THE COURT:  I think that the witness is now muted.

24         THE WITNESS:  I am sorry, Your Honor.

25         Can you hear me now?

1           THE COURT:  Yes.

2           THE WITNESS:  I am not aware that they came

3    together through that gaming.

4    BY MS. KUCHARSKI:

5     Q.  All right.  You're not saying that is not the reason.

6    You're just not aware if it was the reason?

7           MR. BROWN:  Objection, Your Honor.

8           THE COURT:  Well, he could say if -- I think in

9    effect he's already answered it, but go ahead.

10          You could give your -- if you don't know, you

11   don't know.  You can say that.

12          THE WITNESS:  Correct, Your Honor.

13          I don't know.  I can't say one way or another

14   whether the gaming site was what brought them together.

15   BY MS. KUCHARSKI:

16    Q.  And you're aware in the interview that was conducted

17   with Mr. Ferguson that he had a desire to join the military,

18   correct?

19    A.  Yes.

20    Q.  And you knew that not only from him but from family

21   members you spoke to, as well, or other agents involved in

22   the investigation you spoke to, correct?

23    A.  I did not learn that from family members, but I was

24   aware that he tried to join the military.

25    Q.  Is it fair to say that in the complaint, the complaint

1    is just -- it doesn't include the entire case investigation,

2    correct?

3    **A.**   That is correct.

4    **Q.**   All right.  We just have bits and pieces of the

5    conversations that were had on this, I guess, app, this

6    Discord app, correct?

7    **A.**   Yes, that's correct.  Not everything is in there.

8    **Q.**   Okay.  On page 3, when you first get into the -- in

9    paragraph 7, when it talks about chats that you reviewed

10   from March 21 of 2020, it states in there that this is kind

11   of just a summary of what was written, correct?

12   **A.**   That is correct.

13   **Q.**   Okay.  Now, do you see that first quote, it says,

14   "Either we can subdue them or we perform a sync shot."

15        Do you see where that starts there?

16   **A.**   Yes.

17   **Q.**   Then it goes to say, "If you shoot, shoot to kill

18   because they will.  If we can keep one or two alive to get

19   answers, great, but it's not an objective."

20        Do you see that?

21   **A.**   Yes.

22   **Q.**   Was it ever determined in the course of your

23   investigation what was being referred to by answers?

24   **A.**   So later on in the investigation, especially on the day

25   where he specifically went out to conduct an active recon,

1    in preparation for the ambush and assault, he did mention

2    that if they were able to keep any police officers alive, I

3    think at one point, he said if more showed up, if they kill

4    three, they wanted to keep at least one alive so that they

5    could ask that person specifically intelligence questions,

6    along with -- I think just general questions on equipment

7    that's in the police car, but he did keep referencing

8    keeping one alive to at least try to get the intel from him.

9    **Q.**  And this date, this March 21 of 2020 date, this is

10   conversation or text conversation that you are reviewing

11   before the tip came in this April, correct?

12   **A.**  If you are referring to page 3, that paragraph in

13   there?

14   **Q.**  Yes.

15   **A.**  That's from the complainant so that was what was sent

16   to the FBI.  The complainant called us and was concerned

17   about the things obviously that were written there, the fact

18   of going after cops, the complainant sent that to us, and

19   this is what we reviewed that they sent to us.

20   **Q.**  Okay.  And that was reviewed obviously after that

21   conversation had taken place, correct?

22   **A.**  That is correct.  We were not monitoring that realtime

23   at the time.

24   **Q.**  Okay.  And this complainant was someone who was a

25   participant within the group chat.

1        That's why they had access to those messages, correct?

2    **A.**  Yes, I believe so.

3    **Q.**  Now, in paragraph 9 on page 4, it starts off that there

4    were "Various investigative steps that the FBI took to

5    identify CF-Discord," who you later determined to be

6    Christian Ferguson.

7        What were those steps that you are referencing there?

8            MR. BROWN:  Objection, if he knows all the steps.

9            THE COURT:  Well, he can only answer what he

10   knows.  I'm not going to -- the witness should not

11   speculate.

12            So you may answer as to what you know.

13            THE WITNESS:  Yes, Your Honor.

14            I know we used -- we have analysts that will do

15   social media searches and look on line trying to look at

16   similar user names.  We also have confidential human sources

17   that we can ask questions of if they're familiar with names

18   or other individuals on line.

19            We also query databases that we already have, both

20   local, state and federal databases, to see if there were

21   previous investigations with names related.

22   BY MS. KUCHARSKI:

23   **Q.**  Okay.  Those are some of the steps that you use?

24   **A.**  Yes, those would be some of the steps.

25   **Q.**  All right.  With respect to -- well, all of the

1    conversations that's listed out in the complaint, that's

2    prior to April 3.

3        That's prior to any human source being introduced into

4    the investigation, correct?

5            THE COURT:  It might be helpful if you would tell

6    him what you are referring to.

7            Are there paragraphs that you are referring to

8    here?

9    BY MS. KUCHARSKI:

10   **Q.**  Well, the complainant called into the FBI on April 3,

11   correct?

12   **A.**  Checking on the exact dates that's listed in the

13   complaint.  I believe that --

14   **Q.**  That's page 2.  Page 2.

15   **A.**  Yes.  I have on or about April 3, 2020, the FBI

16   received a call-in complaint from a civilian who was later

17   referenced as the complainant named in the complaint.

18   **Q.**  Okay.  And then the complainant who called in that tip

19   to the FBI, is that the person that you ultimately

20   cultivated as one of the two confidential human sources that

21   are --

22            MR. BROWN:  Objection, objection.

23            THE COURT:  Sustain that objection.

24   BY MS. KUCHARSKI:

25   **Q.**  Well, ultimately, Special Agent Taylor, there are two

1    confidential human sources who become a part of this

2    investigation, correct?

3       **A.**  That is correct.

4       **Q.**  All right.  There's basically -- is it three meetings

5    that take place in total, three in-person meetings?

6       **A.**  That is correct.

7       **Q.**  I just want to clarify something in the complaint, and

8    I believe it starts on page 6.

9          There's a reference on page 6 in paragraph 18 to

10   Discord 1, and then I think later there might be a Discord

11   2.  Maybe not.  Yeah, there is.

12         There's a Discord 1 and a Discord 2 that are listed in

13   the complaint.  And my question is, are Discord 1 and

14   Discord 2 separate people from confidential human source 1

15   and confidential human source 2?

16             MR. BROWN:  Your Honor, I am going to object.

17   Footnote 7 is there to identify why Discord 1 and 2 were

18   used, so I object to this question.

19             THE COURT:  Okay.  The footnote that you are

20   referring to talks about screen names are known, but because

21   of an ongoing investigation are used to protect

22   investigative measures.

23             Your objection is to the question asking whether

24   the persons with the screen names Discord 1 and Discord 2

25   are also confidential human sources; is that correct?

1          Is that what you are objecting to?

2          MR. BROWN:  Yes, Source 1 and Source 2.

3          THE COURT:  Okay.  As to which sources?  I thought

4   there were two.

5          MS. KUCHARSKI:  And, Your Honor, the reason for

6   the question is because it's confusing to me in reading the

7   criminal complaint because they don't just name somebody

8   either as Discord 1 or Discord 2.  They interchange Discord

9   1 and Discord 2, and then there's a Confidential Human

10  Source 1 and a Confidential Human Source 2.

11         So I don't know if those two people are the same

12  people, or if there's four people.  It's unclear to me.  And

13  someone needs to clear it up for me.

14         THE COURT:  I don't know if that matters, though,

15  does it?

16         MR. BROWN:  It's not relevant to probable cause.

17         THE COURT:  I don't think so.  I am going to

18  sustain the objection.

19  BY MS. KUCHARSKI:

20   Q.  As far as the first meeting, Special Agent, that

21  meeting takes place -- I should say the first meeting, is

22  the FBI monitoring that first in-person meeting?

23   A.  We had agents in the area, yes.

24   Q.  And what's the date of that first meeting?

25         I know the second meeting is May 2, and the third

1    meeting is May 8 when he's arrested.

2         Do you know what the first date of the meeting is, the

3    in-person meeting?

4    **A.**  I am not 100 percent sure.  I believe it was the

5    weekend prior, so April 25.

6    **Q.**  So that first meeting -- would it be fair to say that

7    that first meeting just entailed Mr. Ferguson and one of the

8    confidential sources?

9              MR. BROWN:  Objection, Your Honor.

10             THE COURT:  Sustained.

11   BY MS. KUCHARSKI:

12   **Q.**  That first meeting was approximately 15 minutes?

13             MR. BROWN:  Objection, Your Honor.

14             And I'm going to raise a standing objection to

15   anything about the first meeting.  It's not in the

16   affidavit.

17             Ms. Kucharski already established that there are

18   facts in this investigation that are not in the affidavit,

19   and this is just to establish the probable cause as set

20   forth in the affidavit.

21             THE COURT:  I am looking, as the questioning is

22   going on here, to see if I can find a reference to the first

23   meeting.

24             So I do see that there's -- in paragraph 25, it

25   refers to the last two meetings, one on May 2 and one on May

1    8.  I am looking before that to see where the first meeting

2    is referred to.

3              Is it, in fact, referred to in this affidavit,

4    Ms. Kucharski?

5              I am seeing it discusses postings and

6    conversations or discusses where he posts.

7    BY MS. KUCHARSKI:

8     Q.  I will move on to the meeting on May 2.

9         Are you familiar with that meeting, Special Agent

10   Taylor?

11    A.  Yes.

12    Q.  And did you review all the text messages that went into

13   setting up that meeting?

14    A.  I don't believe there were text messages.  I believe

15   there were messaging on a private discord, but I did review

16   the messages back and forth.

17    Q.  Okay.  That would have set up that meeting?

18    A.  That's correct.

19    Q.  Okay.  And that meeting occurred at the Cuyahoga Valley

20   National Park, correct?

21    A.  No, that's incorrect.

22    Q.  Oh, I'm sorry.

23        That's the meeting that took place in Lorain, correct?

24    A.  It was Belden Park.

25    Q.  And that's out in Lorain?

1    **A.**   I believe the park is actually on the border there.

2    **Q.**   It's in Lorain County.  I am sorry.

3         And that's indicated on page 9 of the criminal

4    complaint, Camp Belden Wildlife in Lorain County?

5    **A.**   That is correct.

6    **Q.**   And in reviewing the conversations that went to set up

7    that meeting, they discuss going to a shooting range,

8    correct?

9              MR. BROWN:  Objection.

10             THE COURT:  I am sorry.  You are saying in -- can

11   you repeat that question again, Ms. Kucharski?

12             MS. KUCHARSKI:  Yes.

13   BY MS. KUCHARSKI:

14   **Q.**   When that meeting was set up for May 2 with

15   Mr. Ferguson and the confidential human source, the course

16   of those discussions were talking about meeting at a

17   shooting range, correct?

18             MR. BROWN:  Objection.

19             Could you point to the paragraph from the

20   affidavit where that's discussed?

21             MS. KUCHARSKI:  It's not in the affidavit.

22             I am asking him a question in the course of his

23   investigation.

24             MR. BROWN:  Then I'm going to raise my objection

25   that the defendant -- the defense attorney has already asked

1       the witness if there are facts that weren't included in the

2       affidavit, he said yes, there were.

3              But this hearing is about what's contained in the

4       affidavit to establish probable cause.

5              THE COURT:  Well, I think it's permissible for her

6       to make that inquiry, because I mean he recognizes that

7       there were facts not included in the affidavit that were

8       part of the investigation.

9              I think she can ask that question.  I don't think

10      she's necessarily restricted to the four corners of the

11      affidavit.  Maybe he knows, maybe he doesn't know.

12             You may answer, Agent Taylor.

13             THE WITNESS:  What is your specific question?

14             It was the firearms range?

15      BY MS. KUCHARSKI:

16       Q.  Yeah.  On May 2.

17          On that meeting, it was discussed that they were going

18      to go to a shooting range, correct?

19       A.  To the best I recall, I believe they talked about it.

20      There was a shooting range out there.  There was a

21      discussion where Camp Belden had a shooting range, but there

22      was a conversation on whether or not that location had a

23      shooting range.

24       Q.  Okay.  And, in fact, there was no shooting that was

25      ever done on that date, correct?

1           MR. BROWN:  Objection, Your Honor.

2           THE COURT:  He can answer if he knows.

3           THE WITNESS:  That is correct.  No shooting

4    occurred on that day.

5    BY MS. KUCHARSKI:

6    Q.   Okay.  And in the course of any of this investigation,

7    you don't have any evidence that Mr. Ferguson ever fired his

8    firearm in the presence of any of these confidential

9    sources, correct?

10          MR. BROWN:  Again, Your Honor, I'm going to

11   object.

12          This is a probable cause hearing for an attempted

13   kidnapping, not a firearms or even a murder charge.  This is

14   attempted kidnapping.

15          So we would object to the relevance of this line

16   of questioning.

17          THE COURT:  I understand your objection, but I

18   will permit it.

19          THE WITNESS:  Your Honor, I'm not aware -- I'm

20   sorry, Your Honor.

21          THE COURT:  I was going to say, it might be more

22   relevant if we're talking about a detention hearing, but I

23   am going to permit the question.

24          THE WITNESS:  I am not aware of him shooting the

25   firearm in front of the confidential human source.

1    BY MS. KUCHARSKI:

2     **Q.**  That's the Confidential Human Source 1 or 2, correct?

3     **A.**  That is correct.

4         I'm not aware of him firing any in front of either one

5     of those confidential human sources.

6     **Q.**  And on the day that he was arrested, the May 8 date, he

7     didn't even have a firearm on his person or in his car, or

8     you never located any firearm at the Cuyahoga Valley

9     National Park when he was arrested, correct?

10    **A.**  That is correct.

11    **Q.**  And he didn't have any ammunition on him on May 8

12    either?

13    **A.**  No, his ammunition was in the rifle back at his house.

14    **Q.**  So it wasn't with him at the park where you arrested

15    him, correct?

16    **A.**  Correct.

17    **Q.**  And the purpose, according to the criminal complaint

18    that was prepared, the purpose of going to the park was to

19    do a dry run, right?

20    **A.**  That is correct.

21    **Q.**  On that day, on May 8, are you aware of whether

22    Confidential Source 1 or 2 had their firearms?

23    **A.**  They did not have their firearms during the dry run,

24    that's correct.

25    **Q.**  In the course of your investigation, can you tell the

1    court who suggested that location of Cuyahoga Valley

2    National Park?

3        Was that a location that Mr. Ferguson suggested, or was

4    that a location that one of the human sources suggested?

5    **A.**  That was one of the human sources suggested.

6    **Q.**  Okay.  And without that suggestion, there's no federal

7    jurisdiction potentially, correct?

8    **A.**  I can't say.

9        MR. BROWN:  Object, Your Honor.  I am sorry.  I

10   objected before he answered.  I was hitting my unmute

11   button.

12       THE COURT:  I will sustain that objection.

13       That isn't a question that this witness should be

14   asked.

15   BY MS. KUCHARSKI:

16   **Q.**  On May 8, the day of Mr. Ferguson's arrest, he drove

17   out to the park, but then ultimately left his car and got

18   into a car driven by one of the sources, correct?

19   **A.**  Yes, that is correct.

20   **Q.**  And the source then took him to a location where they

21   were going to do this dry run, correct?

22   **A.**  Yes.

23   **Q.**  So the source is the person that picked the location

24   within the park, correct?

25   **A.**  Yes, this location.

1    **Q.**  And are you aware of whether or not Mr. Ferguson had

2    ever been to the Cuyahoga Valley National Park prior to this

3    day?

4              MR. BROWN:  Objection.

5              THE COURT:  I think it's permissible.

6              If he knows the answer, he can answer.

7              THE WITNESS:  I don't know.  I'm not aware whether

8    he's been there before or not.

9    BY MS. KUCHARSKI:

10   **Q.**  And in the criminal complaint, it talks about the hoax

11   call being placed on May 8, correct?

12   **A.**  Where are you referencing in the complaint?

13   **Q.**  Okay.  That would be on page 14, paragraph 46.

14             MR. BROWN:  Objection, Your Honor, both to

15   relevance and there's no question.  It's just a reference.

16             THE COURT:  Ms. Callahan, could you read back

17   whatever it was the last statement by Ms. Kucharski?

18        (Thereupon, the record was read back as requested.)

19             THE COURT:  And so you are making a statement,

20   Ms. Kucharski.

21             I think I agree with Mr. Brown.  It's not a

22   question.  It's a statement.

23             MS. KUCHARSKI:  I was directing him to the

24   complaint, so I could ask him a question about that.

25             THE COURT:  But you didn't reference the paragraph

1    you are talking about.  So if you want to direct him to

2    paragraph 46, go ahead.

3    BY MS. KUCHARSKI:

4      **Q.**  Can you look at paragraph 46, Special Agent Taylor?

5      **A.**  Yes.

6      **Q.**  And it doesn't state in that paragraph who actually

7    placed that call, correct?

8              MR. BROWN:  Objection.

9              THE COURT:  Again, that's a statement rather than

10   a question, but I think it's permissible.

11             She's -- you know, she's cross-examining the

12   witness.

13             It's fine.  I mean, he can look at the paragraph

14   as well.  We can all look at the paragraph.

15             THE WITNESS:  Yes, I agree.

16   BY MS. KUCHARSKI:

17     **Q.**  And Mr. Ferguson is not the one that placed that phone

18   call?

19     **A.**  Correct.

20     **Q.**  And the agents who responded to that call, were they

21   aware of your surveillance of what was going on that day?

22         Were they aware that this hoax call could potentially

23   come in?

24             MR. BROWN:  Objection.  Asking what other people

25   knew or did not know.

1          THE COURT:  I think it isn't worth very much,

2    because he doesn't necessarily know, but he can answer to

3    the best of his ability, Agent Taylor, but if you don't

4    know, you don't know.

5          THE WITNESS:  So are you asking the other rangers

6    that responded, were they aware?

7    BY MS. KUCHARSKI:

8     **Q.**  Yes.

9     **A.**  Yes.

10    **Q.**  And then Mr. Ferguson was arrested shortly after that,

11   correct?

12    **A.**  Yes.

13    **Q.**  Now, in the course of this investigation, the

14   confidential human source, or at least one of them, talks

15   with Mr. Ferguson about helping him or help -- or teaching

16   him certain military tactical maneuvers, correct?

17          MR. BROWN:  Objection.  Relevance to this hearing.

18          THE COURT:  I think potentially it could be

19   relevant.  I don't know.  It could be relevant to a

20   kidnapping.  I'm not sure.  But he can answer it.

21          THE WITNESS:  Mr. Ferguson did ask the

22   confidential human source to help or with certain military

23   knowledge and training, yes.

24   BY MS. KUCHARSKI:

25    **Q.**  And that's because the confidential human source

1    portrayed themselves as somebody with a military background,

2    correct?

3              MR. BROWN:  Objection.

4              THE COURT:  I will let him answer.

5              THE WITNESS:  Yes.

6    BY MS. KUCHARSKI:

7    Q.  So, Agent Taylor, on May 8, 2020, Mr. Ferguson never

8    seized any law enforcement, correct?

9    A.  That is correct.

10   Q.  He saw --

11             MR. BROWN:  I am sorry.  I just -- was it sees,

12   S-E-E-S, or S-E-I-Z-E-D?

13             MS. KUCHARSKI:  S-E-I-Z-E-D.

14   BY MS. KUCHARSKI:

15   Q.  Is that how you understood it, Special Agent Taylor?

16   A.  Yes.

17   Q.  And Mr. Ferguson never made the hoax call that day,

18   correct?

19   A.  Are you asking did he dial the number?

20   Q.  Yes.

21   A.  He did not, no.

22   Q.  Okay.  He -- Mr. Ferguson never kidnapped anybody that

23   day, correct?

24   A.  That was not the operational day, no.

25   Q.  Okay.  He never abducted anybody or carried anybody

1    away, correct?

2    **A.**  Correct.

3    **Q.**  And, in fact, he didn't even have any weapons or

4    firearms on his person in that national park that day,

5    correct?

6    **A.**  That is correct.

7              MS. KUCHARSKI:  I have nothing further.

8              THE COURT:  All right.  Mr. Brown, do you have any

9    I suppose redirect for this witness?

10             MR. BROWN:  Just a few, Your Honor.  Thank you.

11                 REDIRECT EXAMINATION OF RYAN TAYLOR

12   BY MR. BROWN:

13   **Q.**  Special Agent Taylor, from March 21st to the May 8

14   arrest, did the defendant talk about having a hoax distress

15   call made as part of his plan to kidnap a federal agent --

16   or law enforcement?

17   **A.**  Yes.

18   **Q.**  And, in fact, on multiple occasions did he talk about

19   having a hoax distress call made as a way to lure officers

20   to an area?

21   **A.**  Yes.

22   **Q.**  And, in fact, on May 8, was the fact that a hoax call

23   was made consistent with the plan that the defendant

24   repeatedly talked about both in Discord and in person?

25   **A.**  Yes.

1    **Q.**  On May 8, was there an agreement among the CHS's and

2    the defendant about carrying firearms?

3    **A.**  Yes.

4    **Q.**  What was that agreement to the best of your knowledge?

5    **A.**  So the confidential human sources and Mr. Ferguson had

6    agreed, because it was the dry run, they did not want to get

7    caught in the national park by park rangers or another law

8    enforcement in the area with any type of weapon on them.  So

9    they agreed that for the dry run, they were going to what's

10   called a sanitary run, no knives, no guns, no weapons so

11   that they can move freely in and about the woods.

12       They were also concerned because it was hunting season

13   and things like that, and they didn't want to be caught in

14   the woods with a weapon.

15   **Q.**  And did the defendant object to this plan?

16   **A.**  No.

17   **Q.**  In fact, did he agree to this plan?

18   **A.**  Yes.

19   **Q.**  Have a sanitary run?

20   **A.**  Yes.

21   **Q.**  In fact, at this time, did he possess a firearm that

22   you know of?

23   **A.**  A possessed firearm on him in the park or --

24   **Q.**  No, just in general.

25   **A.**  Sorry.  You are coming in a little broken there.

1    **Q.**  But not in the park, but in general did he possess a

2    firearm?

3    **A.**  That is correct.

4    **Q.**  What kind of firearm?

5    **A.**  He had an AR-15 rifle.

6    **Q.**  Did he make any comments about an AR-15 while he was in

7    the park on May 8?

8        Did he make a comment about putting one round in a law

9    enforcement officer's head and having 29 left over?

10   **A.**  Yes.

11   **Q.**  Did he talk about setting up sniper positions on hills

12   or in one of the houses, so if law enforcement came up from

13   that way, he could shoot at them?

14   **A.**  Yes.

15   **Q.**  So based on your training and experience and knowledge

16   of this case, was a firearm part of a plan to kidnap or a

17   plan to carry out a kidnapping, even though he didn't have a

18   firearm during the dry run?

19   **A.**  That is correct.

20   **Q.**  Did he did -- do you know if he, in fact, stayed around

21   and watched to see if officers responded to the fake

22   distress call on May 8?

23   **A.**  That is correct, he did.

24   **Q.**  And did he, in fact, make any statements before he was

25   arrested about what he saw?

1   **A.**   He made -- they talked about from where he was from his

2   observation, how many vehicles, how many officers he thought

3   had responded to the scene, along with the -- which way they

4   came in and also noting the time.

5   **Q.**   Now, Special Agent Taylor, based on your review of the

6   Discord chats and the in-person conversations with CHS, was

7   the -- were the actions taken by the group on the dry run

8   consistent with the planning and the steps suggested by the

9   defendant during those chats and conversations?

10  **A.**   Yes.

11          MR. BROWN:   No further questions, Your Honor.

12  Thank you.

13          THE COURT:   All right.   I believe that concludes

14  the questioning of this witness.

15          So, Officer Taylor, you can leave if you wish to,

16  but you don't have to.

17          At this time, we will hear brief argument from

18  both sides as to the probable cause determination, keeping

19  in mind that the standard is a totality of the

20  circumstances, standard, that is, given all the

21  circumstances, is there a fair probability that the accused

22  has committed the crime that he is charged with.

23          And in this case, he's charged with attempted

24  kidnapping under Title 18, United States Code, Section

25  1201(a)(2)(5) and (d).

1          All right.  So starting with counsel for the

2     United States.

3          MR. BROWN:  Thank Your, Your Honor.

4          Your Honor, the government's position is that the

5     standard for proceeding to the grand jury has been met.

6          Certainly viewing the totality of the

7     circumstances as contained in the affidavit and also the

8     testimony provided today by Special Agent Taylor, the

9     elements to support a probable cause finding of attempted

10    kidnapping of both, an act occurring on the federal -- on

11    federal property and two federal officers has been met.

12         The affidavit and also Special Agent Taylor

13    testified that the chats began in March, proceeded through

14    April.  And certainly as stated in the affidavit, there were

15    multiple statements of planning and steps that the defendant

16    felt should be taken centered around going to a remote

17    location, the use of weapons, the need of weapons, and also

18    the commitment of actions that were going to be necessary to

19    effectuate this kidnapping and then ultimate death.

20         The defendant talked about immobilizing agents or

21    law enforcement officers, either through the use of force or

22    threatened use of force, that he talked about how to lure

23    them out so their defenses would be down, where they would

24    be less suspecting of what was going to happen, like a

25    distress call, and I believe he said that a female calling

1       would achieve that even better than the male calling.

2              And then because of the remote location, they

3       would be able to detain, seize their weapons, seize them,

4       and if need be, dispose of their bodies.

5              So those chats were fairly and consistently put

6       out there on the Discord chat from March through April and

7       also repeated to the confidential human source on May 2 at

8       Belden Park.

9              Furthermore, on the day of the dry run, they did

10      talk about and agree to having a dry run, one without

11      weapons so they wouldn't get caught, so they would be able

12      to practice at a location what they thought they wanted to

13      do and how they would react.

14             They, in fact, took all the steps remotely.  They

15      staggered the location.  They placed the distress call.  And

16      during the scouting time, the defendant made statements

17      consistent with the plans he had been making from March

18      until May 8 and also consistent with the idea that this was

19      a dry run in preparation for what they were going to do, the

20      kidnapping and any other acts that they were going to have

21      to take, including threats or actual physical force,

22      violence, including death.

23             Your Honor, the fact that he did not have a

24      firearm, I think, is -- if anything, it actually supports

25      the steps of planning that was represented.  This was a dry

1    run, and as Special Agent Taylor testified, the lack of

2    weapons was important to the planning stage of this as a dry

3    run so they didn't get caught, so that they did have time to

4    make the hoax call, to see the response, so they would know

5    the next time that this happens, they would be able to

6    respond the way they wanted to, and they would be able to

7    control the attempted -- well, at that point, a kidnapping,

8    because this is the attempt.

9            Your Honor, set forth I think over the span of the

10   15 pages is more than enough facts of planning,

11   follow-through and coordination that supports a finding of

12   probable cause for the charges of 1201(a)(2) and (a)(5) and

13   (d), the attempted kidnapping.

14           Thank you, Your Honor.

15           THE COURT:  Ms. Kucharski.

16           MS. KUCHARSKI:  Thank you, Your Honor.

17           Obviously, Your Honor, in these types of

18   situations, the defense is always at a handicap coming in

19   when we don't have the entire conversations, but we have

20   snippets here and there and just bits and pieces that the

21   government decides to craft together in a criminal complaint

22   to support probable cause.

23           And, you know, we do agree, probable cause is just

24   that, probable cause.  You know, it doesn't require, at this

25   stage, proof beyond a reasonable doubt.  It's basically, I

1    guess if you're going to look at it in percentage-wise, you

2    know, anything over 50 percent, 51 percent or higher.

3         I just point out that the defense is at a severe

4    disadvantage because we don't have the entire conversations,

5    but we do know little snippets here and there that a

6    confidential human source, not just one, but two were

7    introduced in this case.

8         We know that the confidential human source is the

9    one that picked the location that had Mr. Ferguson meet him

10   there, that once they met there was then -- Mr. Ferguson was

11   then driven to another location, and that was all at the

12   doing of the confidential source.

13        There were no firearms.  Nobody was seized.

14   Nobody was kidnapped.  Nobody was abducted.

15        So right now, this is a lot of talk, but really

16   with no action that really substantiates anything by

17   Mr. Ferguson, because Mr. Ferguson is not the one who placed

18   the hoax call.  Certainly he was there.

19        And right now, the complaint is crafted as an

20   attempted kidnapping, but I would submit to the court that

21   the government hasn't presented probable cause on an

22   attempted kidnapping based on the fact that Mr. Ferguson

23   didn't place the hoax call and Mr. Ferguson was not armed

24   with any type of weapon, and he was brought to that location

25   by the confidential human source.

1          So for those reasons, we would ask the court to

2     dismiss the complaint.

3          THE COURT:  All right.  As I indicated earlier,

4     the standard for determining probable cause is the totality

5     of the circumstances.

6          In this case, circumstances are those set forth in

7     the affidavit attached to the criminal complaint, as well as

8     in the additional testimony here today from the agent.

9          And the charge here is not kidnapping.  It is

10    attempted kidnapping.  And that obviously is a difference.

11    I understand that defendant feels that they're handicapped

12    without having all the information that law enforcement has

13    or not -- don't have access currently to all of the

14    conversations, the totality of the conversations.

15         That is a situation that, of course, it's not

16    unique to this case, but probably in most probable cause

17    determinations following the filing of the criminal

18    complaint.  That situation does exist.

19         The court must do the best it can based on what is

20    before it.

21         The fact that the defendant did not place the

22    call, I think, is not really all that persuasive, although,

23    a great deal of weight is placed on it by defense counsel.

24         If the defendant was the architect of the overall

25    plan and the persons accompanying him were charged with

1     carrying out pieces of the plan, it doesn't matter, I don't

2     believe, that the defendant did not personally make the

3     call.

4            So the defendant had apparently, according to the

5     evidence as we understand it, outlined a plan.  He's done

6     that not just on one occasion, but had been consistent over

7     the course of a couple months in developing that plan that

8     would result in a kidnapping and potential harm to law

9     enforcement.

10           He had gone so far as to, you know, detail some of

11    the pieces of the plan that he felt were necessary.  It

12    would be necessary to have firearms.  He did, in fact, have

13    an assault rifle and he had ammunition for the assault

14    rifle.

15           Again, I don't think it's particularly important

16    or persuasive that he didn't have that assault rifle with

17    him on the occasion of the dry run.  The fact that the

18    defendant and the confidential sources elected and decided

19    not to have weapons with them on that dry run doesn't take

20    away from the evidence as the overall plan and to the part

21    that the dry run played in the overall plan.  The dry run

22    was a dry run.  It was not actual implementation of the

23    final objective of the plan.

24           The fact that a dry run occurred at all, I think,

25    is consistent with the defendant having a number of

1   communications, outlined what he felt was the way that this

2   should be carried out and that is there needed to be a call

3   that was a hoax call, in effect, that would be made that

4   would draw law enforcement to a remote location.

5        I understand that he did not select the precise

6   location where the dry run was done, but he did describe

7   what he felt needed to be in place.  They needed a remote

8   location.  They needed a call to be made that would draw law

9   enforcement.  Those things were done on May 8 to draw law

10  enforcement.  They didn't have firearms with them because it

11  was a dry run.  I don't think there's anything inconsistent

12  about that.

13       You know, I can see where later on during the

14  course of this case, there may be defenses that the

15  defendant can attempt to flush out and develop more facts on

16  with regard to his role versus the respective roles of the

17  confidential human sources.

18       But at this juncture, I think that the prosecution

19  has presented enough to constitute probable cause that the

20  crime was committed and that it was committed by this

21  defendant.

22       Accordingly, this case -- you know, I will find

23  that probable cause has been demonstrated for the charge

24  made against this defendant.

25       The defendant has waived his right to a detention

1    hearing.  So at this time, Mr. Ferguson, you will be

2    detained pending further proceedings in the case.

3            MS. KUCHARSKI:  Your Honor, I just want to clarify

4    for the record.

5            Mr. Ferguson has waived detention at this juncture

6    because we're trying to secure a location for him to go to

7    because the residence of his father right now, his father

8    has to leave and relocate, and I did discuss this with the

9    government, and the government is aware that once the father

10   or another location is secured, that the defendant,

11   Mr. Ferguson, will be presenting to the court a request for

12   bond at that time.

13           So I just wanted to be clear on any form that he

14   signs that this was discussed with the government and they

15   are aware that this will be coming and they don't have an

16   objection to us bringing up the issue on that later date.

17   It's not to say that they will agree he will get a bond, but

18   they're aware that it will be presented.

19           THE COURT:  So if his circumstances should change,

20   he certainly can raise that at a later date.  And I take it

21   that's what you are saying.  You believe there may be a

22   change in the circumstances such that while he doesn't have

23   a place to go right now, he may have a place to go some

24   point in the future.

25           MS. KUCHARSKI:  That's correct.

1          THE COURT:  Okay.  I understand what you're

2     saying.

3          He probably -- did he sign a waiver form, but it

4     generally does contain the language that he reserves the

5     right to raise the issue at a later date if his

6     circumstances should change.  That's usually in that form.

7          MS. KUCHARSKI:  And I don't know because I didn't

8     see the form, but Heather did indicate that she was going to

9     send a form down for him to sign.  So I just thought it best

10    that I place something on the record should there be a

11    question about it later.

12         THE COURT:  That's the standard form.

13         Okay.  Was there anything else?

14         MS. KUCHARSKI:  No, Your Honor.

15         THE COURT:  Okay.  Anything from the government?

16         MR. BROWN:  Sorry, Your Honor.

17         Nothing from the government.  Thank you.

18         THE COURT:  All right.  And, Mr. Ferguson, you

19    will be remanded to the custody of the United States

20    marshal.

21         Mr. Ferguson looks like he was waving his hand.

22         Do you wish to speak with your attorney,

23    Mr. Ferguson?

24         THE DEFENDANT:  I am not sure if I am allowed in

25    front of anyone, or should I talk to my attorney before I

1    say it?

2              THE COURT:  I don't know what you're going to say.

3              MS. KUCHARSKI:  I would prefer that you not say

4    anything at this juncture, and you and I will talk after

5    this hearing.

6              THE DEFENDANT:  Okay.

7              THE COURT:  So at this time, he will be remanded

8    to the custody of the United States Marshals pending further

9    proceedings.

10             And that concludes this hearing.  Thank you.

11              C E R T I F I C A T E

12        I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled

14   matter.

15                   s/Lori A. Callahan_____
                     Lori Ann Callahan, RMR-CRR
16                   U.S. District Court, Suite 568
                     2 South Main Street
17                   Akron, Ohio  44308
                     (330) 252-6022

18

19

20

21

22

23

24

25

1                           I N D E X

2

3

DIRECT EXAMINATION OF RYAN TAYLOR      10        2
4     BY MS. KUCHARSKI
      REDIRECT EXAMINATION OF RYAN TAYLOR   33        11
5     BY MR. BROWN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25