1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
2                          EASTERN DIVISION

3       ------------------------------X
        UNITED STATES OF AMERICA,      :  Case No. 5:20-cr-00262
4                                      :  Cleveland, Ohio
                    Plaintiff,         :
5                                      :  Tuesday, May 4, 2021
             v.                        :  9:06 a.m.
6                                      :
        CHRISTIAN FERGUSON,            :  **VOLUME 1 - JURY TRIAL**
7                                      :  *(Pages 1 - 244)*
                    Defendant.         :
8       ------------------------------X

9

10

11              TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12          BEFORE THE HONORABLE SOLOMON OLIVER, JR.

13            SENIOR UNITED STATES DISTRICT JUDGE

14

15

16
        Court Reporter:          Donnalee Cotone, RMR, CRR, CRC
17                               Realtime Systems Administrator
                                 United States District Court
18                               801 West Superior Avenue
                                 Court Reporters 7-189
19                               Cleveland, Ohio 44113
                                 216-357-7078
20                               donnalee_cotone@ohnd.uscourts.gov

21

22

23

24      Proceedings recorded by mechanical stenography, transcript

25      produced by computer-aided transcription.

```
 1    APPEARANCES:

 2

 3    For the Government:      DUNCAN T. BROWN

 4                            JEROME J. TERESINSKI

 5                            Assistant United States Attorney

 6                            801 West Superior Avenue

 7                            Suite 400

 8                            Cleveland, Ohio 44113

 9                            216-622-3600

10                            duncan.brown@usdoj.gov

11                            Jerome.Teresinski2@Usdoj.Gov

12

13

14    For the Defendant:      JOHN J. RICOTTA, ESQ.

15                            910 IMG Center

16                            1360 East Ninth Street

17                            Cleveland, Ohio 44114

18                            216-241-0715

19                            jjricotta@aol.com

20

21    ALSO PRESENT:           Kurt Dirker, FBI Special Agent

22

23

24

25
```

1                          **I N D E X**

2                                                      **PAGE**

3     APPEARANCES........................................   2

4     COURT'S PRELIMINARY INSTRUCTIONS...................   5

5     OPENING STATEMENT BY TERESINSKI....................  14

6     DIRECT EXAMINATION OF RYAN M. TAYLOR...............  32
      BY MR. BROWN
7
      CROSS-EXAMINATION OF RYAN M. TAYLOR................  82
8     BY MR. RICOTTA

9     REDIRECT EXAMINATION OF RYAN M. TAYLOR............. 106
      BY MR. BROWN
10
      DIRECT EXAMINATION OF CONFIDENTIAL HUMAN SOURCE ... 108
11    2-STEVE
      BY MR. BROWN
12
      CROSS-EXAMINATION OF CONFIDENTIAL HUMAN SOURCE .... 164
13    2-STEVE
      BY MR. RICOTTA
14
      REDIRECT EXAMINATION OF CONFIDENTIAL HUMAN ........ 185
15    SOURCE 2-STEVE
      BY MR. BROWN
16
      DIRECT EXAMINATION OF ANGELA BUDD.................. 194
17    BY MR. TERESINSKI

18    CROSS-EXAMINATION OF ANGELA BUDD................... 204
      BY MR. RICOTTA
19
      REDIRECT EXAMINATION OF ANGELA BUDD................ 209
20    BY MR. TERESINSKI

21    DIRECT EXAMINATION OF KURT DIRKER.................. 211
      BY MR. TERESINSKI
22
      CROSS-EXAMINATION OF KURT DIRKER................... 225
23    BY MR. RICOTTA

24    REDIRECT EXAMINATION OF KURT DIRKER............... 240
      BY MR. TERESINSKI

25

1             I N D E X (Continued)

2                                                       **PAGE**

3    RECROSS-EXAMINATION OF KURT DIRKER................. 242
     BY MR. RICOTTA

4    AFTERNOON SESSION,................................. 133

5    CERTIFICATE....................................... 244

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                   1              MORNING SESSION, TUESDAY, MAY 4, 2021

                   2              (Proceedings reconvened at 9:06 a.m.)

                   3           (In Open Court - Jury and Defendant Present)

                   4                            - - -

09:08:51   5              THE COURT:  You may be seated.

                   6              COURTROOM DEPUTY:  Your Honor, the case before

                   7    the Court carries Case Number 20-cr-262, *United States of*

                   8    *America v. Christian Ferguson.*

                   9              THE COURT:  Good morning.

09:09:07  10              PARTICIPANTS EN MASSE:  Good morning.

                  11              THE COURT:  So as I said yesterday, I would

                  12    just swear you in and then give you some preliminary

                  13    instructions, which I did, and then I indicated, I think,

                  14    that I would give you more detailed preliminary instructions

09:09:26  15    this morning, and then after the preliminary instructions,

                  16    we'll be ready to move right into the case with opening

                  17    statements.

                  18         Let me just say first that we have 12 jurors that can

                  19    deliberate in a case.  That's a constitutional requirement

09:09:49  20    in federal law, but we always choose one or two, depending

                  21    on how long the case goes, or more, additional jurors.

                  22         During the course of the trial, all 14 of you are

                  23    exactly the same.  You have exactly the same obligation, and

                  24    you must consider yourself a juror in every way.

09:10:12  25         When we get to deliberations, we'll have to determine

1    what the situation is.  If we have not lost any jurors for

2    any reason, then the two alternate jurors are thanked for

3    their service but asked to not talk about the case until

4    deliberations are over.  Because even during deliberations,

09:10:30   5    if we lost a juror, it's possible that we could call you

6    back.  So we stay in contact with you.

7         So I just wanted to explain that because it's

8    important that you know that.

9         But the responsibilities of alternate jurors, 13 and

09:10:48  10    14, are exactly the same, and you will be involved in

11    exactly the same way throughout the course of the trial.

12    You should not take it -- your responsibilities any

13    differently than those of the other jurors, and all should

14    be very aware and alert to their responsibilities.  So I

09:11:09  15    wanted to say that first.

16         Now, I'm going to give you these preliminary

17    instructions now to guide you, and then we'll go from there.

18         Now that you've been sworn, these instructions are

19    given to guide your participation in the trial.  It will be

09:11:26  20    your duty to find from the evidence what the facts are.  You

21    and you alone will be the judges of the facts.  You will

22    then have to apply to those facts the law as I will give it

23    to you, and you must follow that law whether you agree with

24    it or not.

09:11:42  25         Nothing I say or do during the course of this trial is

1    intended to indicate or should be taken by you as indicating

2    what your verdict should be.

3         The evidence from which you will find the facts will

4    consist of the testimony of witnesses, documents and other

09:12:00  5    things received into the record as exhibits, and any facts

6    that the lawyers agree to or stipulate to, or that the Court

7    may instruct you to find.

8         Now, certain things are not evidence and must not be

9    considered by you as evidence.  And I will list them for you

09:12:17  10   now.

11        Statements, arguments, and questions by lawyers are

12   not evidence.  Objections to questions are not evidence.

13   Lawyers have an obligation to their clients to make

14   objections when they believe evidence being offered is

09:12:31  15   improper under rules of evidence.  You should not be

16   influenced by the objection or by the Court's ruling on it.

17   If the objection is sustained, ignore the question.  If it

18   is overruled, treat the answer like any other.  If you are

19   instructed that some item of evidence is received for a

09:12:51  20   limited purpose only, you must follow that instruction.

21        Testimony that I may exclude or tell you to disregard

22   is not evidence and must not be considered by you.

23        Anything you may have seen or heard outside the

24   courtroom is not evidence.  It must be disregarded.  You are

09:13:08  25   to decide this case solely on the evidence presented here in

1    the courtroom.

2         Now, there are two kinds of evidence, direct and

3    circumstantial.  Direct evidence is direct proof of a fact

4    such as testimony of an eyewitness.

09:13:24  5         Circumstantial evidence is proof of facts from which

6    you may infer or conclude that other facts exist.  I will

7    give you further instructions on these as well as other

8    matters at the end of the case.  But keep in mind that you

9    may consider both kinds of evidence.

09:13:41  10         It will be up to you to decide which witnesses to

11    believe, which witnesses not to believe, and how much of any

12    witness's testimony to accept or reject.  I will give you

13    some guidelines for determining the credibility of witnesses

14    at the end of the case.

09:13:57  15         Now, as you know by now, this is a criminal case.

16    There are three basic rules about a criminal case that you

17    must -- that you must keep in mind:

18         First, the defendant is presumed innocent until proven

19    guilty.  The indictment brought by the Government against

09:14:16  20    the defendant is only an accusation, nothing more.  It is

21    not proof of guilt or anything else.  The defendant,

22    therefore, starts out with a clean slate.

23         Second, the burden of proof is on the Government until

24    the very end of the case.  The defendant has no burden to

09:14:37  25    prove his or her innocence or to present any evidence or to

1    testify.  Since the defendant has the right to remain

2    silent, the law prohibits you from arriving at your verdict

3    by considering the defendant may not have testified.

4         The third, the Government must prove the defendant's

5    guilt beyond a reasonable doubt, and I will give you some

6    further instructions on this point later.  But bear in mind

7    that in this respect a criminal case is different from a

8    civil case.

9         Now, I'm not going through the law here or anything

10   else, but I'm going to read this agreed statement about the

11   case that the lawyers have accepted.  It's a neutral way of

12   just telling you what the case is about.  I read it before,

13   but I will read it again now that you are jurors.

14        The above captioned case involves allegations that

15   defendant, Christian Ferguson, committed two counts of

16   attempted kidnapping in violation of federal law, and that

17   law is 18 United States Code Section 1201(a)(2) and (5) and

18   (d).

19        United States asserts that the victims in this case

20   were federal law enforcement officials carrying out their

21   official duties.

22        The United States in and through its indictment

23   asserts Christian Ferguson unlawfully attempted to seize,

24   confine, inveigle, kidnap and abduct federal officers of the

25   National Park Service Park Rangers, all of which occurred in

1    the Cuyahoga Valley National Park system located within the

2    Northern District of Ohio.  And, of course, Mr. Ferguson has

3    pled not guilty to these charges.

4        Now, let me say a few words about your conduct as

09:16:23  5    jurors.  You as jurors must decide this case, as I said

6    before, based solely on the evidence presented here within

7    the four walls of this courtroom.  This means that during

8    the trial you must not conduct any independent research

9    about this case, as I said yesterday.

09:16:40 10    The matters in this case and the individuals or

11    corporations -- and the individuals involved in the case.

12    In other words, you should not consult dictionaries or

13    reference materials, search the Internet, websites, or

14    blogs, or use any other electronic tools to obtain

09:17:00 15    information about this case or to help you decide the case.

16    Please do not try to find out information from any source

17    outside the confines of this courtroom.

18        Until you retire to deliberate, you may not discuss

19    this case with anyone, even your fellow jurors.  After you

09:17:17 20    retire to deliberate, you may begin discussing the case with

21    your fellow jurors, but you cannot discuss the case with

22    anyone else until you return a verdict and the case is at an

23    end.

24        Now, I know that many of you use cell phones or

09:17:33 25    something of that variety, almost everybody, BlackBerries

1      and so forth.  Also, the Internet and other tools of

2      technology.  I know I'm being redundant, maybe very much so,

3      but I think it's important.  You must not talk to anyone

4      anytime about the case or use these tools to communicate

09:17:56  5      electronically with anyone about the case.

6           I said yesterday, and I repeat, this includes your

7      family and friends.  You may not communicate with anyone

8      about the case -- again, being redundant -- on your cell

9      phone, through email, BlackBerry, iPhone, text messaging or

09:18:12 10      on Twitter, through any blog or website, including,

11      Facebook, My Space, LinkedIn or YouTube.  You may not use

12      any similar technology or social media, even if I have not

13      specifically mentioned it here.

14           I expect you will inform me as soon as you become

09:18:31 15      aware if another juror is violating these instructions.  A

16      juror who violates these restrictions jeopardizes the

17      fairness of these proceedings, and a mistrial could result

18      which would require the entire trial process to start over.

19           Finally, do not form any opinion until all the

09:18:50 20      evidence is in.  Keep an open mind until you start your

21      deliberations at the end of the case.

22           And I think that for all of you, you will find this

23      case interesting, and, obviously, noteworthy and important.

24           If you want to take notes during the course of the

09:19:03 25      trial, you may do so.  Now, in the old days, judges didn't

1     allow that.  Almost all judges said you can't take notes,

2     you just got to listen and you've got to remember and then

3     you got to go back and rely on your collective

4     recollections.  You still have to rely on your collective

09:19:22  5     recollections and also on your own recollection especially.

6     But you are allowed to take notes.

7            We all -- we all rely on notes.  We've come to rely on

8     them as lawyers, as judges.  And there's no reason to think

9     you would not possibly rely on notes.  Now, not everybody

09:19:38 10    does.  But it's difficult to take detailed notes and pay

11    attention to what the witnesses are saying at the same time.

12           So if you do take notes, be sure that your note-taking

13    does not interfere with your listening to and considering

14    all of the evidence.

09:19:55 15          Also, if you do take notes, do not discuss them with

16    anyone before you begin your deliberations.  Do not take

17    your notes with you at the end of the day.  Be sure to leave

18    them here in the jury room -- or in the jury room where you

19    will be when you're not in court.

09:20:09 20          If you choose not to take notes, remember that it is

21    your own individual responsibility to listen carefully to

22    the evidence.  You cannot give this responsibility to

23    someone else who is taking notes.

24           We depend on the judgment of all members of the jury.

09:20:28 25    You all must remember the evidence in this case.

1          Now the trial will begin.

2          First, the Government will make an opening statement,

3      which is simply an outline to help you understand the

4      evidence as it comes in.

09:20:44  5          Next, the defendant's attorney may, but does not have

6      to, make an opening statement.

7          Opening statements are neither evidence nor arguments.

8          And then after the opening statements, the Government

9      will then present its witnesses, and counsel for the

09:20:58 10      defendant may cross-examine them.

11          And following the Government's case, defendant may, if

12      he wishes, present witnesses whom the Government may

13      cross-examine.

14          After all the evidence is in, the attorneys will

09:21:11 15      present their closing arguments to summarize and interpret

16      the evidence for you, and then I will instruct you on the

17      law.

18          After that, you will retire to deliberate on your

19      verdict.

09:21:25 20          That concludes my preliminary instructions to you, and

21      so we are ready to proceed.

22          Let me ask counsel for the United States, are you

23      ready to make your opening?

24                    MR. TERESINSKI:  We are, Your Honor.

09:21:41 25                    THE COURT:  You may proceed.

1          MR. TERESINSKI:  Thank you.

2          "I'm down and I'm in."  Those are the words of this

3     defendant back on May 8th of 2020, when he was given a

4     choice, are you sure you want to go forward with this plan.

09:22:03 5     "I'm down, I'm in."

6          What was the plan?  The plan was to lure law

7     enforcement to an incredibly remote area where -- by using a

8     911 call, a domestic violence call.  The defendant wanted it

9     to come from a woman to ensure a police response.  And when

09:22:23 10    the police got there, or the law enforcement got to that

11    location, the defendant was going to ambush, take control of

12    the police officers by force, tie them up, take their gear

13    from their car, their ammo, their weapons, their vests --

14    they call them SAPI plates -- to take all those things and

09:22:47 15    to kill them, if necessary.  And to tell the world that the

16    Spartans are hunting police.

17          That was the plan.  That was the defendant's plan.

18          Your Honor, counsel, members of the jury, I have the

19    privilege, along with Assistant United States Attorney

09:23:07 20    Duncan Brown, to represent the United States.

21          This case and the evidence will show that all the

22    direct, circumstantial, and physical evidence of this

23    case -- in this case will show that the defendant -- his

24    plan was, and his intent and his actions, were to execute

09:23:24 25    his plan to specifically take down police just because they

Opening Statement - Teresinski                15

1    were police, just because they were law enforcement.

2         Now, what happened and how did it happen?  How did we

3    get here from May 8th -- or to May 8th of 2020?  To

4    understand that, you have to go back to mid-March, and in

09:23:49  5    mid-March of 2020, a tip came into the FBI about someone

6    online expressing extremist comments, extremist statements

7    about killing police, and the FBI had to investigate.  They

8    investigated it.  And online, you will hear testimony about

9    a confidential human source that the FBI -- a person by the

09:24:13 10    name of Guiness -- that the FBI had communicate with this

11    person.  They had to see, is this real?  What is this all

12    about?

13         The communications were on Discord, and it was the

14    defendant communicating on Discord, and the evidence will

09:24:29 15    show that it was the defendant in chat, in texts, and in

16    statements on Discord.  Discord is a platform.  I don't

17    really know much about it.  But it's a platform where you

18    can communicate.

19         And the evidence will show that the defendant vetted

09:24:46 20    people who he wanted to tell his plan to, and he put it out

21    there, that he vetted people to see if they were law

22    enforcement, that he put his plan out there and told the

23    world about it.  And then when he connected with Guiness, he

24    told Guiness that he wanted training.

09:25:01 25         So we have words and his actions now.  So his words

1     now online, between mid-March to end of April, are now going

2     from just words to actions.  And he wants to have a meeting

3     and he wants to meet up with Guiness.  So what does he do?

4     There was a meeting on May 2nd of 2020, at Camp Belden here

09:25:23  5     in the Northern District of Ohio.  And it's -- Guiness wants

6     to also bring along a second confidential human source for a

7     number of reasons, which you'll hear about, but the bottom

8     line is he brings this other confidential human source, who

9     you will hear from the witness stand testify, he brings him

09:25:45 10     to Camp Belden with him.  His name is Steve.

11          And in Steve the defendant saw somebody who could be

12     part of his militia.  Someone who could train him on land

13     navigation and on quick strikes.  And so on May 7th, 2020,

14     the defendant went out there and met up with Guiness and

09:26:04 15     with Steve, and when they got there -- I think it was around

16     mid-day, within 15 minutes, probably within 15 minutes -- it

17     was within minutes, the defendant talked about his plan with

18     two guys he only knew the first name, Guiness and Steve.  He

19     talked about his plan to take, down, and ambush, kill, if

09:26:26 20     necessary, law enforcement.

21          So he talked to -- so when he got there, he says

22     that -- but more importantly he then shows, you know, in the

23     sand, very much like the military plans out, you know, their

24     actions and their operations.  He shows in the sand what it

09:26:42 25     is he really wants to do and how he wants to ambush law

1    enforcement.

2         But most troubling, the evidence will show, is that

3    not only does he do those things on May 2nd in 2020, but he

4    shows up with a loaded AR.  Now, I don't know the technical

09:27:02  5    terms that AR stand for, but it's a big, long black gun, and

6    it's semiautomatic, and it was loaded.  So he meant

7    business.

8         So what did he have?  He had a plan.  He had personnel

9    now that he wanted to use, which he thought were not

09:27:20  10   confidential human sources, that he thought they were part

11   of his militia, part of who he wanted to work with to kill

12   police and to kidnap them and to ambush them.

13        So he had a plan and he had personnel.  And what he

14   needed then at that point was a base of operations, and a

09:27:40  15   place in which he could do a dry run essentially to see if

16   it would work -- to see if his plan would work, to gather

17   more information to then take it to the next level which is

18   the execution phase of his plan.

19        And so from May 2nd to May 8 -- on May 8th there was

09:27:59  20   another meeting, and on that day, on May 8th of 2020, it

21   wasn't the FBI's -- the confidential human sources who

22   picked the spot, it was the defendant who wanted to go out

23   to the Cuyahoga Falls National Park.  And when they got

24   there -- before they got there they met up at a Subway

09:28:22  25   restaurant at 4:30 in the afternoon -- excuse my voice --

1    and at 4:30 in the afternoon they made a decision to go in

2    one car.  Nobody forced the defendant to get in that car.

3    He got in that car and they talked amongst themselves.  And

4    as they talked, the defendant, again, laid out his plan

09:28:35  5    about wanting to ambush and tie up and kidnap and kill them,

6    if necessary, put one in the head one by one, and to -- and

7    to -- if necessary, to have to burn one of the vehicles that

8    the police come in order to hide fingerprints and to get rid

9    of the evidence.  He's telling both Guiness and Steve this

09:29:02 10    on the way to Cuyahoga Valley National Park, which you'll

11    hear is a federal property -- federal land.

12        And when he gets there, and all three get there, they

13    get out.  They walk up a hill, they walk up another hill --

14    you'll hear how out of breath some of them were -- and they

09:29:20 15    get up of this hill and they go down a ravine and they get

16    up to 500 Truxell Road.

17        The defendant -- there were three abandoned structures

18    on 500 Truxell Road in the Northern District of Ohio here,

19    and those three structures could serve, one of them could

09:29:35 20    serve as a base of operations so that the defendant could

21    see the response, see the response time of police and law

22    enforcement when they came there.

23        And part of this is that the FBI at this point needed

24    to manage the safety of everyone involved.  No one knew if

09:29:54 25    the defendant really had a weapon that day on May 8th.  He

1       was told not to bring a weapon because the FBI had to manage

2       the situation.  They didn't want somebody responding to a

3       911 call legitimately, like other police officers, coming to

4       the scene and having a problem at the scene.

09:30:10  5       So what the FBI -- so the defendant -- part of the

6       plan -- it's the defendant's plan -- the defendant wanted to

7       call 911, and he wanted to make it a domestic dispute so

8       that the police and the law enforcement could get there

9       quicker, that they would come quicker if a woman had made

09:30:28 10     the call.  That was his plan.  No one else's, his.  And the

11      evidence will show that the FBI, in managing the safety of

12      everyone involved, had Guiness, rather than find somebody

13      else to make that call.  And low and behold, that call went

14      is in to Special Agent Kurt Dirker, who is our lead case

09:30:51 15     agent on the case.  And along with Special Agent Kurt

16      Dirker, you'll hear from not only him, but also from Ranger

17      Angela Budd, who responded in marked cars with lights and

18      lights in the grill.  They weren't on, but he responded and

19      went to 500 Truxell Road to one of the structures, cleared

09:31:14 20     one of the structures.

21      Right before that 911 call was made, are you sure?

22      You know, there's no turning back, Guiness says.  There's no

23      turning back.  Are you sure you want to go through with

24      this?  Are we sure?  We all good?  He didn't hesitate, not

09:31:34 25     even once, but twice.  "I'm down, I'm in," and I'm -- those

1    are his words.  He had a chance, a choice, and he made that

2    choice.

3         So he had a plan.  He had personnel.  He had a spot

4    from which -- a base from which to operate, and he had a dry

09:31:54  5    run of sorts.  And he talked on -- and you'll hear how he

6    talked about the response time, the number of cruisers that

7    came, the number of police officers that came.

8         Now, if all the direct evidence -- and at that point,

9    once that happened, the FBI arrested the defendant.  And

09:32:14  10    I'll get to that in a second.

11         But all the direct, circumstantial, and physical

12    evidence in this case is going to show that the defendant's

13    intent was to ambush and kidnap law enforcement all

14    throughout this process, from -- his plan never changed from

09:32:30  15    mid-March through the end of April through May 2nd and

16    through May 8th.

17         You're going to hear -- you're going to see texts of

18    the defendant when it was in the words phase of his

19    operation for the Spartans, a militia group that he wanted

09:32:49  20    to start -- that he was starting.  Words.  You're going to

21    see videotape of the May 2nd, 2020, meeting.  You're going

22    to see a videotape of the May 8th, 2020, meeting as well.

23         And then which leads me to the next point.  You're

24    going to see videotape.  After the defendant was arrested,

09:33:13  25    he was brought back and processed, and he waived his *Miranda*

1    rights, and he gave a statement to both Special Agent Dirker

2    and Special Agent Ryan Taylor.  And for an hour and 50

3    minutes, one hour and 50 minutes, he talked about a plan, he

4    talked about an ambush, he talked about taking items from

09:33:36  5    law enforcement.  But he didn't take responsibility then.

6    He blamed it on Guiness for one hour and 50 minutes.  And

7    when the FBI went out and came back and said, hey, look, we

8    got Guiness's texts, at that point, the defendant, okay, it

9    was my plan.  I was going to ambush.  I was going to do all

09:33:59 10    these things, and it was wrong.  That's on a videotape as

11    well.

12         So you'll see direct, circumstantial, physical

13    evidence.  And when we get to the physical evidence part of

14    this, based upon everything that happened, FBI had search

09:34:14 15    warrants.  The FBI got a search warrant for his car.

16    Nothing was found in the car.  FBI got search warrants for

17    his phone.  We have texts and the other conversations and

18    communications that I just talked about.

19         And then we went to where he stayed, where he lived in

09:34:33 20    Philadelphia on Sherry Ave.  And at the execution of that

21    search warrant, we found that AR that he had brought to the

22    May 2nd meeting.  We found ammunition.  We found a helmet.

23    We found another helmet with the name Grinch on it which was

24    his online name, online moniker.  We found vests.  We found

09:34:57 25    more ammunition.  We found a gorilla warfare and special

1   operation field manual from the U.S. Army, which you can get

2   online, but it's -- you can get it, and it was there.

3       We found other items in this case that showed he used

4   the name Christopher MacTavish, along with his name

09:35:19 5   Christian Ferguson, and that's at the search.  That's the

6   physical evidence.  We'll bring in those items.  You'll see

7   photographs of that as well.

8       He's charged with two counts of attempted kidnapping.

9   The United States has to show, first, that the defendant had

09:35:36 10   the intent to kidnap.  And you look at his words, his

11   actions, and all the physical evidence as the Court

12   instructed and will instruct you later.

13       The second point that we have to prove is that he took

14   substantial steps in order to accomplish that plan.  And not

09:35:56 15   just one step here, there were multiple steps all the way.

16       When this case is done, and it's the evidence that

17   comes from that witness stand.  I turned the wrong way.

18   It's the evidence that comes from that witness stand that

19   matters.  You're going to hear all the direct,

09:36:11 20   circumstantial, physical evidence comes from that witness

21   stand.  And when we're done presenting our case and the case

22   is finished and the Judge instructs you, my colleague,

23   Assistant United States Attorney Duncan Brown, will come

24   back up here and ask for a verdict of guilty in this case,

09:36:26 25   because that's what the evidence will show.

1              "I'm down, I'm in.  And tell the world that the

2        Spartans are hunting the police.  Oh, it's because they're

3        police."

4              Thank you.

09:36:41   5              THE COURT:  Thank you, Counsel.

6              Will there be an opening statement for defendant?

7              MR. RICOTTA:  Yes, Your Honor.

8              Thank you.

9              THE COURT:  All right.  Mr. Ricotta.

09:36:53  10              MR. RICOTTA:  Thank you, Your Honor,

11       gentlemen, ladies and gentlemen.

12              Good morning.  How are you guys?

13              EN MASSE:  Good.

14              MR. RICOTTA:  This is opening statement.  This

09:37:05  15       is an opportunity for me to give you somewhat of a roadmap

16       of what I anticipate the evidence will be.  And in

17       litigation, there's always two sides to the story.  You just

18       heard the Government's version of what occurred on May 2nd,

19       May 8th, and I have a different interpretation of those

09:37:31  20       facts.

21              But ultimately, you 12 will decide who to believe,

22       what to believe, and what the evidence actually is.  And

23       then you'll be listening to the instruction of law from

24       Judge Oliver, and you'll apply the law to the facts.

09:37:50  25              Now, what you just heard sounds terrible, by all

Opening Statement - Ricotta                24

1       accounts.  I mean, it sounds like a vicious attack on law

2       enforcement.  But I think what you will learn from the

3       evidence is this is not the scenario that played out.

4           Let me tell you a little bit about Christian Ferguson

09:38:14  5     for a minute, because he's the defendant here.

6           You guys are going to hear the evidence.  You're going

7       to make a determination.  Whatever the determination is,

8       guilty or not guilty, I can live with it, the Government can

9       live with it.  Ultimately it's the defendant that has to

09:38:31 10     live with it for the rest of his life.  So it's most

11      important to him.

12          So what I'm trying to indicate to you is this is a

13      young man that at the time of the event was almost a year to

14      the date, okay?  We're talking, May 8th.  What is today?  I

09:38:48 15     don't even know.  May 4th?  He was 20 years old.

16          Now, let me tell you a little bit about this Discord,

17      okay?  Discord, from what I can gather, and I, like the

18      Government, we're the older guys here -- I don't know -- I'm

19      not that in tune with all this stuff, but I caught on.

09:39:11 20         And basically it's a chat room.  All right?  So he's

21      in a chat room, and you have to know, and you'll learn about

22      Mr. Ferguson, that since his 16th birthday, he has been

23      infatuated with being in the Marines and being in the Army,

24      and he has -- he's one of these kids that everything is

09:39:39 25     military with him.  He's 24/7 on Call of Duty.  I never

1    played the game, but I guess he's -- you know, he's on it

2    all the time.  From what I can gather from my investigation,

3    Assassin's Creed, this and that.

4         All right.  So you get this idea that you got a

09:40:00 5    20-year-old -- now, we got to keep this in perspective -- we

6    got a 20-year-old who wants to be a marine, who applies for

7    the Marines, is put on hold.  So he can't even get in.

8         He even moves to Indiana thinking that that will be a

9    better way for him to join the Marines.  He spends the whole

09:40:19 10   year in Indiana just to try to get into the Service.

11        He sets up this chat room, and the chat room -- and

12   this will come out during the course of the testimony -- is

13   five or six individuals.  Well, they have different

14   nicknames, and you'll see some of the evidence produced by

09:40:37 15   the Government are these conversations or chats between

16   these different individuals.

17        So he used Grinch75R: Which apparently is from one of

18   these games.  Okay?

19        There's another individual -- and the Government, I

09:40:55 20   think we'll find out -- they'll find out later -- named

21   Russ, who is a 14-year-old, okay, and he's chatting back and

22   forth with 75Grinch, and they're talking about making

23   chemicals and doing this and that.  Mind you, he's 14 years

24   old.

09:41:14 25        There's another individual in the group, the 75th

1       Spartans, that's Mike.  He's 15 years old.  Okay?  Russ's

2       girlfriend, who is supposed to be the girl that calls the

3       police, she's 14 years old.  Now, this is the militia, these

4       kids in a chat room.  All right?

09:41:41  5       Now, I understand when the FBI receives information

6       about a potential attack, or whatever you want to say,

7       whatever information they find -- I respect these guys,

8       believe me.  I know they have a tough job.  They have to

9       follow through and find out what's going on, and I

09:42:00 10       understand that.

11       But the problem that I have with the Government's case

12       is they jumped the gun in this case.  Okay?  Rather than

13       vetting out and finding out who these five or six members of

14       this 75th Spartans are, they decide that they're going to

09:42:22 15       bring in these confidential human resources, which they're

16       not law enforcement people.  This guy named Guiness is paid

17       $3,000 to go in there and infiltrate the 75th Spartans.

18       Okay?  He's paid over 25- to $30,000 over the years.  This

19       is what he does, I guess.  I don't know where they can find

09:42:49 20       these guys.  But I can tell you what little I know about him

21       is that he has a military background, and to this young kid,

22       he's like a hero to him.  Do you know what I'm saying?  He's

23       an ex-marine who is going to train him how to do things.

24       This is right up his alley.  He couldn't be happier.

09:43:13 25       And it's important to note that of the 75th Spartans,

1        whatever this group is called, all the people that are in

2        the chat room, he's never met any of them.  They're all over

3        the country.  You know, this is all over the Internet.  He's

4        never met anybody other than in these chat rooms.

09:43:35  5              Finally, he meets this Guiness.  Okay?  He's an older

6        man.  Now, he's not 20 like him.  I don't even know how old

7        he is.  I'm guessing he's 35, 40 years old.  I don't know.

8        We'll see maybe.  And another confidential source, number 2,

9        what is it?  Steve?  Another ex-marine.  And they begin

09:43:58 10       talking to him.

11              Now, what I want you to note -- see, I'm trying to

12       give you a roadmap -- so what I want you to note, which, I

13       think, is important, is the first meet and greet.  Okay?

14       See, he's never met anybody.  When he meets this guy Guiness

09:44:16 15       the first time, unfortunately for us, we don't know what was

16       said because that's not recorded.  Okay?  And I think that's

17       important.  We don't know what he told my client about what

18       they're going to do and how he's going to train him.

19              But that's not recorded.

09:44:39 20              But then, on the May -- then there's chats, and this

21       Guiness is telling him, he can find him a gun, and he can do

22       this.

23              Now, you got to remember, a criminal case is all about

24       intent.  Okay?  We don't lock people up for their thoughts

09:45:01 25       or what they say unless they cross the line and they do

1    overt acts, actions that can result in harm or things of

2    that nature.  The First Amendment gives us the right to say

3    almost anything beyond getting -- you know, it's a pretty

4    wide open protection.

09:45:24  5         The Second Amendment provides us with the opportunity

6    to bear arms.  Now, they'll bring that AR-15 in here and

7    they'll say it's operational.  But the bottom line, ladies

8    and gentlemen, is he had a right to bear arms.  He doesn't

9    have a record.  He lawfully purchased a gun.  And there's

09:45:51 10    nothing illegal about the gun.  He's not charged with the

11   gun.  You got to keep in mind what the charge is here.  The

12   charge is attempted kidnapping on May 8th.  That's very

13   important.  I can't stress that enough.  It's not what

14   occurred before, not what may happen in the future.  It's

09:46:07 15    May 8th.  That's the focus.  That's the charge.  That's the

16   indictment.  That's what I'm defending.  Okay?  That's

17   important.

18        So he has every right to have a gun.  They'll parade

19   that in.  They'll parade the ammunition in because it makes

09:46:23 20    their case look better.  But he had every right to have a

21   weapon.

22        On May 2nd they say Guiness told him to bring a gun.

23   Well, what they failed to tell you is that Guiness, through

24   the chat rooms, told them that they were going to go to a

09:46:42 25    shooting range.  There's nothing illegal about that.  But

1     when he got there to the place that they were meeting, there

2     was no gun range.  They never took the gun out.  He put it

3     back and he left.

4          So there are a lot of factors here that you're going

09:47:01  5     to have to consider.  But the most important thing I want to

6     stress to you is intent.  What was his actual intent?  Were

7     these merely guys that he talked to that talked him into

8     training and preparing for the eventual -- who knows what

9     these kids think today.  I don't know what they're talking

09:47:25  10     about.  Or is this a serious militia group, or is this a

11     bunch of kids that are on the chat room, and Special Agent

12     Taylor jumped the gun by bringing these two ex-marines in

13     and setting this whole thing up.  Because they set it up.

14     This is all Government.  I mean, my client didn't pick out

09:47:45  15     the national park, the federal national park, because if it

16     was in Cuyahoga Metroparks, it wouldn't be a federal case.

17     It had to be federal agents.  It had to be a federal park.

18     He didn't make those decisions.  He didn't call for the

19     police to respond on May 8th.  That was the Government's

09:48:08  20     guys.  It was Guiness.

21          The most important thing I want you to remember is

22     May 8th.  Okay?  You'll receive an instruction that mere

23     preparation -- preparation or a plan is not enough for

24     attempted kidnapping.  Okay?

09:48:29  25          On May 8th, he must have done some substantial acts in

1      furtherance of that kidnapping on that date.  Not in the

2      future, not earlier; on May 8th.  Okay?  And what do we have

3      on May 8th?  The way I see the evidence coming in is

4      May 8th, there's no weapons brought.  Okay?  They're merely

09:48:57  5      looking around at this location.  Guiness calls the park

6      rangers.  Special Agent Dirker responds with another park

7      ranger.

8           Now, how can they have a kidnapping?  What was the

9      furtherance of that act?  How were they going to kidnap --

09:49:18  10      how was he going to kidnap those two individuals?  He had no

11      weapon.  He never confronted those people.  In fact, the

12      plan was to run back to where their cars were because that's

13      what the Government wanted, and they were placed under

14      arrest.

09:49:37  15           Now, the Government will say, well, we did that for

16      everybody's safety.  Malarkey, boloney.  You charge this

17      kid, you got to prove it beyond a reasonable doubt.  They

18      jumped the gun in this case.  They jumped the gun by

19      bringing in the two confidential human resources, or

09:49:58  20      whatever the hell they call them, and they jumped the gun

21      when they arrested him on May 8th because there was no

22      attempted kidnapping.

23           Kidnapping -- you -- we all know what kidnapping is.

24      You'll get the instruction.  You have to restrain somebody,

09:50:14  25      hold them, tie them down, do something, stop their liberty,

1    force them from their movement.  Where was that?  How was

2    that even attempted?

3        So the case sounds great when you hear it.  But you

4    people are smarter than that.  Okay?  And I have complete

09:50:32  5    confidence that when you hear it and you put it in

6    perspective, and when you look at a bunch of 14-year-old

7    kids chatting in the chat room, this is no big malitia.

8        And I'm confident you'll come back and you'll acquit

9    the defendant.

09:50:48 10        Thank you.

11            THE COURT:  Thank you, Counsel.

12        The witnesses have been separated; is that right,

13    counsel?

14            MR. RICOTTA:  Yes, Your Honor.

09:50:58 15            MR. TERESINSKI:  That's correct, Your Honor.

16            THE COURT:  All right.  Will the Government

17    call your first witness.

18            MR. BROWN:  Thank you.

19        The United States of America calls Special Agent Ryan

09:51:10 20    Taylor.

21            THE COURT:  Go ahead and take the stand, sir.

22        Before you take your seat, my deputy will swear you

23    in.

24                (Witness sworn.)

09:51:58 25            THE COURT:  You may be seated.

1               MR. BROWN:  Thank you, Your Honor.

2          May I inquire of the witness?

3                    THE COURT:  You may proceed.

4                    MR. BROWN:  Thank you.

09:52:13  5          DIRECT EXAMINATION OF RYAN M. TAYLOR

6    BY MR. BROWN:

7    Q.    Will you please state your full name for the record.

8    A.    My name is Ryan M. Taylor.

9    Q.    And if it's more comfortable for you --

09:52:23 10               MR. BROWN:  May the witness take the mask off,

11   Your Honor?

12                    THE COURT:  You may.

13                    MR. BROWN:  Thank you.

14   BY MR. BROWN:

09:52:29 15   Q.    And by whom are you employed?

16   A.    The Federal Bureau of Investigation.

17   Q.    And in what capacity are you employed by the FBI?

18   A.    I'm a special agent on the joint terrorism task force.

19   Q.    And what are your duties on the joint terrorism task

09:52:43 20   force?

21   A.    I'm one of our bomb technicians, so I handle

22   post-blast investigations.  I also handle international

23   terrorism and domestic terrorism with an emphasis on the

24   domestic terrorism and right-wing extremists and malitia and

09:52:55 25   sovereign citizens.

1    Q.    And have you received training on those duties?

2    A.    Yes.

3    Q.    What sort of trainings have you received?

4    A.    I've gone to multiple -- multiple schools and further

09:53:08  5    education in all those categories.

6    Q.    And how long have you been a special agent?

7    A.    12 years.

8    Q.    How long have you been working on JTTF or domestic

9    terrorism matters?

09:53:20  10    A.    12 years.

11    Q.    And where you stationed currently?

12    A.    I'm out of the Richmond office, Charlottesville

13    Resident Agency.

14    Q.    That's in Virginia?

09:53:29  15    A.    Yes.

16    Q.    Okay.  And where were you before you were stationed in

17    Virginia?

18    A.    The Cleveland field office.

19    Q.    How long were you in the Cleveland field office?

09:53:36  20    A.    Just shy of 12 years.

21    Q.    And what did you do, if anything, before the FBI?

22    A.    I was in the United States Army as a captain in the

23    military police corps.

24    Q.    And how long were you with the Army?

09:53:47  25    A.    Approximately eight years.

Taylor (Direct by Brown)                    34

1    Q.    And what were your duties in the Army with the police

2    corps?

3    A.    I -- we handled military police operations on post,

4    and then overseas, I did detainee operations and also

09:54:01  5    training Afghan national police forces.

6    Q.    Now, in spring of 2020, where were you assigned?

7    A.    The Cleveland field office.

8    Q.    And that's Cleveland, Ohio, correct?

9    A.    Yes.

09:54:11 10    Q.    Now, generally, in your 12 years, how do cases come in

11    to the FBI?

12    A.    We usually receive a complaint or a lead.  Those can

13    come in many forms, either a walk-in complaint, somebody who

14    comes and verbally tells us, or we'll also receive

09:54:29 15    telephonic or email complaints.

16    Q.    Okay.  Now, you mentioned a lead.  What is a lead?

17    A.    A lead, that usually comes from an outside agency or

18    sometimes other law enforcement agencies or other field

19    offices that, through the course of their investigations,

09:54:42 20    they see something and they pass it on to us.

21    Q.    And what generally do you do when you're assigned a

22    lead?

23    A.    Usually when you're first assigned a lead, you'll look

24    at it, and we usually open up an assessment just to assess

09:54:55 25    the validity of the lead.

Taylor (Direct by Brown)                35

1      Q.    Okay.  And what goes into an assessment?

2      A.    So once we get an assessment, we open it up as a

3      guardian assessment.  We have multiple investigative levels

4      from assessment all the way up to a full investigation.  So

09:55:12  5   with an assessment, that -- usually that comes in, that's

6      just an allegation.

7            So once we have an allegation, we'll start to assess,

8      and we keep it at that level to do just baseline checks with

9      computer systems or just interview or reinterview the

09:55:28 10   complainant.

11     Q.    Okay.  And do all assessments result in full cases

12     being opened?

13     A.    No.

14     Q.    Why?

09:55:36 15   A.    The vast majority, once we do a little bit of

16     investigation, talk to some people, we find out that there's

17     no credibility to the threat or it doesn't warrant further

18     investigation.

19     Q.    Okay.  And in your training and experience, what

09:55:51 20   considerations go into converting an assessment or a lead

21     into a full case?

22     A.    As we start to do the assessment, we build up to where

23     we have articulable facts.  So that's where we delineate

24     between the assessment to a full.

09:56:06 25         An assessment, I sort of look at it as -- an

Taylor (Direct by Brown)                36

1        assessment is somebody who is given allegations.  So I look

2        at that as, like, there's smoke; we don't know if there's

3        fire yet.  If we bump it to a full, that means that we have

4        found articulable facts through the baseline investigations

09:56:19   5    that we have done, and now we think there's something much

6        more substantial, either criminally or potential terrorists.

7        Q.    Okay.  And is that your sole -- is that an agent's

8        sole decision, or is there consultation?

9        A.    There's consultation.

09:56:38  10    Q.    Now, in the spring of 2020, were you assigned or

11       became aware of any assessments?

12       A.    Yes.

13       Q.    And based on that, what, if anything, did you do?

14       A.    We received a lead from our -- from NTOC, which is the

09:56:52  15    National Threat Operations Center.  That's our national

16       online lead center where people can send either online or

17       verbal leads.  That was passed down to us.  And once we

18       received it, it was an allegation of an online threat where

19       people were talking about doing potential criminal activity.

09:57:12  20    Once we received that, we opened a guardian assessment.

21       Q.    Okay.

22                   MR. BROWN:  Now, without showing this to the

23       jury, could the witness be shown Exhibit 100?  Just the

24       witness.

09:57:32  25                   COURTROOM DEPUTY:  Let me see.  I don't know

Taylor (Direct by Brown)                    37

1    how we're going to do that unless we turn those around,

2    because it was usually just the witness monitors over here

3    that we were able to black out.  Let me figure this out.

4           Unless we can give him the hard copy?

09:57:47 5                    MR. BROWN:  Okay.

6           Your Honor, may I approach the witness?

7                    THE COURT:  You may.

8                    MR. BROWN:  Thank you.

9                    MR. RICOTTA:  Mr. Brown, which exhibit?  I'm

09:58:02 10   sorry.

11                   MR. BROWN:  Yeah, I'll -- 100.

12                   MR. RICOTTA:  Okay.

13          I have no objection to it.  So --

14                   MR. BROWN:  Your Honor, may we just publish

09:58:12 15   them?

16                   THE COURT:  You may.

17                   MR. BROWN:  Okay.

18                   THE COURT:  It shall be admitted without

19    objection.

09:58:20 20   BY MR. BROWN:

21    Q.   And, Special Agent Taylor, what is Exhibit 100?

22    A.   This was one of the posts that we received.  It had

23    username Grinch75R and then a picture of the individual.

24    Q.   Okay.  And do you recognize the individual in the

09:58:35 25   picture in court today?

Taylor (Direct by Brown)                    38

1    A.    Yes.

2    Q.    And could you point out who you recognize and what

3    he's wearing?

4                MR. RICOTTA:  (Indiscernible) identification,

09:58:45 5    Your Honor.

6                MR. BROWN:  Okay.  Your Honor, then the record

7    will show that the witness was pointing out the defendant.

8                THE COURT:  The record shall so reflect.

9                MR. BROWN:  Okay.  Thank you very much.

09:58:55 10   BY MR. BROWN:

11   Q.    Did you learn the name of Grinch75?

12   A.    Yes.

13   Q.    And what was that name?

14   A.    Christian Ferguson.

09:59:00 15   Q.    Okay.  Now, what happened next after getting that

16   lead?

17   A.    So we started doing our -- what we call our baseline

18   assessment.  So we started running database checks, and at

19   that point asked one of our confidential human sources to

09:59:16 20   start looking online at the Discord site to see if they

21   could find some of the postings that were referenced in the

22   complaint.

23   Q.    And did you, in fact, find a Discord site linked on

24   the defendant?

09:59:30 25   A.    Yes.

Taylor (Direct by Brown)                    39

1    Q.    And what was the name that was being used by the

2    defendant on that Discord site?

3    A.    Spartan 75.

4    Q.    Okay.  And just generally, in the course of your

09:59:41  5    investigation, did you learn about Discord?

6    A.    Yes.

7    Q.    What is Discord?

8    A.    Discord, it's a social media site.  Discord, it's a

9    free voice and video chat room app where you can set up

09:59:55 10    group servers, and then those group servers, you can --

11    they're all private.  So you can set up a private group

12    server, then have subservers below that.  And it's an all

13    invite-only chat room site.

14    Q.    Okay.  And when you say chat, website, is that voice

10:00:11 15    chat, is it typing chat?  What do you mean?

16    A.    Mostly typing chat, yes.

17    Q.    Okay.  Now, after locating that Discord page, what, if

18    anything, did you do?

19    A.    Once we started seeing some of the postings, they were

10:00:22 20    corroborated by what the -- those postings that we saw

21    corroborated with what the original complaint said, and then

22    we started seeing some more concerning posts related to

23    criminal acts.

24    Q.    Okay.  And based on those observations, what, if

10:00:38 25    anything, did you do?

1    A.    We then asked another confidential human source to try

2    to make contact with the leaders of that group.

3    Q.    Okay.  And did that -- how did the confidential human

4    source make contact on that website?

10:00:52  5    A.    He just went to the Discord Spartan 75 website.

6    Q.    Okay.  And was he using a screen name?

7    A.    Yes.

8    Q.    What was that screen name?

9    A.    Guiness.

10:01:04  10    Q.    Okay.  Now, I'd like to show you what's been premarked

11    as Government's Exhibit 101.

12              MR. BROWN:  Permission to approach the

13    witness, Your Honor?

14              THE COURT:  You may.

10:01:28  15    BY MR. BROWN:

16    Q.    Do you recognize that?

17    A.    Yes.

18    Q.    Okay.  And what do you recognize that to be?

19    A.    So this is the opening -- or the screen capture of the

10:01:38  20    Discord site, and you can see a listing -- this is typically

21    the list of friends of the user of the Discord site, and

22    then off to the left you'll see where they have direct

23    message, and then you'll also have the different group

24    servers on this homepage.

10:01:55  25    Q.    Okay.  So if -- and is this a fair and accurate copy

1    of the Grinch75 Christian Ferguson Discord page as you saw

2    it?

3    A.    Yes.

4           MR. BROWN:  Okay.  I'd like to post this to

10:02:08  5    the jury, then, Your Honor.

6           THE COURT:  Okay.  Any objections?

7           MR. RICOTTA:  No objection.

8           THE COURT:  You may publish.

9           MR. BROWN:  Okay.  Thank you.

10:02:13  10    BY MR. BROWN:

11    Q.    Okay.  Now, if you're looking at this, there's a

12    column called "Friends"?

13    A.    Yes.

14    Q.    Did you learn, like, what that column or what these

10:02:22  15    friends would be?

16    A.    Yes.

17    Q.    And what does that represent?

18    A.    Those are just the people that he has listed under as

19    his friends, so folks that he would have direct

10:02:34  20    communication with on this site.

21    Q.    Okay.  And there's a column next to it with sort of

22    photo circles.

23           Do you know what those are?

24    A.    Yes.  I believe those would be the subserver sites for

10:02:48  25    group sites.

Taylor (Direct by Brown)                          42

1    Q.    Are those called channels on Discord?

2    A.    Yes.

3    Q.    Did you learn if Grinch75R or the defendant maintained

4    any channels on his Discord site?

10:02:57  5    A.    The Spartan 75 channel.

6    Q.    Okay.  Were there any other channels the defendant

7    maintained?

8    A.    He had -- you mean -- he had individual chat channels

9    with members as well.

10:03:09 10    Q.    Okay.  And did you learn the names of those individual

11    chat channels?

12    A.    Yes.  So within the -- within the Discord, you can

13    have one group channel, and then you can have subchannels.

14    So some of the other subchannels he had was the Sparta,

10:03:23 15    Vanguard, Pilot.  These are all different secured channels.

16    Q.    And could any of his -- people in the friends column

17    go into, say, Vanguard or Pilot?

18    A.    He had to give them access to those.

19    Q.    Okay.  So some of those subchannels are restricted

10:03:40 20    access?

21    A.    Yes.

22    Q.    Okay.  So just to sum up, just so I'm clear as well,

23    so there are channels and subchannels which are chat rooms.

24          Was there any other way to message people?

10:03:51 25    A.    Yes.  You could do direct, one-on-one.

Taylor (Direct by Brown)                    43

1    Q.    So that's like a one-on-one chat?

2    A.    Yes.

3    Q.    Okay.  Now, did you observe, during the course of your

4    investigation, Guiness use subchannels and direct messaging

10:04:05  5    with the defendant?

6    A.    Yes.

7    Q.    Which channels did Guiness ultimately use?

8    A.    He used Sparta, Vanguard.  I believe he had access to

9    all of them, and then he did direct one-on-one chat.

10:04:23  10    Q.    And did you observe how Guiness got access to those

11    subchannels?

12    A.    He was granted access by Mr. Ferguson.

13    Q.    And did you observe direct messages also between

14    Guiness and the defendant?

10:04:36  15    A.    Yes.

16    Q.    Okay.  Now, prior to coming to Court, have you read

17    and reviewed Exhibits 102 through 130?

18    A.    Yes.

19    Q.    Okay.  And without disclosing the content, what are

10:04:47  20    they?

21    A.    They are various Spartan 75 group messaging -- message

22    boards.  Some of them are messages between Mr. Ferguson and

23    other members of the Spartan 75 group.  Others are direct

24    conversations he had with Guiness.

10:05:07  25    Q.    Okay.  And are they screenshots that you saw on the

Taylor (Direct by Brown)                    44

1   defendant's Discord pages?

2   A.    Yes.

3   Q.    And are they fair and accurate copies of those

4   screenshots?

10:05:16 5   A.    Yes.

6   Q.    Have they been edited or modified?

7   A.    No.

8          MR. BROWN:  Your Honor, in the interest of

9   time, we'd like to admit -- or offer 102 to 130 as a group.

10:05:29 10  I think we --

11         MR. RICOTTA:  Yeah, I have no objection.

12         THE COURT:  They shall be admitted without

13  objection.

14         MR. BROWN:  Thank you very much, Your Honor.

10:05:34 15  BY MR. BROWN:

16  Q.    Now, approximately what date did Guiness first make

17  contact with the defendant on Discord that you observed?

18  A.    I believe that was about April 14th.

19  Q.    Okay.  And by the way, were you in communication with

10:05:47 20  Guiness about his conduct on Discord?

21  A.    Yes.

22  Q.    Did you give him instructions on how to act on

23  Discord?

24  A.    Yes.

10:05:57 25  Q.    In sum and substance, what were those instructions?

Taylor (Direct by Brown)                                45

1    A.    He was to be an observer, try to make contact, try to

2    identify, because almost everybody on these sites are just

3    using usernames.  So he was asked to fully identify who was

4    behind the username, be an observer, see what is being

10:06:19  5    talked about, and relay any criminal or terrorist activity

6    back to us.

7    Q.    And as he was -- when he would go online, would you

8    debrief with him while he was on online, or after he was

9    online?

10:06:33  10    A.    After, yes.

11    Q.    Now, I'd like to show you what's been marked as

12    Exhibit 114.  1-1-4.

13          Okay.  And looking at the top of the page, what is the

14    date of the communication?  It says, @Guiness, correct?

10:06:56  15    A.    April 15th, 2020.

16    Q.    So this is basically one day, approximately, after he

17    was online?

18    A.    Yes.

19    Q.    Okay.  And lower on the page, does it change to a

10:07:08  20    different date?

21    A.    It goes -- yes, April 17th then.

22    Q.    Okay.  And what was Guiness asking about on the 17th?

23    A.    He was asking about meeting face-to-face.

24    Q.    Okay.  And, to your knowledge of Guiness's

10:07:30  25    conversations on Discord, was that -- was that an idea you

Taylor (Direct by Brown)                46

1    told him to float, or to propose?

2    A.    Yes.

3    Q.    Okay.  And what was the -- what was the defendant's

4    response to that?

10:07:42  5    A.    They started talking back and forth.  You see on here,

6    Guiness wrote, "For tomorrow?"

7          Or "Let's shoot for 3:00."  There's more back and

8    forth with tomorrow.  "Yes."  That will work.  Let's meet at

9    a restaurant.  And I'm paraphrasing a little bit there.

10:07:58 10          He goes, "Yeah.  I know a park that's near the

11   Metropark Zoo."  And then they -- and then Grinch75R, which

12   is Mr. Ferguson, wrote back the "4101 Fulton Park,

13   Cleveland, Ohio, 44144."

14   Q.    Okay.  So based on your review of this chat, who

10:08:19 15   proposed the location?

16   A.    Mr. Ferguson.

17   Q.    And who proposed the time?

18   A.    Mr. Ferguson.

19   Q.    Okay.  Now, did there come a time when you observed

10:08:27 20   other channels and direct messages with members of this

21   group?

22   A.    Yes.

23   Q.    And in observing those messages, did you observe

24   anything that would be relevant to the conversation about a

10:08:38 25   meeting?

Taylor (Direct by Brown)                    47

1    A.    Yes.

2    Q.    How would you describe the defendant's reaction with

3    we these other members on the group about a meeting with

4    Guiness?

10:08:48  5    A.    It seemed like he -- well, he was.  He was trying to

6    vet Guiness.  Otherwise, he was trying to have other members

7    ask about the background and trying to dig into who Guiness

8    was and whether it would be trustworthy to meet with him.

9    Q.    Okay.  So you said the word "vet" again.

10:09:06  10         What do you mean by vetting?

11   A.    Vetting is basically trying to do a background check

12   or to have an understanding of who somebody is -- or who

13   somebody -- who they are online, who they are in person,

14   what groups they may be a part of.

10:09:20  15   Q.    Okay.  And pulling up 108.

16         Did you observe this vetting with a user named

17   SecretAgentRandyBeans.

18   A.    Yes.

19   Q.    And what was discussed by SecretAgentRandyBeans.  I

10:09:42  20   think starting from the top of the page.

21   A.    The very first -- Grinch75R: "I know I'm going to get

22   there early, look for escape route, and look for suspicious

23   cars, check his ig" -- there's a couple of typos here --

24   "and I'll do some research.  He seems well, but my gut is

10:09:58  25   telling me be careful.  I trust you guys.  I need to know

Taylor (Direct by Brown)          48

1     how he found us and put a post in a bit back, but let me do

2     some homework on this."

3     Q.    Okay.  And does he further discuss with

4     SecretAgentRandyBeans logistics of the meeting?

10:10:17  5     A.    Yes.

6     Q.    And what does he say, if you reviewed anything

7     further?

8     A.    He goes on to say, "If you can make a smurf account.

9     He looks solid.  Posts same stuff as some.  He fits the role

10:10:34 10     of a heavy first sign of trouble, and I'm dipping only

11     backpack I got" -- that's RM -- is German shepherd."

12           SecretAgentRandyBeans then writes, "Bring gun and

13     knives."

14           Grinch75R: "I only have my AR."

10:10:53 15           SecretAgentRandyBeans: "What knives do you have?

16           A tanto, Smith and Weston."

17           And then he looks "like a solid knife."

18     Q.    And what is an AR based on your training and

19     experience and in the FBI?

10:11:05 20     A.    It's a semiautomatic rifle.

21     Q.    Is it consistent with the type the military uses?

22     A.    Yes.

23     Q.    Now, did he also talk further with

24     SpecialAgentRandyBeans [sic]?

10:11:18 25     A.    Yes.

Taylor (Direct by Brown)                    49

1    Q.    Okay.  Showing you 109, Exhibit 109.

2                   MR. RICOTTA:  I object to special agent.

3                   MR. BROWN:  That's his name.  He says -- or

4    I'm sorry.  SecretAgentRandyBeans.  Pardon me.

10:11:32  5         Your Honor, may the record reflect that it's

6    SecretAgentRandyBeans, not SpecialAgentRandyBeans.

7                   THE COURT:  The record will reflect that

8    correction.

9                   MR. BROWN:  Thank you, Your Honor.

10:11:42  10   BY MR. BROWN:

11   Q.    What further did he discuss with

12   SecretAgentRandyBeans?

13   A.    So SecretAgentRandyBeans: "You got to meet with him.

14   If you don't, he'll probably leave you."

10:11:49  15        Grinch75R: "I know I just didn't my mask yet.  So I

16   want to get caught before the bog starts."

17        SecretAgentRandyBeans: "Do you have a bandana or

18   something that will work too?"

19        Grinch75R: My respirator, I'll use that.  That way it

10:12:11  20   doesn't catch an extra eye."

21   Q.    Okay.  Let me interrupt you here.

22        Do you know what the bog is?

23   A.    I've seen the bog referenced throughout the country as

24   the boogaloo movement.

10:12:21  25   Q.    And what is the -- based on your training and

Taylor (Direct by Brown)                    50

1   experience as an FBI agent, what is the boogaloo movement?

2   A.    The boogaloo movement, it's an anti-Government,

3   anti-law enforcement pro-Second Amendment group.

4   Q.    Okay.  So he says he doesn't want to get caught before

10:12:35 5   the buke [sic], or the bog starts, right?

6   A.    Yes.

7   Q.    And by the way, do you see the defendant referencing

8   the bog in later posts?

9   A.    Yes.

10:12:47 10   Q.    Okay.  Now, did he also discuss with other members of

11   the group, of the chat group?

12   A.    Yes.

13   Q.    Okay.  Looking at Exhibit Number 110.

14         And this is with WWJWD?

10:13:09 15   A.    Yes.

16   Q.    And what, if anything, did the defendant ask WWJWD to

17   do?

18   A.    Well, the third line down from his first paragraph on

19   this page, "Also, if you can do some homework on the new

10:13:22 20   guy.  He got here pretty fast and didn't go through the

21   usual process.  I'm meeting in person to figure everything

22   out.  I put a nonexpiring ticket here and that's how he got

23   here.  Seems legit and he is ig, but we can't be too safe."

24   Q.    Okay.  And then this screen -- oh, I'm sorry.

10:13:40 25   A.    Yep.  And then he just shows a picture of the 75 -- or

Taylor (Direct by Brown)                    51

1       75th Spartan homepage on Discord.

2       Q.    Okay.  And had you seen that screenshot before with

3       the helmet?

4       A.    Yes.

10:13:50  5   Q.    And where had you seen that before?

6       A.    On the 75th Spartan Discord page.

7       Q.    Okay.  Was that part of Exhibit 100 as well?

8       A.    Yes, I believe so.

9       Q.    Now, when he says, "I need an M9 Beretta," do you know

10:14:05 10   based on your training and experience what that is?

11      A.    Yes.  That's a pistol.

12      Q.    And on what date did he say he needs an M9 Beretta

13      pistol?

14      A.    That was April 15th, 2020.

10:14:14 15   Q.    Okay.  And what is Level 3 sapping plates?

16      A.    I believe he's referring to ballistic body armor

17      plates.

18      Q.    Okay.  Is that a bulletproof vest?

19      A.    Those are the plates, yes, that you put in that

10:14:32 20   essentially makes it a bulletproof vest, yes.

21      Q.    Okay.  So those are plates that actually drop into a

22      vest?

23      A.    Yes.

24      Q.    And what is a deagle, if you know, based on your

10:14:42 25   training and experience?

Taylor (Direct by Brown)                        52

         1    A.    I believe he was referencing a Desert Eagle, which is

         2    a specific type of pistol.

         3    Q.    Okay.  And does he sound, based on your review -- or

         4    based on your review, what is the intent of him checking out

10:15:01 5    Guiness at this point?

         6                 MR. RICOTTA:  Objection, Your Honor.

         7                 THE COURT:  Okay.  Sustained.

         8                 MR. BROWN:  Thank you.

         9    BY MR. BROWN:

10:15:11 10   Q.    Based on your review of this chat, does he seem to

        11    have an opinion of Guiness at this point?

        12    A.    Yes.

        13    Q.    And what is that opinion, based on your review?

        14    A.    It seems like he wants to meet with him and have him

10:15:25 15   in the group, but he wants other members to vet him and to

        16    check his background and be cautious with him until they

        17    know more about him.

        18    Q.    Okay.  And now, does he ask other members to continue

        19    vetting as well?

10:15:41 20   A.    Yes.

        21    Q.    Okay.  If you could look at Exhibit 111.

        22                 MR. BROWN:  Thank you.

        23    BY MR. BROWN:

        24    Q.    And who does he ask at this point to vet Guiness?

10:15:57 25   A.    ViagraOverdose.

Taylor (Direct by Brown)                    53

1    Q.    Okay.  And is that another member on a private

2    channel?

3    A.    Yes.

4    Q.    Okay.  And then if we look at Exhibit 112.

10:16:21  5         Does it appear based on your review that this

6    individual named ViagraOverdose is, in fact, doing a vetting

7    process on Guiness?

8    A.    Yes.

9    Q.    And what does he say about Guiness that he found out?

10:16:35  10   A.    So ViagraOverdose on April 15th, wrote:  "Guiness is

11   okay so far.  Be careful with him.  He says he's been to

12   sniper school, in the rangers, and infantry, and airborne.

13   All in eight years in the Army.  He seems a bit fishy, but

14   not dangerous.  He could be useful, but don't get too

10:16:55  15   comfy."

16   Q.    Okay.  And did there come a time when the defendant

17   came to a conclusion about Guiness?

18   A.    Yes.

19   Q.    And if you could go to Exhibit 115.

10:17:04  20        And this is a conversation with WWJWD again.

21        And what was the conclusion that the defendant came to

22   if you can tell from this text?

23   A.    Yes.  So about halfway down from this page, you see

24   WWJWD on April 15th, 2020.  "Guiness is good to go based on

10:17:29  25   the people I've talked to.  He seems to be -- or affiliated

Taylor (Direct by Brown)                    54

```
           1    with the ODF and has for three, four year.  He's solid."

           2    Q.    Okay.  And what is ODF?

           3    A.    The Ohio Defense Force.

           4    Q.    Okay.  How would you characterize Ohio Defense Force

10:17:42   5    based upon your training and experience?

           6    A.    They are a militia group, anti-Government, pro Second

           7    Amendment.

           8    Q.    Okay.  And what -- based on that, what does Grinch

           9    conclude, about four lines, three lines down?

10:17:56  10    A.    He writes then, "Good.  I'm meeting with him soon this

          11    week.

          12          WWJWD: "Right on.

          13          Grinch75R: "He's got my approval."

          14    Q.    Okay.  And then does Grinch75R talk about -- pardon

10:18:10  15    me -- anything else after that?

          16    A.    Yes.

          17    Q.    What is a 1911?

          18    A.    1911, again, is a firearm pistol.

          19    Q.    Okay.  So he's talking, again, on -- what date is

10:18:20  20    this?

          21    A.    That was April -- he said he approved of Guiness on

          22    April 15th, and then it was April 16th, the message about

          23    the 1911.

          24    Q.    Okay.  Now, do you know if this meeting ever happened?

10:18:33  25    A.    Yes.
```

Taylor (Direct by Brown)                    55

1       Q.    Okay.  And when did it happen?

2       A.    April 18th.

3       Q.    Where did it happen?

4       A.    At the Metroparks close to the Cleveland Zoo.

10:18:43  5    Q.    And is that the location that the defendant picked?

6       A.    Yes.

7       Q.    Okay.  I'd like to show you what's been marked as

8       Government's Exhibit Number 1.

9             Do you recognize that?

10:18:58  10   A.    Yes.

11      Q.    What do you recognize that to be?

12      A.    This was the park, the meeting location.

13      Q.    Does it accurately show the location, landmarks, roads

14      of the area proposed by the defendant?

10:19:09  15   A.    Yes.

16      Q.    Is it a fair and accurate representation as this area

17      appeared on May 2nd -- or on April 18th?

18      A.    Yes.

19      Q.    Okay.

10:19:17  20            MR. BROWN:  I'd like to offer this as Exhibit

21      Number 1.

22            MR. RICOTTA:  It looks like you already did.

23            MR. BROWN:  Okay.

24            THE COURT:  Any objections to that?

10:19:26  25            MR. RICOTTA:  No.  I don't object.

| | | |
|---|---|---|
| | 1 | THE COURT:  It shall be admitted without |
| | 2 | objection. |
| | 3 | BY MR. BROWN: |
| | 4 | Q.    Now, sort of using the cursor, if you can, if you |
| 10:19:35 | 5 | know, could you point out where the defendant and Guiness |
| | 6 | met? |
| | 7 | A.    Let me see if I can -- oh, sorry. |
| | 8 | So they were meeting -- they were going to meet -- the |
| | 9 | parking lot there and then between the baseball and |
| 10:19:50 | 10 | volleyball pit. |
| | 11 | Q.    So that square sandpit is -- |
| | 12 | A.    Yes. |
| | 13 | Q.    Okay.  Now, based on that meeting, do you know if |
| | 14 | Guiness took any further steps on Discord? |
| 10:20:06 | 15 | A.    Yes.  He continued to talk to him on Discord. |
| | 16 | Q.    Did you observe the defendant accepting Guiness into |
| | 17 | the group? |
| | 18 | A.    Yes. |
| | 19 | Q.    Okay.  I'd like to show you Exhibit 116. |
| 10:20:22 | 20 | And there might be a clear button, Special Agent |
| | 21 | Taylor. |
| | 22 | Okay.  Thank you. |
| | 23 | And based on your review of this conversation, what |
| | 24 | did Grinch do to accept Guiness into the group? |
| 10:20:39 | 25 | A.    At the very bottom you can see, Grinch75R:  And this |

Taylor (Direct by Brown)                    57

1      was on April 20th, says, "Yeah.  I'm going to make the

2      legion secure server, and I'm getting Russ to talk about

3      sensitive subjects on a secure line."

4           And then the next post you see a sent invite.

10:20:54  5      Q.    Okay.  So he -- it's your understanding that Guiness

6      was granted accesses to the more secure subchannels?

7      A.    Yes.

8      Q.    And based on your observations, did he, in fact, have

9      after the 18th access -- or after, I guess, the 20th here,

10:21:10  10     access to the more security subchannels?

11     A.    Yes.

12     Q.    Okay.  Now, after the 4/18, the April 18th meeting,

13     did you take any action on your assessment?

14     A.    Yes.

10:21:24  15     Q.    And what, if anything, did you do?

16     A.    We then initiated paperwork to bump this to a full

17     investigation.

18     Q.    Why did you take that step?

19     A.    We did that, one, because we saw sustained messages

10:21:39  20     being posted.  It wasn't a one time.  We also had an

21     individual now that actively -- took the proactive step of

22     actually showing up and meeting our confidential human

23     source.  We were able to confirm the individual was actually

24     linked to a username.  And so now that we had an individual

10:21:57  25     who was motivated enough to show up and who had posted these

Taylor (Direct by Brown)                    58

1    things online repeatedly, we felt that we had enough of an

2    articulable fact pattern to move this to a full

3    investigation.

4    Q.    Now, after the April 18th meeting, did the defendant

10:22:12  5    and Guiness meet again?

6    A.    Yes.

7    Q.    And prior to that meeting, did you observe any meeting

8    between the defendant and Guiness on Discord?

9    A.    Yes.

10:22:21  10    Q.    Okay.  I'd like to show you Exhibit 117.  1-1-7.

11            MR. BROWN:  Okay.  And -- yeah, get that blown

12    up.

13        Thank you.

14    BY MR. BROWN:

10:22:40  15    Q.    And based on your review, what are Grinch and Guiness

16    discussing?

17    A.    They are discussing a follow-on meeting at Camp Belden

18    in Grafton.

19    Q.    Okay.  And what was the purpose of the meeting?

10:22:51  20    A.    This was to do some training and also talk about the

21    future plans and operations.

22    Q.    Okay.  And who suggested the meeting area this time?

23    A.    Guiness.

24    Q.    Okay.  And why did he suggest this location?

10:23:09  25    A.    This was a remote area, and there wasn't that many

Taylor (Direct by Brown)                    59

1    people who went to this park, especially during this time of

2    year.

3    Q.    Okay.  Were there any other reasons he suggested this

4    location?

10:23:19  5    A.    This also put them -- it was central proximity to

6    where Guiness was living and where Mr. Ferguson was living.

7    Q.    Okay.  Did you know that Guiness proposed this

8    location?

9    A.    Yes.

10:23:31 10    Q.    Okay.  And did you have any input on why this location

11    was chosen?

12    A.    Yes.

13    Q.    And what was that reason?

14    A.    We chose it for, again, because of the limited use and

10:23:42 15    the remoteness of it, we were looking at it from a public

16    safety standpoint and also a source and agent and officer

17    safety.

18    Q.    Okay.  And based on your review of the chats, did the

19    defendant agree to this location?

10:23:59 20    A.    Yes.

21    Q.    And did the defendant suggest something else to

22    discuss prior to the meeting?  In general.

23          I'll show you Exhibit Number 120.

24    A.    I think at this point he was asking about -- well,

10:24:21 25    they were talking about follow-on training.  Guiness was

Taylor (Direct by Brown)                60

| | |
|---|---|
| 1 | going to do Land Nav, and then I believe he asked about some |
| 2 | type of hand-to-hand combat.  Maybe Jujutsu. |
| 3 | Q.    Okay.  And that was on April 24th? |
| 4 | A.    Yes. |
| 10:24:37 5 | Q.    Okay.  After April 24th, did they continue to discuss |
| 6 | plans leading up to the next meeting? |
| 7 | A.    Yes. |
| 8 | Q.    And showing you Exhibit Number 120. |
| 9 | Okay.  And are they still talking -- this is |
| 10:25:03 10 | April 28th.  Are they still talking about scheduling a |
| 11 | meeting? |
| 12 | A.    Yes.  So on the top part, this is April 26th, 2020. |
| 13 | Grinch says, "Yeah, I need to get my card so I can buy |
| 14 | supplies.  I've saving what I can so I can buy a sidearm." |
| 10:25:20 15 | Q.    Okay.  And on the 28th, did he talk to Guiness about |
| 16 | the meeting? |
| 17 | A.    Yes. |
| 18 | Q.    And did Guiness ask about the plan? |
| 19 | A.    Yes. |
| 10:25:31 20 | Q.    Okay.  And what was he referring to earlier in that |
| 21 | conversation? |
| 22 | A.    So Guiness wrote, "We got to get together soon.  If |
| 23 | any kind of strike or something similar is going to happen |
| 24 | in the near future, I got to know so I can plan |
| 10:25:49 25 | accordingly." |

| | | |
|---|---|---|
| | 1 | Q.    Okay.  Let me ask you right there.  What was -- if you |
| | 2 | know, what was Guiness referring to? |
| | 3 | A.    He's referring to any small strike or ambush. |
| | 4 | Q.    Okay.  Was he proposing that? |
| 10:25:59 | 5 | A.    No. |
| | 6 | Q.    Who was proposing that, if you know? |
| | 7 | A.    Grinch75, which is Mr. Ferguson. |
| | 8 | Q.    And how did Grinch75 or the defendant respond to that |
| | 9 | after he brought that up? |
| 10:26:10 | 10 | A.    He goes, "Okay.  Give me my email and I'll be good to |
| | 11 | go this weekend.  I got some pay heading my way.  Switch to |
| | 12 | Vanguard channel.  I have an idea that we can work -- work |
| | 13 | it will be small hit, but we can use it to get media |
| | 14 | attention." |
| 10:26:26 | 15 | Q.    Okay.  And, in fact, did they switch to Vanguard? |
| | 16 | A.    Yes. |
| | 17 | Q.    Okay. |
| | 18 | MR. BROWN:  If we could pull up 122. |
| | 19 | BY MR. BROWN: |
| 10:26:33 | 20 | Q.    Okay.  And is this the Vanguard channel? |
| | 21 | A.    Yes. |
| | 22 | Q.    Okay.  And how could you tell you're on Vanguard? |
| | 23 | A.    If you look at the top of the page.  So at the very |
| | 24 | top, it looks like a little hashtag mark, and you can see |
| 10:26:49 | 25 | Vanguard next to it. |

Taylor (Direct by Brown)                 62

1    Q.    Okay.  And also just outside of the red box on the

2    left line, is Vanguard highlighted in the channel?

3    A.    Yes.

4    Q.    Okay.  Now, this is still on April 28th, correct?

10:26:57  5    A.    Yes.

6    Q.    Okay.  And does -- were you able to observe in this

7    chat what the plan was?

8    A.    Yes.

9    Q.    And what was the plan that you were able to observe?

10:27:07  10    A.    So Grinch75R on April 28th wrote, "We need to keep the

11    ops small but loud.  We still building numbers, but this

12    will get Patriots and future Spartans interested.  We also

13    can't afford martial law to be installed until I know all my

14    pilots are fully armed and armored up.  I still need a

10:27:29  15    sidearm and waiting on my Armorsmith."

16    Q.    Okay.  And did he also -- did Grinch75, the defendant,

17    also discus other details of the plan?

18    A.    Yes.

19    Q.    What did he describe to Guiness?

10:27:43  20    A.    Later on he wrote, and this is towards the bottom of

21    the page, towards the mid bottom, "We need four people

22    for -- we need four people for this work, three minimum."

23          SecretAgentRandyBeans writes: "What type of strike are

24    you thinking?

10:27:58  25          Grinch75R:  "We hit a sheriff or police cruiser that

Taylor (Direct by Brown)                    63

1    gas" -- I think -- "has an AR.  Take to fed Brady armor and

2    equipment.  If we get our hands in a radio, we'll be able to

3    plan around them."

4    Q.    Okay.  Now, during your investigation, did you observe

10:28:18  5    the defendant discuss this plan elsewhere on Discord?

6    A.    Yes.

7    Q.    Okay.  When generally did that begin?

8    A.    I think the first time on Discord we saw this plan was

9    listed back in March -- March 21st.

10:28:35 10   Q.    Okay.  And what was discussed in sum and substance on

11   March 21st?

12   A.    He was talking to Russ then and wrote, "Either we can

13   subdue them or perform a sink shot.  If you shoot, shoot to

14   kill, because they will.  If we can keep one or two alive to

10:28:53 15   get answers, great.  But it's not an objective."

16   Q.    Okay.  I'm sorry.

17   A.    No, and then I was going to say, later on, he wrote,

18   "Once the IMC is not combatant, we all need to be able to

19   rip out all coms and gear from the car.  It's too risky to

10:29:10 20   take the cruiser to throw the bodies in and light them.

21   This way there will be no DNA they can use."

22   Q.    Okay.  And after that March 21st -- looking at

23   104 -- did he provide other details to that plan?

24   A.    Let's see.  So at the bottom of 104, you see on

10:29:34 25   April 7th, 2020, he's talking to SecretAgentRandyBeans, and

1    he writes, "Any luck in more posts we can find feds.  We can

2    still pull the cops and hit them."

3    Q.    Okay.  In 105 did he also make -- and that's on

4    April 7th.

10:29:50  5        In Exhibit 105 -- if you can pull that up -- does he

6    make any further comments about the plan?

7    A.    Yes.

8    Q.    Okay.  And what did he say?

9    A.    So in that first paragraph, you see, "If we can get

10:30:08 10   some of you boys we can do the first small claim with the

11   cops.  We just need to leave a calling card with the

12   Spartans' name.  Once the media gets ahold of our card,

13   we'll spread like wildfire and other malitias will get up."

14   Q.    And the Spartans are who, based on your investigation?

10:30:26 15   A.    His group, Spartans 75.

16   Q.    And on April 9th on this exhibit, does he further talk

17   about the plan?  Or how does he characterize it based on

18   your observation of the plan?

19   A.    Yes.  So on April 9th, 2020, he starts off with, "We

10:30:41 20   are building an Army to revolt.  We do not tolerate rats or

21   unloyal members."

22   Q.    Okay.  Now, looking at 107, does he discuss the plan

23   as well?

24        And specifically, does he discuss how thorough or how

10:31:10 25   far the plan can go?

Taylor (Direct by Brown)                65

1    A.    So the third paragraph down, you'll see -- I'll read

2    the whole paragraph.  This was Grinch75 on April 13th, 2020.

3    The tail end of that last -- or that third paragraph,

4    "That's a no no.  If you see a pedophile, this goes on all

10:31:35  5    Spartans, you have the authority to shoot on-site."

6    Q.    Okay.  Now, in that last paragraph, in the last

7    paragraph on the page on April 13th, does he talk about

8    another part of the plan?

9    A.    Yes.

10:31:52 10    Q.    And what does he say?

11    A.    So he goes -- Grinch75R on April 13th, 2020, "If you

12    have interest in joking the military, make sure I know.  You

13    can be -- you can be a sleeper agent and give us insight

14    when they're moving.  I prefer only two pilots do so, and we

10:32:10 15    have a small task force for the covert Spartans.  They will

16    be killing the Government grin the inside."

17    Q.    Okay.  And based on your investigation, as it's

18    proceeding, what was the -- what did that mean to you and

19    your investigation, that he was talking about sleeper

10:32:27 20    agents?

21    A.    We took that as he was actively trying to -- they

22    actively had potential military members that were part of

23    the group.

24    Q.    Okay.  Now, during your investigation, were you

10:32:39 25    identifying other members of the groups?

Taylor (Direct by Brown)                66

1    A.    Yes.

2    Q.    Okay.  Were you able to identify anybody who that

3    might be relevant or material to?

4    A.    Yes.

10:32:46  5    Q.    And what was relevant or material about that?

6    A.    We did find a National Guard member who was a part of

7    the group.

8    Q.    Okay.

9    A.    In other parts of the investigation, we had seen where

10:32:58  10    they talked about going after a military armory.

11    Q.    Now, looking at paragraph -- or Exhibit 118, the

12    second post down, he starts -- what does he state about the

13    bog?

14    A.    "Well not -- or not now.  We need to start the bog and

10:33:28  15    it's too soon."

16    Q.    Okay.  And was that what you were referring to when

17    you said you saw other references to the bog?

18    A.    Yes.  I've seen that as a reference to the boogaloo

19    movement.

10:33:39  20    Q.    Okay.  Now, looking at Exhibit 121.

21          What date is this, by the way?

22    A.    This looks like April 28th, 2020.

23    Q.    Okay.  And does he outline the plan again?

24    A.    Yes.

10:33:58  25    Q.    Okay.  And could you -- could you see what you

Taylor (Direct by Brown)                    67

1    observed about the outline of the plan?

2    A.    Yes.  So on April 28th, 2020, Grinch75R: "Mainly this

3    is the plan.  We call a patrol car out to the open location.

4    When he comes to check out the location, we ambush him and

10:34:16  5    subdue him, raid his cruiser, and strip him of all his

6    weapons and send him walking home brushed and with our

7    calling card.  That's why we need something that will get

8    members and finally get a spark going."

9    Q.    Okay.  And that plan in Exhibit 121, is that the same

10:34:36 10    plan as he -- the defendant told Guiness on Exhibit 122?

11    A.    Yes.

12    Q.    Okay.  And after that, does the -- does the defendant

13    speak with Guiness about sort of more of a time frame about

14    when this plan was going to be put into action?

10:34:56 15    A.    Yes.

16    Q.    Okay.  Looking at 123.

17          And what is the -- looking at the last conversation.

18          What is the date on that?

19    A.    So he writes, "Let's do some drills and ince.  We are

10:35:25 20    set.  We can do my cruiser plan.  We just need to make sure

21    we leave our calling card and get media attention ince.  We

22    do, all of America will wake up.  But let's make sure we

23    don't have any loose ends with being set."

24    Q.    Okay.  And what did you take that sort of statement to

10:35:50 25    mean about the timing of the plan, the cruiser plan?

```
          1    A.    We took that as he was getting close to executing this

          2    plan.

          3    Q.    Okay.  And what was the condition he wanted to have

          4    met before the plan happened?

10:36:04  5    A.    That they just have their calling cards so they get

          6    the media attention.

          7    Q.    And what else did he want to do before the plan

          8    started?

          9    A.    And he wanted to do a drill.

10:36:15 10    Q.    Okay.  Now, in fact, did that second meeting happen?

         11    A.    Yes.

         12    Q.    When?

         13    A.    May 2nd.

         14    Q.    Okay.  Is that three days after the 29th?

10:36:24 15    A.    I believe so, yes.

         16    Q.    Okay.  And where did it happen?

         17    A.    That happened at the Camp Belden, which is in Grafton.

         18    Q.    Okay.  And that's the location that they had discussed

         19    and agreed on?

10:36:39 20    A.    Yes.

         21    Q.    Okay.  And who attended on May 2nd?

         22    A.    That was attended by Mr. Ferguson, Guiness, and a

         23    third person, Steve.

         24    Q.    Okay.  And who was Steve?

10:36:52 25    A.    Steve at the time was a subsource.
```

Taylor (Direct by Brown)                    69

1    Q.    Okay.  And did you also supervise Steve?

2    A.    Yes.

3    Q.    Okay.  And why did you -- was it your decision to send

4    two confidential human sources?

10:37:06  5    A.    Yes.

6    Q.    Why did you make that decision?

7    A.    We did that for safety.  We knew the source was going

8    to be out in the middle of the woods with him, and we wanted

9    a second person with him.

10:37:16 10    Q.    Okay.  And what other steps did you take?

11    A.    We also had surveillance further out, and we had a

12    quick response team that was close by.  We also put a

13    recording device on the confidential human source.

14    Q.    Okay.  And who set up the recording device?

10:37:30 15    A.    I did.

16    Q.    And did you review the recording device?

17    A.    Yes.

18    Q.    When you reviewed it, did it appear that it was

19    altered or manipulated in any way?

10:37:39 20    A.    No.

21    Q.    I'd like to show you Government's Exhibit Number 2.

22              MR. BROWN:  Without going up to the screen.

23              MR. RICOTTA:  No objection.

24              MR. BROWN:  Thank you.

10:37:57 25         If you could show Government's Exhibit 2.

                         THE COURT:  It shall be admitted without

objection.

                         MR. BROWN:  Thank you, Your Honor.

                         THE COURT:  I think I heard Mr. Ricotta say no

objection.

                         MR. RICOTTA:  Yes.  No objection, Your Honor.

        I'm sorry.

BY MR. BROWN:

Q.      And what is this?

A.      This is an overview or overhead of Camp Belden

wildlife area.

Q.      And what was the purpose of the meet at camp Belden?

A.      Twofold.  They were going to do some training to

include Land Nav and do a ruck march, and then they were

going to get back into the woods, and whenever they felt

they were out of eye of earshot of anybody that may have

been at the park, they were going to discuss the operation.

Q.      Okay.  And did you task Guiness with anything?

A.      Yes.  He was told to wear the recorder, to go ahead

and do the training where -- the ruck march, and then to

have Mr. Ferguson explain what he wanted to do.

Q.      And did you task Steve with anything?

A.      Steve was there basically to be that second person

protection for the confidential human source.

Q.      Did you task them concerning elements of the plan?

Taylor (Direct by Brown)                71

1    A.    No.  They were supposed to be just observers and

2    listen to what the plan was supposed to be.

3    Q.    Okay.  And you stated you reviewed the recording after

4    they created it?

10:39:21  5    A.    Yes.

6    Q.    Now, based on that 5/2 meet, what, if any, additional

7    investigative steps did you take?

8    A.    After that meeting, we continued to -- well, we

9    continued to do all the investigative steps that we were

10:39:37  10   doing, and we continued to use both sources to gather

11   information both on Discord and to set up follow-along

12   meetings with Mr. Ferguson.

13   Q.    Okay.  Did you take any steps concerning firearms?

14   A.    Yes.

10:39:49  15   Q.    What steps, if any, did you take?

16   A.    So at Camp Belden, Mr. Ferguson showed up with an AR

17   rifle that appeared to be functioning.  The confidential

18   human source, Guiness, looked at his rifle and reported back

19   that it was a functioning rifle.  At that point we had

10:40:08  20   concerns.  So we tried to start a plan where we would swap

21   out the barrel or sell Mr. Ferguson a barrel in an attempt

22   to try to make that rifle inert.

23   Q.    I'm sorry.  Did you say "inert"?

24   A.    Inert, yes.

10:40:24  25   Q.    Okay.

Taylor (Direct by Brown)                72

1    A.    Nonfunctioning.

2    Q.    Okay.  And why did you want to take those steps?

3    A.    We were just concerned based on everything that he had

4    posted online, the active steps that he had already taken,

10:40:35  5    the -- and the negativity, especially towards law

6    enforcement, and now the fact that we knew that he had

7    ammunition and a functioning rifle, we were concerned just

8    with overall law enforcement safety in the area.

9    Q.    Did you --

10:40:48  10              THE COURT:  Mr. Brown.

11              MR. BROWN:  Yes.

12              THE COURT:  I think this would be a good time

13    to take a brief break, because you got some more examination

14    to do, I know.  But I think this would be a good time.

10:41:00  15              MR. BROWN:  Thank you, Your Honor.

16              THE COURT:  So we'll take about 15 minutes.

17        So we certainly should be back in the courtroom

18    starting up at 11:00.

19              MR. BROWN:  Thank you very much.

10:41:08  20        Your Honor, may I just -- or have one of our table

21    just direct Mr. Taylor to another room, but have no other

22    conversation with him?

23              THE COURT:  Sure.

24              MR. BROWN:  Thank you very much.

10:41:23  25              COURTROOM DEPUTY:  All rise.

Taylor (Direct by Brown)                73

```
 1                              - - -

 2                    (Proceedings in recess at 10:41 a.m. )

 3                    THE COURT:  Mr. Brown, you may proceed.

 4                    MR. BROWN:  Thank you, Your Honor.

11:10:47  5    BY MR. BROWN:

 6    Q.    Special Agent Taylor, we were discussing the purchase

 7    of a barrel, I believe, correct?

 8    A.    Yes.

 9    Q.    And what was the FBI's concern about intent -- the

11:11:05 10    investigative intent about selling a barrel to the

11    defendant?

12    A.    At that point, we were worried about officer safety

13    and generally public safety.  We knew based on what he had

14    said online, his actions up to that date, the fact that he

11:11:21 15    had a firearm that appeared to be functioning and

16    ammunition, we were -- we knew -- we were trying to manage

17    the situation and trying to manage the fact that he had that

18    firearm and his antipolice views.

19          So we were going to try to get his barrel and try to

11:11:39 20    at least make the weapon inoperable.

21    Q.    Okay.  And looking at 124, did the defendant talk to

22    Guiness about how he was going to acquire a new firearm?

23    A.    Yes.  I think it's the third statement down.

24    Grinch75R on May 4th, "I can only afford the pistol right

11:12:05 25    now and we'll have to -- we'll all -- we'll all get newer
```

Taylor (Direct by Brown)                    74

1    rifles soon."

2    Q.    Okay.  And what did you understand the statement,

3    "We'll all get new rifles soon" to mean?

4    A.    We took that as he's going to get the rifle from when

11:12:22  5    they do the ambush on the law enforcement.

6    Q.    Okay.  And did that cause any concern investigatively

7    when he made that statement?

8    A.    Yes.

9    Q.    And what was that concern?

11:12:29 10    A.    The concern was we were no longer going to be able to

11    manage the rifle situation to try to switch out the rifle

12    barrel so that he was going to have an active -- a fully

13    functional rifle, and that he also felt that he was going to

14    get a newer rifle very soon.

11:12:47 15    Q.    Okay.  And did you also try to manage the situation

16    with the sidearm purchase?

17    A.    Yes.

18    Q.    How?

19    A.    We were also trying to sell an inert -- or an inert

11:13:00 20    pistol, if possible.  But that ultimately did not occur.

21    Q.    Okay.  Now, looking at 125, Exhibit 125.

22          Did he continue to talk with Guiness about the

23    purchase of a firearm?

24    A.    Yes.

11:13:22 25    Q.    And is it the M9?

Taylor (Direct by Brown)                    75

1      A.    Yes.

2      Q.    Okay.  And did you understand that to be the M9

3   Beretta?

4      A.    Yes.

11:13:30  5   Q.    Now, did he also discuss with Guiness an encounter

6   with what he called the five?

7      A.    Yes.

8      Q.    Okay.  And was there any -- what did you understand

9   the five to be?

11:13:41 10   A.    Law enforcement.

11     Q.    Based on that statement, was there any concern

12  investigatively about how he described his interaction with

13  the police?

14     A.    Yes.  He wrote, "My last encounter with the five was

11:13:54 15  yesterday."  Excuse me.  The last line, "I was tempted by

16  my" -- "I was tempted.  My gun was loaded, but it's in

17  storage and they were walking up on me."

18     Q.    Okay.  And what -- you said that caused you

19  investigative concern?

11:14:15 20   A.    Yes.

21     Q.    And what concern did that cause you?

22     A.    That he had an engagement with law enforcement and

23  was -- he had a loaded firearm and was talking about the

24  fact that he was tempted by his gun.

11:14:25 25   Q.    Okay.  Now, did there come a time after that that the

Taylor (Direct by Brown)                76

1    defendant, Guiness, continued to discuss the plans?

2    A.    Yes.

3    Q.    Looking at 126, please.

4          And in 126, what did Guiness say they needed about --

11:14:48  5    to carry out the plan?

6    A.    Towards the bottom, he wrote, "We got three.  I may

7    have a couple of guys that we can recruit into it.  They are

8    like us, but not 100 percent as committed as us."

9    Q.    And what was Grinch's reaction?

11:15:10  10    A.    "All right.  I'll have them hit me up and can do more

11    drills."

12    Q.    And what was your concern -- did that comment cause

13    you investigative concern?

14    A.    Yes, that he wanted to continue on with the plan,

11:15:23  15    continue on with the drill.

16    Q.    Okay.  Now, did they -- after -- what is this,

17    May 4th? -- did they continue to talk online?

18    A.    Yes.

19    Q.    And looking at Exhibit 127.

11:15:35  20          On May 6th, did the defendant make any comments that

21    gave you investigative concern concerning the plot?

22    A.    Towards the bottom, he wrote, I think his last post in

23    there, Grinch75R on May 5th, 2020, "All right.  Once we can

24    get that guard out, we may find full auto MEANS and sucj.

11:16:01  25    The only gun you would give my gun up for is a 416."

Taylor (Direct by Brown)                77

```
           1    Q.    Okay.  So did that give you any concern?

           2    A.    We took that as that he -- yes.  We took that as he

           3    was looking for a fully automatic.

           4    Q.    Okay.  And did it cause you concern about the

11:16:19   5    statement that he would not give this gun up for anything?

           6    A.    I'm sorry.  Would you repeat that?

           7    Q.    Were you concerned that he stated he would not give

           8    his gun up for anything but a certain other kind of gun?

           9    A.    Yes.

11:16:33  10    Q.    Now, did they discuss other aspects of the plan?

          11    A.    Yes.

          12    Q.    Okay.  Looking at 128.

          13          And this is -- yeah.  This is on March 5th -- or

          14    May 5th; is that correct?

11:16:58  15    A.    Yes.

          16    Q.    Okay.  And what is this picture here?

          17    A.    So that is a picture of the proposed ambush site.

          18    Q.    Okay.  And is this consistent with the defendant's

          19    statement about what he wanted as an ambush site?

11:17:13  20    A.    Yes.

          21    Q.    And were those statements things that you reviewed on

          22    May 2nd?

          23    A.    Yes.

          24    Q.    Okay.  And what did he say he preferred?

11:17:20  25    A.    He wanted something that they -- would be remote and
```

Taylor (Direct by Brown)                78

1    they could conceal themselves.

2    Q.    Okay.  And what was the defendant's reaction when he

3    was emailed this location?

4    A.    So Grinch75R on May 5th, 2020, in response to the

11:17:38  5    overhead photo of the ambush site, wrote, "Send this to the

6    pilot server and Vanguard.  I want some input.  Pro, we will

7    have max coverage and foliage to blend in.  Con, we may have

8    to let off a boom once we're done to get some media

9    attention since we're in a remote area."

11:18:02  10    Q.    Okay.  And in this, was he also provided the address

11    of the location?

12    A.    Yes.

13    Q.    Okay.  And he was provided sort of an overhead

14    picture, correct?

11:18:10  15    A.    Yes.

16    Q.    Now, did you observe any more discussions about the

17    location or plan?

18    A.    Yes.

19    Q.    Okay.  Looking at Exhibit 129, please.

11:18:22  20          Okay.  And what are they discussing here, once we get

21    this --

22          First of all, what's the date of these conversations,

23    once we get it pulled up?

24    A.    All right.  May 7th, 2020.

11:18:37  25    Q.    Okay.  And based on these conversations, did you draw

Taylor (Direct by Brown)                    79

```
          1    any conclusions about what they were discussing for timing?

          2    A.    They were looking for the evening.  Grinch75R wrote,

          3    "Let's shoot for 6:30."

          4    Q.    Okay.  And did he give any other directions about the

11:18:56  5    meeting?

          6    A.    The second line down, Grinch75R wrote, "Just casual

          7    wear so we don't get attention.  No armor."

          8    Q.    Okay.  And did that statement give you any

          9    investigative concern?

11:19:08 10    A.    Yes.

         11    Q.    What concern did it cause you?

         12    A.    We felt that the fact that he didn't want to bring any

         13    attention meant that they were very close to conducting the

         14    operation.

11:19:16 15    Q.    Okay.  Now, did defendant and Guiness discuss any

         16    further after May 7th?

         17    A.    Yes.

         18    Q.    And when was that?

         19    A.    The following day.

11:19:23 20    Q.    Okay.  And what, in sum and substance, was that

         21    conversation?

         22    A.    That was just the follow-on details before they met up

         23    on May 8th.

         24          MR. BROWN:  And if we could pull up 130.

11:19:33 25    BY MR. BROWN:
```

Taylor  (Direct by Brown)                    80

1    Q.    And did Grinch75 describe what they were doing on

2    May 8th?  On May 8th.  These conversations are from May 8th,

3    correct?

4    A.    Yes.

11:19:51   5    Q.    Does he describe what they were going to do?

6    A.    Yes.

7    Q.    How did he describe it?

8    A.    So Guiness asked if he was able to work on the ops

9    plan, and Grinch75R, Mr. Ferguson, wrote, "For the ambush."

11:20:05  10    Q.    Now, based on your investigation, Special Agent

11    Taylor, both with Guiness and Steve, and your subsequent

12    search of Discord, did the defendant's plans change from

13    what you believe the plan was after the May 2nd meeting?

14    A.    No.

11:20:18  15    Q.    Did the defendant's plan on May 8th change from what

16    it was on April 28th, based on your investigation?

17    A.    Nope.  The general substance stayed the same.

18    Q.    And that was when he described it both to Guiness and

19    on Vanguard and other people?

11:20:33  20    A.    Yes.

21    Q.    On May 8th, did that plan change from how you saw it

22    described in April?

23    A.    No.

24    Q.    In March?

11:20:41  25    A.    No.

Taylor (Direct by Brown)                81

1    Q.    Based on your investigation, his statements to Guiness

2    and Steve, and his online statements, based on that, what

3    was your understanding the purpose was for the -- from March

4    to May 8th?

11:20:55 5    A.    Our understanding was that they were going to conduct

6    an ambush on law enforcement with the attempt to take

7    equipment, both body armor, firearms, radios, and any other

8    equipment in the patrol car, and during that ambush, they

9    would subdue the officers, if not subdue, shoot them, and

11:21:16 10   once they had all the equipment, they were -- that was going

11   to be their first strike before following on to more

12   activities.

13   Q.    And based on your investigation of the online

14   statements, statements made to Guiness and Steve, both

11:21:30 15   online on May 2nd and May 8th, did the defendant take steps

16   on April 28th, May 2nd through May 8th, to carry out that

17   plan and achieve that purpose?

18   A.    Yes.

19            MR. BROWN:  Thank you.

11:21:44 20       No further questions at this time.

21            THE COURT:  All right.  Any cross-examination?

22            MR. RICOTTA:  Oh, yeah.  I have a few

23   questions, Your Honor.

24            THE COURT:  Microphone not working?

11:22:03 25            MR. RICOTTA:  It's still red. I don't know.

1           COURTROOM DEPUTY:  We can solve that if you

2    need to.

3               MR. RICOTTA:  Excuse me?

4           COURTROOM DEPUTY:  We can solve that.  It may

11:22:10  5    have died.

6               THE COURT:  Get another one.

7           CROSS-EXAMINATION OF RYAN M. TAYLOR

8    BY MR. RICOTTA:

9    Q.    Special Agent Taylor, how are you today?

11:22:48 10   A.    Good.

11   Q.    Good.

12         A little of your background.  It appears that even in

13   the military, you were basically in law enforcement.

14         Is that a fair statement?

11:23:04 15   A.    Yes.

16   Q.    And did you -- do you have a formal education, like

17   college, beyond high school?

18   A.    I do.

19   Q.    Okay.  And where did you go to school?

11:23:16 20   A.    I went to Dickinson College and then my Master's

21   degree from Eastern Kentucky University.

22   Q.    Okay.  And when did you achieve those?

23   A.    2002, and then 2012.

24   Q.    Okay.  And when were you in the military?

11:23:30 25   A.    I was in the military approximately 2002 to -- the end

Taylor (Cross by Ricotta)                83

1    of 2001 to the beginning of 2009.

2    Q.    Okay.  And your rank?

3    A.    I left as a captain.

4    Q.    Very good.  Thank you.

5          Now, it appears from what I understand that your

6    central focus within the FBI is on terrorism and these

7    so-called militia groups.

8          Is that a fair characterization?

9    A.    I handle domestic terrorism, international terrorism,

10   and post-blast investigations, yes.

11   Q.    What would you characterize this as?

12         What is this?

13   A.    This would fall into what we would call

14   anti-Government.

15   Q.    Okay.  So is that another subpart of it?

16   A.    Anti-Government extremism is one of the extremist

17   threats under the domestic terrorism threat stream, yes.

18   Q.    It's under what?  It's under what?

19   A.    Domestic terrorism.

20   Q.    Okay.  Is that a special unit just devoted to that?

21   A.    I'm not sure I understand the question.  There's -- we

22   investigate international terrorism and domestic terrorism.

23   Q.    Okay.  But the anti-Government, okay, that seems to be

24   what you're characterizing this as, correct?

25   A.    Yes.

11:23:42 (line 5)
11:24:06 (line 10)
11:24:14 (line 15)
11:24:30 (line 20)
11:24:49 (line 25)

Taylor (Cross by Ricotta)                    84

1    Q.    Okay.  Is there a special unit within the FBI that

2    deals with anti-Government groups?

3    A.    We have specific squads that deal with domestic

4    terrorism, which includes anti-Government groups.

11:25:06  5    Q.    Okay.  And the 12 years that you spent in Ohio, how

6    many of these militias or anti-Government groups are there

7    approximately in your professional opinion?

8    A.    That number varies from year to year.  I've looked at

9    these groups for the last 12 years, and they vary in size,

11:25:33 10   and they also vary in just the number of groups throughout

11   Northern Ohio.  But there could be dozens.

12   Q.    Okay.  So in the year that we're dealing with, last

13   year, how many would you say you were actively

14   investigating?

11:25:50 15          MR. BROWN:  Objection, Your Honor.

16          MR. RICOTTA:  Just background, Your Honor.

17          THE COURT:  Overruled.

18      Don't go into detail.

19          MR. RICOTTA:  No, I'm not.  I understand the

11:26:05 20   parameters.

21          THE WITNESS:  When you say "investigate," are

22   you talking full investigations or assessments or just aware

23   of groups?

24   BY MR. RICOTTA:

11:26:14 25   Q.    Okay.  Well, we can go one at a time.

1          How many assessments were you doing?

2     A.   I wouldn't know off the top of my head.

3     Q.   How many investigations were you doing?

4     A.   I would guess probably, within my last year here,

11:26:29  5   maybe two or three at that time.

6     Q.   All right.  Now, as it relates to Ferguson's case, my

7     understanding is the latter part of March -- was it

8     March 24th you received a tip for an investigation?

9     A.   I believe it came in April 3rd, or April 4th.

11:26:51 10   Q.   Okay.  I'm sorry.  April 3rd.  All right.

11          And based on that information, you were going to

12    assess the situation; is that correct?

13    A.   Yes.

14    Q.   Now, based on that information, you had the moniker --

11:27:07 15   did you know 75GrinchR?

16          Did you know that part?

17    A.   That's what we received from the complaint, yes.

18    Q.   And did you know about Discord?

19    A.   That's what we received from the complaint, yes.

11:27:25 20   Q.   So you had those two aspects of the information,

21    correct?

22    A.   Yes.

23    Q.   All right.  So from April 4th to the time that you

24    decided to use a confidential human source, how much time

11:27:43 25   lapsed?

1    A.    I believe by the time the source made contact,

2    probably eight -- or nine, ten days, approximately.

3    Q.    Okay.  In the nine or ten days, tell the ladies and

4    gentlemen of the jury, what did you do in furtherance of

11:28:02  5    your investigation.

6    A.    So during that time, we were first trying to figure

7    out where exactly the -- we had a general area where we

8    thought whoever was using the username was located.  So we

9    spent a considerable amount of time trying to find a

11:28:15  10    location, whether it was in Southern Ohio or Western Ohio.

11    We also then started doing various database searches.

12    Q.    Okay.  Did you -- prior to getting the confidential

13    human source involved, were you able to locate or identify

14    Christian Ferguson?

11:28:36  15    A.    We had the general location.

16    Q.    Okay.  What was that?

17    A.    We thought he was in sort of west of Cleveland.

18    Q.    Okay.  So you got the general area of Cleveland,

19    correct?

11:28:48  20    A.    Yes.

21    Q.    All right.  Did you actually have his name at that

22    point?

23    A.    At that point, I -- we believed we had his name, but

24    we weren't 100 percent sure it was him.

11:28:59  25    Q.    Okay.  Did you do anything further at that point?

Taylor (Cross by Ricotta)                87

1    A.    We continued to do our checks of that username, a

2    crosscheck against other law enforcement databases.

3    Q.    Okay.  Were you able to determine anything about these

4    groups, the 75th Spartans at that time?

11:29:21  5    A.    During that time, we saw the -- we saw the mention of

6    a planned ambush on law enforcement, yes.

7    Q.    Well, we all know about the planned ambush.

8          My question to you more directly is, I asked you if

9    the 75th Spartans, were you able to identify anyone in the

11:29:40 10    group?

11    A.    We started to look at other members of the group, yes.

12    Q.    Okay.  Tell me who were you able to identify at that

13    point.

14    A.    I don't believe we had anybody fully identified at

11:29:50 15    that time.

16    Q.    Okay.  SecretAgentRandyBeans, were you able to

17    identify him?

18    A.    I don't believe so.

19    Q.    Now, he also goes by Russ, correct?

11:30:05 20    A.    I would have to go back and check.

21    Q.    Okay.  Well, you're aware, are you not, through the

22    course of your investigation, that at some point, he was

23    confronted by members of your task force, right?

24    A.    Yes.

11:30:24 25    Q.    And what were you able to learn about that person that

Taylor (Cross by Ricotta)                    88

1   has been identified in the chat rooms talking to my client,

2   Mr. Ferguson?

3        I don't need his name.  Just tell me some of his

4   background.

11:30:42  5   A.    If I recall, he was -- he was just online.  He was in

6   the group.  He was talking to Mr. Ferguson.  He was younger

7   than Mr. Ferguson.

8        I don't recall any other details of him right now.

9   Q.    Okay.  You don't recall that he was 14 years old?

11:30:58 10   A.    I knew he was younger than Mr. Ferguson, yes.

11   Q.    And that your agents had to talk to his parents about

12   Russ or SecretAgentRandyBeans, right?

13        You read those reports, did you not?

14   A.    Yes.

11:31:13 15   Q.    Did you read them before you came to court?

16   A.    Today, no.

17   Q.    At some time in the last 30 days, have you reviewed

18   them?

19   A.    No.

11:31:25 20   Q.    How about Mike3962, did you have an opportunity to

21   check him out?

22   A.    I can't recall who Mike -- which one was it?

23   Q.    He was the 15-year-old.  Do you recall that?

24   A.    I don't remember that username.

11:31:49 25   Q.    How about with SecretAgentRandyBeans, he had a female

Taylor (Cross by Ricotta)                    89

1     cousin.

2             Do you remember her?  She was 14.

3     A.    I don't remember her, no.

4     Q.    Well, with the FBI and all its resources, they were

11:32:07 5    not able to vet out or check out these names prior to

6     bringing in the confidential human source?

7             You didn't have the skill or ability to do that?

8     A.    We do not have them vetted out before bringing in the

9     confidential human source, no.

11:32:26 10   Q.    Now, let me ask you this:  Why -- what stopped you

11    from using a law enforcement person to get into the chat

12    room and work and develop the case?

13    A.    That would have -- we would have needed to have a full

14    investigation that would have been deemed a higher level or

11:32:44 15   higher use of investigative resources.

16    Q.    So you chose to use a layperson, correct?

17    A.    This was the least invasive -- between the -- or of

18    the investigative options that we had, yes.

19    Q.    Who makes that determination?

11:33:04 20   A.    The FBI, our policies and procedures.

21    Q.    Okay.  But do you have to check it out with some

22    supervisor, or is that your independent judgment?

23    A.    So everything is run by our supervisor special agent

24    and the chief division counsel for our division.

11:33:22 25   Q.    Who would that be?

                1   A.    At the time it Kim Schwarting.

                2   Q.    So this was run up the chain before you engaged a

                3   confidential human source 1?

                4   A.    Yes.

11:33:34        5   Q.    Tell me, where -- how does one become a confidential

                6   human source, or confidential human?

                7   A.    There's lots of ways.  Usually they have access to

                8   potential information, whether it be related to criminal or

                9   terrorist activity.

11:33:56       10   Q.    Let's narrow in on this case.

               11        Source 1, tell me -- tell me about him.

               12              MR. BROWN:  Objection, Your Honor.

               13   BY MR. RICOTTA:

               14   Q.    I don't need his name.  Just tell me some of his

11:34:10       15   background.

               16              THE COURT:  If you want to approach the bench,

               17   you can, but I think since he was involved, without getting

               18   into his name or identification or anything like that, he's

               19   referred to him being there and involved, I think he would

11:34:24       20   be allowed some latitude.

               21              MR. BROWN:  Your Honor, some, but as we had

               22   argued in our motion --

               23              THE COURT:  If you want to come -- if you want

               24   to be at sidebar, but I think he has to be given some

11:34:39       25   latitude.  I think he knows the parameters.

1          MR. BROWN:  Okay.  Thank you, Your Honor.

2          THE COURT:  Okay.  Overruled.

3          MR. RICOTTA:  I understand the parameters,

4     Your Honor.

11:34:46  5     BY MR. RICOTTA:

6     Q.    This is an individual that you have used before?

7     A.    Yes.

8     Q.    On how many occasions?

9          MR. BROWN:  Objection, Your Honor.

11:34:58 10          THE COURT:  Overruled.

11          THE WITNESS:  I would say dozens of times.

12    BY MR. RICOTTA:

13    Q.    All right.  And this individual is paid for his

14    services, correct?

11:35:15 15    A.    Yes.

16    Q.    And on those occasions that you use him, he's been

17    paid between 25- and 30,000, correct?

18    A.    I believe that's the approximate number, yes.

19    Q.    And in this particular case he was paid approximately

11:35:33 20    $3,000, correct?

21    A.    I don't know if it was for this specific case, but I

22    think during the time this case was going on, yes.

23    Q.    Well, is he on -- is he paid monthly or --

24    A.    No.

11:35:45 25    Q.    So it's an individual case basis?

1    A.    Yes.

2    Q.    Did the result of either the arrest or indictment or

3    conviction have any influence on the amount he's paid?

4    A.    No.

11:36:00 5    Q.    Who determines the rate of pay?

6    A.    So that's a process where it's kicked up through upper

7    management of the FBI, and they'll assess the intel value of

8    what the individual provided.

9    Q.    Okay.  So he's paid after the information comes in?

11:36:21 10    A.    And that is validated.

11    Q.    Okay.  So nothing up front?

12    A.    No.

13    Q.    So there is some kind of incentive for this person to

14    gather information that's valuable then.

11:36:33 15          Would you agree with that statement?

16    A.    Yes.

17    Q.    All right.  Now, the moniker Grinch75R, do you know

18    where that comes from?

19    A.    I know Mr. Ferguson used that before -- before he

11:36:55 20    started the group, but I don't know specifically where it

21    comes from.

22    Q.    You're not familiar with Call of Duty, the game?

23          MR. BROWN:  Objection.  He said he didn't know

24    where it came from.

11:37:08 25          THE COURT:  Okay.  Overruled.

1        You may answer that, just that question that he asked.

2             THE WITNESS:  No, I am not.

3     BY MR. RICOTTA:

4     Q.    Okay.  Now, you make a determination on what day to

11:37:25  5     contact confidential informant 1, or confidential source 1?

6     A.    What day?

7     Q.    Yeah.  What day?

8     A.    It would have been somewhere between when we

9     originally received the complaint and before he made contact

11:37:44 10     with him, so I'd say probably three, four days maybe before.

11    Q.    Okay.  You don't have a vivid recollection of the

12    timetable, the timeline?

13    A.    It happened over a year ago.  No, I don't.

14    Q.    Well, let's talk about April 14th.

11:38:05 15        It seems to be that that was the date that you, for

16    lack of a better term, had that, like, meet and greet maybe

17    we could call it.

18        Do you know what that is?

19    A.    I believe that was on April 18th, wasn't it?

11:38:22 20    Q.    Was it?

21        The first -- the first meeting between my client --

22    A.    Yes.  That was April 18th.

23    Q.    Okay.  Where were you when they met?

24    A.    I was approximately two, three blocks away from the

11:38:48 25    park.

1    Q.    Okay.  So you can observe them, correct?

2    A.    Correct.

3    Q.    There's no wire on him or any other recording device,

4    correct?

11:38:59  5    A.    Correct.

6    Q.    So you don't know what he said to my client during

7    that period of time?

8    A.    No.

9    Q.    So he must have come back at some point and you

11:39:14  10    debriefed him?  Is that how it works?

11    A.    Yes.

12    Q.    How do you then determine if he's telling the truth if

13    it's not recorded?

14    A.    We then match up what was said to us, and then we see

11:39:29  15    follow-on activity and follow-on actions.

16    Q.    But -- and just follow my logic here -- if his

17    incentive monetarily is to provide you with information, how

18    can you tell that that information provided to you on the

19    April 18th is accurate?

11:39:46  20    A.    Again, we don't take it for 100 percent accurate when

21    we receive it.  We have to do follow-on checks and check the

22    validity of what he reported based off of what actually

23    happens.

24    Q.    But you certainly, as we can see later in your

11:40:02  25    investigation, have the technology to put a wire or source

```
        1    or a recording device on that individual, correct?

        2    A.    No, that's not correct.

        3          At that time we were not able to put a wire on the

        4    source.  This was still at the assessment phase, and to

11:40:18 5    protect the people's civil liberties and their rights, we

        6    don't use advanced techniques such as recording until the

        7    investigation is pushed to a full.

        8    Q.    Okay.  When did that occur?

        9    A.    That occurred after this meeting.

11:40:33 10   Q.    So whatever he told you, whether it was reliable or

        11   unreliable, now it turned it into a full blown case, right?

        12   A.    The chief determination for that was the fact that

        13   Mr. Ferguson showed up in person, and we were actually able

        14   to put a person associated with the moniker on the Discord

11:40:54 15   site.

        16   Q.    Okay.  And I assume, being a good FBI agent that you

        17   are, you ran a record check on Mr. Ferguson, correct?

        18   A.    Yes.  That's part of opening the investigations, yes.

        19   Q.    No criminal record, correct?

11:41:08 20   A.    I believe at the time, no, no criminal history.

        21   Q.    Okay.  And were you able to do any further background

        22   on him at all at that point?

        23   A.    Yes.  We continued -- once we identified that he was

        24   on -- that he was the person that showed up, we started to

11:41:26 25   look at surrounding circumstances of both contacts he may
```

| | | |
|---|---|---|
| | 1 | have, personal numbers, and things like that. |
| | 2 | Q.    Okay.  Now, the subconfidential source -- confidential |
| | 3 | human source number 2, again, you used him in the past? |
| | 4 | A.    Yes. |
| 11:42:00 | 5 | Q.    How many occasions? |
| | 6 | A.    I believe only two times. |
| | 7 | Q.    Now, the indictment, have you had an opportunity to |
| | 8 | look at that? |
| | 9 | A.    Yes. |
| 11:42:13 | 10 | Q.    You know there's two counts charged in this case, |
| | 11 | correct? |
| | 12 | A.    Yes. |
| | 13 | Q.    Do you know what the charges are? |
| | 14 | A.    Kidnapping of a federal law enforcement officer. |
| 11:42:23 | 15 | Q.    I'm sorry? |
| | 16 | A.    Kidnapping of a federal law enforcement officer. |
| | 17 | Q.    Attempted kidnapping. |
| | 18 | A.    Attempted. |
| | 19 | Q.    There's a difference, right?  It was an attempt, |
| 11:42:31 | 20 | right? |
| | 21 | A.    Yes. |
| | 22 | Q.    Now, on May 8th, where were you positioned? |
| | 23 | A.    May 8th, I was in our command post. |
| | 24 | Q.    Okay.  Tell me, where is that? |
| 11:42:45 | 25 | A.    The command post is at a -- I believe it's the ranger |

            1    station and it was approximately maybe a mile from the

            2    ambush site.

            3    Q.    Well, let's just call it the site, correct?

            4          Strike that.

11:43:03    5          That's 500 Truxell Road, right, the location of the

            6    park?

            7    A.    Yeah.  I'd have to go back and check, but I believe

            8    that's the correct address.

            9    Q.    Does that sound right?

11:43:18   10          Where is that located?  What community?

           11    A.    It's down by Grafton.  I mean, it's part of the

           12    National Parks, so down south closer towards Akron.

           13    Q.    Okay.  And you guys, meaning you guys, the FBI, you

           14    chose that site, or provided it to him, and he acquiesced,

11:43:34   15    correct?

           16          Is that how that went on?

           17    A.    We provided -- that was one of the sites that we

           18    provided, yes.

           19    Q.    Did you provide any other sites?

11:43:45   20    A.    That was the cite that we gave to Guiness to recommend

           21    for the site.

           22    Q.    So you, meaning the FBI, told Guiness to provide this

           23    site and give it to Ferguson, correct?

           24    A.    That is correct.

11:44:00   25    Q.    So I'm correct in saying that the FBI had set this up,

1    at least as to the location, correct?

2    A.    Yes.

3    Q.    Okay.  And describe the location for me, if you would,

4    please, if you recall.

11:44:15  5    A.    As you come up the road, there's a driveway that goes

6    less than 100 meters off the main road that goes back to

7    three or four structures.  They're all smaller houses.  It's

8    a deep wooded area.

9         If you go maybe another 100 yards beyond those houses

11:44:38  10   through the woods, there's an opening and a warehouse in the

11   background.  But generally this is all sort of a wooded

12   area.

13   Q.    Okay.  Now, the plan was provided to Guiness, and

14   Guiness then provided or discussed it with Ferguson,

11:44:57  15   correct?

16   A.    Ferguson provided the plan to Guiness, yes.

17   Q.    No, that's not what I said, sir.

18        The location and what was planned for May 8th was

19   provided by the FBI to Guiness and Guiness discussed it with

11:45:15  20   Ferguson, correct?

21   A.    I don't -- I'm not sure I understand your question.  I

22   don't believe I agree with that statement.

23   Q.    Okay.  Let me back up then.

24        Let's start with step 1.

11:45:28  25        The location that we're discussing for May 8th, that

1    was where the FBI wanted this to occur, correct?

2    A.    That's the site where we provided, yes.

3    Q.    So you provided that to Guiness; Guiness provided that

4    to Ferguson, correct?

11:45:42  5    A.    Yes.

6    Q.    Step 2, you told Guiness to tell him not to bring any

7    guns, correct?

8    A.    Yes.  We recommended not to bring any guns.

9    Q.    Okay.  So that went from the FBI to Guiness; Guiness

11:45:58  10   to Ferguson, correct?

11   A.    Yes.

12   Q.    The third thing was, they were going to meet up and

13   drive to the barn, wherever that location was.

14         Do you remember that?

11:46:09  15   A.    Yes.

16   Q.    Okay.  So that was the FBI to Guiness; Guiness to

17   Ferguson, correct?

18   A.    I --

19   Q.    Where were they going to park their car?

11:46:24  20   A.    Yeah.  I remember where they were going to park their

21   car.  I don't recall the conversation between Guiness and

22   Mr. Ferguson on who -- I believe told -- yes, said they were

23   going to park there behind the barn.

24   Q.    Well, who drove the car?

11:46:38  25   A.    That was Guiness.

Taylor (Cross by Ricotta)                    100

1    Q.    Okay.  So Guiness parks the car unbeknownst to

2    Ferguson, but known to Guiness and confidential human source

3    2, you guys, meaning the FBI and task force and SWAT and

4    whoever else, is going to be going to the headquarters or

11:47:02 5    barn to effectuate an arrest at some point, correct?

6    A.    Yes, that's where they were staged.

7    Q.    So that's the FBI's plan, correct?

8    A.    That's the location where we told him we were going to

9    park the car.

11:47:16 10   Q.    Okay.  So you directed him to that location, correct?

11   A.    That's the location where they parked the car, yes.

12   Q.    Now, follow me on this:  When they got into their car,

13   they drove to that location.  They got out of the car.  Was

14   it at that point, from Guiness to Ferguson, that they should

11:47:37 15   go scout this location, look around?

16   A.    I believe that they were planning on scouting that

17   location before May 8th.  They had talked about scouting the

18   location.

19   Q.    Right.  And that's exactly what they did.  Once they

11:47:55 20   arrived in the car, got out of the car, walked down that

21   hill, through the woods, and sort of scouted that area,

22   correct?

23   A.    Yes.  My understanding was that was the dry run to

24   scout the area.

11:48:06 25   Q.    Okay.  So it sounds like they're preparing for

1    something, correct?

2          Is this a fair assessment?

3    A.    Yes, I believe that was -- as it was stated -- our

4    understanding was that that was the dry run for the

11:48:21  5    attempted ambush, yes.

6    Q.    So they have no weapons.  Part of this preparation is

7    to make a call to the rangers, correct?

8    A.    I believe they were going to call 911, yes.

9    Q.    So we're on the fourth step, that's that they're

11:48:43  10   scouting the area.

11          We're on step five now.  Step five is to make the

12   phone call, correct?

13   A.    Yes.

14   Q.    Now, the phone call originates -- or the 911 call, who

11:48:58  15   makes that call?

16   A.    I believe that was Guiness.

17   Q.    So Guiness initiates the call.  That's step number, I

18   guess, five or six, right, per my scenario?

19   A.    If I recall, yeah.  He asked Ferguson for permission

11:49:20  20   to make the call, then he made the call, yes.

21   Q.    He asked permission.

22          Okay.  So he makes the call.  Unbeknownst to Ferguson,

23   the call is actually to Special Agent Dirker and another

24   park ranger, correct?

11:49:38  25   A.    I forget exactly who received the call.  I don't know

            1    if it was Special Agent Dirker.  But, yes, the call was

            2    routed to the FBI.

            3    Q.    Well, aren't these important details, where the call

            4    went?  Isn't that an important detail?

11:49:51    5    A.    The call went to the FBI, yes.

            6    Q.    So the call from Guiness goes to Dirker, who is

            7    sitting right over here, correct?

            8    A.    He was the one that responded, yes.

            9    Q.    So that when Dirker and the park ranger stroll back

11:50:09   10    into the scene, right, or what you're calling the crime

           11    scene correct, the idea was they're going to see how long it

           12    took for them to arrive.

           13          Is that kind of the gist of it?

           14    A.    Yes.

11:50:25   15    Q.    And then they're going to retreat back to the house.

           16          Wasn't that the plan?

           17    A.    Yes.

           18    Q.    Okay.  So here's where I'm puzzled.  If the plan is

           19    just to observe, okay, and then retreat back to the house,

11:50:41   20    where -- how are they going to effectuate -- or how is

           21    Ferguson going to commit the kidnapping?

           22          Explain that to me.

           23    A.    So this was the final run through before they

           24    conducted the operation.

11:50:57   25    Q.    I don't care about the run through.  This is the

Taylor (Cross by Ricotta)                    103

1    charge that you made, the attempted kidnapping; that is,

2    that he took a substantial step towards kidnapping Dirker

3    and/or this park ranger.

4         How is he going to do that without a weapon, without

11:51:18  5    confronting them?

6         Explain that to me.

7    A.   I believe you're correct, with the substantial step,

8    we view that as May 2nd, whenever he organized two men --

9    laid out his plan to assault and ambush law enforcement and

11:51:32 10    then take their equipment.  That was -- that was a very

11    overt and substantial step towards the attempt.

12    Q.   But he's not charged with May 2nd.  He's charged with

13    May 8th, correct?

14    A.   He's charged with attempted kidnapping, yes.

11:51:45 15    Q.   On May 8th, correct?

16    A.   He's charged with attempted kidnapping.

17    Q.   That happened on or about May 8th, right?

18    A.   The totality of -- from his initial planning from

19    March all the way to May 8th accounted for the attempted

11:52:05 20    kidnapping, yes.

21    Q.   Totality.  There's no conspiracy here, is there?

22              MR. BROWN:  Objection, if we're going to argue

23    legal definitions.

24              THE COURT:  Okay.  He's not charged with an

11:52:18 25    individual count against himself, right?  He's not charged

1    with anything else.

2                    THE WITNESS:  Yes, Your Honor.

3    BY MR. RICOTTA:

4    Q.    The other individuals that you may have spoken to,

11:52:27  5    whether it's Russ or Viagra, or whatever his name is, all

6    these guys, anybody else arrested in this case?

7                    MR. BROWN:  Objection, Your Honor.

8         The jury is actually going to be instructed about the

9    presence or nonpresence of other people involved in cases,

11:52:43 10   and I think this is inappropriate to be introducing it on a

11   question.

12                    THE COURT:  Okay.  I think the main point of

13   the questioning -- and so I think we can cut through it --

14   is that the defendant was charged only for his activities

11:52:57 15   and not for being part of a group, any illegal charges of

16   that type.  I think that's --

17                    MR. RICOTTA:  That's where I was going,

18   Your Honor.  That's correct.

19                    THE COURT:  Yeah.  He's charged for his own

11:53:12 20   actions.  And sometimes you can be charged for not only your

21   own actions, but those of others who act in concert with

22   you.  And I think that's all he was trying to ask.

23                    MR. BROWN:  Yes.  But the Government is

24   concerned that that would be used against the decision of

11:53:30 25   charging for the Government, and we'd ask for a curative

1    instruction, that the jury is not to consider who may or may

2    not ultimately have been charged or would be charged.

3                   THE COURT:  Well, he will -- I will give an

4    instruction like that.  I mean, the fact that other people

11:53:44  5    are not charged is not something they can consider in

6    determining whether this defendant committed a crime.

7                   MR. BROWN:  Thank you, Your Honor.

8                   THE COURT:  That's a -- yeah.  That's a

9    different point than whether he may have been charged

11:53:58  10    himself in relationship to what other people did.

11                   MR. BROWN:  Thank you, Your Honor.

12        I just don't want those issues to be confusing for the

13    jury.

14                   THE COURT:  All right.  Mr. Ricotta, you may

11:54:10  15    continue.

16                   MR. RICOTTA:  All right.  Thank you.

17    BY MR. RICOTTA:

18    Q.    Now, at some point there's been conversation about the

19    AR-15, correct?

11:54:18  20    A.    Yes.

21    Q.    Okay.  And during your questioning with the

22    U.S. Attorney, obviously, the FBI was concerned about the

23    gun, correct?

24    A.    Yes.

11:54:34  25    Q.    Okay.  Now, let me ask you this:  The fact that he

1    owned the weapon and it was at his house, that was all

2    legal, correct, in your estimation?

3    A.    Yes.

4    Q.    He was never charged with anything regarding the

11:54:48 5    AR-15, correct?

6    A.    That is correct.

7                MR. RICOTTA:  All right.  Thank you, Special

8    Agent Taylor.  That's all I have.

9                THE WITNESS:  Thank you, sir.

11:55:02 10                THE COURT:  Any redirect?

11                MR. BROWN:  Yeah, just a couple of follow-up

12    questions.

13         Thank you, Your Honor.

14                REDIRECT EXAMINATION OF RYAN M. TAYLOR

11:55:07 15    BY MR. BROWN:

16    Q.    You said that one of the people on the Discord chat

17    was on the National Guard?

18    A.    Yes.

19    Q.    Were you aware if his conduct had been referred to the

11:55:19 20    department of defense?

21    A.    Yes.

22    Q.    Now, you were asked a series of questions about the

23    FBI controlling the -- or picking the site.

24         Do you recall those questions?

11:55:32 25    A.    Yes.

1    Q.    Why did the FBI need to control the site logistics on

2    May 8th?

3    A.    Well, there's -- we -- there was the overall plan, and

4    we had an individual who had a rifle, and so we were trying

11:55:47    5    to manage the best we could from a safety aspect.  That site

6    provided a really -- a large area where we could get the

7    right personnel in there to effect the arrest, but also

8    maintain coverage, and also keep him away from the community

9    at large.

11:56:04    10    Q.    Okay.  Thank you.

11          Now, you were also asked about the ages or identities

12    of other people in the group.

13          Who showed up from the Spartans on April 18th?

14    A.    Mr. Ferguson.

11:56:16    15    Q.    And who showed up from the Spartans on May 2nd?

16    A.    Mr. Ferguson.

17    Q.    And who showed up on May 2nd with a loaded firearm?

18    A.    Mr. Ferguson.

19    Q.    And who in the Spartans created the plan that was

11:56:28    20    described to guns?

21    A.    Mr. Ferguson.

22    Q.    Who in the Spartans created the plan that was

23    circulated on the Vanguard channel?

24    A.    Mr. Ferguson.

11:56:41    25    Q.    Who on the 75th Spartans showed up on May 8th?

Confidential Human Source 2-Steve (Direct by Brown)  108

1    A.    Mr. Ferguson.

2              MR. BROWN:  Thank you.  No further questions.

3              THE COURT:  Thank you.  Any recross?

4              MR. RICOTTA:  No, Your Honor.

11:56:52  5              THE COURT:  Okay.  So you may step down.

6              THE WITNESS:  Thank you, Your Honor.

7              THE COURT:  Call your next witness.

8              MR. BROWN:  Your Honor, the Government would

9    call confidential human source 2, Steve.

11:59:24 10              THE COURT:  Come down here and then go ahead

11    and take the witness stand.  Before you sit down, my

12    courtroom deputy will swear you in.

13                        (Witness sworn.)

14              THE COURT:  You may be seated.

11:59:58 15              MR. BROWN:  You.

16              THE COURT:  You may proceed.

17              MR. BROWN:  Thank you, Your Honor.

18      DIRECT EXAMINATION OF CONFIDENTIAL HUMAN SOURCE 2-STEVE

19    BY MR. BROWN:

12:00:03 20    Q.    For the purposes of this case, were you referred to as

21    Steve?

22    A.    Steve, yes.

23    Q.    All right.  And, Steve, how long have you been a

24    confidential human source for the FBI?

12:00:14 25    A.    About six years.

1    Q.    As a confidential human source?

2    A.    Yes.

3    Q.    Signed up as a source with the FBI?

4    A.    One year.

12:00:25  5    Q.    Okay.  And before being physically signed up as a

6    source, did you also work as a subsource?

7    A.    Yes.

8    Q.    And for how long?

9    A.    Approximately six years.

12:00:36 10    Q.    And when you were signed up as a full source, did you

11   receive instructions or what are called admonitions from the

12   FBI?

13   A.    Yes.

14   Q.    And are those essentially sort of the rules and

12:00:49 15   expectations?

16   A.    Yes.

17   Q.    And as a source or a subsource, did you meet with

18   agents?

19   A.    I didn't hear you.

12:01:02 20   Q.    Did you meet with agents as a source and a subsource?

21   A.    Did I meet who?

22   Q.    Agents.

23   A.    Yes.

24   Q.    And were you were supervised by agents of the FBI both

12:01:10 25   as a source and a subsource?

1    A.    Yes.

2    Q.    Okay.  And during this time, both as a source and a

3    subsource, did the FBI provide you with any money?

4    A.    No.

12:01:22 5    Q.    Did they provide you with anything of value?

6    A.    So far a chicken sandwich.

7    Q.    Okay.  And did that chicken sandwich motivate you to

8    provide information to the FBI?

9    A.    No.

12:01:40 10    Q.    Now, did that create a bias to please the FBI, the

11    chicken sandwich?

12    A.    Say that again.

13    Q.    Did the chicken sandwich create a bias on you to

14    please the FBI?  Like, to do things -- to create the favor

12:01:56 15    of the FBI, the fact that they bought you a meal.

16    A.    No.

17    Q.    Now, as part of the signing, did they discuss the

18    potential for pay?

19    A.    No.

12:02:09 20    Q.    Okay.

21    A.    They did describe the potential for pay, yes.

22    Q.    And did that -- but have you received any pay yet?

23    A.    No.

24    Q.    Has that potential for pay created in you a motivation

12:02:22 25    to please the FBI?

Confidential Human Source 2-Steve (Direct by Brown)  111

1    A.    No.

2    Q.    And are you -- but at times sources can be given sort

3    of legal consideration.

4          Have they offered any legal consideration for you?

12:02:41  5    A.    No.

6    Q.    Okay.  This is commonly called working off time.

7          Are you working off any time?

8    A.    No.

9    Q.    Okay.  And, in fact, do you have a criminal history to

12:02:49 10    work off of?

11    A.    No.

12    Q.    Now, a little bit about your background, Steve.

13          Did you serve in the military?

14    A.    Yes.

12:02:55 15    Q.    Okay.  And do you know CHS-1 in this case?

16    A.    Yes.

17    Q.    Okay.  In this case, do you know him as Guiness?

18    A.    Yes.

19    Q.    Okay.  And have you worked as a subsource with Guiness

12:03:06 20    in the past?

21    A.    Yes.

22    Q.    Okay.  And have you helped Guiness provide information

23    in the past?

24    A.    Yes.

12:03:12 25    Q.    Okay.  Now, is it fair to say that you and Guiness

Confidential Human Source 2-Steve (Direct by Brown)  112

 1   have worked together with various groups to provide

 2   information to the FBI?

 3   A.    Yes.

 4   Q.    How would you consider -- or how do you characterize

12:03:25  5   some of those groups?

 6   A.    Some of the what?

 7   Q.    Some of those groups you've worked and provided --

 8   A.    Militia type.

 9   Q.    Militia type?

12:03:35 10   A.    Yes.

11   Q.    Okay.  And is that in part because of your military

12   training?

13   A.    Yes, that helps.

14   Q.    Okay.  Are some of those -- would some of those groups

12:03:44 15   at times be considered, like, white supremacist groups or

16   racial superiority groups?

17   A.    No.  Not for me, no.

18   Q.    Okay.  Now, you're not a white supremacist, are you?

19   A.    No.

12:04:01 20   Q.    You're not in favor of overthrowing the Government or

21   starting a civil war, are you?

22   A.    No.

23   Q.    Okay.  Are you motivated in providing the FBI

24   information based on any anti-government or anti-race

12:04:15 25   beliefs you have?

Confidential Human Source 2-Steve (Direct by Brown)  113

1    A.    No.

2    Q.    Okay.  Because of your background and experience in

3    the military, have you found that you're able to gain access

4    to those types of groups easily?

12:04:26  5    A.    Yes, it helps.

6    Q.    And is it fair to say that your involvement in these

7    groups with the CHS, or with Guiness, is for reporting to

8    the FBI?

9    A.    Yes.

12:04:34  10    Q.    Okay.  And is it fair to say that through that work

11    you've become -- you've gained some experience in the

12    culture of people in groups who want to overthrow the

13    Government?

14    A.    Yes.

12:04:43  15    Q.    Okay.  Is it fair to say that based on that

16    experience, that groups commonly --

17                   MR. RICOTTA:  Objection, Your Honor.

18                   THE COURT:  Okay.  Sustained.  When you say

19    "groups" . . .

12:04:59  20                   MR. BROWN:  Okay.

21    BY MR. BROWN:

22    Q.    Based on your experience with militias, is it common

23    that they use similar lingo and imagery of the military?

24    A.    Yes.

12:05:10  25    Q.    And is it similar that they -- or is it common that

Confidential Human Source 2-Steve (Direct by Brown)  114

1    militias try to do things sort of secretly?

2    A.    Yes.

3    Q.    And why is that?

4    A.    Not to be caught up with the authorities.

12:05:25 5    Q.    Okay.  And do they use things like secure

6    communications, in your experience?

7    A.    Yes.

8    Q.    Okay.  Do they use vetting or vouching to recruit?

9    A.    Yes.

12:05:36 10    Q.    Okay.  And why is that?

11    A.    To make sure you weren't law enforcement or working

12    for them.

13    Q.    Okay.  And do they expect conformity among the militia

14    members in language and in actions?

12:05:51 15    A.    Yes.

16    Q.    And why is that?

17    A.    Everybody has to be on the same page.

18    Q.    Okay.  And did there come a time when you were asked

19    to provide information about a group called the 75th

12:06:05 20    Spartan?

21    A.    Yes.

22    Q.    And who asked you?

23    A.    Guiness.

24    Q.    Okay.  And approximately when was that?

12:06:11 25    A.    That was May of 2020.

Confidential Human Source 2-Steve (Direct by Brown)  115

1    Q.    Okay.  And did you know at that time to whom the

2    information would be provided?

3    A.    Yes.

4    Q.    Okay.  And who?  Who were you providing information

12:06:24  5    to?

6    A.    FBI.

7    Q.    Okay.  And did there come a time when you met with

8    agents of the FBI?

9    A.    Yes.

12:06:30 10    Q.    Okay.  And who did you meet with?

11    A.    I met with a Ryan.

12    Q.    Okay.  Ryan?

13    A.    Yeah, and Kurt.

14    Q.    Okay.  And Kurt.

12:06:43 15          And at that meeting, without saying what specifically

16    you were told, were you given instructions on what to do?

17    A.    Yes.

18    Q.    Okay.  And were you given instructions about a meeting

19    on a specific date?

12:07:01 20    A.    Yes.

21    Q.    Okay.  And what date was that?

22    A.    The date was May 8th.

23    Q.    Okay.  Was there a date before May 8th?

24    A.    Yes.

12:07:12 25    Q.    What date was that?

1    A.    May 2nd.

2    Q.    Okay.  And so you were given instructions on a meeting

3    on May 2nd and also May 8th?  Both of those?

4    A.    I was given instructions on May 2nd from Guiness.

12:07:27  5    Q.    Okay.  Now, after that -- and did, in fact, you go to

6    a meeting on May 2nd?

7    A.    Yes.

8    Q.    And who was there?

9    A.    Guiness and Grinch.

12:07:38  10    Q.    And Grinch.  Okay.

11         Do you see the person you know as Grinch in the

12    courtroom today?

13    A.    Yes.

14    Q.    Okay.  And could you describe what he's wearing?

12:07:45  15    A.    He's over there with the blue mask on and, like, a tan

16    suit.

17              MR. BROWN:  Okay.  Could the record reflect

18    that Steve pointed out Grinch -- or Steve pointed out the

19    defendant, Christian Ferguson?

12:07:58  20              THE COURT:  The record should so reflect.

21              MR. BROWN:  Thank you.

22    BY MR. BROWN:

23    Q.    Now, you said you had that meeting on May 2nd.

24         Did there come a time when your status with the FBI

12:08:07  25    changed?

Confidential Human Source 2-Steve (Direct by Brown) 117

1    A.    After May 2nd, yes.

2    Q.    Okay.  Do you recall what date that was?

3    A.    Yes.  May 6th.

4    Q.    Okay.  And what happened on May 6th?

12:08:14  5    A.    I was an official CHS.  I was made official.

6              MR. RICOTTA:  I'm sorry.  I didn't hear that.

7         I didn't hear what he said.

8              MR. BROWN:  Could you repeat the answer?

9              THE WITNESS:  What's that?

12:08:29 10   BY MR. BROWN:

11   Q.    What happened on May 6th?

12   A.    I was made, like, an official CHS.

13   Q.    Okay.  You were signed up as a CHS?

14   A.    Yes.  I signed up as a CHS.

12:08:38 15   Q.    Now, going back to the May 2nd meeting, where did you

16   go?

17   A.    It was a place called Belden.  It's a Belden wildlife

18   area.

19   Q.    Okay.  Do you know the purpose of that meeting?

12:08:52 20   A.    Yes.

21   Q.    What was the purpose of the meeting as you understood

22   it?

23   A.    First off, to meet Grinch and then to do training.

24   Q.    Okay.

12:09:00 25   A.    Go over plans.

1    Q.   And what sort of training did you expect to do?

2    A.   Tactics, moving tactics.

3    Q.   Okay.  Was it called any sort of --

4    A.   Yeah.  What we trained on was bounding.

12:09:18  5    Q.   Bounding?

6    A.   Yeah.

7    Q.   Okay.  And what would you wear for bounding?

8    A.   Well, whatever you -- whatever military type of gear

9    you were -- had at the time.

12:09:28  10   Q.   Okay.  Did you understand --

11   A.   It all depends where you're at, yeah.

12   Q.   Sure.

13        Did you understand that you were supposed to bring

14   anything for this type of training?

12:09:36  15   A.   Yes.

16   Q.   What?

17   A.   Military gear, rifles, weapon.

18   Q.   Backpack?

19   A.   Rug sacks, yeah.

12:09:43  20   Q.   And what's a rug sack?

21   A.   It's basically a backpack you carry your equipment in.

22   Q.   Okay.  And were you told -- was the expectation to

23   bring a firearm, you said?

24   A.   Yes.

12:09:52  25   Q.   A rifle or a sidearm?

1    A.    The expectation is a rifle, or you could bring both.

2    Q.    Okay.  Did you, in fact, bring a rifle?

3    A.    Yes, I brought a rifle.

4    Q.    Did Guiness bring a rifle?

12:10:04  5    A.    Yes.

6    Q.    Did Grinch bring a rifle?

7    A.    Yes.

8    Q.    Okay.  Was your rifle loaded that day?

9    A.    No.

12:10:13 10    Q.    Do you know if Guiness's rifle was loaded that day?

11    A.    It was not.

12    Q.    Okay.  Do you know if Grinch's -- or if the

13    defendant's rifle was loaded that day?

14    A.    It was.

12:10:25 15    Q.    How do you know?

16    A.    Later when we went to clear the rifles, we noticed it

17    was loaded.

18    Q.    Okay.  Now, I'd like to show you Exhibit Number 2

19    that's already been admitted into evidence.

12:10:39 20          Do you recognize this?

21    A.    Yes.

22    Q.    And what is this?

23    A.    That's the Belden wildlife area.

24    Q.    Okay.  This is the site of the May 2nd meeting?

12:10:51 25    A.    Yes.

Confidential Human Source 2-Steve (Direct by Brown)  120

1    Q.    And could you, using the screen, point out where you

2    met the defendant.

3    A.    Where we met?

4    Q.    Yes.

12:11:05  5    A.    At the parking lot?

6    Q.    Yes.

7    A.    I believe it was somewhere up here.

8    Q.    Okay.  And what was the -- like, what was sort of the

9    plan where you'd go from the parking lot?

12:11:14 10    A.    The plan was just to walk into the woods.

11    Q.    Okay.

12    A.    And to train and go over plans.

13    Q.    Now, do you know, if you know, was this being

14    recorded?

12:11:25 15    A.    Yes, it was.

16    Q.    And do you know who was wearing their recording

17    device?

18    A.    Yes.  Guiness.

19    Q.    Okay.  Did you see that being put on him?

12:11:34 20    A.    No.

21    Q.    Okay.  How do you know he was wearing a recording

22    device?

23    A.    Because he told me.

24    Q.    Okay.  And did there come a time when you reviewed the

12:11:45 25    recording device, the recording?

1    A.    Yes.

2    Q.    Okay.  Were you on it?

3    A.    Yes.

4    Q.    Okay.  Were on it during this May 2nd -- your voice

12:11:56 5    and your image?

6    A.    Yes.

7    Q.    And did you review that -- the recording prior to

8    coming into court?

9    A.    Yes.

12:12:03 10    Q.    Okay.  Was it marked Exhibit 200?

11    A.    Yes.

12    Q.    Okay.  And based on your review, was it a fair and

13    accurate recording of what happened on May 2nd?

14    A.    Yes.

12:12:14 15              MR. BROWN:  At this time, Your Honor, I'd like

16    to move Exhibit 200 into evidence.

17              THE COURT:  Any objection?

18              MR. RICOTTA:  No.

19              THE COURT:  It shall be admitted without

12:12:23 20    objection.

21              MR. BROWN:  Okay.

22              THE COURT:  Now, prior to coming to court

23    today, did you also review Exhibits 206 through 214?

24              THE WITNESS:  Could you refresh my memory what

12:12:35 25    those were?

1    BY MR. BROWN:

2    Q.    Did you review a number of exhibits that were small

3    clips or small excerpts of that day?

4    A.    Yes.

12:12:43 5    Q.    Okay.  Were those numbers 206 to 214?

6    A.    Yes.

7    Q.    Okay.  And were those fair and accurate clips or

8    excerpts of Exhibit 200?

9    A.    Yes.

12:12:53 10    Q.    And likewise, did you review transcripts marked 206A

11    through 214A?

12    A.    Yes.

13    Q.    And did those transcripts accurately reflect the

14    dialogue being said on the video?

12:13:06 15    A.    Yes.

16    Q.    Okay.  And did you, in fact, review the full

17    transcript as well?

18    A.    Yes.

19    Q.    And are -- were those transcripts, the 206A

12:13:15 20    through 214A, fair and accurate transcriptions?

21    A.    Yes.

22            MR. BROWN:  Okay.  Your Honor, I'd like to

23    move 206 through 214 and 206A through 214A into evidence.

24            THE COURT:  All right.  Any objections to the

12:13:30 25    clips?

1       MR. RICOTTA:  No, Your Honor.  But my

2   understanding is -- I don't know if we should go to

3   sidebar -- my understanding is, the jury is going to get the

4   complete --

12:13:36 5       MR. BROWN:  Yes.

6       MR. RICOTTA:  -- videos and the complete

7   transcripts --

8       MR. BROWN:  Correct.

9       MR. RICOTTA:  -- if they want to review them,

12:13:39 10  correct?

11      MR. BROWN:  Correct.

12      MR. RICOTTA:  I have no objection.

13      THE COURT:  All right.  And in terms of the

14  transcripts, you have no objection to the use of the

12:13:45 15  transcripts?

16      MR. RICOTTA:  No.  I've reviewed them and they

17  appear to be accurate.

18      THE COURT:  All right.  Okay.  So

19  admit -- they shall be admitted.

12:13:56 20      MR. BROWN:  Thank you.

21  BY MR. BROWN:

22  Q.    And, Steve, based on your military training and

23  experience, when you saw the defendant's firearm, did that

24  appear to be real?

12:14:05 25  A.    Yes.

Confidential Human Source 2-Steve (Direct by Brown) 124

1    Q.    Based on your training and experience, what about it

2    made it appear to you to be a real firearm?

3    A.    Well, it was basically an AR-15.  It looked like an

4    AR-15.

12:14:19 5    Q.    Was it made of metal?

6    A.    Yes.

7    Q.    Okay.  When you saw that it was loaded, was it taking

8    a brass round?

9    A.    Yes.

12:14:26 10   Q.    Or a metal round?

11   A.    Yes.

12   Q.    It wasn't taking, like, a plastic round or a --

13   A.    No.

14   Q.    Okay.  And you have experience with AR-15s?

12:14:35 15   A.    Yes.

16   Q.    Okay.  Is that a common firearm to use in the

17   military?  For that platform.

18   A.    Yeah.  That platform, yes.

19   Q.    Okay.  Now, in addition to your observations, did the

12:14:50 20   defendant say anything that made you think his rifle was

21   real?

22   A.    When?

23   Q.    No.  Did he say anything to make you believe that his

24   rifle was real?

12:14:59 25   A.    At what time?

Confidential Human Source 2-Steve (Direct by Brown)  125

1    Q.    On May 2nd.

2          When he arrived and you were bringing out rifles, did

3    he say --

4    A.    Yes.  I mean, it looked like it was real and I assumed

12:15:13  5    it was real.  I don't know if I recall exactly --

6    Q.    Would reviewing a clip from that day refresh your

7    recollection?

8    A.    Yes.

9              MR. BROWN:  Okay.  Would you please play 206.

12:15:28 10              (Video played in open court.)

11              THE WITNESS:  Yes, I recall that.

12    BY MR. BROWN:

13    Q.    Okay.  And based on your knowledge and experience of

14    these firearms, what does "building out" mean?

12:15:55 15    A.    Building an AR-15 from pieces and parts that you can

16    obtain.

17    Q.    Okay.  And at that time of arrival, did the defendant

18    say anything further about his rifle or his gear?

19    A.    Yes.

12:16:09 20    Q.    Okay.

21              MR. BROWN:  Would you please play 207.

22              (Video played in open court.)

23    BY MR. BROWN:

24    Q.    Okay.  What did you take "unloaded" to mean?

12:17:04 25    A.    His firearm was loaded.

Confidential Human Source 2-Steve (Direct by Brown)  126

1   Q.    Okay.  Now, was this the first time he spoke of a

2   strike to you?

3   A.    Yes.

4   Q.    Then about how soon after you met the defendant was he

12:17:19  5   talking about the strike?

6   A.    Five minutes.

7   Q.    Okay.  And are you still in the parking lot at this

8   point?

9   A.    Yes.

12:17:24 10   Q.    And now, after that, what, if anything, happened?

11   A.    We started to load up to walk out.

12   Q.    Okay.

13            MR. BROWN:  And can we look at number 2 again.

14   BY MR. BROWN:

12:17:40 15   Q.    Okay.  And your parking lot mark is still there.

16            And could you show generally where you walked?

17   A.    Well, we walked the pathway.

18   Q.    Okay.  And when you say "the pathway," what do you

19   mean?

12:17:55 20   A.    Do you want me to draw?

21   Q.    If you could, please.

22   A.    (Drawing.)  All the way down.

23   Q.    Okay.  So is this pathway -- it's sort of gray.  Is

24   that -- what is that material?

12:18:10 25   A.    That's like wooded area.

1    Q.    Okay.  No, but is the pathway, like, stone?  Is it

2    dirt?

3    A.    The pathway was stone, and then grass and mud mixture.

4    Q.    Okay.  Now, during the time you were hiking down the

12:18:25 5    pathway, what, if anything, happened?

6    A.    We just continued to talk.

7    Q.    Okay.  Was the defendant -- did -- were you able to

8    observe if the defendant was prompted about his plan by you

9    or Guiness during that walk?

12:18:46 10                MR. RICOTTA:  Objection.  Leading.

11   BY MR. BROWN:

12   Q.    Did you ever hear the defendant say anything?

13   A.    Yes.

14                MR. BROWN:  If you could play 208.

12:18:59 15        Actually, before you play it, could you clear the

16   screen, if you can.

17        Oh, no.  Never mind.  It's done.

18   BY MR. BROWN:

19   Q.    During that walk -- and you said you heard the

12:19:15 20   defendant talking -- what in general did he talk about?

21   A.    The defendant?

22   Q.    Yeah.

23   A.    We -- he talked about the plan again.

24   Q.    Okay.  Did you ask him about the plan?

12:19:24 25   A.    No.

Confidential Human Source 2-Steve (Direct by Brown)  128

1    Q.    Okay.  And about how long after you met him was this

2    conversation?

3    A.    Probably 15 minutes.

4    Q.    Okay.

12:19:33  5          MR. BROWN:  Could you please play 208.

6             (Video played in open court.)

7    BY MR. BROWN:

8    Q.    Okay.  Did he -- did he say anything else about the

9    plan that you observed?

12:19:59  10   A.    Yes.

11   Q.    Okay.

12            MR. BROWN:  And could you pull up 209.

13   BY MR. BROWN:

14   Q.    Okay.  And this is while you're still on the path?

12:20:11  15   A.    Yes.

16   Q.    Okay.

17             (Video played in open court.)

18   BY MR. BROWN:

19   Q.    Okay.  Did he explain who the Spartans were?

12:21:55  20   A.    Not at that point.  I think eventually he's going to

21   explain that.

22   Q.    Okay.  But that's not the term that you used, right?

23   You didn't introduce the idea that we should call ourselves

24   Spartans?

12:22:05  25   A.    I didn't introduce anything, no.

1    Q.    Now, and who are the Three Presenters, if you know?

2    A.    That's a militia group.

3    Q.    And at that point in time after he explained this plan

4    to you, did you believe you were being considered a Spartan?

12:22:20 5    A.    Yes.

6    Q.    Okay.  And why did you believe that?

7    A.    Well, I believed I was part of the group at that point

8    because he's sharing pretty detailed information with us.

9    Q.    Okay.  And his gun is loaded at that point, right?

12:22:33 10    A.    What's that?

11    Q.    His gun is still loaded at that point, right?

12    A.    Yes.

13    Q.    Now, after that, what, if anything, happened during

14    the hike?

12:22:42 15    A.    We just -- we found a place to go down and describe

16    the plans in more detail.

17    Q.    Okay.

18              MR. BROWN:  If you could pull up number 2

19    again.

12:22:55 20    BY MR. BROWN:

21    Q.    Okay.  Could you show on the map about where what you

22    just described happened?

23    A.    Yeah.  I believe we were right around this area here.

24    Q.    Okay.  And you're calling that, like, the field or the

12:23:10 25    treeline?

Confidential Human Source 2-Steve (Direct by Brown)  130

1    A.    Yes.

2    Q.    Okay.  And what happened at the treeline?

3    A.    We found a place to go over details of his plan.

4    Q.    Okay.  And how -- what did you use to go over the

12:23:27  5    details?

6    A.    We created a little space on the ground --

7    Q.    Okay.

8    A.    -- and cleared it out so he could draw us a plan.

9    Q.    Okay.  And is that in the military called a sand

12:23:39 10    table?

11    A.    Yes.

12    Q.    And that's just so you could draw it out on the dirt?

13    A.    Yes.

14    Q.    Okay.  And what, based on your military training and

12:23:47 15    experience, is the purpose of talking out a plan like that?

16    A.    To make sure it's followed accurately.

17    Q.    Okay.

18            MR. BROWN:  And if we could look at -- if you

19    could pull up 210.

12:23:58 20    BY MR. BROWN:

21    Q.    And before we play this, could I ask you to clear the

22    screen, if you know how.

23        Oh, okay.  It's done.  Thank you.

24    A.    It looks like clear, yeah.

12:24:10 25    Q.    Thank you.

Confidential Human Source 2-Steve (Direct by Brown)  131

1              MR. BROWN:  Could you please play 210.

2                  (Video played in open court.)

3    BY MR. BROWN:

4    Q.    Now, at this point in your hike, in your walk, based

12:28:05  5    on what the defendant said, both during the hike and the

6    sand table, what was the defendant planning?

7    A.    What was his plan?

8    Q.    Yeah.

9    A.    To lure cops into a certain area, an abandoned house,

12:28:20 10    ambush them, and kill them.

11    Q.    Now, did you add any material elements to that plan

12    during the hike?

13    A.    No.

14    Q.    Based on your observations, who was in charge of the

12:28:31 15    operations?

16    A.    The Grinch.

17              THE COURT:  Okay.  Let's -- if you need to go

18    back and refresh when you come back, you can do that.  Let's

19    take our lunch now.

12:28:42 20              MR. BROWN:  Thank you.

21              THE COURT:  Okay.  We'll take one hour.

22         So you should be back at 1:30.

23         Jurors, you may go back to your room.  (Jurors out.)

24              MR. BROWN:  Your Honor, if the witness wanted

12:29:21 25    to go to Tower City to get some lunch, is that okay?

1          THE COURT:  Yeah.  I don't have a problem with

2     that.  He knows not to discuss the case.

3          MR. BROWN:  Absolutely.

4        Okay.

5                    (Witness excused.)

6                        -  -  -

7                  (Luncheon recess taken.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential Human Source 2-Steve (Direct by Brown)  133

1              AFTERNOON SESSION, TUESDAY, MAY 4, 2021

2                  THE COURT:  You may be seated.

3          Sir, you're still under oath.

4          You understand?

13:37:34  5                  THE WITNESS:  Yes.

6                  THE COURT:  You may proceed, Mr. Brown.

7                  MR. BROWN:  Thank you, Your Honor.

8      BY MR. BROWN:

9      Q.    Now, we were talking about May 2nd before the break,

13:37:54  10     May 2nd, 2020.

11     A.    Okay.

12     Q.    You had testified, just to summarize very briefly,

13     that based on your observations, you believed that the

14     defendant was in charge of the operation?

13:38:07  15     A.    Yes.

16     Q.    Now, did the defendant say anything to reinforce that

17     after the sand table?

18     A.    Yes.

19     Q.    Okay.

13:38:21  20                  MR. BROWN:  Could you play 211.

21                  (Video played in open court.)

22     BY MR. BROWN:

23     Q.    And during that time, did he say anything further that

24     led you to believe that he was in charge of the

13:39:14  25     organization?

1    A.    Yes.

2                   MR. BROWN:  Could you play 212, please.

3                      (Video played in open court.)

4    BY MR. BROWN:

13:39:55 5    Q.    Based on those statements, did you have an opinion if

6    you were in the group?

7    A.    Yes, I was in the group.

8    Q.    Okay.  And what group was that?

9    A.    Spartans 75.

13:40:07 10    Q.    And based on those communications, what was that

11    purpose of that group?

12    A.    Was to -- so far was to gain equipment from cops that

13    we assault and ambush -- or ambush and kill.

14    Q.    Now, did he ever talk about any ways to communicate?

13:40:29 15    A.    Yes.

16    Q.    Did he talk about his presence online?

17    A.    Yes.

18    Q.    Okay.

19                   MR. BROWN:  Could you play 213, please.

13:40:39 20                      (Video played in open court.)

21    BY MR. BROWN:

22    Q.    Now, did you ever communicate with him online?

23    A.    No.

24    Q.    Finally, at the end of this sand table, did the

13:41:19 25    defendant say anything about his plan for the Spartans?

1   A.   Yes.

2   Q.   Okay.

3              MR. BROWN:  Could you play 214, please.

4              (Video played in open court.)

13:41:33 5   BY MR. BROWN:

6   Q.   Okay.  And this was on May 2nd, correct?

7   A.   Yes.

8   Q.   Now, did there come a time when you met with the

9   defendant again?

13:41:57 10  A.   Yes.

11  Q.   When was that?

12  A.   May 8th.

13  Q.   Okay.  And where did you meet him?

14  A.   It was in Peninsula.  I can't remember the name of the

13:42:10 15  wildlife area.  At first it was at a car.

16  Q.   Okay.  At a car --

17  A.   He met us up at a Subway station.

18  Q.   The Subway restaurant, right, sandwich, not a --

19  A.   Yes.  Yes.

13:42:21 20  Q.   And at this time, were you still a subsource or had

21  something changed?

22  A.   Or what?

23  Q.   Or had something changed in your status?

24  A.   Yeah, my status changed.

13:42:33 25  Q.   Okay.  So you were a fully registered source at this

Confidential Human Source 2-Steve (Direct by Brown)  136

1       point?

2       A.    Yes.

3       Q.    And who did you drive with to the meeting spot, to

4       that Subway meeting spot?

13:42:44  5     A.    Guiness.

6       Q.    Okay.  In his car or your car?

7       A.    His car.

8       Q.    Do you know if the meeting was recorded?

9       A.    Yes, it was.

13:42:51  10    Q.    Okay.  Do you know who was recording it?

11      A.    Yes.

12      Q.    Who?

13      A.    I was and Guiness was.

14      Q.    Okay.  And who provided you with the recording

13:43:00  15    devices?

16      A.    FBI agent.

17      Q.    Okay.  And after the meet, did they take them back?

18      A.    Yes.

19      Q.    Now, did you and Guiness -- okay.  I take that -- I

13:43:11  20    withdraw that.

21           After you got to the location, what, if anything,

22      happened?  The Subway station.  What, if anything, happened?

23      A.    We waited there for a little while.

24      Q.    Okay.  Did the defendant arrive?

13:43:27  25    A.    Yes.

Confidential Human Source 2-Steve (Direct by Brown)  137

1    Q.    Okay.  And how did he arrive?

2    A.    He drove.

3    Q.    Now, what happened next after he arrived?

4    A.    What happened what?

13:43:35  5    Q.    What happened next, if anything, after he showed up?

6    A.    He -- well, I got out of the car, and he got out of

7    his car, and then we just said, hi, how are you doing, and

8    he got in the car.  He got in Guiness's car.

9    Q.    Okay.  And did he offer to drive?

13:43:52  10    A.    No.

11    Q.    Did the defendant hesitate getting into Guiness's car,

12    from what you could observe?

13    A.    No.

14    Q.    And after he got into the car, and you're in the car

13:44:04  15    as well, what, if anything, happened?

16    A.    Then we proceeded to the location.

17    Q.    Okay.  And while you were driving, were you able to

18    observe the defendant from where you were sitting?

19    A.    Yes.

13:44:13  20    Q.    Okay.  Are we talking like a big car or a four door?

21    Are we talking a truck?  What kind of car?

22    A.    No, just a midsize.

23    Q.    Okay.  So you were able to see him in the car?

24    A.    Yeah.  We were pretty close.

13:44:26  25    Q.    And how would you describe him during the drive?

1    A.    Pretty much the same as May 2nd, just eager to get

2    moving along.

3    Q.    Okay.  Eager, you said?

4    A.    Yes.

13:44:43  5    Q.    And what, if anything, did the defendant say to make

6    you think that, that he was eager to get things moving along

7    as you said?

8    A.    Well, we just -- he was asking where the location was,

9    where we are going exactly, and just things of that sort.

13:45:00 10    And then we started -- he started, again, talking about

11    certain plans, contingencies.

12    Q.    Okay.  And again, you said this was recorded?

13    A.    Yes.

14    Q.    And prior to coming to court today, did you review

13:45:14 15    Exhibit 201?

16    A.    Yes.

17    Q.    And is that the recording that day, of May 8th?

18    A.    Yes.

19    Q.    And were you able to observe the individuals and the

13:45:22 20    voices on that recording?

21    A.    Yes.

22    Q.    And it was a fair and accurate recording of the voices

23    and the images as they happened on May 8th?

24    A.    Yes.

13:45:31 25    Q.    Okay.

Confidential Human Source 2-Steve (Direct by Brown)  139

1          MR. BROWN:  At this time, I'd like to offer in

2     201.

3              THE COURT:  Any objection?

4              MR. RICOTTA:  No objection, with the same

13:45:39  5     conditions, Your Honor, as previously stated.

6              THE COURT:  Okay.  It shall be admitted.

7     BY MR. BROWN:

8     Q.   And, likewise, did you review Exhibits 215 to 220?

9     A.   Yes.

13:45:49 10    Q.   And are those excerpts of Exhibit 201?

11    A.   Yes.

12    Q.   And are those fair and accurate excerpts of the larger

13    recording?

14    A.   Yes.

13:45:59 15    Q.   Likewise, did you review Exhibits 215A through 220A?

16    A.   Yes.

17    Q.   And are those excerpts of the -- are those transcripts

18    of the recordings?

19    A.   Yes.

13:46:12 20    Q.   And do those fairly and accurately represent the words

21    spoken on the recording?

22    A.   Yes.

23    Q.   Now, you said he was talking about the plan in the

24    car?

13:46:23 25    A.   Yes.

1           MR. BROWN:  Could you play 215, please.

2                (Video played in open court.)

3    BY MR. BROWN:

4    Q.   And was this the same plan he discussed with you on

13:48:54 5    May 2nd?

6    A.   Yes.

7    Q.   Did you add anything to the plan on May 8th?

8    A.   No.

9    Q.   Now, what, if anything, did the defendant say after

13:49:02 10    that during the car ride?

11           Did he continue to discuss the plan?

12    A.   Yeah.  He discusses the plan and maybe expanding the

13    operation, things of that sort.

14    Q.   Okay.

13:49:15 15           MR. BROWN:  Could you please play 216.

16                (Video played in open court.)

17    BY MR. BROWN:

18    Q.   So he started also talking about the next strikes?

19    A.   Yes.

13:50:17 20    Q.   Did you continue to talk about additional plans after

21    this strike in the car?

22    A.   Yes.

23           MR. BROWN:  Could you please play 217.

24                (Video played in open court.)

13:50:28 25    BY MR. BROWN:

Confidential Human Source 2-Steve (Direct by Brown) 141

1    Q.    And were you able to observe the demeanor of the

2    defendant at this time during the drive?

3    A.    Yes.

4    Q.    Were you able to observe any sort of change in the

13:51:22 5    defendant?

6    A.    No.

7    Q.    Did he continue to talk about the plan?

8    A.    Yes.

9    Q.    Okay.

13:51:28 10            MR. BROWN:  Could you please play 218.

11                (Video played in open court.)

12    BY MR. BROWN:

13    Q.    So he's talking about the police cars -- of the law

14    enforcement responding --

13:52:12 15    A.    Yes.

16    Q.    -- to burn them?

17    A.    Yes.

18    Q.    And did he continue to talk about the plan?

19    A.    Yes.

13:52:27 20            MR. BROWN:  Please play 219.

21                (Video played in open court.)

22    BY MR. BROWN:

23    Q.    So is this the same -- based on your training and

24    experience, did this appear to be the same 3 percent [sic]

13:53:21 25    group that he had mentioned on May 2nd?

1    A.    Yes.

2    Q.    And did you understand what he meant by leaving a

3    calling card?

4    A.    Yeah, I understand what he wanted to do.

13:53:33 5    Q.    What was the purpose of that?  Or what was the calling

6    card?

7    A.    That's to gain publicity for what he's doing and to be

8    intimidating.

9    Q.    Now, did he say -- did he continue to talk about the

13:53:48 10    plan during the drive after the calling card comment?

11    A.    Yes.

12    Q.    Okay.  And while he was talking, did he say anything

13    that led you to believe that he was no longer in charge?

14    A.    No.

13:54:00 15    Q.    And, in fact, during that drive, who did you believe

16    to still be in charge?

17    A.    Grinch.

18    Q.    Okay.

19              MR. BROWN:  Could you please play 220.

13:54:11 20              (Video played in open court.)

21    BY MR. BROWN:

22    Q.    So is it fair to say that he was talking about

23    bringing more people?

24    A.    Yes.

13:54:57 25    Q.    And who identified those people that he wanted to

Confidential Human Source 2-Steve (Direct by Brown)  143

```
          1   bring?

          2   A.    Who identified them?

          3   Q.    Yes.

          4   A.    Grinch.

13:55:04  5   Q.    Okay.  Those were not people you knew?

          6   A.    No.

          7   Q.    Okay.  And he said No Name was a college student?

          8   A.    Yes.

          9   Q.    Now, did there come a time when the drive ended?

13:55:16 10   A.    Yes.

         11   Q.    Okay.  Were you able to observe a change in the

         12   defendant's demeanor at all?

         13   A.    No.

         14   Q.    When the drive ended, did he try to get out of the car

13:55:25 15   and flee?

         16   A.    No.

         17   Q.    Did he try to withdraw?

         18   A.    No.

         19   Q.    Did he try to change what he was saying the plan was?

13:55:34 20   A.    No.

         21   Q.    At the time of arriving at the barn, at the parking

         22   spot, what did you think would happen on May 8th?

         23   A.    What did I -- what do I think would happen --

         24   Q.    Yes.

13:55:47 25   A.    -- on May 8th?
```

1    Q.   Like, what did you think the plan was for May 8th?

2    A.   Was to go and scout out the abandoned house --

3    Q.   Okay.  And -- oh, sorry.

4    A.   -- and do a dry run of the plan.

13:56:00  5    Q.   And what was that belief based upon?

6    A.   What's that?

7    Q.   What was that belief based upon?

8    A.   Why we're there.  That's why we came here.

9    Q.   Okay.  And who created that idea?

13:56:15  10   A.   For the abandoned house?

11   Q.   Well, and just to use May 8th as a dry run.

12   A.   That was between Guiness and Grinch.

13   Q.   Okay.

14           MR. BROWN:  Now, could you pull up Exhibit

13:56:37  15   Number 6, the series of overheads.

16   BY MR. BROWN:

17   Q.   Okay.  Do you recognize this?

18   A.   Yes.

19   Q.   What do you recognize it to be?

13:56:45  20   A.   That's where we met up in Peninsula.

21   Q.   Okay.  And does this accurately show the relationship

22   of the roads and the landmarks as they existed on May 8th,

23   2020?

24   A.   Yes.

13:56:56  25   Q.   And --

1          MR. BROWN:  Have we shown this to the jury, or

2    should I publish to the jury now?

3          MR. RICOTTA:  I have no objection.  They're

4    already seeing it, I guess.

13:57:12  5    BY MR. BROWN:

6    Q.    Now, could you point out where the --

7          THE COURT:  Just one moment.

8          Number 6, okay, is admitted without objection.

9          MR. RICOTTA:  Thank you.

13:57:20 10          THE COURT:  Could you point out where the

11    parking area was that you drove to.

12          THE WITNESS:  Yeah.  Here.

13    BY MR. BROWN:

14    Q.    And this is what's been called 500 Truxell Road; is

13:57:39 15    that correct?  This sort of area.

16    A.    That area, yeah.

17    Q.    Now -- okay.  So you parked by that red dot.

18          And could you point out roughly where you were going

19    to walk to?

13:57:48 20    A.    Yeah.  This area.  (Drawing.)

21    Q.    Okay.  Now, let's do this then so we don't --

22          I'll show you Exhibit Number 3.

23          MR. RICOTTA:  I have no objection.

24          MR. BROWN:  Can you pull up Exhibit Number 3.

13:58:20 25          THE COURT:  It shall be admitted without

1    objection.

2                        MR. BROWN:  Thank you, Your Honor.

3    BY MR. BROWN:

4    Q.    Okay.  And what is this?

13:58:25  5    A.    That's what we were just looking at.  It's magnified.

6    Q.    Okay.  Just a little bit more close cropped?

7    A.    Yeah.

8    Q.    Okay.  So, now, in the bottom right-hand corner, what

9    is that building, the gray one?

13:58:36  10    A.    That's where we parked.

11    Q.    Okay.  And could you, again, point out where you were

12    going to walk to?

13    A.    Where we walked to?

14    Q.    Yes.

13:58:43  15    A.    We walked to this area.

16    Q.    Okay.  And what is in that area?

17    A.    That's the abandoned house.

18    Q.    Okay.  And how would you describe the area between the

19    barn and your red circle?

13:58:58  20    A.    That's a wooded area.

21    Q.    Okay.  What's the terrain like there?

22    A.    It's a steep terrain.

23    Q.    Okay.  Is it like a ravine?

24    A.    Like a ravine, yes.

13:59:10  25    Q.    Okay.  And, in fact, is that sort of like this dark

1    line in the middle?  Is that a creek or some sort of water

2    feature?

3    A.    Yes.

4    Q.    Okay.  And between the barn and where the ravine

13:59:22  5    starts to go down, is there anything or any sort of landmark

6    or feature?

7    A.    Between where?

8    Q.    The barn and where the ravine starts to go down

9    towards the creek.

13:59:34  10    A.    Just it's wooded area.

11    Q.    Okay.

12    A.    It's a wooded area.

13    Q.    Okay.  And at this point, were you still recording?

14    A.    Yes.

13:59:46  15    Q.    Okay.  And did you review a recording of the walk from

16    the barn and up until the end of the recordings?

17    A.    Yes.

18    Q.    Okay.  And was that Exhibit 202?

19    A.    Yes.

14:00:00  20    Q.    Okay.  And did you review that prior to coming into

21    court?

22    A.    Yes.

23    Q.    Okay.  And did that fairly and accurately represent

24    the voices and the images of that day?

14:00:10  25    A.    Yes.

Confidential Human Source 2-Steve (Direct by Brown)  148

1    Q.    And did you also review 221 through 233, or were those

2    excerpts taken from 202?

3    A.    Yes.

4    Q.    And were those accurate and fair representations of

14:00:25 5    excerpted parts of Exhibit 202?

6    A.    Yes.

7    Q.    And finally, did you review transcripts of those

8    videos?

9    A.    Yes.

14:00:31 10    Q.    And were those marked 221A through 233A?

11    A.    Yes.

12    Q.    And were those fair and accurate transcriptions of

13    excerpted recordings?

14    A.    Yes.

14:00:41 15                MR. BROWN:  At this time, Your Honor, I'd like

16    to move those into --

17                MR. RICOTTA:  No objection.

18                MR. BROWN:  Thank you.

19                THE COURT:  They shall be admitted without

14:00:48 20    objection.

21    BY MR. BROWN:

22    Q.    Okay.  Now, on this Exhibit Number 3, can you roughly

23    trace the route you took from the barn to the location?

24    A.    Yeah.  (Drawing.)

14:01:14 25                MR. BROWN:  Okay.  And finally, I'd like to

1    show you Exhibit Number 4 before it's pulled up.

2                    MR. RICOTTA:  No objection.

3                    THE COURT:  Okay.  It shall be admitted

4    without objection.

14:01:29  5    BY MR. BROWN:

6    Q.    Okay.  And could you describe what this is?

7    A.    Yeah.  That's the abandoned house location.

8    Q.    Okay.  And could you describe the buildings or the

9    structures here?

14:01:41 10    A.    Yeah.  This is like a small guesthouse, I imagine.

11    This is a larger tan house, and over here is, like, a barn

12    garage.

13    Q.    Okay.  And is this like a traffic -- not a traffic,

14    but like a parking circle or --

14:02:01 15    A.    Yes.

16    Q.    Okay.  And then going up off the top of the picture,

17    it goes up to Truxell Road?

18    A.    Yes.

19    Q.    Now, during the walk on that route that you traced,

14:02:20 20    were you able to observe the defendant's demeanor during

21    that hike?

22    A.    Yes.

23    Q.    How would you describe his demeanor going in and out

24    of the ravine?

14:02:31 25    A.    Eager and confident.

                 1    Q.    Okay.  And were you able to observe statements he made

                 2    to make you think that?

                 3    A.    Yes.

                 4    Q.    Okay.

14:02:38         5              MR. BROWN:  Could we play 223.

                 6                 (Video played in open court.)

                 7    BY MR. BROWN:

                 8    Q.    Okay.  He's talking about having the high ground.

                 9    A.    Yes.

14:03:07        10    Q.    Were the buildings you pointed out on Exhibit 4, where

                11    were they in relation to that ravine you talked about?

                12    A.    They were basically on top.

                13    Q.    Okay.  So they -- is it fair to say that they'd be on

                14    the high ground?

14:03:20        15    A.    Yes.

                16    Q.    And based on your military training, what's the -- is

                17    there a strategic value for being on the high ground?

                18    A.    Better vantage point, and it's always harder to fight

                19    uphill.

14:03:33        20    Q.    Okay.

                21              MR. BROWN:  Oh, I'm sorry, Your Honor.  I

                22    thought you were saying something.

                23              THE COURT:  I didn't say anything.

                24              MR. BROWN:  Oh, sorry.

14:03:41        25    BY MR. BROWN:

Confidential Human Source 2-Steve (Direct by Brown)  151

1  Q.    Now, was there anything else you observed by the

2  defendant to make you think that he was still willing to go

3  through with the plan?

4  A.    Yes.

14:03:51  5  Q.    Okay.

6                    MR. BROWN:  Could you play 224.

7                    (Video played in open court.)

8  BY MR. BROWN:

9  Q.    Okay.  So you're still hiking up to the structures at

14:04:27  10  this point?

11  A.    Yes.

12  Q.    And did there come a time when you were getting near

13  the structures?

14  A.    Yes.

14:04:33  15  Q.    Okay.  Was he still talking about the plan at that

16  point?

17  A.    Yes.

18  Q.    Was he exhibiting, from what you could observe, any

19  hesitation about the plan as he was -- as he had described

14:04:44  20  it?

21  A.    No.

22                    MR. BROWN:  Could you play 225.

23                    (Video played in open court.)

24                    MR. BROWN:  Okay.  Now, could you pull up

14:05:31  25  number 4, please again.

Confidential Human Source 2-Steve (Direct by Brown)  152

1     BY MR. BROWN:

2     Q.    Did there come a time when you came up to the

3     structures?

4     A.    Yes.

14:05:39 5     Q.    Which one did you first go to?

6     A.    Lower right.

7     Q.    Okay.  And what color would you describe that house

8     being?

9     A.    I described it as white because I didn't think I saw

14:05:52 10    the white trim.

11    Q.    Okay.

12    A.    So I just took it as white, so I . . .

13    Q.    Is it a light-colored house?

14    A.    Light colored, yeah.

14:05:59 15    Q.    Okay.  And was the other house like a darker color?

16    A.    Yeah.  It was more of a tannish type of color to me.

17    Q.    Okay.  And were you able to observe the defendant's

18    demeanor as he approached that house?

19    A.    Yeah.  It was pretty much the same way.  He's getting

14:06:13 20    ready to go.

21    Q.    Did you all enter?

22    A.    Yes.

23    Q.    Did the defendant enter that house willingly?

24    A.    Yes.

14:06:18 25    Q.    And were you able to observe him say anything once he

Confidential Human Source 2-Steve (Direct by Brown)  153

1    got to the house?

2    A.    Yes.

3    Q.    Okay.

4              MR. BROWN:  And could you please play 226.

14:06:29  5              (Video played in open court.)

6    BY MR. BROWN:

7    Q.    Now, were you able to observe the defendant's demeanor

8    when he said those statements?

9    A.    Yes.

14:08:01  10   Q.    How would you describe his demeanor?

11   A.    Just excited.

12   Q.    Okay.  Was he scared based on how you could observe?

13   A.    No.

14   Q.    Did he appear nervous?

14:08:11  15   A.    No.

16   Q.    Did he appear to be kidding?

17   A.    No.

18   Q.    Did he say anything else that made you think he was

19   willing and eager, I think as you said?

14:08:19  20   A.    Yes.

21   Q.    Okay.

22             MR. BROWN:  Could you play 227, please.

23             (Video played in open court.)

24   BY MR. BROWN:

14:09:59  25   Q.    Okay.  When he said 1 and there are 29 more waiting,

1   did that mean anything to you based on your training and

2   experience?

3   A.    Yes.

4   Q.    What did that mean to you?

14:10:08 5   A.    That's how many cartridges will be left in the

6   magazine --

7   Q.    Okay.

8   A.    -- after firing one shot.

9   Q.    So he's talking about bullets?

14:10:17 10   A.    Yeah.

11   Q.    Now, after he said this, what, if anything, happened?

12   A.    We just continued our tour.

13   Q.    Could you --

14        MR. BROWN:  Exhibit 4 again.

14:10:37 15   BY MR. BROWN:

16   Q.    Could you point out after you went to the white house

17   or the house on the corner?

18   A.    Yeah.  We went to the left, the larger house.

19   Q.    Okay.  Did you go directly to that house?

14:10:46 20   A.    Yes, I believe so.

21   Q.    Okay.  And how did you walk to that house?

22   A.    Just -- we might have looked around a second or two.

23   Q.    Okay.

24   A.    Then we went to the house.

14:10:55 25   Q.    Okay.  And while you were walking around looking, did

1    the defendant continue to say anything?

2    A.    Yes.

3    Q.    Okay.

4                 MR. BROWN:  Could you play 228, please.

14:11:07  5              (Video played in open court.)

6    BY MR. BROWN:

7    Q.    Okay.  So could you describe what you had observed

8    during this clip?

9    A.    What I observed?

14:11:24  10   Q.    Yes.

11   A.    I saw a ranger drive by or so.

12   Q.    Okay.  And what was Ferguson's -- the defendant's

13   reaction to that?

14   A.    He wasn't overly concerned about that one.

14:11:37  15   Q.    Okay.  Now, did you continue to talk about the plan

16   while you were walking to the brown house?

17   A.    Yes.

18   Q.    Okay.

19                MR. BROWN:  Could you play 229, please.

14:11:50  20              (Video played in open court.)

21   BY MR. BROWN:

22   Q.    Okay.  And going back to Exhibit 4, could you point

23   out where he was talking about leaving the bodies?

24   A.    It kind of changed here and there, but I'm just

14:12:31  25   thinking somewhere in the cars, which would have been

1    somewhere around this area.

2    Q.    Okay.  It's the larger squiggle?

3    A.    Yes.

4    Q.    Now, after he made that comment, what, if anything

14:12:43 5    else, happened?

6    A.    We continued to the house.

7    Q.    Okay.  And based on the statements you observed, was

8    he finding specific locations for his plan?

9    A.    Yes.

14:13:07 10    Q.    Okay.

11                   MR. BROWN:  Could you play 230.

12                        (Video played in open court.)

13    BY MR. BROWN:

14    Q.    Okay.  Did there -- after he made that statement, did

14:14:14 15    there come a time when he talked about timing?

16    A.    About what?

17    Q.    Timing of the event.

18    A.    Yes.

19    Q.    Okay.

14:14:19 20                   MR. BROWN:  Could you play 231, please.

21                        (Video played in open court.)

22    BY MR. BROWN:

23    Q.    Now, you're in a different location, correct?

24    A.    Yes.

14:14:50 25                   MR. BROWN:  Could we pull up Exhibit Number 5.

1    Or don't pull it up yet.  Let me show it to you.

2                    MR. RICOTTA:  No objection, Your Honor.

3                    THE COURT:  It shall be admitted without

4    objection.

14:15:17  5                    MR. BROWN:  Thank you.  Thank you.

6    BY MR. BROWN:

7    Q.    Okay.  And looking at Number 5, can you point out on

8    this overhead --

9          Or first of all, is this also an overhead of 500

14:15:37 10   Truxell?

11   A.    Yes.

12   Q.    Okay.  And can you point out on the photograph where

13   that last clip was taken?

14   A.    Yeah.  That's probably somewhere around down in this

14:15:48 15   area.

16   Q.    Okay.  And what was -- there's like a large brown

17   thing.  What was that in the --

18   A.    That was an old tree stump.

19   Q.    Okay.  And why had you all moved to behind that tree

14:16:02 20   stump?

21   A.    Because we were completing a dry run.  We were placing

22   a phone call to the police basically.

23   Q.    Okay.  Let's talk about that a little bit.

24         What phone call was placed?

14:16:18 25   A.    We were placing a phone call to see -- to call to the

1    police.  That's what was believed by Guiness to figure out

2    how long it was going to take for the police to get there,

3    how many might arrive, and to figure out what we wanted to

4    do from there.

14:16:37  5    Q.    Okay.  Based on what you observed just at that time,

6    did Guiness call the police directly?

7    A.    No.

8    Q.    Okay.  How was the phone call planned to be done?

9    A.    He called an agent.

14:16:50  10   Q.    Okay.  Did he say, I'm calling an agent?

11   A.    No.

12   Q.    What did he say?

13   A.    He said, I'm calling my baby mama to place a call for

14   us.

14:17:00  15   Q.    And why did he say he was calling his baby mama?

16   A.    Because we couldn't say he was calling an agent at the

17   time.

18   Q.    Okay.  But what was the purpose of using his baby

19   mama?

14:17:12  20   A.    Oh, baby mama, just so that the Grinch will believe

21   we're calling the police.

22   Q.    Okay.  And was calling a female consistent with

23   Grinch's plan?

24   A.    Yes.

14:17:24  25   Q.    And after that call was placed, what, if anything,

1    happened?

2    A.    Well, there was a -- we were supposed to wait -- the

3    baby mama was going to call in approximately five minutes

4    from the time we placed that call.  So that's when we -- we

14:17:40 5    were waiting for that call to happen, and then wait after

6    five minutes and then time how long it was going to take for

7    the police to show up.

8    Q.    Okay.  And were you, in fact, able to see the location

9    from the -- were you able to see the buildings from that

14:17:54 10    stump?

11    A.    Yes.

12              MR. RICOTTA:  What is the number?

13              MR. BROWN:  10.

14              THE COURT:  Okay.  10 shall be admitted

14:18:22 15    without objection.

16    BY MR. BROWN:

17    Q.    And is this a fair and accurate representation of the

18    view from the stump to the 500 Truxell Road?

19    A.    Yes.

14:18:34 20    Q.    And is this an approximation of how it looked on

21    May 8th of 2020?

22    A.    Yes.

23    Q.    Okay.  And, in fact, is this on the right the light

24    colored house?

14:18:46 25    A.    Yes.

Confidential Human Source 2-Steve (Direct by Brown)  160

1    Q.    And off to the left, is that the brown house?

2    A.    Yes, that's what it looks like.

3    Q.    Okay.  And there's a black car there, correct?

4    A.    Yes.

14:18:54 5    Q.    Is that about where the turnaround is?

6    A.    Yes.

7    Q.    Okay.  Now, were there conversations, in addition to

8    the one we just played, at the stump?

9    A.    What's that?

14:19:07 10    Q.    Were there other conversations at the stump other than

11    the ones we just played?

12    A.    Yes.

13    Q.    And were you able to observe the defendant's demeanor?

14    A.    Yes.

14:19:18 15    Q.    How would you describe him at the stump?

16    A.    Still eager, or just excited to be there, I guess.

17    Q.    Was he trying to run away?

18    A.    No.

19    Q.    Was he trying to leave because he got bored?

14:19:40 20    A.    No.

21    Q.    Okay.

22              MR. BROWN:  And could you play 232, please.

23                (Video played in open court.)

24    BY MR. BROWN:

14:20:20 25    Q.    Okay.  And while you were hiding behind the stump, did

1    you observe anything?

2    A.    Yes.

3    Q.    What did you observe?

4    A.    Well, we waited for the police to arrive, which they

14:20:31  5    did.

6    Q.    Okay.  And when they arrived, did the defendant -- did

7    you observe the defendant trying to catch their attention?

8    A.    No.

9    Q.    Did you observe him trying to call them over to say

14:20:43  10    there're bad people in the woods?

11    A.    No.

12    Q.    What happened next?

13    A.    Well, after seeing them show up, Guiness and Grinch

14    started to run down the hill.  I glanced over just to look

14:21:02  15    at the driveway, and then I followed them.

16    Q.    Okay.  And did there come a time when you stopped

17    together?

18    A.    Yes.

19    Q.    Approximately where was that?

14:21:12  20    A.    Approximately when?

21    Q.    Where.

22    A.    That was once we went through the ravine and on top of

23    the hill.  On top of the next hill, I guess.

24    Q.    Okay.  And were you able to observe the defendant's

14:21:24  25    demeanor at the top of the ravine?

Confidential Human Source 2-Steve (Direct by Brown)  162

1  A.    Yes.

2  Q.    How would you describe that demeanor?

3  A.    Well, he looked happy.

4  Q.    Okay.  Did he say anything to confirm that observation

14:21:34  5  by you?

6  A.    Yes.

7  Q.    Okay.

8              MR. BROWN:  And could we play 233, please.

9              (Video played in open court.)

14:21:41  10  BY MR. BROWN:

11  Q.    Now, on either May 2nd or May 8th, did you ever hear

12  the defendant try to back out?

13  A.    No.

14  Q.    On either May 2nd or May 8th, did you ever hear the

14:23:17  15  defendant try to change the plan?

16  A.    No.

17  Q.    On either May 2nd or May 8th, did you ever try to hear

18  the defendant postpone the plan?

19  A.    No.

14:23:27  20  Q.    On May 8th, did you ever hear the defendant protest

21  that this was the -- protest doing a dry run?

22  A.    No, he never protested.

23  Q.    On May 8th did you ever hear that May 2nd was a joke?

24  A.    No.

14:23:41  25  Q.    Did hear him say that anything he said on May 8th was

1    a joke?

2    A.    No.

3    Q.    Based on the May 2nd and May 8th recordings, what did

4    you believe the purpose of these meetings was?

14:23:51 5    A.    Was to set up an ambush, kill cops, and gather

6    equipment.

7    Q.    Okay.  And based on the May 2nd and May 8th meetings,

8    what did you believe the goal of the meetings was?

9    A.    The goal of --

14:24:03 10    Q.    The meetings, yes.

11    A.    That dry run?

12    Q.    Yeah.

13    A.    Was to get the plan -- to start moving it forward.

14    Q.    And based on what happened on May 8th -- or May 2nd

14:24:16 15    and May 8th that you observed, what did you believe the next

16    step would be?

17    A.    To execute the plan.

18    Q.    Based on what is that belief?

19    A.    He basically stated the time frame that he wanted to

14:24:33 20    go.

21    Q.    Thank you.

22              MR. BROWN:  Nothing further for this witness

23    at this time.

24              THE COURT:  Thank you.

14:24:36 25          Cross-examination.

1    CROSS-EXAMINATION OF CONFIDENTIAL HUMAN SOURCE 2-STEVE

2    BY MR. RICOTTA:

3    Q.    How are you doing, Steve?

4    A.    All right.

14:25:11  5    Q.    Good.

6          That last answer you gave to the Court, to the jury,

7    was that you anticipated he was going to put this plan into

8    action, correct?

9    A.    Yes.

14:25:25  10    Q.    Did he verbalize that?

11    A.    He didn't give us that date.

12    Q.    Did he say on any recording that you have or reviewed

13    that that was what he wanted to do?

14    A.    Yes.  He wanted to execute the plan, yes.

14:25:43  15    Q.    So we should have that recording somewhere, right?

16    A.    Yes.

17    Q.    Okay.  Have you reviewed that recording?  Have you

18    seen it?

19    A.    Yes.

14:25:51  20    Q.    Okay.  Which one -- what number is that, do you know?

21    A.    I can't bring the number right off the top of my head.

22    I don't know.

23    Q.    Okay.  When was that said?

24    A.    I believe that was on May 2nd.

14:26:04  25    Q.    Oh, May 2nd.

            1    A.    Yeah.

            2    Q.    Well, let's forget about May 2nd for one second.

            3    A.    Yes.

            4    Q.    And let's kind of concentrate on May 8th, okay?

14:26:13    5    Because he's charged with the incident on May 8th.

            6          Do you understand that?

            7    A.    Okay.

            8    Q.    Do you understand that?

            9    A.    No.  Say it again.

14:26:20   10    Q.    Do you understand that the charge against him, the

           11    attempted kidnapping, is May 8th --

           12    A.    Okay.

           13    Q.    -- of 2020.  Okay?

           14    A.    Okay.

14:26:29   15    Q.    So keep that in mind.

           16          On May 2nd, you already indicated that there was

           17    this -- I guess it's a military term -- sand table where you

           18    draw up, like, a plan or something like that?

           19    A.    Yes.

14:26:49   20    Q.    Let me ask you this before we get into May 8th.

           21          Can you describe this Guiness fellow for me?

           22    A.    Can I describe him?  He's a military veteran.

           23    Q.    A what?

           24    A.    Military veteran.

14:27:05   25    Q.    Size?  Shape?  Age?

Confidential Human Source 2-Steve (Cross by Ricotta) 166

1            MR. BROWN:  Objection.

2            THE COURT:  Overruled.

3            THE WITNESS:  He's similar to my size.

4    BY MR. RICOTTA:

14:27:14  5    Q.    Okay.  Well, I can't tell because you're sitting down.

6          What is that?

7    A.    I'm 5'6.  I think he's 5'4.

8    Q.    Okay.  And heavier set?

9    A.    Not heavier set, no.  No, he's athletic built.

14:27:33 10   Q.    Okay.  And how old are you?

11   A.    I'm 56.

12   Q.    All right.  And how old is he?

13   A.    40.

14   Q.    Now, how old would you surmise that the defendant is?

14:27:46 15   A.    What's that?

16   Q.    How old do you think he is?

17   A.    20.

18   Q.    Okay.  Did you know that going in?

19   A.    Yes.

14:27:55 20   Q.    Okay.  So you're 56 and Guiness is in his 40s,

21   correct?

22   A.    He's 40.

23   Q.    During your encounters with Ferguson, did it seem like

24   he was gung-ho on the military and enjoyed the discussions

14:28:16 25   about military tactics, things of that nature?

Confidential Human Source 2-Steve (Cross by Ricotta) 167

1    A.    Yes.

2    Q.    And what kind of things did you talk about with him

3    regarding your military experience and things of that

4    nature?

14:28:32 5    A.    I didn't discuss a whole lot about my military

6    experience with him.

7    Q.    Did you see Guiness do that?

8    A.    A little bit, yes.

9    Q.    Talk about being a sniper, things of that nature?

14:28:45 10   A.    Yes.

11   Q.    Okay.  And did you know based on the fact that you're

12   56 years old or whatever, that a 20-year-old could be

13   somewhat gullible and may look up to you and Guiness?

14   A.    Yes.

14:28:59 15   Q.    Okay.  And that he may be doing all this talking and

16   yakking to impress you?

17         Did that ever cross your mind?

18   A.    Not really.

19   Q.    And that he may have idolized you and Guiness as to be

14:29:20 20   someone that he wanted to be?

21         Did that ever cross your mind?

22   A.    No.  He didn't really know me.

23   Q.    I didn't ask you whether he really knew you.

24         My question was, did he look up to you and Guiness

14:29:36 25   because of your military background?

Confidential Human Source 2-Steve (Cross by Ricotta) 168

1    A.    I don't know.

2    Q.    Did it appear that he did?

3    A.    Not necessarily.

4    Q.    Well, I mean, the May 2nd, you were supposed to go out

14:29:46  5    to shoot.  Wasn't that the idea?

6    A.    To train.

7    Q.    Huh?

8    A.    To train, not to shoot.  We weren't going to shoot

9    that day.

14:29:58  10    Q.    But I thought you told Ferguson that you were going to

11    go to a shooting range, bring your gun?

12    A.    Not on May 2nd.  I don't -- we didn't go to a shooting

13    range.  We didn't have a plan to go to a shooting range on

14    May 2nd.

14:30:08  15    Q.    Okay.  And if that was said, that would be mistaken,

16    right?

17    A.    It was said -- I believe it was said that at a later

18    time that we would get some shooting in.

19    Q.    Okay.  And he seemed amenable to that, correct?

14:30:22  20    A.    Yes.

21    Q.    All right.  So you were having some kind of rapport,

22    conversations, right?

23    A.    Yes.

24    Q.    I mean, all we heard in the courtroom today was what

14:30:32  25    the Government felt was these plans or what was discussed

Confidential Human Source 2-Steve (Cross by Ricotta) 169

 1    about this so-called plan, correct?

 2    A.    Yes.

 3    Q.    How many hours would you surmise that your

 4    conversations went on with your encounters with him?

14:30:51  5    A.    All my conversations with him were recorded.

 6    Q.    Okay.  How long are the recordings?

 7    A.    I think approximately five hours.

 8    Q.    Okay.  So what we heard today was -- of the five

 9    hours, was -- I don't know -- would you surmise or guess

14:31:13 10    four minutes of five hours?

11    A.    Okay.

12    Q.    Okay.  Now, you answered some of U.S. Attorney's

13    questions that he asked you based on your training and

14    experience, or based on your military training.

14:31:31 15          What is that that you based it on?

16    A.    I was in the Army.

17    Q.    Well, it must be a little more than that.

18    A.    I was in the Army.  I was five years Reserves, and I

19    was a transport operator.

14:31:45 20    Q.    Okay.  And how long have you known Guiness?

21    A.    Around ten years.

22    Q.    Okay.  And prior to this event with Ferguson, had you

23    worked with him before?

24    A.    Worked with him before?

14:32:04 25    Q.    Yeah.  I take it this is kind of work, right?

Confidential Human Source 2-Steve (Cross by Ricotta) 170

1    A.    Kind of, I guess so, yeah.  As a sub, I would say.

2    Q.    I'm sorry?

3    A.    As a sub.

4    Q.    Sub?

14:32:14    5    A.    Sub CHS.

6    Q.    What is the distinction -- do you have certain ranks

7    with the FBI or something?  What is a sub?

8    A.    That comes from the FBI, not me.  But that's --

9    Q.    You keep using it.  What did you understand it to

14:32:29    10    mean?

11    A.    That I am not signed on as a CHS at that time.

12    Q.    But what is your function then?

13    A.    As a sub?

14    Q.    As a sub, yeah.

14:32:43    15    A.    I assisted one -- I assisted a CHS that was signed up.

16    Q.    Okay.  So you're like an apprentice, maybe like that?

17    A.    A what?

18    Q.    You're an apprentice, like you're learning or

19    something?

14:33:01    20          Is that fair?

21    A.    No.

22    Q.    Well, then, what you were doing on these occasions?

23    A.    No.  I was assisting Guiness, CHS Guiness.

24    Q.    Okay.  Now, somewhere in your testimony you indicated

14:33:18    25    that there -- it's been explained to you that there's

Confidential Human Source 2-Steve (Cross by Ricotta) 171

1   potential for pay.

2       What does that mean?

3   A.    That means that there -- I know that CHS people get

4   paid.

14:33:33 5   Q.    Okay.  You knew Guiness was getting paid, right?

6   A.    Yes.

7   Q.    Do you know how much?

8   A.    No.

9   Q.    You never asked?

14:33:44 10   A.    He didn't just work one thing, so it's a -- I think he

11   got paid several different times.  I don't know exactly

12   which one you're talking about.

13   Q.    Okay.  But isn't it kind of human nature that if

14   you're doing things, he's getting paid, maybe you should

14:34:01 15   want to get paid?

16   A.    Yes.

17   Q.    Okay.  But did you ever bring that up with the FBI?

18   A.    No.  No, I didn't.

19   Q.    Okay.  And do you anticipate that now you're going to

14:34:15 20   get paid?

21       MR. BROWN:  Objection, Your Honor.

22   BY MR. RICOTTA:

23   Q.    Regarding this case.

24       THE COURT:  Overruled.

14:34:23 25       THE WITNESS:  I don't know.

Confidential Human Source 2-Steve (Cross by Ricotta) 172

1    BY MR. RICOTTA:

2    Q.    It's a possibility?

3    A.    It's a possibility.  Anything is a possibility.  But I

4    don't know.  I do not distinctly know.

14:34:35 5    Q.    Okay.  Now, on May 8th -- let's focus on May 8th.

6    Strike that.  Let me go back for one second.

7          How is it, since you were never on the chat rooms,

8    that you end up showing up -- is the first time on May 2nd?

9    A.    Yes.

14:34:55 10   Q.    You just show up with Guiness?  Ferguson doesn't know

11   you're coming?

12   A.    No, he knew I was coming.

13   Q.    Okay.  How did he know you were coming?

14   A.    CHS Guiness was his contact online, I wasn't.

14:35:12 15   Q.    Okay.  He said, I'm bringing along a buddy, or

16   whatever?

17   A.    I guess so, yes.  I didn't read it or anything like

18   that, but -- I did not read it.  But I guess it was

19   something of that sort, that he was informed that I was

14:35:25 20   going to show up.

21   Q.    Okay.  And you showed up.  Did you talk about your

22   background and things of that nature?

23   A.    A little bit.  Very little.

24   Q.    Okay.  Well, did it become clear that you and Guiness

14:35:40 25   were going to show him some of the military kind of tactics

Confidential Human Source 2-Steve (Cross by Ricotta) 173

1      and things of that nature?

2      A.    Yes.

3      Q.    Wasn't that the clear intent of Guiness and you

4      talking to Ferguson, that based on your experiences in the

14:35:55 5     military, whatever they may be or whatever you told him,

6      that you were going to help him, correct, tactically, and

7      things of that nature?

8      A.    Yes.

9      Q.    Okay.  Now, on May 8th, did you sit down with the FBI?

14:36:13 10          Did you know how things were going to go down?

11     A.    Yes.

12     Q.    Okay.  Tell me what you understood.

13     A.    Tell me -- tell you what?

14     Q.    Tell me what you understood to happen on May 8th as

14:36:26 15    explained to you by the FBI.

16     A.    That we were going to meet, and we were going to meet

17     Grinch at the Subway, pick him up.  We were going to travel

18     to the abandon house.  Or we were going to travel to the

19     abandon house, but we were going to park in the garage area,

14:36:48 20    and then we were going to walk and do whatever Grinch wanted

21     to do.  And then when we returned, we'd be arrested.

22     Q.    Okay.  So the plan was to go to Subway and pick him

23     up, right?

24     A.    Yes.

14:37:04 25    Q.    Go to the federal national park, whatever, right?

1    A.    Yes.

2    Q.    Walk around, and then he was going to get arrested,

3    right?

4    A.    Yes.

14:37:14  5    Q.    So the idea was just to walk around and record him?

6          Is that kind of the idea?

7    A.    Not just to walk around.  We had a distinct plan.

8    Q.    Well, that's what I just asked you.

9    A.    Okay.  Well, we walked -- we were --

14:37:27 10    Q.    What is the distinct plan?

11    A.    Well, we were -- as I just testified, we walked to the

12    abandoned house.

13    Q.    Okay.

14    A.    And on --

14:37:38 15    Q.    What was the purpose of that?

16    A.    What was the purpose to walk there?

17    Q.    Yeah.

18    A.    Because Grinch wanted to find an abandoned house to

19    use for his plan.

14:37:49 20    Q.    Okay.  And what were you going to do in the abandoned

21    house?

22    A.    What were we going to that there?  We were scouting it

23    out to see if it was a good candidate.

24    Q.    Okay.  You find a house.  It's abandoned.  You knew it

14:38:06 25    was going to be there because the FBI set this up, right?

Confidential Human Source 2-Steve (Cross by Ricotta) 175

 1         What purpose did the abandoned house serve?  That's

 2    what I wanted to know.

 3    A.    What did it serve?  Because that's where we were going

 4    to station ourselves to call police officers in and ambush

14:38:25  5    them.

 6    Q.    Okay.  But the house is nowhere near where the police

 7    would arrive, are they?

 8         I've been to the scene.  Those three houses are

 9    nowhere near where the police would arrive, are they?

14:38:39 10         Well, yes or no?  Yes or no?

11    A.    What police are you talking about?

12              MR. BROWN:  Objection.  Let him answer the

13    question.

14              THE COURT:  Okay.  Just one moment.

14:38:45 15         I think it was a yes/no question.  Give him a chance

16    to answer.  But I think it was a yes/no question.

17              THE WITNESS:  I don't understand what police

18    he's talking about.  If he's talking about the FBI or if

19    he's talking about how we were actually supposed to get the

14:39:02 20    police at the house.  I'm a little confused right there.

21              THE COURT:  All right.  Let him rephrase.

22    BY MR. RICOTTA:

23    Q.    Let me clarify.

24         Apparently the plan, right --

14:39:10 25    A.    Yes.

Confidential Human Source 2-Steve (Cross by Ricotta) 176

1    Q.    -- as you understood it, was to make this call, and

2    the park rangers, or law enforcement, would show up, and

3    then they'd be ambushed, okay?

4    A.    Yes.

14:39:24 5    Q.    My point was -- to you is that this house is nowhere

6    near where the police would arrive.  Okay?

7          Is that a fair statement?  Yes or no?

8    A.    No.

9    Q.    Okay.  Isn't it true that you have to go down a ravine

14:39:44 10    and travel down that way, walk down there, as you showed the

11    U.S. Attorney to actually see where the police actually

12    arrived?

13    A.    No.  That was the barn where we parked.

14    Q.    Huh?

14:39:52 15    A.    That was the barn where we parked.  The house --

16    that's where the police arrived, at the abandoned house.

17    They arrived there where we were viewing where they were

18    going to arrive.  They were there.  The rangers that we

19    called basically arrived there.

14:40:02 20    Q.    Were you then when the police arrived?

21    A.    I was back at the stump.

22    Q.    At the what?

23    A.    We were back at the stump that we showed.  Three of us

24    were back at the tree stump watching the abandoned house and

14:40:17 25    watching the police arrived.

Confidential Human Source 2-Steve (Cross by Ricotta) 177

1    Q.    So if the police were arriving at the house -- maybe I

2    got it mixed up -- if the police were arriving at the house

3    and you're at the tree stump, what's the purpose of the

4    house?

14:40:30   5        What do you need the house for?

6    A.    The reason why we were at the tree stump, because we

7    were observing what would happen and just set up the plan

8    later on for when we were in the house to ambush them.

9    Q.    Okay.  So the plan was not set then?  Is that -- it's

14:40:46  10   kind of fluid at this point?

11   A.    No, it was a dry run.

12   Q.    The question was, apparently the plan was not set just

13   by your own statement there; is that correct?

14   A.    As far as a date?

14:41:01  15   Q.    No, as far as what's going to happen, how it was going

16   to occur.

17   A.    It was going to occur like that.

18   Q.    Well, what?  Then explain it to me again.

19   A.    That we were going to place a call.

14:41:13  20   Q.    Okay.

21   A.    Police were going to show up --

22   Q.    Stop right there.

23   A.    Okay.

24   Q.    You were going to place a call.  Guiness does that,

14:41:20  25   correct?

1    A.    Yeah.  I'm talking about the actual plan right now

2    that you asked me.  I'm talking about the actual plan, the

3    way -- the reason why we did the dry run.  If you want to

4    know about the May 8th, what happened there.  That's a

14:41:32 5    different thing.  But if you're actually -- the plan was, we

6    did a dry run on exactly what the plan was supposed to be.

7    We were supposed to be in the house at the plan, the

8    actual -- when we were going to actually do it, we were

9    going to be in the house.

14:41:48 10   Q.    So the main --

11                        (Court reporter clarification.)

12                        THE WITNESS:  Okay.  Go ahead.

13                        MR. RICOTTA:  I'm sorry.

14   BY MR. RICOTTA:

14:41:52 15   Q.    So the May 8th was not Ferguson's plan?

16   A.    No, that was his plan.

17   Q.    All right.  Then maybe I'm getting confused.

18   A.    Okay.

19   Q.    Let's slow down.  I get excited.

14:42:08 20        When you -- May 8th, what was your understanding of

21   what was going to occur after your debriefing with the FBI?

22   A.    After my debriefing?

23   Q.    After your briefing with the FBI.

24   A.    After the -- when?  Sorry about that.  Explain that

14:42:27 25   again.

Confidential Human Source 2-Steve (Cross by Ricotta) 179

1   Q.    Okay.  These aren't that confusing.  We're talking

2   about May 8th.

3         What was your understanding of what was going to occur

4   after you went to the Subway, you picked up Ferguson, and

14:42:40 5   you drove to the barn.  Okay?  Right?

6         The barn is where he was arrested, right?

7   A.    Yes.

8   Q.    Okay.  You get to the barn.

9         What's the plan from there?  Let's start there.

14:42:52 10  A.    At the end or the beginning?

11  Q.    It shouldn't be that difficult.

12  A.    At the end or the beginning, then I'll answer your

13  question.

14              MR. BROWN:  Your Honor --

14:43:02 15  BY MR. RICOTTA:

16  Q.    Let's go at the beginning.

17              MR. BROWN:  I'm going to object.

18              THE COURT:  Just one moment.  Stop.

19        Okay.  First of all, we can't talk across each other.

14:43:11 20  Only one person at a time, whatever is being said, and it is

21  proper to object if you have an objection.

22        Now, let's slow down for a minute, and let's just

23  start in all over again.  And so let's assume no question is

24  before the witness right now.

14:43:28 25              MR. RICOTTA:  Okay.

Confidential Human Source 2-Steve (Cross by Ricotta) 180

1              THE COURT:  And then if there's -- you may

2       question, and if there's an objection, you put it on, I'll

3       rule on it, if there is one.

4            Let's go.

14:43:39 5  BY MR. RICOTTA:

6       Q.    Okay.  Were at Subway.  Okay?  Understand that?

7             Guiness is driving the vehicle.  You pick up Ferguson;

8       is that correct?

9       A.    Yes.

14:43:50 10 Q.    Where are you headed?

11      A.    In the Peninsula.  In the wildlife area to check out

12      an abandoned house.

13      Q.    Okay.  And where are you going to go to check out the

14      abandoned house?

14:44:04 15 A.    In Peninsula.

16      Q.    Okay.  To a national park?

17      A.    To a national park, yes.

18      Q.    Okay.  You drive up to an area which we're going to

19      characterize as the barn, okay?

14:44:16 20 A.    Yeah.

21      Q.    What do you know about that particular location, the

22      barn?

23      A.    I know that that's where we were supposed to park and

24      that's where everything was going to end.

14:44:28 25 Q.    Okay.  So you knew, at least when you got there, that

Confidential Human Source 2-Steve (Cross by Ricotta) 181

1    eventually you park your car there and eventually you'll go

2    back to that spot and then they'd effectuate an arrest,

3    right?

4    A.    Yes.

14:44:41  5    Q.    Okay.  So we're clear on that.

6          From the barn, when you arrive to park your car, where

7    do you go?

8    A.    Then we walked over to the house.

9    Q.    Okay.  Now, in all these conversations that had been

14:44:56 10    recorded about Ferguson's plan, is it ever mentioned in any

11    of those conversations about going to an abandoned house, to

12    your recollection?

13    A.    I think -- in the car ride.  In the car ride, it was.

14    And anything that -- to come up with that particular

14:45:25 15    abandoned house idea came from Grinch and Guiness.

16    Q.    But if you're already in the car, the abandoned house

17    had already had to be -- had been discussed because that's

18    where you were planning on going with the FBI, correct?

19                  MR. BROWN:  Objection, Your Honor.

14:45:45 20                  THE COURT:  Overruled.

21          He asked whether you discussed that already in the

22    planning with the FBI.

23                  THE WITNESS:  Yes.

24    BY MR. RICOTTA:

14:45:50 25    Q.    Okay.  So it should be somewhere on these tapes -- or

Confidential Human Source 2-Steve (Cross by Ricotta) 182

1    body recorders, correct?

2    A.    I would think so.

3    Q.    Now, what is the idea, in your understanding, of going

4    to the abandoned house?  For what purpose?  Your

14:46:12  5    understanding.

6    A.    My observation is to complete a dry run and to scout

7    out the area for potential -- a location.

8    Q.    Okay.  And is it your testimony that the ambush was

9    supposed to occur from that abandoned house?

14:46:30  10   A.    Yes.

11   Q.    That's your understanding?

12   A.    Yes.

13   Q.    So that should have been part of Ferguson's plan

14   somewhere from May 2nd on, correct?

14:46:39  15   A.    Yes.

16   Q.    All right.  Guiness makes the phone call or pretends

17   to make the phone call to his girlfriend or someone like

18   that?

19   A.    Yes.

14:46:53  20   Q.    That never really occurred, right?

21   A.    Correct.

22   Q.    All right.  And where are you when the -- Agent Dirker

23   and the ranger arrive?

24   A.    All three of us were at the stump.

14:47:10  25   Q.    I'm not clear.  Is this like a stump or something?

1    A.    Yeah.  We -- yeah.  We left the area, the house area,

2    and we went -- I think we dropped back about probably

3    100 yards to view the area.

4    Q.    Okay.

14:47:27  5    A.    From a distance.

6    Q.    All right.  And where would the barn be in relation to

7    where you were set up?

8    A.    The barn?

9    Q.    Behind you?

14:47:37  10    A.    It was behind us, yes.

11    Q.    So you could just turn around and go that way?

12          You could turn around and go back to the barn?

13    A.    Yes.

14    Q.    Okay.  So when you observed the law enforcement

14:47:48  15    arrive, how long did it take from the phone call to them

16    arriving?

17    A.    I think it was around 12 or 13 minutes.

18    Q.    Okay.  Not a very quick response, was it?

19    A.    Yeah.

14:48:01  20    Q.    And then how -- did you -- what did you or Ferguson or

21    Guiness, what did you do when they arrived?

22    A.    We basically turned around and started running towards

23    the barn.

24    Q.    Okay.  So you didn't make any attempts to kidnap them

14:48:18  25    or hold them or hold them at bay at that point on May 8th?

Confidential Human Source 2-Steve (Redirect by Brown) 184

1    A.    Correct.

2    Q.    Is that correct, you didn't do that?

3    A.    No, we did not do that.

4    Q.    You hit the road and went back to the barn, correct?

14:48:30  5    A.    Yes.

6    Q.    And then what occurred when you got back to the barn?

7    A.    We were all arrested, taken down and arrested.

8    Q.    Okay.  And did the law enforcement make it -- the

9    defendant believe that you were arrested also?

14:48:44 10    A.    Yeah.  Yes.

11    Q.    Okay.  And did they throw some kind of explosive out

12    or something to distract you guys?

13    A.    Yes.

14    Q.    All right.  And how many police officers were there?

14:48:57 15    A.    Quite a few.  I don't know really.  There was quite a

16    few.

17    Q.    10?  15?  20?

18    A.    15-plus.

19    Q.    Okay.  And last, we -- you had no weapons on you that

14:49:11 20    day, correct?

21    A.    Correct.

22              MR. RICOTTA:  All right.  That's all I have.

23         Thank you, Your Honor.

24              THE COURT:  Mr. Brown, anything further?

14:49:29 25              MR. BROWN:  Yes, a few questions.

Confidential Human Source 2-Steve (Redirect by Brown) 185

1          Thank you, Your Honor.

2          Could we look at Exhibit Number 10, please.

3      REDIRECT EXAMINATION OF CONFIDENTIAL HUMAN SOURCE 2-STEVE

4    BY MR. BROWN:

14:49:46  5    Q.    Steve, is this the view from the stump to the houses?

6    A.    Yes.

7    Q.    Okay.  And you can see the houses clearly from the

8    stump?

9    A.    Yes.

14:49:55  10   Q.    And this was where you were observing the police

11   response, correct?

12   A.    Yes.

13   Q.    On May 8th.

14          Now, defense counsel asked if you -- if it ever

14:50:07  15   crossed your mind that the defendant was trying to impress

16   you.  And you answered no.

17          Do you remember that?

18   A.    Yes.

19   Q.    What did cross your mind about the defendant?

14:50:15  20   A.    What's that?

21   Q.    What did cross your mind about the defendant?

22   A.    I -- he was basically in charge already.  This was

23   already in motion before I was there, and there was no

24   impressing -- I -- basically initially meet him.  I was all

14:50:38  25   ears basically.

1    Q.    Based on what he said and how he treated you, did an

2    impression of him cross your mind by May 8th?

3    A.    Yes.

4    Q.    What?

14:50:49  5            MR. RICOTTA:  Objection.

6            THE WITNESS:  My impression --

7            THE COURT:  Just one moment.  One moment.

8            THE WITNESS:  That he was in charge.

9            THE COURT:  No, just one moment.

14:50:57  10           THE WITNESS:  Oh, sorry.

11           THE COURT:  Strike that, that answer.

12        Let me just look back at the question.

13           MR. BROWN:  I can ask it a different way,

14    Your Honor, if you'd like.

14:51:14  15           THE COURT:  All right.  Do that.

16    BY MR. BROWN:

17    Q.    Based on what he said to you, did you have any

18    concerns about the defendant?

19    A.    Yes.

14:51:20  20    Q.    What were they?

21    A.    He was dangerous and intent on doing some bad things.

22    Q.    Okay.  Now, let's talk about these houses.

23           MR. BROWN:  Can you play clip 209, please.

24            (Video played in open court.)

14:51:35  25    BY MR. BROWN:

Confidential Human Source 2-Steve (Redirect by Brown) 187

1    Q.    Okay.  Was that on May 2nd?

2    A.    Yes.

3    Q.    And did the defendant mention an abandoned house as

4    the location for the plot?

14:53:15  5    A.    Yes.

6              MR. BROWN:  Now play Exhibit 210.

7              (Video played in open court.)

8    BY MR. BROWN:

9    Q.    Okay.  In that clip, was he talking about a house in

14:57:15 10    the country?

11    A.    What's that?

12    Q.    Was he talking about a house in the country?

13    A.    Yes.

14    Q.    And was this the same plan and the same house that he

14:57:23 15    had just talked about earlier?

16    A.    Yes.

17    Q.    This is the same May 2nd, correct?

18    A.    Yes.

19    Q.    Okay.  This is still on that hike, that walk, and this

14:57:32 20    is the sand table that happened right after he talked about

21    the abandoned house?

22    A.    Yes.

23    Q.    Okay.  And, again, on May 2nd, he mentioned the house

24    plan again, correct?

14:57:41 25    A.    Yes.

1           MR. BROWN:  211, please.

2               (Video played in open court.)

3       BY MR. BROWN:

4       Q.   Okay.  And that -- again, an abandoned house was

14:58:30 5   mentioned, correct?

6       A.   Yes.

7       Q.   Did he -- did the defendant say, no, I don't mean an

8       abandoned house?

9       A.   No.

14:58:37 10  Q.   What did he want to put in that house?

11      A.   What did he want to put in that house?

12      Q.   Yes.

13      A.   Initially us and then the dead cops.

14      Q.   Now, on May 8th did he talk about the house?

14:58:52 15  A.   Yes.

16      Q.   So again, just to clarify, on May 2nd, he mentions the

17      house at least three times, correct?

18      A.   Yes.

19      Q.   Twice the abandoned house?

14:58:59 20  A.   Yes.

21      Q.   Okay.  On May 8th --

22              MR. BROWN:  Could you play 215.

23                  (Video played in open court.)

24              MR. BROWN:  Okay.  Could you stop that.

15:00:04 25  BY MR. BROWN:

1    Q.    Now, that's driving to the location on May 8th,

2    correct?

3    A.    Yes.

4    Q.    And he talks about having a house to draw people

15:00:13  5    inside to, correct?

6    A.    Yes.

7    Q.    And based on that -- based on that and May 2nd, was it

8    your understanding that it was going to be an occupied

9    house?

15:00:20  10   A.    No.

11   Q.    So it would be an abandoned house, based on your

12   understanding?

13   A.    Yes.

14   Q.    Now, when you got there, were you able to observe the

15:00:29  15   defendant walking around the location?

16   A.    Yes.

17   Q.    Okay.  Now, actually, walking from the cars through

18   the ravine, where was the defendant during that walk?

19   A.    He was leading the walk.

15:00:40  20   Q.    Okay.  Now, when he got there, were you able to

21   observe how he was looking at the location and talking about

22   his plan?

23   A.    Yes.

24   Q.    How would you describe that?

15:00:51  25   A.    He was looking for the strategic place for cars to

Confidential Human Source 2-Steve (Redirect by Brown) 190

           1   come in, how they would be trapped and where we would lay
           2   out bodies or torch cars.
           3   Q.    Is it fair to say he was applying his plan to the
           4   physical location?
15:01:09   5   A.    Yes.
           6   Q.    Okay.
           7               MR. BROWN:  Could we play 227.
           8                  (Video played in open court.)
           9   BY MR. BROWN:
15:02:49  10   Q.    So now, you were in the smaller house while talking
          11   about that, correct?
          12   A.    Yes.
          13   Q.    And he was talking about the other house on the site,
          14   correct?
15:02:58  15   A.    Yes.
          16   Q.    So he was, again, applying his plan to an actual house
          17   on the site --
          18   A.    Yes.
          19   Q.    -- correct?
15:03:04  20   A.    Yes.
          21               MR. BROWN:  Can you play 229.
          22   BY MR. BROWN:
          23   Q.    And that was on May 8th, correct?
          24   A.    Yes.
15:03:27  25                  (Video played in open court.)

Confidential Human Source 2-Steve (Redirect by Brown) 191

1    BY MR. BROWN:

2    Q.    Okay.  Now, he doesn't mention the house in this clip,

3    does he?

4    A.    No, I don't believe so.

15:03:46  5    Q.    But he says the location is perfect, correct?

6    A.    Yes.

7    Q.    And he's, again, pointing out where the bodies should

8    be dumped, correct?

9    A.    Yes.

15:03:54  10          MR. RICOTTA:  Objection.  Leading, Your Honor.

11          THE COURT:  Okay.  Sustain the objection.

12          It's been leading, but generally, the lawyers have not

13   objected, and so I haven't had to rule.  So I'll sustain the

14   objection.

15:04:09  15          MR. BROWN:  Thank you.

16   BY MR. BROWN:

17   Q.    Did he describe the location in that clip?

18   A.    Yes.

19   Q.    How did he describe it?

15:04:15  20   A.    As a great location.

21          THE COURT:  Okay.  And finally, can you play

22   232.

23                  (Video played in open court.)

24   BY MR. BROWN:

15:04:47  25   Q.    So and what did he say about the buildings in that

1    clip?

2    A.    I didn't -- just about the bodies or the building?

3    Q.    The buildings.

4    A.    I didn't notice that in there.

15:05:05 5              MR. BROWN:  Could you play it again, please?

6              THE WITNESS:  Yeah.  Thanks.  Sorry about

7    that.

8              (Video played in open court.)

9    BY MR. BROWN:

15:05:21 10   Q.    Were you able to observe what he said about the

11   buildings?

12   A.    Well, he was going to torch them.

13   Q.    Okay.

14   A.    Yeah.

15:05:26 15   Q.    And was it your understanding that they were

16   abandoned?

17   A.    Yes.

18   Q.    Okay.  And that was on May 8th?

19   A.    Yes.

15:05:32 20   Q.    So, in fact, on both May 2nd and May 8th, multiple

21   times he made reference to abandoned buildings?

22   A.    Yes.

23   Q.    Now, the defense attorney asked you about your age in

24   relation to the defendant's age, correct?

15:05:48 25   A.    Yes.

Confidential Human Source 2-Steve (Redirect by Brown) 193

1    Q.    On May 2nd, did the defendant bring a loaded weapon to

2    Belden woods?

3    A.    Yes.

4    Q.    Is there any difference between a 20-year-old shooting

15:06:04  5    a loaded weapon at somebody versus an older person shooting

6    somebody?

7                    MR. RICOTTA:  Objection, Your Honor.

8                    THE COURT:  Sustained.

9                    MR. BROWN:  Thank you.

15:06:11  10         Nothing further.

11                   THE COURT:  All right.  Any further questions?

12                   MR. RICOTTA:  No, Your Honor.  Thank you.

13                   THE COURT:  All right.  You may step down,

14   sir.

15:06:18  15                        (Witness excused.)

16                   THE COURT:  We'll take our afternoon break.

17   About 20 minutes.  It may take us a little longer to get

18   situated back in the courtroom.  But everybody should be

19   ready to come back in 20 minutes.

15:06:41  20                   COURTROOM DEPUTY:  All rise.

21                              - - -

22                        (Jury out.)

23              (Proceedings in recess at 3:06 p.m. )

24                   THE COURT:  You may be seated.

15:41:56  25         Call your next witness.

1          MR. TERESINSKI:  Thank you, Your Honor.

2      The United States called United States Park Ranger

3  Angela Budd.

4              THE COURT:  Just come ahead and take the

15:42:34  5  stand.

6      Before you take your seat, though, my deputy will

7  swear you in.

8                  (Witness sworn.)

9              THE COURT:  You may be seated.

15:42:47 10              MR. TERESINSKI:  Your Honor, is it acceptable

11  for the witness to remove her mask?

12              THE COURT:  It's okay while she's testifying.

13              MR. TERESINSKI:  Thank you very much.

14      You can do that, Ranger Budd.  Thank you.

15:42:56 15      Thanks, Your Honor.

16      May I proceed?

17              THE COURT:  You may.

18              MR. TERESINSKI:  Thank you.

19              DIRECT EXAMINATION OF ANGELA BUDD

15:43:01 20  BY MR. TERESINSKI:

21  Q.    State your name for the record.

22  A.    Angela Budd.

23  Q.    And speak up in that microphone so -- our jury is in a

24  different place right now, so you got to keep your voice up.

15:43:08 25      Thank you.

1    A.    Yes, sir.  Angela Budd.

2    Q.    Thank you.  Much better.

3          Where do you work?

4    A.    I work at Cuyahoga Valley National Park.

15:43:17 5    Q.    And who do you work for?

6    A.    The National Park Service.

7    Q.    All right.  And you're assigned as a ranger, right?

8    Is that a park ranger?

9    A.    Yes, sir.

15:43:25 10    Q.    Okay.  And how long have you been doing that?

11    A.    Approximately nine years.

12    Q.    So where have you worked?  What do you do in the

13    rangers?

14    A.    This is my eighth national park.

15:43:35 15    Q.    What are your current duties now?

16    A.    Oh, okay.  Current duties.

17          Current duties, we preserve and protect the resources

18    in the park and also the visitors within.

19    Q.    Okay.  And prior to that, where did you work for the

15:43:46 20    United States -- is it part of the Department of the

21    Interior?

22    A.    Yes, sir.

23    Q.    And where did you work before being a ranger in

24    Cuyahoga -- it's Cuyahoga Valley National Park; is that

15:43:55 25    right?

1    A.    Yes.

2    Q.    And before that, where did you work?

3    A.    Padre Island National Seashore, Gulf Islands.

4    Q.    And did you have experience before becoming a ranger?

15:44:06  5    A.    Yes.

6    Q.    What did you do?

7    A.    I was a seasonal law enforcement ranger for a while.

8    Q.    And where were you assigned doing that?

9    A.    Numerous parks throughout the country.

15:44:15  10   Q.    Okay.  Now, as a ranger, you -- you obviously, at

11   Cuyahoga Falls National Park, you respond to calls, I take

12   it, right?

13   A.    Correct.

14   Q.    Okay.  And on May 8th of 2020, did you respond to --

15:44:33  15   or were you with assisting an agent for the FBI, Special

16   Agent Kurt Dirker?

17   A.    Yes.

18   Q.    Did a radio call come in for assistance on that day?

19   A.    Yes, sir.

15:44:43  20   Q.    Was it a real call, or was it a call basically to go

21   to a certain location?

22   A.    It was a domestic violence call at 500 Truxell Road.

23   Q.    And you knew, I take it then -- that call at 500

24   Truxell Road, what did you know at that point going out

15:44:59  25   there?

Budd (Direct by Teresinski)                 197

1    A.    I knew that an individual was coming to Cuyahoga

2    Valley National Park to preplan an attack on federal

3    officers.

4    Q.    Is that all you knew at that point?

15:45:10 5    A.    Yes, sir.

6    Q.    All right.  And so did you respond to an area at 500

7    Truxell Road?

8    A.    Yes, sir.

9    Q.    And when you arrived there, what did -- just describe

15:45:22 10   for the members of the jury what you did when you arrived

11   there.

12   A.    So I arrived in my patrol vehicle, which is marked

13   with lights and has sirens on it.  I drove down the

14   driveway, positioned my vehicle.  I wish I had a map.  I can

15:45:37 15   show you.

16   Q.    I think we have that for you.  We can do that.

17                MR. TERESINSKI:  Can we pull up Exhibit

18   Number 4?  Thank you.

19   BY MR. TERESINSKI:

15:45:45 20   Q.    It's in evidence already.

21         So is this a fair and accurate sort of depiction of

22   where you would have pulled in with your vehicle?

23   A.    Yes, sir.

24   Q.    Go ahead.  Continue describing what you did.

15:45:55 25   A.    All right.  So I pulled into the driveway with my

Budd (Direct by Teresinski)                    198

1    patrol vehicle.  There's another patrol vehicle behind me.

2    I was the first in a position.  I parked my vehicle right

3    where I'm drawing the red circle.

4    Q.    Okay.  And what did you do next?

15:46:12  5    A.    After I parked my vehicle, I interacted with the agent

6    that was with me.  We approached the front of the residence

7    here, the vacant residence at the doorway.

8    Q.    Okay.

9              MR. TERESINSKI:  And for the record, another

15:46:27  10   circle was put on the structure on the left of Exhibit

11   Number 4.

12   BY MR. TERESINSKI:

13   Q.    Could you -- what did you -- just describe what you

14   did when you -- where you -- at the house there.

15:46:39  15   A.    Yes, sir.

16         The agent and I entered the house and we conducted a

17   check on the interior of the house.

18   Q.    Why did you do that?

19   A.    We wanted to clear the building in case there was any

15:46:50  20   persons in the house that could be a threat to us.

21   Q.    And would you do that regardless of whatever

22   May 8th -- at that point, would you have done that anyway?

23   A.    Yes, sir.

24   Q.    Okay.  And you mentioned that you had a patrol car

15:47:07  25   that day?

             1    A.    Yes, sir.

             2                 MR. TERESINSKI:  Would you pull up Exhibits 11

             3    and 12.

             4          I don't know that they're in evidence yet, Your Honor.

15:47:14     5          But, counsel, do you have any objection?  I think I

             6    mentioned --

             7          Okay.  There's no objection, Your Honor.  We'd ask

             8    that --

             9                 MR. RICOTTA:  No objection.

15:47:21    10                 MR. TERESINSKI:  -- Exhibits 11 and 12 be

            11    admitted into evidence, and I'll get to that with the

            12    witness.

            13                 THE COURT:  They shall be admitted without

            14    objection.

15:47:30    15                 MR. TERESINSKI:  Thank you, Your Honor.

            16          Can we pull up Exhibit 11.

            17          Thank you.

            18    BY MR. TERESINSKI:

            19    Q.    And is this a fair and accurate representation of the

15:47:38    20    vehicle you would have driven up on that day?

            21    A.    Yes, sir.

            22                 MR. TERESINSKI:  Can we have another photo of

            23    Exhibit 12.

            24    BY MR. TERESINSKI:

15:47:44    25    Q.    Is that also a fair and accurate?

Budd (Direct by Teresinski)                    200

1    A.    Yes, sir.

2    Q.    All right.  Thank you.

3          How many structures at 500 Truxell, do you know?

4    A.    On 500 -- on that property itself?

15:47:58  5    Q.    Yes.

6    A.    Approximately three structures.

7    Q.    Okay.  And there's nobody living there, right?

8    A.    Correct.

9    Q.    They're abandoned?

15:48:04  10    A.    There's no one living there.

11    Q.    Okay.  I just have a few more questions.

12          Your ranger vehicle that you showed us, Exhibits 11

13    and 12, what type of equipment is standard in that vehicle

14    that you have?

15:48:19  15    A.    Standard equipment, we have two long guns.  One is a

16    Daniel defense AR-15 semiautomatic rifle, a Remington 870

17    shotgun.

18    Q.    Are they loaded?

19    A.    Duty carry.  So we do have a magazine or the shotgun

15:48:38  20    shells are prepped in the chamber.

21    Q.    So let's go one by one.

22          So in the AR that you mentioned, there's one in the

23    chamber or there's none in the chamber?

24    A.    There is not a bullet in the chamber.

15:48:48  25    Q.    But do you have the magazine?

Budd (Direct by Teresinski)                201

1    A.    Correct.

2    Q.    And how many cartridges did you have in the magazine?

3    A.    30.

4    Q.    30.

5          And you said there were additional -- you said it was

6    a shotgun.

7          Is the shotgun loaded?

8    A.    It wasn't loaded.

9    Q.    Okay.  And how many shells would you have for the

10   shotgun?

11   A.    Approximately ten.

12   Q.    And you mentioned a radio.

13         Is that loose or attached to the vehicle?

14   A.    We have in-car radio, which is permanently attached.

15   Q.    Okay.  You mentioned the AR with 30 rounds.

16         Did you have any extra magazines?

17   A.    Yes, sir.

18   Q.    How many?

19   A.    Approximately three.

20   Q.    And would they also have 30 rounds in it?

21   A.    Yes, sir.

22   Q.    I see you've got a vest on today.  What's that called

23   underneath it in terms -- I know it's a bulletproof vest

24   casually, but is there a an official name for it?

25   A.    Most call it bullet proof or Kevlar vest.

1    Q.    Have you heard the term "SAPI" as well?  SAPI plate?

2    A.    Yes, sir.

3    Q.    Now, in the vehicle, did you have vests like that, as

4    well?

15:49:49  5    A.    Yeah.  I had a plate carrier.

6    Q.    And how many of those?

7    A.    Just one.

8    Q.    Okay.  Now, you have a sidearm, I see, as you came in

9    today?

15:49:57 10    A.    Yes, sir.

11    Q.    And what kind of sidearm is that?

12    A.    It's a Sig Sauer P320 9-millimeter.

13    Q.    And how many rounds of ammunition do you have in that,

14    standard?

15:50:05 15    A.    It's 17 rounds per magazine.  I had three magazines.

16    Q.    And on that day, on May 8th, you would have had three

17    rounds -- three magazines?

18    A.    Yes, sir.

19    Q.    And how many rounds again in each?

15:50:18 20    A.    17 rounds per magazine.

21    Q.    All right.  Did you have anything else on that day

22    that you usually have standard in a vehicle, you know, in a

23    ranger vehicle?

24    A.    It's called a IFAK kit or a gunshot wound kit.

15:50:28 25    Q.    Okay.

       1    A.    And also a ballistic helmet.

       2    Q.    Okay.  And is that a big Kevlar helmet?

       3    A.    Yes, sir.

       4    Q.    The kind the military use?

15:50:40  5    A.    Yes, sir.

       6    Q.    And how about, you have a taser as well?

       7    A.    Yes, sir.

       8    Q.    And where do you wear that?

       9    A.    I wear it on my offhand side, my left side.

15:50:50 10    Q.    Okay.  In anything else in the vehicle?

      11    A.    No, sir.

      12    Q.    Okay.

      13              MR. TERESINSKI:  I don't have anything further

      14    he.

15:51:00 15         Oh, I'm sorry.  One more question.  I'm sorry.

      16    BY MR. TERESINSKI:

      17    Q.    Can you define the plate carrier, what it's called?

      18    A.    It's basically, it's two rifle plates, metal plates in

      19    the front and back, and it's supposed to stop any rifle

15:51:13 20    rounds.

      21    Q.    Is it familiar to say it's a small arms protective

      22    insert?

      23    A.    Yes, sir.

      24    Q.    Have you heard that term before?

15:51:20 25    A.    Yes, sir.

Budd (Cross by Ricotta)                    204

```
             1              MR. TERESINSKI:  Any other --

             2          With the Court's indulgence.

             3          Thank you.  I have no more questions, but defense

             4      counsel may.  I don't know.

15:51:32     5              THE COURT:  Any cross-examination?

             6              MR. RICOTTA:  Just a couple, I think.

             7              CROSS-EXAMINATION OF ANGELA BUDD

             8      BY MR. RICOTTA:

             9      Q.   Ranger Budd; is that correct?

15:51:43    10      A.   Yes, sir.

            11      Q.   Is that correct?

            12      A.   You are correct.

            13      Q.   The area that you drove to, you drove there with

            14      Special Agent Dirker?

15:51:55    15      A.   Yes, sir.

            16      Q.   Okay.  Did you meet him before?  Was it prearranged?

            17      A.   I met him beforehand, yes.

            18      Q.   Okay.  And what time would that have been?

            19      A.   It was throughout the day.  I don't recall the exact

15:52:10    20      time.

            21      Q.   Okay.  Do you know -- did you make any kind of report

            22      that you responded to this location?

            23      A.   I don't recall.  I don't believe so.

            24      Q.   So there's no -- there's no official documentation

15:52:25    25      that you generated as a park ranger for this particular
```

|    |    |
|----|----|
| 1  | call? |
| 2  | A.    I don't recall. |
| 3  | Q.    Is it the normal course of business for you to write |
| 4  | reports? |
| 15:52:37 5 | A.    Yes, sir. |
| 6  | Q.    Any reason why this was different? |
| 7  | A.    I don't recall.  It's been a year.  I don't recall |
| 8  | writing a report. |
| 9  | Q.    A year is not that long ago, is it? |
| 15:52:50 10 | A.    It can be, but . . . |
| 11 | Q.    Okay.  So there's no report.  But suffice it to say, |
| 12 | you do remember doing it, correct? |
| 13 | A.    Yes, sir, I do. |
| 14 | Q.    Okay.  Now, the area that you referenced on the |
| 15:53:06 15 | exhibit -- |
| 16 |               MR. RICOTTA:  Can you put that Exhibit back |
| 17 | up, please. |
| 18 |               MR. TERESINSKI:  Exhibit 4? |
| 19 |               MR. RICOTTA:  4, I think it was, yes. |
| 15:53:15 20 | BY MR. RICOTTA: |
| 21 | Q.    There's some homes there, is that correct? |
| 22 | A.    Yes, sir. |
| 23 | Q.    Okay.  Tell the jury, why are there homes on a |
| 24 | national park? |
| 15:53:23 25 |        How does that work? |

Budd (Cross by Ricotta)                          206

1    A.    It's a good question.  So basically in a nutshell, the

2    Government came in years ago by eminent domain.  They took

3    over these homes.  They paid off the people that lived in

4    the house, and if those people moved out and/or died, the

15:53:45 5    Government took possession of these homes.

6          So 500 Truxell Road, I don't recall what happened to

7    the former owner, but we took possession of it.  Therefore,

8    this property -- these residences ended up vacant, and,

9    therefore, they sit.

15:53:59 10   Q.    Okay.

11   A.    Did that answer your question?

12   Q.    Yeah, that was a good answer.

13         Now, the three homes -- there's three homes there,

14   correct?

15:54:09 15   A.    To my knowledge, there's only two with one garage.

16   Q.    Oh, one's a garage?  Okay.

17   A.    Yes, sir.

18   Q.    Three structures then?

19   A.    Yes.

15:54:17 20   Q.    Okay.  Are they locked up normally?

21   A.    They are normally locked up, yes.

22   Q.    When you arrived on the scene, were they locked up?

23   A.    No, sir.

24   Q.    Did you check all three -- or is it all three

15:54:31 25   structures?

1    A.    No, sir.

2    Q.    Okay.  Why not?

3    A.    So basically we checked 500 Truxell, which is this

4    large building right here first.

15:54:46  5          MR. TERESINSKI:  Indicated for the record that

6    the witness has circled that house on the left of Exhibit

7    Number 4.

8          MR. RICOTTA:  That's fine.  I didn't even

9    notice.

15:54:57 10          THE COURT:  The record should so reflect.

11          THE WITNESS:  So we checked 500 Truxell, which

12    I just circled.  We cleared the building.  No one was

13    inside.

14       Once we were just outside the front door, I was

15:55:10 15    informed that the subject was apprehended at that time.

16    BY MR. RICOTTA:

17    Q.    Okay.  Now, did you expect to confront anybody in that

18    house when you went in?

19    A.    Unknown.  I didn't know what to expect.

15:55:25 20    Q.    Okay.  Did you discuss that with Special Agent Dirker,

21    that you may have a confrontation?

22    A.    I don't recall that specific conversation.

23    Q.    Were your guns drawn?

24    A.    Yes, sir.

15:55:38 25    Q.    Now, was the defendant in that house that you circled

Budd (Cross by Ricotta)                    208

1    on 500 Truxell?

2    A.    No.

3    Q.    Okay.  Did you see him in the area at all when you

4    arrived at that scene?

15:55:51 5    A.    No.

6    Q.    Okay.  During the course of the whole day, did you

7    even observe Mr. Ferguson?

8    A.    No.

9    Q.    All right.  Now, when you arrive at that -- on

15:56:09 10   Government's Exhibit 4, is that like a driveway that circles

11   around?  Is that what that is, a circle drive?

12   A.    Yes, sir.

13   Q.    Now, to get to that circle drive, is there a longer

14   road that goes up the street?

15:56:23 15   A.    Yes, sir.

16   Q.    Is that normally barricaded?

17   A.    There's typically a cable gate.

18   Q.    Okay.  So normally there's like a wire gate that goes

19   across so that they can't access that area going towards

15:56:39 20   those homes, correct?

21   A.    Yes, sir.

22   Q.    Did you have to get out of your vehicle and undo the

23   gate?

24   A.    Yes.

15:56:46 25   Q.    Okay.  So that whomever may have been there never went

1    that way through the gate.  Is that a fair statement, at

2    least to your knowledge?

3    A.    Unknown.  There's a lot people that walk through the

4    woods.

15:57:02  5    Q.    Right.  But I'm just saying, the gate was shut when

6    you went?

7    A.    Correct.  Yes.

8    Q.    You had to open the gate, and then you went through?

9    A.    Yes.

15:57:09 10    Q.    Okay.  Now, during -- how long would you say you're at

11    that address?

12    A.    Approximately 6 to 10 minutes.

13    Q.    Okay.  From that 6 to 10 minutes on May 8th, 2020, did

14    anyone unlawfully seize, confine, inveigle, kidnap, or

15:57:28 15    abduct you?

16    A.    No.

17              MR. RICOTTA:  That's all I have, Your Honor.

18         Thank you.

19              THE COURT:  Is there anything further?

15:57:33 20              REDIRECT EXAMINATION OF ANGELA BUDD

21    BY MR. TERESINSKI:

22    Q.    You can reach that house by going through the woods;

23    is that right?

24    A.    I'm sorry.  Can you restate that?

15:57:43 25    Q.    You can reach that house by going through the woods;

1    you don't have to go down that road, right?

2    A.    Yes, sir.

3               MR. TERESINSKI:  Thank you.

4          I have the nothing further.

15:57:49 5      THE COURT:  Okay.  Anything further?

6               MR. RICOTTA:  Thank you.

7               THE COURT:  You may step down.  That will be

8    all.

9               THE WITNESS:  Thank you, sir.

15:57:54 10     THE COURT:  Call your next witness.

11              MR. TERESINSKI:  Special Agent Kurt Dirker,

12   Your Honor.

13              THE COURT:  All right.

14              MR. TERESINSKI:  Thank you, Agent.

15:57:59 15      May the agent be excused to go back to work?

16              THE COURT:  Yes.

17              MR. TERESINSKI:  Thank you.

18                  (Witness excused.)

19              THE COURT:  You may be seated.

15:58:23 20     THE WITNESS:  Thank you, Your Honor.

21              MR. TERESINSKI:  May the witness remove his

22   mask, Your Honor, for testimony?

23              THE COURT:  Yes, for testimony.

24              THE WITNESS:  Thank you, Your Honor.

15:58:31 25     MR. TERESINSKI:  May I proceed, Your Honor?

Dirker (Direct by Teresinski)                211

1          THE COURT:  You may.

2          MR. TERESINSKI:  Thank you.

3          DIRECT EXAMINATION OF KURT DIRKER

4    BY MR. TERESINSKI:

15:58:34 5    Q.    Agent Dirker, how long have you been employed by the

6    FBI?

7    A.    Just under ten years.

8    Q.    And what do you do on a day-to-day basis?  Please tell

9    the members of the jury.

15:58:45 10   A.    I am assigned to investigate cases.  I work out of the

11   Akron resident agency, which is a small satellite office of

12   the Cleveland division.

13   Q.    And you have previous experience at other law

14   enforcement jobs; is that right?

15:58:56 15   A.    Yes.

16   Q.    Could you explain what it is that you did before you

17   became a special agent?

18   A.    Prior to becoming a special agent, I was a sworn

19   police officer in the State of Ohio, in which my time was

15:59:08 20   split approximately over 11 years; six years as a detective,

21   and then the remaining time in the patrol division.

22   Q.    And prior to becoming -- was that in the Cuyahoga

23   Falls police department?

24   A.    Yes.

15:59:20 25   Q.    And prior to becoming a local police officer, and

           1    also, obviously, before you became an FBI agent, what did

           2    you do?

           3         Did you do anything else?

           4    A.    I was a sergeant in the military police in the

15:59:33   5    United States Marine Corps.

           6    Q.    Okay.  And your training and experience, could you

           7    tell us a little bit about your training and experience as

           8    an FBI agent?

           9    A.    Yes.  I went through new agents training that all FBI

15:59:46  10    agents attend in 2011.

          11         Since then, I attended various courses relative to

          12    what I investigate.  My experience in investigations

          13    includes foreign counterintelligence cases, domestic

          14    terrorism, child exploitation cases, white-collar crime,

16:00:06  15    international parental kidnapping, fugitive cases, and other

          16    similar types of work.

          17    Q.    Okay.  In the case that we're here for, *The*

          18    *United States v. Christian Ferguson*, you are the assigned

          19    lead agent -- investigator; is that right?

16:00:21  20    A.    That's correct.

          21    Q.    And did you work with Special Agent Ryan Taylor --

          22    A.    Yes.

          23    Q.    -- in this case?

          24         Could you describe a little bit -- we talked about the

16:00:30  25    different kinds of cases.  Could you describe a little bit

Dirker (Direct by Teresinski)                213

1    what a lead investigator does?

2    A.    Yes.  When you're a lead investigator on a case, it's

3    primarily your job to essentially run and sort of guide the

4    case.

16:00:46  5        You bring in whatever assets you might need on the

6    periphery.  You may bring in analysts or other support staff

7    to assist.  You might bring in other agents to run down

8    leads.  You might cut leads to other areas of the country to

9    do interviews.  And you basically just simply run the

16:01:07  10   investigation in -- pretty much like a quarterback, I

11   suppose.

12   Q.    Quarterback with various different people doing

13   different things in the case?

14   A.    That's correct.

16:01:14  15   Q.    All right.  And did there come a time -- how

16   many -- can you estimate how many times you were a lead

17   investigator, how many cases?

18   A.    Right now I'm currently carrying 12 cases.

19   Q.    And so you're the lead investigator in 12 different

16:01:27  20   cases?

21   A.    That's correct.

22   Q.    And that's just in the Akron office?

23   A.    In the Akron office, yes.

24   Q.    Now, did there come a time when you had contact with

16:01:35  25   the defendant on May 8th of 2020?

1    A.    Yes.

2    Q.    What did you do on that date?

3    A.    At approximately 6:45 p.m., I came in contact with the

4    defendant after he had been arrested.

16:01:50 5    Q.    And was he -- was he arrested in the area of 500 -- or

6    actually, in the area of -- was he in Cuyahoga Falls

7    National Park when he got arrested?

8    A.    Cuyahoga Valley National Park, yes.

9    Q.    Cuyahoga Valley.  My mistake.

16:02:07 10          And what happened that day after you took him into

11    custody?

12    A.    Myself and Special Agent Taylor walked over to

13    Mr. Ferguson while he was in custody and introduced

14    ourselves to him and told him that we were the case agents

16:02:21 15    on the investigation, and that he would be coming with us.

16    Q.    Okay.  And on that date of May 8th of 2020, was there

17    something specific -- or what were you specifically worried

18    about that day in terms of your investigation before you

19    took him into custody?

16:02:42 20    A.    Well, we wanted to get him -- I'm sorry.

21          Could you repeat the question?

22    Q.    Let me rephrase it.  I'll go back to that question.

23    Strike it.

24          So you took the defendant into custody on May 8th of

16:02:54 25    2020.  What did you do next?  Let's go there.

Dirker (Direct by Teresinski)                215

1    A.    On May 8th -- once we took the defendant into custody,

2    we placed him in my vehicle, which is an FBI vehicle.  It's

3    a Chevy Tahoe that had a camera, audio and video recording

4    inside the vehicle.

16:03:11  5    Q.    Okay.  And then what did you do at that point?

6    A.    I began to verbally -- between myself and

7    Special Agent Taylor, we verbally advised the defendant of

8    his *Miranda* rights.

9    Q.    And what did you do next after that?

16:03:22  10    A.    After that, we departed the area and drove him

11    directly to the Cuyahoga Falls police department located at

12    2310 2nd Street in the City of Cuyahoga Falls.

13    Q.    And why did you go there?

14    A.    We went there because of the proximity to where he was

16:03:40  15    arrested, and they had audio and video recording in their

16    interview room.  And we had a local prosecutor there that

17    was also assisting us on this case.

18    Q.    Okay.  And was that interview -- I'm sorry.

19          What did you do next once inside the building?

16:03:59  20    A.    So once we brought Mr. Ferguson into the interview

21    room, we removed his handcuffs and asked him to take a seat

22    in the interview room.

23    Q.    And what happened in the interview room?

24    A.    So we began the interview by telling him we wanted to

16:04:15  25    ask him a couple of questions about the events of the day.

Dirker (Direct by Teresinski)                    216

1         We provided him with a form FD-395, which is an FBI

2    advice of *Miranda* rights form, and we place that in front of

3    the defendant, and we proceeded to advise him of his *Miranda*

4    rights, and during the course of that, it's usually my

16:04:37  5    standard practice to read them their rights verbally, have

6    them verbally acknowledge to me that they understand, and

7    then I have them initial at the end of each.  And then once

8    they finish their *Miranda* rights, we finish their *Miranda*

9    rights with them, they sign a -- at the bottom indicating

16:04:57 10    that they're willing to speak with us.

11    Q.    And was that done in this case?

12    A.    It was, yes.

13    Q.    And were you present when the advice of rights form,

14    the FD-395, was actually initialed and signed?

16:05:09 15    A.    Yes.

16    Q.    All right.

17              MR. TERESINSKI:  And could we pull up

18    Exhibit 301.

19    BY MR. TERESINSKI:

16:05:15 20    Q.    And showing you what's been marked -- I don't think

21    there's going to be an objection from counsel, but showing

22    you what's been marked as Exhibit 30 is, what is that?

23    A.    That is the FD-395 form that I just described.

24    Q.    And do you see the initials there?

16:05:30 25    A.    Yes.

Dirker (Direct by Teresinski)          217

1    Q.    Okay.  Is it a fair and accurate representation of the

2    rights form?  Is it a copy of the rights form that was

3    signed on May 8th?

4    A.    Yes.

16:05:39  5    Q.    And --

6               MR. TERESINSKI:  I'll move it into evidence,

7    Your Honor.

8               THE COURT:  Okay.

9               MR. RICOTTA:  No objection.

16:05:45  10              THE COURT:  It shall be admitted without

11    objection.

12    BY MR. TERESINSKI:

13    Q.    All right.  Exhibit 301, specifically I see there's

14    some initials.

16:05:51  15         Describe what they are, and then also the signature.

16    A.    Yes.  The initials at the end of each of those *Miranda*

17    rights is -- appears to me to be "CM," and the -- based on

18    my previous knowledge, the signature at the bottom appears

19    to be Christian MacTavish.

16:06:16  20    Q.    And what is the defendant's name?

21    A.    Christian Ferguson.

22    Q.    Okay.  Regardless, that form was signed in your

23    presence?

24    A.    That's correct.

16:06:25  25              MR. TERESINSKI:  With the Court's indulgence.

1    BY MR. TERESINSKI:

2    Q.    Now, after it was signed -- Special Agent Taylor was

3    with you; is that right?

4    A.    Yes.

16:06:33 5    Q.    And after it was signed, what happened next in the

6    interview?

7    A.    We proceeded to interview the defendant regarding the

8    events of the day, and one of my opening questions with the

9    defendant was relative to a comment that he made to us

16:06:52 10   during the transport from the vicinity of 500 Truxell to the

11   police department where the interview was taking place.

12   Q.    And what was that comment?

13   A.    That had to do with a statement the defendant made

14   about he was tired of being pushed around by the police,

16:07:08 15   something thereabout.

16   Q.    And you listened -- how long did this interview last?

17   A.    The interview itself was a little over two and a half

18   hours, but the tape actually runs longer.  But the whole

19   time, it was not an actual interview.

16:07:25 20   Q.    And prior to today did you have an occasion to listen

21   to the entirety of that tape?

22   A.    Yes.

23   Q.    And if we could --

24            MR. TERESINSKI:  For the record, I'm referring

16:07:33 25   to Exhibit 203.

Dirker (Direct by Teresinski)                 219

1    BY MR. TERESINSKI:

2    Q.    Did you listen to the entirety of Exhibit 203?

3    A.    I listened to it and viewed the entire video, yes.

4    Q.    And is it a fair and accurate recording of the

16:07:45 5    representation of what took place on May 8th of 2020 during

6    the interview?

7    A.    Yes.

8              MR. TERESINSKI:  All right.  Your Honor, the

9    United States moves in Exhibit 203 in its entirety into

16:07:57 10   evidence.

11             MR. RICOTTA:  I have no objection, as long as

12   it's in its entire form to the jury.

13             MR. TERESINSKI:  It is.  It's in its entirety.

14             THE COURT:  All right.  It shall be admitted

16:08:05 15   without objection.

16             MR. RICOTTA:  I'm just clarifying it, Jerry.

17             MR. TERESINSKI:  Of course.

18        May I proceed?

19             THE COURT:  You may.

16:08:13 20             MR. TERESINSKI:  Thank you, Your Honor.

21   BY MR. TERESINSKI:

22   Q.    So you talked about -- now to talk a little bit more

23   about what took place in the interview.

24        You talked about a comment he made.  Did the defendant

16:08:25 25   also make another comment to you as well?

1    A.     The defendant made several comments during the

2    interview, but the one specifically I'm referring to had to

3    do with being pushed around by -- being tired of being

4    pushed around by law enforcement.

16:08:40  5    Q.     Okay.

6                        MR. TERESINSKI:  And could we go to 8:20 of

7    the interview, Mr. Brown.

8         While we're having that -- I believe it's 8:20.

9    BY MR. TERESINSKI:

16:09:00  10   Q.     Did the defendant talk about -- oh, it's playing for

11   the record.

12                       MR. BROWN:  Do you want me to play it?

13                       MR. TERESINSKI:  One second.  Let me ask a

14   question.

16:09:06  15   BY MR. TERESINSKI:

16   Q.     During -- at approximately 8:20 of the interview --

17   it's 8 minutes and 20 seconds of Exhibit 203 -- did the

18   defendant make a statement a little bit about -- or a

19   passing statement about what happened earlier that day on

16:09:19  20   May 8th?

21   A.     I'm not recalling the specific statement.

22   Q.     All right.

23                       MR. TERESINSKI:  Why don't we play it.  Maybe

24   it will refresh your recollection.

16:09:30  25                       (Video played in open court.)

1           MR. TERESINSKI:  You can stop it.

2    BY MR. TERESINSKI:

3    Q.    Does that refresh your recollection?

4    A.    Yes.

16:10:01 5   Q.    And what -- what, if anything -- it's hard to hear, so

6    it's -- for the record, what did the defendant say about

7    some of the events earlier at that day?

8    A.    So my context in that question was, the defendant had

9    made a statement that he was tired being pushed around by

16:10:17 10  law enforcement.  He cited a couple of different situations

11   in his past.

12          And then I asked the defendant whether or not those

13   instances in his life had caused him to want to change and

14   do something offensive against law enforcement, meaning an

16:10:34 15  offensive move.  What I meant by that was an attack rather

16   than being defensive.  And that was my general comment -- my

17   general intent in that question.

18   Q.    All right.  Now, you said the interview went for

19   almost two and a half hours.

16:10:55 20         For the first hour and 50 minutes, could you describe

21   to the members of the jury how that interview went?

22   A.    So for approximately the first hour and 50 minutes of

23   the interview, the defendant had -- when he described the

24   overall plan and what had taken place, he had put the blame

16:11:16 25  on, the entire plan and the scenario, onto Guiness.

Dirker (Direct by Teresinski)                          222

1    Q.    And who did the defendant say put together the plan to

2    ambush the police?

3    A.    He said it was Guiness.

4    Q.    And who did the defendant say had the plan to take the

16:11:31  5    officer's gear when he tied up the police?

6    A.    He said it was Guiness.

7    Q.    And who did the defendant say that had the plan to

8    kill the police if it became necessary?

9    A.    He said it was Guiness.

16:11:39 10    Q.    What did you know about what the defendant was saying

11    to you at that point?

12    A.    We knew based on the facts to that point in our

13    investigation that it was actually the defendant who had

14    made those statements.

16:11:51 15    Q.    So he wasn't telling you the truth at that point?

16    A.    He was not.

17    Q.    Did there come a time during this interview when

18    things sort of changed?

19    A.    Yes.  It was roughly approximately an hour and 50

16:12:06 20    minutes into the interview, myself and Special Agent Taylor

21    had stepped out for a break, or had looked at our phones, or

22    had had a conversation during one of the breaks.  And we

23    told the defendant that Guiness had allowed us access to

24    look at his phone.

16:12:26 25    Q.    And what happened next?

1    A.    It changed the --

2    Q.    What did you observe in terms of the defendant and his

3    demeanor?

4    A.    There was a difference in his demeanor when he reacted

16:12:37 5    to that.

6    Q.    Describe it.

7    A.    He sort of leaned forward a little bit, and he lost

8    his posture.  His posture changed.

9              MR. TERESINSKI:  And if we could play --

16:12:47 10   Your Honor, with the Court's permission -- Exhibit 203 from

11   1:55 through 1:58 point -- and 5 seconds for the record.

12              THE COURT:  All right.  You may.

13              MR. BROWN:  I'm getting it as close to 1:55 as

14   I can.

16:13:03 15              MR. TERESINSKI:  That's okay.

16        Thank you.

17          (Video played in open court.)

18   BY MR. TERESINSKI:

19   Q.    Just a few more questions, Agent Dirker.

16:17:02 20        We just watched this videotape.  Who did the defendant

21   say had the plan, to put together the plan to ambush the

22   police?

23   A.    The defendant said it was his.

24   Q.    And not Guiness's?

16:17:10 25   A.    That's correct.

Dirker (Direct by Teresinski)                    224

1    Q.    And who did the defendant say had the plan to take the

2    officer's gear after they tied up the police?

3    A.    The defendant said it was his.

4    Q.    And who did the defendant say had the plan to kill the

16:17:21  5    police if necessary?

6    A.    He said it was his.

7    Q.    And what was that complete plan for the dry run on

8    May 8th?

9    A.    It was for a future attack on law enforcement.

16:17:32  10   Q.    Had the plan ever changed, to your knowledge?

11   A.    No.

12   Q.    And what else did the defendant say about his actions?

13   A.    He admitted that his actions were wrong, and he knew

14   they were wrong.

16:17:45  15   Q.    And did at some point based upon -- as the lead

16   investigator, did you get search warrants in the case?

17   A.    Yes.

18   Q.    Did you get a search warrant for a vehicle?

19   A.    Yes.

16:17:54  20   Q.    Did you get a search warrant for a phone?

21   A.    Yes.

22   Q.    Did you get all those texts and conversations between

23   Guiness and the defendant?

24   A.    Yes.

16:18:05  25   Q.    Did you also get a search warrant for the home that

          1    the defendant shared -- you believe, shared with his father,

          2    on Sherry Avenue in Ohio.

          3    A.    Yes.  13517 Sherry, in Cleveland, Ohio, yes.

          4    Q.    Okay.

16:18:24  5                MR. TERESINSKI:  With the Court's indulgence.

          6          Thank you, Agent Dirker.  I have no more questions

          7    right now.  Counsel may.

          8                THE WITNESS:  Thank you.

          9                THE COURT:  Any cross-examination?

16:18:41 10                MR. RICOTTA:  Yes, Your Honor.

         11                CROSS-EXAMINATION OF KURT DIRKER

         12    BY MR. RICOTTA:

         13    Q.    Special Agent Dirker, how are you today?

         14    A.    Fine, sir.  Thank you.

16:18:52 15    Q.    You're the lead officer on this case, or agent?

         16    A.    Yes.  I'm a co-case agent with Special Agent Taylor,

         17    but, yes.

         18    Q.    When I listened -- you've been in the courtroom for

         19    the entire time, correct?

16:19:07 20    A.    That's correct.

         21    Q.    So you've heard all the testimony thus far?

         22    A.    Yes, I have.

         23    Q.    It appeared to me, at least from the testimony of

         24    Special Agent Taylor, that initially he was calling the

16:19:22 25    shots.

1      Does that sound fair?

2    A.    Not necessarily.  The reason that it came off that way

3    is that the initial -- the way that we are set up in

4    Cleveland, like I explained to the jury earlier, I'm in a

16:19:36  5    resident agency, which is the satellite office of the

6    Cleveland headquarters division.

7          So when a guardian lead is routed in, it initially

8    comes into the Cleveland division, and it would have come to

9    Special Agent Taylor's squad.  Therefore, he would have had

16:19:54 10   visibility on it, and eventually they saw a nexus to Akron

11   based on a statement that defendant had made in a chat

12   somewhere.  Therefore, it was sent down to Akron.

13   Q.    Okay.  Well, I mean, it initially kicked off with an

14   anonymous tip, right?  I mean, isn't that --

16:20:16 15   A.    The tip was not anonymous.

16   Q.    Okay.  So you verified who that was?

17   A.    Yes.  It was a 21-year-old male living, I believe, in

18   Massachusetts.  He fully identified himself to us.

19   Q.    Okay.  And there was some -- what exactly was it --

16:20:31 20   was the statement that he revealed or concerns?

21   A.    This individual was on a Discord chat, and he saw the

22   statements made by Grinch75R that involved a proposed attack

23   on law enforcement.  And he found these statements to be

24   alarming, therefore, he contacted the national threat

16:20:55 25   operations center.

Dirker (Cross by Ricotta)                    227

1    Q.    Okay.  And was there a specific target?  Was it the

2    rangers or the park system?

3    A.    The target was just law enforcement.

4    Q.    All right.  So it was just law enforcement generally?

16:21:05  5    A.    Generally, but there was a mention of feds at some

6    point.

7    Q.    Now, were you involved in the decision to use the

8    confidential human sources?

9    A.    Yes.

16:21:27 10    Q.    And when was that decision made?

11    A.    That decision would have been made sometime in early

12    April, that first week thereabout.

13    Q.    Now, from the initial complaint, or tip, or whatever

14    we want to call it, to the May 8th arrest, all right?  Was

16:21:58 15    any person actually detained, abducted, held hostage in any

16    form physically?

17    A.    No.

18    Q.    Okay.  Now, the arrest was made on May 8th, correct?

19    A.    Yes.

16:22:16 20    Q.    All right.  You take him to Cuyahoga Falls; is that

21    correct?

22    A.    Yes.

23    Q.    Who was the prosecutor you were working with, the

24    local one?

16:22:26 25    A.    We had a prosecutor named Greg Ward.

              1    Q.    Okay.  And when you advised the defendant of his

              2    *Miranda* rights on that form, did it have what he was going

              3    to be charged with?

              4    A.    No, but I informed the defendant of the reason -- or

 16:22:44     5    what the charge would be.

              6    Q.    But is it normal that on your form that you would have

              7    these warnings and here's what you're going to be charged

              8    with?

              9    A.    No, that's not normal.  There's no space on that form

 16:22:59    10    for that.

             11    Q.    Well, what did you tell him he was going to be charged

             12    with?

             13    A.    A conspiracy to commit murder charge.

             14    Q.    Okay.  And did that ever come to fruition?

 16:23:08    15    A.    He was charged with that under the Ohio Revised Code

             16    and was held on that pending a criminal complaint in the

             17    federal system.

             18    Q.    Okay.  Now, tell me this, Special Agent Dirker, who

             19    was he conspiring with?

 16:23:26    20    A.    In that particular --

             21                   MR. TERESINSKI:  Objection.

             22          It was at the state level, and we're talking about the

             23    federal case here.

             24                   THE COURT:  Okay.  I think you're trying to

 16:23:36    25    get the background of what he was told in the context of the

|              | 1  | *Miranda* warnings he was given?  Is that what you're saying? |
|              | 2  | MR. RICOTTA:  That's correct, Your Honor. |
|              | 3  | THE COURT:  You have limited latitude.  I'll |
|              | 4  | let you -- I'll allow you a question or two, but -- |
| 16:23:53     | 5  | BY MR. RICOTTA: |
|              | 6  | Q.    Yeah.  Can you tell me who he conspired with? |
|              | 7  | A.    In that particular case, it would have been the two |
|              | 8  | defendants he was with or potentially others online that he |
|              | 9  | was talking to. |
| 16:24:04     | 10 | Q.    The two defendants he was with were agents of the |
|              | 11 | Government, were they not? |
|              | 12 | A.    They were not agents of the Government.  They were |
|              | 13 | confidential human sources. |
|              | 14 | Q.    Well, when the Government pays somebody to be a |
| 16:24:18     | 15 | confidential human source, doesn't that make him an agent of |
|              | 16 | the Government? |
|              | 17 | A.    No.  You become an agent of the -- no, you're not an |
|              | 18 | agent of the Government.  You're defined as a confidential |
|              | 19 | human source. |
| 16:24:29     | 20 | THE COURT:  Okay.  I'm going to allow limited |
|              | 21 | latitude.  I think you're entitled to ask some questions, |
|              | 22 | because in the context of his arrest, he was told certain |
|              | 23 | things.  It doesn't mean that the state had to move forward |
|              | 24 | on it or the agent. |
| 16:24:45     | 25 | So but I thought it was fair that you got a chance to |

1    ask him.  Since he made that initial statement and

2    determination, I don't think we can go back and forth and

3    debate on, you know, whether the charge was good or not.

4        But I'm okay with the questions you asked so far.

16:25:05  5            MR. RICOTTA:  Okay.  And that's all I wanted

6    to really get into, Your Honor.

7            MR. TERESINSKI:  Thank you, Your Honor.

8    BY MR. RICOTTA:

9    Q.    Now, the original -- strike that.

16:25:23 10        During the first hour and 50 minutes of this so-called

11   statement by Ferguson -- the jury will have that and they

12   can listen to it -- what was basically discussed at that

13   point?

14   A.    The overall events of the day.  Like I mentioned

16:25:42 15   earlier, we opened with that question about

16   whether -- what -- what -- we asked him to explain what he

17   meant by those comments he made in the vehicle about being

18   tired of being pushed around by law enforcement.

19        Then we asked him if he ever thought about going

16:26:01 20   offensive with it, and then we went into sort of a tell us

21   about the details of today.  What happened today?  And then

22   we went into the sort of the statement where he

23   pushes -- turns everything to Guiness.

24   Q.    So for an hour and 50 minutes, he's not cooperating,

16:26:20 25   in your mind?

Dirker (Cross by Ricotta)                    231

1   A.    I wouldn't call it not cooperating.  I would just say,

2   we were interviewing him, and he was not telling the truth.

3   Q.    And at some point, this 4 or 5 minutes of what you

4   played is, in your estimation, professionally as a special

16:26:44  5   agent, his confession?

6   A.    It's part of it, yes.

7   Q.    And what did he confess to?  I'm sort of lost on that.

8   A.    He admitted to the overarching plan of luring law

9   enforcement to an area to commit an ambush-style attack on

16:27:04  10   them and take their gear as being his idea and his plan.

11   Q.    Okay.  And would you agree with me, Special Agent

12   Dirker, that a plan is merely words.  It's words that he

13   said, correct?

14   A.    In this particular case, the defendant had words

16:27:24  15   paired with actions.

16   Q.    Okay.  That's good.

17         Now, the words were what we spent hours listening to

18   on the tape, correct?

19   A.    The -- which specifically, sir, are you referring to?

16:27:42  20   Q.    I don't know.  We had two, three -- we had a number of

21   little clips, right?

22   A.    So May 2nd was a combination of words and actions in

23   the form of the defendant describing his plan, and then

24   proceeding to explain to people that he thought were

16:28:00  25   coconspirators in the sand, that is -- I would define that

Dirker (Cross by Ricotta)                    232

1    as words and actions --

2    Q.    Okay.  Well, just let me -- let me ask the questions

3    please.

4                     MR. TERESINSKI:  Your Honor, objection.  He's

16:28:07  5    trying to answer the question.  Counsel --

6                     MR. RICOTTA:  Then let me ask the question.

7                     THE COURT:  All right.  Just one moment.

8            Again, we can't let this deteriorate.

9                     MR. TERESINSKI:  No problem here, Judge.

16:28:18 10                     THE COURT:  All right.  Okay.  Let's start up

11    fresh.

12                     MR. TERESINSKI:  The objection simply was, for

13    the record, that the witness was trying to answer the

14    question and counsel cut him off.

16:28:27 15                     THE COURT:  I understand.

16            Okay.  Let's start fresh.  Ask the question you want

17    to ask and we'll --

18    BY MR. RICOTTA:

19    Q.    Okay.  So it's your testimony, Special Agent Dirker,

16:28:34 20    that on May 2nd, the actions were this drawing in the sand

21    by Ferguson that was recorded, correct?

22    A.    My testimony to that, sir, would be that the

23    defendant's actions on that day were showing up to meet who

24    he thought was a coconspirator with a fully loaded, fully

16:29:01 25    functioning AR-15 rifle, and proceeding to walk around and

```
          1    show them --

          2               THE COURT:  Now, you didn't --

          3               THE WITNESS:  -- this particular plan.

          4               THE COURT:  I dont mean to interrupt you, but

16:29:10  5    you didn't answer his question.

          6               THE WITNESS:  I'm sorry, Your Honor.

          7               THE COURT:  Then you went ahead and said what

          8    you wanted to say.  But your lawyers can ask questions and

          9    bring out those things that they think they want to.  So

16:29:24 10    just make sure, because I don't think you were totally

         11    responsive to his question.

         12               THE WITNESS:  Understood, Your Honor.

         13               THE COURT:  All right.

         14    BY MR. RICOTTA:

16:29:33 15    Q.    Again, you're saying that the actions were, in part,

         16    him in the sand drawing out a plan, right?

         17    A.    That's correct, yes.

         18    Q.    Okay.  Now, would you agree with me that drawing it

         19    out or speaking it are really not that different, are they?

16:29:50 20    A.    I don't agree with that.

         21    Q.    Okay.  What is the difference if I do something in the

         22    sand or I say, let's go 5 feet this way, turn left, and stop

         23    at the abandoned house?

         24         What's the difference?

16:30:05 25    A.    In my opinion, if that's what you're asking --
```

Dirker (Cross by Ricotta)                234

1    Q.    Well, your professional opinion as an FBI agent.

2    A.    My opinion is, he's actually creating something rather

3    than pointing and making a notional situation.  He's

4    actually creating a physical map in the ground drawing up

16:30:24  5    essentially a play, and then describing it.

6    Q.    Okay.  Sort of like a football play, then, huh?

7    A.    You could compare it to that.

8    Q.    Okay.  Now, the bringing of the gun that you wanted to

9    bring out, wasn't that at the request of Guiness that they

16:30:40 10    were going to go to a shooting range?

11    A.    I don't remember the specifics on the shooting range,

12    but I know that Guiness did request that he brought his

13    rifle out.

14    Q.    Okay.  So Guiness is directing him, and at some point

16:30:54 15    I recall in one of these chats that they say we'll do some

16    shooting.

17          Do you recall that?

18    A.    I recall it being in a chat, but I can't recall

19    specific to this scenario.

16:31:04 20    Q.    Okay.  So, again, it's your confidential human source

21    that's directing him, not the other way around, correct?

22    A.    In terms of what specifically, sir?

23    Q.    To bring the gun.

24    A.    Yes.

16:31:21 25    Q.    So other than the words and being directed by Guiness

```
            1    to bring the gun, tell me what other actions, in your

            2    estimation, as an FBI agent, took place?

            3    A.    On which specific day, sir?

            4    Q.    Well, let's start with May 8th.

16:31:39    5    A.    May 8th?  The --

            6    Q.    That's the date of the crime, isn't it?

            7    A.    It's the date that the defendant showed up for his dry

            8    run, yes.

            9    Q.    Okay.  Now, before I ask any further questions, was

16:31:53   10    there anywhere in any of this -- how many hours of video do

           11    we have?

           12    A.    Between the --

           13    Q.    Between the confession --

           14    A.    Several --

16:32:04   15    Q.    -- and all the body cams.

           16    A.    My estimation, north of ten.

           17    Q.    In the ten hours or more of videos, was there ever

           18    a -- out of the words of -- or the mouth of Ferguson a

           19    specific day that this was going to happen?

16:32:19   20    A.    In one --

           21    Q.    Yes or no.

           22    A.    No.

           23              MR. TERESINSKI:  Objection.  He doesn't need

           24    to yell at the witness.  He didn't barely answer the

16:32:29   25    question.
```

            1                   THE COURT:  None of you may --

            2                   MR. TERESINSKI:  Okay, Your Honor.

            3                   THE COURT:  -- yell, okay?  And I know you

            4       know better.

16:32:37    5          I think he did ask a specific question.

            6                   MR. TERESINSKI:  All right.  But he was

            7       yelling at the witness.  I'll withdraw my objection.

            8                   THE COURT:  Okay.  Well, keep the tone even.

            9          But he -- I think the question was a specific one

16:32:50   10       about whether -- well, we can read the question back.

           11                   THE WITNESS:  I recall the question,

           12       Your Honor.

           13                   THE COURT:  All right.  Why don't you answer

           14       it then.

16:33:00   15                   THE WITNESS:  As far as a specific day, no.

           16       BY MR. RICOTTA:

           17       Q.    On May 8th, this alleged dry run, correct?

           18       A.    Yes.

           19       Q.    The defendant is picked up by Guiness in his vehicle,

16:33:20   20       correct?

           21       A.    Yes.

           22       Q.    He and Steve, Ferguson, they all go to what I've

           23       described as, I don't know, the barn, but through the park,

           24       right?

16:33:37   25       A.    That's correct.

Dirker (Cross by Ricotta)                    237

1    Q.    Okay.  Now, that was already planned and discussed

2    with the two confidentials 1 and 2, correct?

3    A.    Yes.

4    Q.    And tell the ladies and gentlemen of the jury exactly

16:33:50  5  what was the plan, as you recall it.

6    A.    The plan on that specific day was for the confidential

7    human sources to verify whether or not the defendant was

8    going to do a dry run for a future attack and if that

9    specific location would be suitable to him for that specific

16:34:14  10  event.

11   Q.    Okay.  So everything that was going to occur, at least

12   by that testimony, would have been in the future; is

13   that -- is that a fair statement?

14   A.    Yes.

16:34:28  15  Q.    Now, once he's arrested, at some point he makes these

16   admissions or parts of what we have characterized as a

17   confession, correct?

18   A.    Yes, sir.

19   Q.    Does he also cooperate with you and your agents by

16:34:47  20  signing releases allowing you to go to his chat room and

21   things of that nature?

22   A.    Yes.

23   Q.    Tell me exactly, what does he do?

24   A.    He gave us a -- we put in front of him -- I can't

16:35:01  25  remember the form number -- but we placed in front of the

1    defendant a consent to search form, which basically allows

2    us to search his different platforms.  So, in other words,

3    his Discord, Instagram, and things like that.

4    Q.    Now, were you able during the course of your

16:35:28  5    investigation to learn who was actually in the 75th

6    Spartans?

7    A.    We learned the names of a couple of the people that he

8    was speaking to online.

9    Q.    Okay.  Can you recall who they were?

16:35:43 10    A.    Yes.  One of them is a minor, so I'd avoid -- probably

11    avoid saying his name.  And then the other was another

12    individual who was referred to earlier in testimony who is a

13    member of the National Guard.

14    Q.    Do you recall what his moniker was?

16:35:58 15    A.    Shaland (phonetic).

16    Q.    Now, who is Luis Espinosa, Jr.?

17    A.    That, I don't know.

18    Q.    Okay.  You're not familiar with him as a law

19    enforcement agent?

16:36:17 20    A.    Not to my recollection.

21          Are you talking about an online moniker on the Discord

22    chat?

23    Q.    No.  I'm reading a report from a Luis, Jr. -- or Luis

24    Espinosa, Jr.?

16:36:42 25    A.    Yes, I'm familiar with him.  He's a task force officer

Dirker (Cross by Ricotta)                    239

1    out of the Toledo resident agency.

2    Q.    And I'm reading it.  It's dated Tuesday, April 14th,

3    2020, and he identifies Dawg Vox,

4    SecretAgentRandyBeans/Russ.  That's the 14-year-old,

16:37:01  5    correct?

6    A.    That's correct.

7    Q.    Sergeant SpaghettiO, 7104.

8          Did you ever identify him?

9    A.    I did not.

16:37:11 10    Q.    ViagraOverdoes, 5603, any clue who that is?

11    A.    No, sir.

12    Q.    Andrew the Cool Kid.  Identify him?

13    A.    No.

14    Q.    Delta 5269?

16:37:31 15    A.    No.  That person wasn't officially identified, no.

16    Q.    Obviously, we got Grinch75R, and then Mike 3962.

17          Now, Mike was identified, was he not?

18    A.    Not to my recollection.

19    Q.    Wasn't he the 15-year-old?

16:37:47 20    A.    I don't recall seeing anything on that.  I'm not

21    familiar.

22    Q.    And with Russ, the 14-year-old, he had a cousin that

23    was also 14 that was supposedly going to work with this

24    thing, correct?

16:37:59 25    A.    I believe so.

Dirker (Redirect by Teresinski)                240

1  Q.    Now, once you have all this information, does the FBI

2  have any way to go back and track who these individuals are,

3  or they just -- they just remain out there in Discord land

4  or whatever?

16:38:21  5  A.    You can, if you're able to get -- you could issue

6  a -- yes, you could issue a subpoena and try to identify.

7  Q.    Was that ever considered in this particular

8  investigation?

9  A.    Not in every one of those people, no.

16:38:35  10  Q.    Were any of them?

11  A.    Some of them we did.  We had concerns over the one

12  individual who claimed to be a member of the National Guard.

13  That was concerning to us.

14  Q.    All right.

16:39:04  15            MR. RICOTTA:  All right.  Thank you, Special

16  Agent.  I appreciate it.

17            THE WITNESS:  Thank you.

18            MR. TERESINSKI:  A few more questions, Your

19  Honor --

16:39:09  20            THE COURT:  All right.

21            MR. TERESINSKI:  -- on redirect.

22            REDIRECT EXAMINATION OF KURT DIRKER

23  BY MR. TERESINSKI:

24  Q.    Counsel asked you questions about the 14-year-old and

16:39:16  25  following up on any of these people.

Dirker (Redirect by Teresinski)          241

1      Did you follow up on the 14-year-old?

2   A.   We did, yes.

3   Q.   And what was that person's name you referred to?

4   A.   It was --

16:39:25  5   Q.   That's okay.

6      What did you follow up about?  What did you learn

7   about the 14-year-old?

8   A.   We cut a lead out to that division, and the FBI agents

9   went out there and interviewed him with his mother there,

16:39:37  10   and we learned that he is, indeed, a 14-year-old who owns,

11   according to the mother, an AR-15 rifle, a couple of long

12   guns, has a book on how to make explosives, and owns several

13   knives and a homemade spear.

14   Q.   And of all those people that were mentioned, including

16:40:05  15   the 14-year-old, who showed up on May 2nd, 2020, in this

16   case, out to do an ambush?

17   A.   On May 2nd, the defendant showed up.

18   Q.   And how about on May 8th, who showed up?

19   A.   The defendant.

16:40:19  20   Q.   And did it give you concern for the fact that the

21   defendant showed up on both days?

22   A.   Yes.

23   Q.   What was that concern?

24   A.   The concern was on May 2nd, once we learned that the

16:40:36  25   defendant -- his statements paired with the fact that he

1    actually owned a functioning rifle that was confirmed by us

2    by two men who are experienced in handling rifles.  Once it

3    was confirmed that he did have the capability and a stated

4    desire to do that, that raised significant concerns with us,

16:40:56  5    that he actually had the ability to carry out what he was

6    saying he wanted to do.

7    Q.    Any of the these other people online between the time

8    the Discord chat started happening up until May 8th want to

9    commit an ambush?

16:41:11  10    A.    No.

11    Q.    Ambush police?

12    A.    No.

13    Q.    Kill them, if necessary?

14    A.    No.

16:41:15  15    Q.    And it wasn't just words, right, in this case of the

16    defendant?

17    A.    That's correct.

18                MR. TERESINSKI:  I have nothing further.

19          Thank you.

16:41:23  20                THE COURT:  Anything further, counsel?

21                RECROSS-EXAMINATION OF KURT DIRKER

22    BY MR. RICOTTA:

23    Q.    Well, that's not completely accurate, is it, Special

24    Agent Dirker, as it regards to Russ, the 14-year-old?

16:41:36  25    A.    In what context, sir?

Dirker (Recross by Ricotta)                243

1    Q.    Well, didn't he send chats describing how he could

2    make a chemical bomb, or some kind of thing like that?

3    A.    Yes.  I thought I was answering in the context of

4    people showing up to take an overt action.  My apologies.

16:41:52  5    Q.    Apology accepted.

6          We don't know what happened to this 14-year-old.

7    Apparently nothing, correct?

8    A.    As far as I know, nothing.

9    Q.    Maybe grounded, punished?

16:42:02 10    A.    Possibly.

11                MR. RICOTTA:  Thank you.  Nothing further.

12                MR. TERESINSKI:  Nothing further.

13                THE COURT:  All right.  You may step down.

14                THE WITNESS:  Thank you, Your Honor.

16:42:12 15                   (Witness excused.)

16                THE COURT:  Okay.  I think we probably should

17    conclude for today.  There are 15 minutes to 5:00 almost.

18          But before I do that, counsel, do you have any

19    thoughts contrary to that?

16:42:34 20          Either counsel.

21                MR. TERESINSKI:  No, Your Honor.  It's

22    probably a good plan.

23                THE COURT:  We can talk later about --

24                MR. TERESINSKI:  Sure.

16:42:43 25                THE COURT:  -- tomorrow and what the schedule

1    will be.

2         But I can tell the jurors now that our intent is to

3    start at 9:00, but to be here earlier.  And I say that,

4    being honest with you, that we're going to start at 9:00.

16:42:59  5    But I'm telling you to be here at 8:30.  You see it takes a

6    bit to organize, and I'd like to be in the courtroom at

7    9:00.  And so that's why I tell you that.

8         I think we're making very good progress.  I don't --

9    you know, I don't want to say exactly, you know, how long

16:43:17  10   we'll go or what will happen, other than to say, based on

11   what the lawyers have told me, I think we're making very

12   good progress.

13        So I'm going to let you go home now.  And we'll start

14   up promptly in the courtroom at 9:00 tomorrow.

16:43:33  15            MR. TERESINSKI:  Thank you, Your Honor.

16            COURTROOM DEPUTY:  All rise.

17                 (Jury out.)

18                    - - -

19            (Proceedings adjourned at 4:48 p.m.)

20                    - - -

21            **C E R T I F I C A T E**

22

23        I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.

24
         */s/ Donnalee Cotone _____22nd of December, 2021*
25   DONNALEE COTONE, RMR, CRR, CRC                    DATE