1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
2                          EASTERN DIVISION

3       ------------------------------X
        UNITED STATES OF AMERICA,     :   Case No. 5:20-cr-00262
4                                     :   Cleveland, Ohio
                     Plaintiff,       :
5                                     :   Wednesday, May 5, 2021
            v.                        :   9:24 a.m.
6                                     :
        CHRISTIAN FERGUSON,           :   **VOLUME 2 - JURY TRIAL**
7                                     :   *(Pages 245 - 362)*
                     Defendant.       :
8       ------------------------------X

9

10

11            TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12         BEFORE THE HONORABLE SOLOMON OLIVER, JR.

13           SENIOR UNITED STATES DISTRICT JUDGE

14

15

16
        Court Reporter:          Donnalee Cotone, RMR, CRR, CRC
17                               Realtime Systems Administrator
                                 United States District Court
18                               801 West Superior Avenue
                                 Court Reporters 7-189
19                               Cleveland, Ohio 44113
                                 216-357-7078
20                               donnalee_cotone@ohnd.uscourts.gov

21

22

23

24      Proceedings recorded by mechanical stenography, transcript

25      produced by computer-aided transcription.

```
 1    APPEARANCES:

 2

 3    For the Government:        DUNCAN T. BROWN

 4                              JEROME J. TERESINSKI

 5                              Assistant United States Attorney

 6                              801 West Superior Avenue

 7                              Suite 400

 8                              Cleveland, Ohio 44113

 9                              216-622-3600

10                              duncan.brown@usdoj.gov

11                              Jerome.Teresinski2@Usdoj.Gov

12

13

14    For the Defendant:        JOHN J. RICOTTA, ESQ.

15                              910 IMG Center

16                              1360 East Ninth Street

17                              Cleveland, Ohio 44114

18                              216-241-0715

19                              jjricotta@aol.com

20

21    ALSO PRESENT:             Kurt Dirker, FBI Special Agent

22

23

24

25
```

1                           **I N D E X**

2                                                        **PAGE**

3      APPEARANCES........................................ 246

4      DIRECT EXAMINATION OF PETE MAURO................... 256
       BY MR. TERESINSKI
5
       CROSS-EXAMINATION OF PETE MAURO.................... 273
6      BY MR. RICOTTA

7      REDIRECT EXAMINATION OF PETE MAURO................. 277
       BY MR. TERESINSKI
8
       CLOSING STATEMENT BY MR. BROWN..................... 293
9
       CLOSING STATEMENT BY MR. RICOTTA................... 310
10
       REBUTTAL CLOSING STATEMENT BY MR. BROWN............ 317
11
       CHARGE TO THE JURY................................. 321
12
       JURY QUESTIONS..................................... 353
13
       CERTIFICATE........................................ 362
14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | MORNING SESSION, WEDNESDAY, MAY 5, 2021 |
| 2 | (Proceedings reconvened at 9:24 a.m.) |
| 3 | (In Open Court - Jury Not Present) |
| 4 | - - - |
| 08:54:57  5 | THE COURT:  We can go on the record now. |
| 6 | So I've been meeting briefly with counsel about the |
| 7 | proposed jury instructions that we prepared.  So they were |
| 8 | largely prepared from the joint proposed instructions |
| 9 | submitted by the lawyers. |
| 09:24:55 10 | I indicated to them that I have taken out the proposed |
| 11 | instruction regarding judicial notice, that we knew that if |
| 12 | defendant was to testify, the jury instructions shouldn't |
| 13 | have a paragraph about his testimony and how to judge that; |
| 14 | that I had taken out paragraphs having to do with opinion |
| 09:25:22 15 | testimony, such as by experts, and then also I've taken out |
| 16 | paragraphs relative to opinion testimony and opinion |
| 17 | testimony and fact testimony together and what you do there. |
| 18 | Then I thought none of those were pertinent, and I thought |
| 19 | could possibly be confusing. |
| 09:25:50 20 | I have one other thing that I took out, and that was |
| 21 | the proposed instruction that says defense theory.  And then |
| 22 | it had not gone forward to say what the defense theory was, |
| 23 | but it says the summary of the defendant's position.  I took |
| 24 | that out because I thought -- well, normally I don't put |
| 09:26:22 25 | that in, but sometimes I do. |

1          I think in a criminal case the main thing is to stress

2     from a -- from a jury instruction standpoint that the

3     Government has the burden of proof; the defendant has no

4     burden.  The defendant doesn't have to produce anything, and

09:26:40  5     so forth.  Those are really the key hallmarks of our system.

6     And if you go too far and try to summarize -- the Court to

7     summarize the defendant's position, that you could very well

8     get it wrong or not leave open arguments that could be made.

9     And so traditionally I have not put in the defense theory

09:27:03 10     because the defense doesn't have to have any position at

11     all, and I think -- so that's why I took that out.

12          Mr. Ricotta --

13               MR. RICOTTA:  Yeah.

14               THE COURT:  -- I forgot to mention that.

09:27:15 15     Do you disagree with that?

16               MR. RICOTTA:  No, I do not, Your Honor.

17     Your changes were fine.

18               THE COURT:  All right.

19     Do you disagree with that?

09:27:24 20               MR. BROWN:  No, not at all, Your Honor.

21               THE COURT:  All right.  So I had spoken with

22     the Government's attorney, and Mr. Brown indicated that he

23     accepted the Court's changes, and he had no objections now

24     to the proposed instructions as they exist.

09:27:38 25          Is that correct, Mr. Brown?

1          MR. BROWN:  That is correct, Your Honor.

2          THE COURT:  All right.  Mr. Ricotta had a

3     couple of things that he wanted to raise and that he wanted

4     to put on the record, or get a ruling on.

09:27:49  5     And so I want to turn to him so that we could make

6     sure that he has that opportunity.

7          MR. RICOTTA:  Thank you, Your Honor.

8          The original indictments, Counts 1 and 2 of the

9     instant case, they charge as it relates to the kidnapping

09:28:07 10    that the time frame is March 21st, 2020, to on or about

11    May 8th, 2020.

12         After hearing the evidence that was produced by the

13    Government, at this juncture, I'd be asking the Court,

14    pursuant to Criminal Rule 7, to strike the language in the

09:28:29 15    indictment regarding March 21st to on or about May 8th.

16         It seems clear to me that the evidence produced by the

17    Government supports a theory that on May 8th, 2020, there

18    was a dry run, as they consider it, and that two potential

19    rangers came down, and that was the juncture when the

09:28:55 20    kidnapping was about to occur.

21         So that the substantive charges are actually May 8th,

22    2020, for Counts 1 and 2, in that I would be asking the

23    Court to strike that language and to limit it to May 8th,

24    2020.

09:29:13 25         THE COURT:  All right.  And then --

1    MR. RICOTTA:  I also object then to

2    paragraph 14 of your jury instructions, which has the on or

3    about instruction, because I think that would then become

4    confusing to the jury.

09:29:27  5    THE COURT:  Okay.  All right.

6    MR. BROWN:  Your Honor, may I?  Thank you.

7    The Government's position is that the testimony, in

8    fact, presented multiple dates about what witnesses even

9    called substantial steps.  Those dates would be April 18th,

09:29:43 10    April 28th, May 2nd, May 4th, and May 8th.

11    And, Your Honor, the way the Government had charged

12    the case is consistent with the case law citing

13    *United States v.* Williams, 704 F.2d. 315, Sixth Circuit

14    1983, where they talk about the substantial step being

09:30:05 15    something more than mere preparation, yet, less than the

16    last act necessary before the commission of the substantive

17    crime.

18    So they're talking about potentially an indefinite

19    date, or possibly the Government would argue multiple dates.

09:30:23 20    Likewise, in *United States v. Price*, 134 F.3d 340,

21    pinpoint site 351, Sixth Circuit 1998, evidence is

22    sufficient to establish an attempt that shows, quote, "the

23    defendant's conduct goes beyond preliminary activities" --

24    in the plural -- "and a fragment of the crime was

09:30:44 25    essentially in progress."

252

1    So, again, that court case, Sixth Circuit case, talks

2    about crime or attempts in progress, which would

3    logically -- and I don't think it's fair to restrict to just

4    a certain date, if a crime is in progress or an attempt is

09:31:02  5    in progress, to limit the inquiry just to a specific date.

6    Specifically, also because under the idea of

7    *res gestae*, just generally, a crime like an attempt should

8    be viewed in the context of the testimony given.  And then

9    like I said, there have been multiple dates provided by

09:31:22  10   witnesses for the jury to look at.

11   And the jury ultimately will decide what's a

12   substantial -- or a substantive step.  So they should be

13   able to view the evidence in the context it was presented.

14   As to the on or about argument, I think we're further

09:31:38  15   restricting the well-accepted language of how to charge a

16   case by taking away an on or about.  I don't think it's

17   confusing for the jury.  I think the pattern instruction,

18   which is what this is derived from, is abundantly clear, and

19   it's been given numerous countless times without objection.

09:31:59  20            THE COURT:  Thank you, Counsel.

21            MR. BROWN:  Thank you.

22            THE COURT:  Mr. Ricotta, I'm going to overrule

23   your objection, but I understand your arguments.  And I want

24   to make sure which, of course, you're entitled to have, that

09:32:20  25   a good record is made on your position.

1        I -- this is a tough area in terms of law, in terms of

2    how you work through this, especially when you're dealing

3    with attempt, and especially also when planning instruction

4    is not enough.  But there are arguments that a thing is

09:32:49  5    planning or it's a substantial step, or which one is it, and

6    so because of that dichotomy, when does the plan become a

7    substantial step, or when does it not.  And that it does

8    contemplate looking at things before the kidnap itself.

9        And so I don't know that the law even -- well, the law

09:33:18 10    doesn't even seem to require that the kidnap date be

11    established.  I don't disagree with any arguments that you

12    would have in terms of to the jury about all of those

13    things.  But in terms of, you know, whether it actually

14    happened, whether the fact that there was no set date and

09:33:38 15    all that, whether -- that could go to the argument that he

16    hadn't taken any concrete steps and all of that.  I

17    understand the argument.

18        But I think it's an area where it does allow the

19    Government to argue that concrete steps were taken at times

09:34:08 20    before the alleged kidnapping, and that the kidnapping not

21    necessarily be spelled out in terms of exactly when.

22        I think as to on or about language, I don't think it's

23    confusing in this case.  I think we have specific dates and

24    specific testimony.  But I don't think they will be

09:34:33 25    speculating about whether there are other dates or time

254

1      frames.  I think the language is just to capture that if the

2      indictment says October 7th, it turns out it was

3      October 8th, or October 6th, that that's not sufficient to

4      have the case be thrown out, that that shouldn't be a

09:35:03  5      problem.  So I don't see it being an issue.  But I do

6      understand your argument in light of all the various dates

7      that have been put forth.

8           So that's my ruling on those.  I anticipate that we'll

9      get these drawn up and have them ready when we're done with

09:35:28  10     the case, wherever -- however long it takes.

11          We'll take a short break so if there are motions to be

12     made, we'll hear those.  And then we'll be ready.

13          All right.

14               MR. RICOTTA:  All right, Your Honor.

09:35:40  15               MR. BROWN:  Your Honor, not on the record, but

16     just to let you know --

17                    (Discussion held off the record.)

18                         (Recess taken.)

19                              - - -

09:47:15  20          (In Open Court - Defendant and Jury Present)

21               THE COURT:  Good morning.

22               PARTICIPANTS EN MASSE:  Good morning.

23               THE COURT:  You may be seated.

24          Sorry, we weren't able to get started right at 9:00,

09:47:27  25     but believe me, we were working.  It's not because we

```
 1      weren't here.  I had some matters that I needed to go over

 2      with the lawyers, and we worked through them.  And that's

 3      helpful because it allows the case to move along smoothly.

 4           We are, as I told you the other day, I think well on

 5      the schedule that we had anticipated.

 6           So let me ask the Government, then, to go ahead and

 7      call their next witness.

 8                    MR. TERESINSKI:  Yes, Your Honor.

 9           May I remove my mask?

10                    THE COURT:  You may.

11                    MR. TERESINSKI:  Thank you, Your Honor.

12           The United States calls Special Agent Pete Mauro.

13           That's M-A-U-R-O for the record.

14                    THE COURT:  All right.

15                    MR. TERESINSKI:  Your Honor, permission for

16      the witness to remove his mask?

17                    THE COURT:  You may.  You may remove the mask

18      so you may testify.

19                    MR. TERESINSKI:  Thank you, Your Honor.

20                    THE COURT:  At the Courtroom Deputy will swear

21      you in.

22                         (Witness sworn.)

23                    THE COURT:  You may be seated.

24                    THE WITNESS:  Thank you, Your Honor.

25                    MR. TERESINSKI:  Your Honor, may I proceed?
```

Mauro (Direct by Teresinski)
256

```
          1              THE COURT:  Yes.

          2              MR. TERESINSKI:  Thank you.

          3              DIRECT EXAMINATION OF PETE MAURO

          4    BY MR. TERESINSKI:

09:49:29  5    Q.    Keep your voice up.  Speak nice and clear, okay?

          6          Agent Mauro, how long -- I assume your assigned to the

          7    FBI?

          8    A.    That's correct.

          9    Q.    How long have you been with the FBI?

09:49:39 10    A.    I became a special agent August of 2009.

         11    Q.    And where do you work in the FBI?  What do you do?

         12    A.    The Cleveland field office.  I'm a special agent on

         13    the joint terrorism task force here in Cleveland.

         14    Q.    Okay.  What are some of your duties?

09:49:50 15    A.    I investigate allegations of federal violations of

         16    crime, I handle confidential human sources, and I'm on a

         17    collateral team called the evidence response team.

         18    Q.    Okay.  And are you assigned to the Cleveland division

         19    of the FBI?

09:50:07 20    A.    That's accurate, yes.

         21    Q.    Okay.  And were you -- what did you do before you

         22    joined the FBI?

         23    A.    I was a staff sergeant in the United States Air Force

         24    in security forces.

09:50:17 25    Q.    And how long did you do that?
```

Mauro (Direct by Teresinski)

257

1    A.    Six years, from 2003 to 2009.

2    Q.    Okay.  And what does security forces do?

3    A.    They're kind of like military police.  We guard and

4    protect air bases around the world.  I was in Europe, in the

09:50:31  5    Middle East, and in the United States.

6    Q.    Okay.  Thank you for your service.

7          Were you in charge of the team -- the search team

8    executing a search warrant at 13517 Sherry Avenue in

9    Cleveland, Ohio?

09:50:46  10   A.    Yes.  As part of the evidence response team, my duties

11   there, I was a search team leader, so I'm responsible for

12   executing the warrant, the systematic and procedural search

13   and discovery of evidence, packaging the evidence, labeling

14   the evidence, filling out the FBI paperwork to seize the

09:51:07  15   evidence, transporting the evidence back to the office, and

16   then lastly, importing the evidence into the FBI's system

17   for the case agent.

18   Q.    Okay.  And how many agents were involved in the search

19   that day?

09:51:18  20   A.    On this search there were 20 FBI employees.  Not all

21   of them are agents.  Some of them are agents.  Some of them

22   are task force officers, which are federally deputized law

23   enforcement officers from other departments, such as

24   Cleveland police, the marshal service, for example.

09:51:36  25         There's also some unarmed FBI employees, such as our

1    photograph or administrative specialists, that assist us in

2    the collection of evidence.

3    Q.    Okay.

4                  MR. TERESINSKI:  Your Honor, I have a series

09:51:48  5    of photographs.  I don't believe there's going to be any

6    objection, but photos 14 through 26, that I'd like to show

7    the witness.

8                  THE COURT:  All right.  Just one second.

9                  MR. TERESINSKI:  Can you bring them up, I

09:52:00  10    guess, one at a time.

11        Can you please bring up Exhibit Number 14.

12                  THE COURT:  Any objections to those?

13                  MR. TERESINSKI:  Counsel had the photographs.

14                  THE COURT:  12 through 14?

09:52:11  15                  MR. TERESINSKI:  14 through 26.

16                  MR. RICOTTA:  I'm looking right now,

17    Your Honor.

18        No objection.

19                  MR. TERESINSKI:  Thank you, Your Honor.

09:52:35  20                  THE COURT:  They shall be admitted without

21    objection.

22                  MR. TERESINSKI:  All right.  So they're in

23    evidence now.  Show -- I'd ask that they be moved in

24    evidence.

09:52:43  25        Thank you, Your Honor.

Mauro (Direct by Teresinski)
259

1    BY MR. TERESINSKI:

2    Q.    I'd like to pull up Exhibit Number 15.

3                MR. TERESINSKI:  Or I'm sorry.  Go to 14.  I

4    apologize.

09:52:50    5    BY MR. TERESINSKI:

6    Q.    Agent Mauro, can you please explain -- what is

7    Exhibit 14?

8    A.    So during the execution of the warrant, the address

9    that the Government lawyer mentioned is a single-family

09:53:07   10    dwelling.

11          When we went into the residence, I did a walkthrough

12    with our photographer, which is normal procedure.  The

13    residence was an up/down residence.  You walked in the door,

14    there was stairs going into the basement, and then there

09:53:20   15    were stairs going to another part of the house and upstairs.

16          In the basement there was a living space, which we

17    found the majority of the evidence that we're going to talk

18    about today.  This box was found next to the bed sleeping

19    area in which contained a firearm.

09:53:36   20    Q.    And that's Exhibit 14?

21    A.    The firearm is 14, or the box?

22    Q.    No, Exhibit Number 14.  What you're looking at.

23    A.    Yes.  Yes.

24    Q.    Okay.

09:53:48   25                MR. TERESINSKI:  Okay.  Can we pull up Exhibit

Mauro (Direct by Teresinski)

1    Number 15.

2    BY MR. TERESINSKI:

3    Q.    What is Exhibit Number 15?

4    A.    It's a DPMS Panther AR-15 assault-style rifle with a

09:54:00  5    loaded magazine that was found in the box with the gun.

6              MR. TERESINSKI:  And can we pull up Exhibit

7    Number 16.

8    BY MR. TERESINSKI:

9    Q.    What is that?

09:54:10 10    A.    This was a tactical stealth helmet that we found in

11    the basement, you know, near the sleeping area, and the box

12    that we just talked about.

13         On the helmet you can see there's Velcro for patches

14    and whatnot.  There was also written in Sharpie marker the

09:54:31 15    word "Grinch" right on the forehead just below where you

16    would see like a mount for accessories and whatnot.

17    Q.    Okay.

18              MR. TERESINSKI:  And I'd like to go to Exhibit

19    Number number 17.

09:54:43 20    BY MR. TERESINSKI:

21    Q.    What is that?

22    A.    Also in the basement was a footlocker style case that

23    contained a tactical ballistic plate carrier vest, you know,

24    that you'd where in the military, or for whatever purpose.

09:55:06 25    But as you can see, it's a, you know, digital cam plate

         1    carrier that we found in the footlocker.  It had some

         2    magazines in it.

         3    Q.    And magazines to what?

         4    A.    To -- they're high-capacity plastic magazines that

09:55:15  5    would fit the rifle that we also found.

         6    Q.    Okay.  And that's the AR that you're talking about?

         7    A.    Yes.

         8    Q.    All right.

         9              MR. TERESINSKI:  Could we bring up Exhibit

09:55:26 10    Number 19.

        11    BY MR. TERESINSKI:

        12    Q.    And what is Exhibit Number 19?

        13    A.    This is a close-up of the serial number of, I believe

        14    it was Exhibit 14, of the rifle that we found in the box.

09:55:38 15    Q.    All right.

        16              MR. TERESINSKI:  Can we bring up Exhibit

        17    Number 21.

        18    BY MR. TERESINSKI:

        19    Q.    And what is Exhibit Number 21?

09:55:45 20    A.    This is an overall picture that shows the vest, the

        21    tactical plate carrier that we found in the footlocker style

        22    box.

        23    Q.    And now, Exhibit Number 22, and what is that?

        24    A.    Also in the box underneath the tactical plate carrier

09:56:04 25    was an ammo can that contained 190 rifle rounds of

Mauro (Direct by Teresinski)

262

1    ammunition.

2    Q.    And Exhibit Number 23, please.

3          What is that?

4    A.    This is a close-up picture of the box of ammunition

09:56:19  5    that we just talked about, with a scale for reference.

6    Q.    Okay.  And you mentioned there was a helmet.

7          Were there two helmets?

8    A.    There was a second helmet found in a different part of

9    the basement.

09:56:32  10    Q.    Okay.

11    A.    Very similar in nature to the one first one.

12    Q.    Okay.

13                MR. TERESINSKI:  Will you pull up Exhibit

14    Number 24.

09:56:36  15    BY MR. TERESINSKI:

16    Q.    And is this the helmet that you were referring to

17    earlier?

18    A.    Yes.

19    Q.    Okay.

09:56:45  20    A.    They're almost identical in type.  They had slightly

21    different modifications on the outside.

22    Q.    Okay.  And Exhibit Number 25.

23          What is that?

24    A.    We found a gorilla warfare and special operations

09:57:04  25    field manual.  This is something that would be available at

Mauro (Direct by Teresinski)
263

```
         1   like an army surplus store.  Originally it would be
         2   something that would be issued in the military.
         3   Q.    Now, you also seized a knife and a camo outfit; is
         4   that right?
09:57:19 5   A.    We did not seize it.  We found it and took photographs
         6   of it.
         7   Q.    Okay.
         8   A.    The battle dress uniform.  It was issued maybe ten
         9   years ago in the Air Force or Army.
09:57:28 10  Q.    Okay.  And I'll show you Exhibit Number 20.  What is
        11   that?
        12         Is that the knife that you were referring to?
        13   A.    Yes.
        14   Q.    And Exhibit Number 26.  And what is that?
09:57:39 15  A.    Those are the battle dress uniforms that we
        16   photographed, you know, that we found in the basement.
        17   Q.    Okay.  And did you find any other -- and all these
        18   photographs that I've just shown you, they're fair and
        19   accurate?
09:57:52 20  A.    They are fair and accurate, yes.
        21   Q.    As the items found on May 8th?
        22   A.    Yes.
        23   Q.    And as they appear in this -- these photos?
        24   A.    Right.  We just didn't have the Government exhibit
09:58:05 25  stickers, yep.
```

1    Q.    Okay.  Were there other -- when you go and search

2    pursuant to a warrant, were there other things that were

3    seized that aren't -- we don't have photographs of, but,

4    yet, you seized?

09:58:19  5    A.    Yes.

6    Q.    You know, the paperwork and things like that.

7    A.    Right.  So how the FBI evidence response team does a

8    search is we arrive on scene, we secure the residence.  At

9    this time there was no residence or family members in the

09:58:32 10    house.  There was a dog that we took custody of for the

11    duration of the search.

12          At that point, once the house is secured, myself, as

13    the team leader, and the photographer, we do a walkthrough

14    of the residence, and we just get an idea of what kind of

09:58:47 15    evidence we're going to deal with.  In this case, it was

16    firearms evidence, ammunition, helmet, the tactical stuff.

17    We also look for things that we may want to take for

18    fingerprints later because there's special procedures in

19    seizing those items.  So we do a walkthrough of the entire

09:59:00 20    residence.

21          I also get an idea of approximately who I should send

22    to which location in the house to be searched, and I set up

23    a station where the evidence is then brought, packaged,

24    labeled and seized.

09:59:14 25          When we went into the basement where all of the items

1    that we talked about today were found, we also found a

2    nightstand style table, and in that nightstand we found some

3    documents, one of which was the defendant's birth

4    certificate in his true name and --

09:59:34   5    Q.    What name was that?

6    A.    Christian Stanley Ferguson.

7    Q.    Okay.  What else did you find in paperwork?

8    A.    In addition to the birth certificate that we

9    discovered, we found a filled out U.S. passport application

09:59:47  10    in the name of Christian Stanley MacTavish.

11    Q.    And those items were seized and placed in evidence; am

12    I right about that?

13    A.    I believe so.  They were photographed and then taken,

14    yes.

09:59:59  15    Q.    And who else lived at this location that was searched?

16    A.    So my knowledge of the case before the search warrant

17    was very limited.  I assessed based on the search that there

18    was -- likely his dad was present at the house, and then the

19    dog that we found, and then the defendant was likely staying

10:00:15  20    in the basement.

21    Q.    Okay.

22    A.    However, I don't have knowledge of case specifics

23    before that.

24    Q.    But you found the items with the identification along

10:00:23  25    with the items that were seized?

1    A.    Yeah, that's accurate.

2    Q.    Okay.  Any other -- strike that.

3              MR. TERESINSKI:  May I approach, Your Honor,

4    with a box of items?

10:00:41  5              THE COURT:  You may.

6              MR. TERESINSKI:  Okay.

7    BY MR. TERESINSKI:

8    Q.    I'm going to place it down here for the record, if you

9    wouldn't mind, Agent Mauro.

10:00:59  10             MR. TERESINSKI:  Now, they've been premarked,

11   Your Honor, for identification purposes as Exhibits 303

12   through 309, those are.  And we also have another exhibit

13   that's been premarked as Exhibit 310.

14   BY MR. TERESINSKI:

10:01:12  15   Q.    Agent, I'm going to go one by one with these exhibits,

16   if you wouldn't mind.

17         Can you pick up from the box the first one and refer

18   to the exhibit number and tell us what it is.

19   A.    All right.  Exhibit 304, this is the tactical plate

10:01:27  20   carrier that we talked about in the photographs.  It's, you

21   know, something you would get in the military or you can buy

22   aftermarket on the Internet at an army surplus event.  It's,

23   you know, what we get issued in the FBI when we do raids,

24   that kind of thing.

10:01:42  25   Q.    Okay.  Put that aside.

1          Take the next item that you have in the box.

2          And what is that?

3     A.   This is the tactical stuff, helmet we talked about,

4     with rails for accessories, places to put patches and the

10:01:57  5     word "Grinch" that we talked about earlier.

6     Q.   And which exhibit number is that?

7     A.   Oh, I'm sorry.  This is 311.

8     Q.   Thank you.  Take the next item, please.

9     A.   I'll try to go in order.

10:02:09 10     Q.   It's okay if you go out of order.

11     A.   This is Exhibit 303.  This is the ammo can with the

12     190 rounds of ammunition we talked about.

13     Q.   And is that closed or sealed right now?

14     A.   Yep.  We packaged it with plastic, yep.

10:02:21 15     Q.   I notice the jingle in that.  Are the projectiles

16     still in there?

17     A.   Yes.

18     Q.   Take the next item, please.

19          What exhibit was that again just for the record?

10:02:32 20     A.   The ammo can was 303.

21     Q.   Thank you.

22          Take the next item, please.

23     A.   Item 308 is a gorilla warfare and special forces

24     operations field manual.

10:02:44 25     Q.   Okay.  And that was seized in the basement as well?

1    A.    This was found in the basement, yes.

2    Q.    What is that book?  It's an Army field manual, I

3    think.

4    A.    Yes.  It's a manual that you'd get in the military to

10:02:56  5    be taught, in this case, gorilla warfare and special

6    operations.  They make these manuals for all sorts of, you

7    know, military operations in built-up areas.  This one

8    specifically is to teach people how to commit gorilla

9    warfare, that kind of stuff.

10:03:10  10    Q.    What is gorilla warfare, do you know?

11    A.    From my experience --

12    Q.    From your experience.

13    A.    Yeah.  From my --

14              MR. RICOTTA:  Objection, Your Honor.

10:03:17  15    BY MR. TERESINSKI:

16    Q.    Well, you're in the military, right?

17              THE COURT:  Okay.  I'll sustain the objection

18    to what's gorilla warfare.  I think -- I think it's a word

19    that has a general, common understanding.  I don't think we

10:03:43  20    need a long discussion on that.

21              MR. TERESINSKI:  Okay.  Your Honor, just one

22    follow-up.  I promise.

23    BY MR. TERESINSKI:

24    Q.    What's the title of the field manual?

10:03:52  25    A.    Gorilla Warfare and Special Forces Operation,

Mauro (Direct by Teresinski)

1    Department of the Army.

2    Q.    Thank you.

3          Next item.

4    A.    Exhibit 306, it's an empty high-capacity rifle

10:04:05  5    magazine.

6    Q.    And how many magazines -- how many projectiles does

7    that hold?

8    A.    It says pin egg 30, and in my experience, magazines

9    like this carry between 25 and 30 bullets.

10:04:19 10    Q.    And is that for a handgun?

11    A.    This would fit the rifle that we seized.

12    Q.    Okay.

13    A.    It was found in the vest.

14    Q.    Okay.  Next item.

10:04:30 15    A.    Exhibit 305 is the same thing.

16    Q.    Same thing as what, just for the record?

17    A.    Same thing as Exhibit 306.  It's a high-capacity rifle

18    magazine, an empty one.

19    Q.    Thank you.

10:04:43 20          The next item.

21    A.    Exhibit 307 is a -- the same exact thing; however,

22    this one has bullets in it.  This was found with the rifle

23    in the box in the basement.

24    Q.    Okay.  And the next item.

10:04:59 25    A.    Exhibit 309, again, another rifle magazine found in

Mauro (Direct by Teresinski)
270

1    the vest this time.

2    Q.    Okay.  They also -- that also contains projectiles?

3    A.    Yes.  This is all in a magazine.

4    Q.    Okay.

10:05:12  5    A.    That's everything that was in the box.

6                  MR. TERESINSKI:  All right.  Your Honor, may I

7    approach with Exhibit Number 310?

8                  THE COURT:  You may.

9                  MR. TERESINSKI:  It's been made safe, just for

10:05:22 10    the record.

11                  THE COURT:  All right.

12                  MR. TERESINSKI:  And it's got a lock on it.

13                  THE COURT:  All right.

14    BY MR. TERESINSKI:

10:05:27 15    Q.    I want to show you what's been marked as Government

16    Exhibit 310 for the record.

17          What is it?

18    A.    It's a DPMS Panther AR-15 assault-style rifle.

19    Q.    And where was this seized?

10:05:40 20    A.    It was in the basement of the residence.

21    Q.    And was it in that box with the ammunition that you

22    indicated?

23    A.    It was in a box with a magazine separate from the

24    firearm in the same box, yes.

10:05:51 25    Q.    Okay.  And the exhibits, for the record --

Mauro (Direct by Teresinski)
271

1          MR. TERESINSKI:  Your Honor, may I show it?

2              THE COURT:  You may.

3          MR. TERESINSKI:  Or walk to the middle and

4    show it?

10:05:58  5          THE COURT:  Yes.

6    BY MR. TERESINSKI:

7    Q.   As long as I point it down away from everyone.

8          MR. TERESINSKI:  And for the record, I'm

9    holding it up so the jury can see it, Exhibit Number 310.

10:06:10 10          THE COURT:  The record shall so reflect.

11        Counsel, can you see it?

12          MR. RICOTTA:  I see it.

13          MR. TERESINSKI:  And for the record, counsel

14    has seen --

10:06:13 15          MR. RICOTTA:  I've seen a picture of it.  I

16    see it now.  I've seen it.

17    BY MR. TERESINSKI:

18    Q.   All right.  And just a few more questions.

19        Exhibits 303 through 310 that you've testified to and

10:06:27 20    the exhibit numbers that you've testified to -- okay.

21        Exhibit Number 310 that we're talking about in terms

22    of the rifle, what is it capable of firing?

23    A.   5.56-millimeter bullets, yeah.  I mean, rifle bullets.

24    Q.   And is that the kind of ammunition that was found in

10:06:56 25    Exhibit 303 that you talked about?

Mauro (Direct by Teresinski)
272

1   A.    303 was the box?

2   Q.    The exhibits with the magazines that are loaded.

3   A.    Yes.

4   Q.    Those projectiles?

10:07:06   5   A.    Yes.

6   Q.    Are they the same that would fire from Exhibit

7   Number 310, which is the rifle?

8   A.    Yes.

9   Q.    Okay.  And is Exhibit Number 310 -- 303 through 310 in

10:07:16  10   the same or substantially the same condition as they were on

11   the date that you seized them, which is May 8th of 2020?

12   A.    Generally, yes.  We -- in our process, we take the

13   evidence, you know, we seize it, we package it, we label it.

14   Sometimes I make a determination to label it directly on the

10:07:37  15   item, like adding an FBI label with tape for the chain of

16   custody.

17        For example, the 310, the gun, I had to bring to the

18   Marshals yesterday, and they put the lock on it.  So it

19   didn't have a lock when we found it.

10:07:52  20        We also sent the gun to Quantico, Virginia, to be test

21   fired to make sure that it worked.  All standard procedures.

22        So generally, yes, everything was as we found it.  But

23   we did package some things, label some things, add stickers

24   to some things for recordkeeping for chain of custody, that

10:08:10  25   kind of thing.

1    Q.    And only for those reasons, right?

2    A.    Right.

3    Q.    Okay.  And Exhibit Number 310 was sent, it was test

4    fired, and it's operable?

10:08:19  5    A.    Right.

6              MR. TERESINSKI:  I don't believe I have

7    anything further at this time.

8         Thank you very much, Agent Mauro.

9              THE WITNESS:  Thanks.

10:08:26  10              THE COURT:  Thank you, Counsel.

11              MR. TERESINSKI:  Thank you, Your Honor.

12              THE COURT:  Any cross-examination?

13              MR. RICOTTA:  Just a couple of questions, Your

14    Honor.

10:08:38  15              CROSS-EXAMINATION OF PETE MAURO

16    BY MR. RICOTTA:

17    Q.    Special Agent Mauro --

18    A.    Good morning, sir.

19    Q.    Good morning.  How are you?

10:08:43  20         I asked you preliminarily before you testified today

21    regarding that photograph of that knife.

22         Do you recall that, where we had a little conversation

23    before?

24    A.    I sure do, yes.

10:08:56  25    Q.    And I asked you if, in fact, that knife was plastic in

1    nature.

2         What was your response today?

3    A.   That I didn't remember, and I had to make a call.

4    Q.   Okay.  And what did you determine?

10:09:06  5    A.   That we did not seize a knife, we just photographed it

6    in place.  So I don't know for sure.

7    Q.   Okay.  So it may be plastic, we're not sure at this

8    point, correct?

9    A.   That's fair, yes.

10:09:17  10    Q.   All right.  Now, the rifle that we spent quite a bit

11    of time on, there's nothing illegal about that weapon, is

12    there?

13    A.   Not that I know of, no.

14    Q.   Okay.  And there was nothing illegal about it in the

10:09:31  15    State of Ohio to own it, correct?

16    A.   Right.  I believe so, no.

17    Q.   Okay.  And the ammunition that goes with the gun,

18    nothing illegal about that, is there?

19    A.   Right.

10:09:40  20    Q.   All right.  All that other paraphernalia -- I'm not

21    even sure what they call them, but the fatigues and those

22    kinds of things, nothing illegal about those, correct?

23    A.   No, sir.  Available at, like, military surplus, things

24    like that.

10:09:59  25    Q.   Those helmets, are they, like, plastic in nature?

Mauro (Cross by Ricotta)
275

1        A.     Yeah.  Composite, something like that, yep.

2        Q.     So they wouldn't be like military grade then, correct?

3        A.     Can you clarify your question?  I mean, I'm sure they

4        issued --

10:10:14    5   Q.     Would you want to go into combat with a plastic

6        helmet?

7        A.     I don't -- it's not a ballistic helmet.  It's like a

8        climbing helmet, something like that.

9        Q.     Okay.  Are you familiar with those air soft games that

10:10:28   10   these young men play, like they play war games?

11       A.     I mean, limited, yeah.  I mean, if it's TV or

12       something maybe I've seen it.

13       Q.     Is all this stuff consistent that -- besides the

14       gun -- the fatigues, the helmet, those type of things?

10:10:41   15   A.     A tactical plate carrier, I don't think is consistent.

16       Q.     Okay.  Fair enough.

17       A.     The high-capacity magazines I would say is not

18       consistent.

19       Q.     Let me ask you about high capacity.

10:10:52   20          Is -- the standard capacity of the gun is what?  This

21       gun that we've identified.

22       A.     Can you -- so it fires one bullet through sugar pole,

23       but you can put a 100-round magazine, or a 7-round magazine.

24       You know, there's a lot of options.

10:11:07   25   Q.     Right.  But now it's at 30?

1    A.    For the magazines that you have?  Those are 30-round

2    magazines.

3    Q.    That's not high capacity, is it?

4    A.    My understanding is, yes, 30 rounds --

10:11:18  5    Q.    I thought over 30 was high capacity.

6    A.    Okay.  I don't know.  They're 30-round magazines.

7    Q.    Okay.  So you can't say one way or another?

8    A.    I believe 30 rounds is high capacity.

9    Q.    Okay.  Fair enough.

10:11:32 10    A.    In the State of New Jersey, it's a high-capacity

11    magazine.

12    Q.    And a gun is not much good without ammunition,

13    correct?

14    A.    Accurate.  Yep.

10:11:44 15    Q.    All right.  And that was in the case, and the case was

16    shut when you retrieved it?

17    A.    Yep.  Yes.

18    Q.    Is that a standard and safe way to keep a weapon, or

19    at least --

10:11:56 20    A.    My personal experience is you should keep the

21    ammunition separate from the firearm.

22    Q.    Okay.  And where was the ammunition?

23    A.    In the box with the firearm.

24    Q.    Okay.  So that was a mistake, correct, in your

10:12:08 25    opinion?

1    A.    A mistake?

2    Q.    For safety purposes.

3    A.    Yes.

4    Q.    Okay.  How long were you on the scene?

10:12:16  5    A.    We arrived at approximately 6:40, and we departed at

6    approximately 8:15.

7    Q.    Okay.  You put the dog back?

8    A.    Absolutely.

9    Q.    Was it a German Shepherd?

10:12:29  10   A.    Yes.

11                   MR. RICOTTA:  Thank you.

12                   MR. TERESINSKI:  Just a couple of questions,

13   Your Honor.

14                   THE COURT:  Sure.

10:12:33  15                   REDIRECT EXAMINATION OF PETE MAURO

16   BY MR. TERESINSKI:

17   Q.    If you had to estimate, how many rounds were in that

18   box as well?

19   A.    190.

10:12:39  20   Q.    So that's not an estimate.  They were counted?

21   A.    Correct.

22   Q.    And that helmet that counsel referred to, can you use

23   that for other purposes in the military?

24   A.    I've seen them be used for propelling out of

10:12:53  25   airplanes, or helicopters to, you know, climb.  They're like

Mauro (Redirect by Teresinski)
278

1    rock climbing helmets, something like that.

2    Q.    They don't have to be like Kevlar heavier duty, right?

3    A.    Right.  They're lighter and cheaper.

4    Q.    And counsel asked some questions about the rifle

10:13:04  5    possessing it legally, but you can also use it for illegal

6    purposes, can't you?

7              MR. RICOTTA:  Objection, Your Honor.

8              MR. TERESINSKI:  He asked the question.  I was

9    following up.

10:13:16  10             THE COURT:  Okay.  Overruled.

11             THE WITNESS:  In my experience, you can use a

12    firearm for illegal actions.

13    BY MR. TERESINSKI:

14    Q.    That -- we're talking about 310, Exhibit 310?

10:13:24  15    A.    Yes.

16             MR. TERESINSKI:  No further questions.

17        Thank you.

18             THE COURT:  Anything further?

19             MR. RICOTTA:  No, Your Honor.  Thank you.

10:13:31  20        Thank you.

21             THE WITNESS:  Thank you, Judge.

22             MR. TERESINSKI:  Thank you, Agent.

23        Thank you, Your Honor.

24             THE COURT:  All right.  Counsel -- do you have

10:13:39  25    any further witnesses, counsel?

1          MR. BROWN:  Your Honor, subject to the

2    admission of evidence, the Government has no further

3    witnesses at this time.

4          THE COURT:  All right.  So the Government

10:13:48 5    would rest its case subject to the admission of exhibits?

6          MR. BROWN:  That's correct, Your Honor.

7          THE COURT:  All right.  Okay.  Mr. Ricotta,

8    does the defendant wish to call any witnesses?

9          MR. RICOTTA:  No, Your Honor.

10:14:01 10       Subject to our motions, I have no witnesses.

11          THE COURT:  All right.  And, of course, I've

12    instructed the jury when we were choosing them, and I'll

13    instruct them further, that he is not required to call any

14    witnesses or to take the stand, and that that cannot be used

10:14:19 15    against him.  And that he's not required to put on anything.

16    So I'll instruct the jury on that.

17       Okay.  So that would conclude the case, except for the

18    Court working with the lawyers relative to exhibits and also

19    meeting with the lawyers about other matters.  So we'll need

10:14:39 20    to take some time for transition here before we would move

21    to closing arguments.

22       So what I would do now is have the jury go back to, I

23    would say the jury room, which is a courtroom that you have.

24    Normally it would be a jury room.  And then await further

10:15:00 25    instructions.  And then we'll work here, and we'll let you

1    know shortly the schedule that we're on.

2        All right?

3                    MR. RICOTTA:  Thank you, Your Honor.

4                    THE COURT:  You may go now.

10:15:11  5                    COURTROOM DEPUTY:  All rise.

6                         (Jury out.)

7                    THE COURT:  You may be seated.

8                    MR. BROWN:  Your Honor, could Special Agent

9    Dirker come collect the evidence?

10:16:04  10                    THE COURT:  Sure.

11                    MR. BROWN:  Thank you.

12                    SPECIAL AGENT DIRKER:  Thank you, Your Honor.

13                    THE COURT:  Just one moment.

14        Just one moment, counsel.

10:17:56  15        If there are going to be motions, I would hear them

16    now.  I just wanted to take one moment before I did.

17        Mr. Ricotta, are there any motions you wish to make?

18                    MR. RICOTTA:  Yes, Your Honor.

19        I move for judgment of acquittal, and pursuant to

10:19:54  20    Federal Criminal Rule 29.

21        Your Honor, if I look at the evidence in the light

22    most favorable to the Government at this --

23                    THE COURT:  Before you continue, I just want

24    to be clear, because I'm looking at the rule.

10:20:06  25        I think I should consider your motion has been made at

1    the end of the Government's case, right?

2                    MR. RICOTTA:  Yes.

3                    THE COURT:  Okay.

4                    MR. RICOTTA:  Thank you.

10:20:16  5        We've been looking at the evidence as presented by the

6    Government.  In the light most favorable to the Government,

7    the attempted kidnapping fails on a number of reasons.  The

8    Sixth Circuit has defined the two requisite elements of

9    attempt as an attempt to engage in criminal conduct in the

10:20:40 10   performance of one or more overt acts which constitute a

11   substantial step towards the commission of the substantive

12   offense.

13        It is my position, on behalf of the defendant, that at

14   this juncture, the evidence thus far leading up to May 8th

10:20:59 15   of 2020, indicated, at best, some acts by my client that may

16   go to the requisite intent of my client, but it certainly

17   wasn't substantial overt acts in the furtherance of the

18   crime of kidnapping.

19        To me, there's a distinction between intent and a

10:21:25 20   substantive overt acts in furtherance of the commission of

21   the offense.

22        I believe that the evidence has established that there

23   were a number of events that transpired that the Government

24   established that may go to the defendant's intent or

10:21:47 25   preparation of a plan.  But when it comes to the execution

1    of the plan, which is the substantive crime of attempting

2    kidnapping, their case fails.

3         If you look at the language, or the jury instruction

4    from the Sixth Circuit, it says basically that you

10:22:08  5    need -- in order to convict someone, you need a substantial

6    step, more than mere preparation, yet, it may be less than

7    the last necessary step for the actual commission of the

8    substantive crime.

9         As I interpret the law -- and I know the Court

10:22:27 10    indicated earlier that it is kind of a fuzzy area when you

11    start talking about intent and you talk about attempt.

12    Intent and attempt.

13         I think correctly that in order for the Court -- for

14    the Government to prevail in this particular case, they must

10:22:47 15    show that the defendant had the requisite intent to commit

16    kidnapping.

17         Many of the events that they're calling substantial

18    acts in furtherance of the kidnapping for purposes of the

19    attempt, I think, fail.  Those are -- those must be closely

10:23:10 20    timed within the substantive offense itself.  Those are not

21    the same tests that you use for intent.

22         If you look at the definition of intent, you look at

23    the actions of the defendant, what the action -- what the

24    defendant may have said, whether he was preparing for this

10:23:31 25    or for that.  Those are things that you look at to formulate

1    what his intent was.

2         When you look at attempt, you're actually in -- at

3    least as I interpret it -- you're in the movement of

4    committing the substantive offense, which would be

10:23:49  5    kidnapping.  But you haven't completed it.  But you must

6    show more than he merely prepared to do the kidnapping, and

7    you must show a substantial act, and I believe closely

8    within the time frame of the commission of the offense,

9    which I believe is May 8th, 2020.

10:24:05  10         I pulled a case from -- it's not from our circuit,

11    it's from the Ninth Circuit, but it says -- and I'll give

12    you the quote -- it says, the holding -- "The second element

13    to constitute a substantial step, a defendant's actions must

14    cross the line between preparation and attempt by

10:24:28  15    unequivocally demonstrating that the crime will take place

16    unless interrupted by independent circumstances.

17    *United States v. Goetzke*, 494 F.3d 1231 Ninth Circuit, 2007.

18         That's kind of the thrust of my argument, that the

19    fact that there were substantial steps taken toward the

10:24:57  20    completion of the actual attempted kidnapping.  And I think

21    the Government has failed in that aspect, Your Honor.  I

22    don't think there's any nexus that's close to showing that

23    Agent Dirker, who is being offered as the victim in this

24    case, and Ranger Budd were at any time close to being

10:25:18  25    kidnapped.

284

1          Where is the offense of kidnapping?  How is anybody

2     detained or held or abducted, all of the elements that you

3     need for kidnapping?  Where are those in the Government's

4     case?  I haven't heard anything that anybody was even

10:25:37  5     remotely in the situation where they could be kidnapped.

6          And the only situation that I see factually from the

7     evidence is the May 8th, where the two agents showed up at

8     that scene on 500 Truxell Road.  But I haven't seen anything

9     else that would indicated that anybody was potentially

10:26:04 10     kidnapped in this matter.

11          For those reasons, I ask for a Rule 29 and acquittal

12     of the defendant.

13               THE COURT:  Thank you, counsel.

14          Mr. Brown.

10:26:13 15               MR. BROWN:  Thank you, Your Honor.

16          The Government would, again, reiterate the standard

17     that it is the evidence viewed most favorably in the

18     Government in this case.

19          And the Government would argue that the evidence as

10:26:22 20     presented over the last two days more than adequately allows

21     this case to go to the jury, the ultimate trier of the fact,

22     to determine whether the elements of the crime, as defined

23     by the Sixth Circuit have been met.  And we would argue that

24     there are -- there is certainly enough evidence to send this

10:26:40 25     case to the jury.

1        The Government would point out that in the definition

2   of the crime, as the Court is going to be using it,

3   *United States v. Williams* and *United States v. Price*, which

4   we cited earlier in the record, are the controlling laws,

10:26:58  5   not additional elements used by the Ninth Circuit.

6        So, again, the Government would argue that using the

7   definition of attempt and kidnap as provided by the

8   Sixth Circuit and then interpreted by the Sixth Circuit,

9   there is sufficient evidence.

10:27:13 10       Because specifically what they say is that a

11  substantial step toward the committing of the crime and

12  strongly corroborating the defendant's intent to commit the

13  crime.  The Government puts forth that between -- there is

14  testimony that between March 21st and May 8th, there were

10:27:32 15  substantial and numerous elements that the jury could

16  consider as substantial steps.  We won't go into all of

17  those right now.  And -- but because the evidence was

18  complete with a number of steps, they should be able to

19  weigh the evidence.

10:27:48 20       The Government would argue that this creation of a

21  temporal relationship is, again, not in the Sixth Circuit

22  definition.

23       So the Government would urge the Court, in the context

24  of the Rule 29 motion, to look at the totality of the

10:28:05 25  circumstances between March 21st and May 8th and how that

1    marries up with the Sixth Circuit.  When it does that, the

2    Government argues that there's more than enough weight to

3    send this to the jury.

4        Thank you.

10:28:20  5        THE COURT:  Thank you, Counsel.

6        So Rule 29 gives me the option of ruling on the motion

7    now or reserving a decision on the motion and proceeding

8    with trial, if there's any additional thing to be tried.

9        The defendant has indicated he's not putting on any

10:28:39 10   testimony, so I can submit the case to the jury, and we can

11   move forward.  That's what I'm going to do in this case and

12   reserve a decision on the Rule 29 motion.

13       So I won't specifically address the arguments that

14   have been made here.  And if I do have to address them, I

10:29:04 15   can do so after having looked very carefully and closely at

16   the law which the parties disagree about.

17       But I think the case should go to the jury.  And I'm

18   prepared to send it to the jury.

19       So that's my ruling, and then I'll rule at an

10:29:30 20   appropriate time, if needed.

21            MR. RICOTTA:  Yes, sir.

22            THE COURT:  So it's 10:29 now.

23       I would think we could start at 11:00 with the jury,

24   or about that.

10:29:48 25       Let me ask you a question about that with the jury.

1          So if we start at 11:00, let's see how long -- how

2     much time, Mr. Brown, do you think you will take for your

3     argument?

4                    MR. BROWN:  Your Honor, I would anticipate 15

10:30:05  5     to 20 minutes --

6                    THE COURT:  Okay.  And --

7                    MR. BROWN:  -- for my closing.

8                    MR. RICOTTA:  Okay.

9                    THE COURT:  How long is yours?

10:30:14 10                    MR. RICOTTA:  Half hour, 20 minutes.  I don't

11     know, something.

12                    THE COURT:  So I think we could -- then I

13     think we could get both --

14          And then your rebuttal, though, your overall, how

10:30:26 15     much?

16                    MR. BROWN:  Oh, overall -- I guess overall,

17     between 30 and 45 minutes.  And so I think we're looking at

18     an hour to an hour and 15 together.

19                    THE COURT:  Because Ricotta -- Mr. Ricotta is

10:30:40 20     given the same amount of time.  But I explained to the jury,

21     because the Government has the burden, that the Government

22     gets to go first, and the Government also gets to go last.

23          So I guess that's sort of why I was looking at your

24     total amount of time.

10:30:54 25                    MR. BROWN:  Okay.  If Mr. Ricotta is saying

1      about 30 minutes, we can -- I can speak for about 30

2      minutes.

3                          THE COURT:  Combination?

4                          MR. BROWN:  Yes.

10:31:04   5            THE COURT:  Okay.  So if we start them at

6      11:00, we certainly can get the arguments in.

7            Should we let them have lunch -- I've asked that lunch

8      be brought over for them -- and then do the instructions

9      right after lunch?

10:31:15  10            Is that satisfactory?

11                         MR. BROWN:  Or do we want to let them have a

12     working lunch.

13                         THE COURT:  What did you say?

14                         MR. BROWN:  Should we give them a working

10:31:27  15   lunch?  Charge them, then let them eat lunch and --

16                         THE COURT:  Well, if they can hold -- I'm just

17     trying to see if they'll hold out.

18           If they hear the arguments are starting at 11:00 or so

19     and they go to 12:15, say, with -- and then the

10:31:43  20   closing -- the instructions are going to probably take a

21     half an hour.  So --

22                         MR. BROWN:  At the risk of incurring the wrath

23     of the court reporter, I can speak very, very quickly,

24     Your Honor.

10:31:58  25                THE COURT:  Well, let's see where we are and

1    how it goes along and then determine whether we need to give

2    them a break at all or not.

3         Sharon, we did order some lunch for them, right?

4              COURTROOM DEPUTY:  They're not open until

10:32:14  5    11:00, so I'll get the orders -- get them placed right at

6    11:00.  So that's what we have to do with that.

7              THE COURT:  Okay.  All right.  Well, let's

8    take a break now.  I have something that I need to do right

9    now that gives you also a half an hour --

10:32:25 10              MR. RICOTTA:  Your Honor, one question.

11         Did they ever move for the admission of those physical

12    exhibits?

13              THE COURT:  Oh.

14              MR. TERESINSKI:  I believe we did, but --

10:32:31 15              MR. RICOTTA:  Well, I don't think he did.

16              MR. BROWN:  Well, no, we reserved -- or we

17    rested based upon the admission.

18         We can do that right now, Your Honor.

19              THE COURT:  Well, you can go ahead.  You've

10:32:41 20    got your list.  Or do you want to talk about them together

21    and then have that prepared?

22              MR. RICOTTA:  Yeah.  I don't know if they need

23    the physical if you've got the notes photos, right?

24              MR. BROWN:  Yeah.  We definitely wouldn't be

10:32:54 25    sending the firearm back.

1        MR. RICOTTA:  Why would they need the

2   ammunition?  You have pictures of it.

3        THE COURT:  Why don't we do this:  Why don't

4   you write down -- because I'm not sure -- I admitted

10:33:06  5   whatever you moved.

6        MR. BROWN:  Correct.

7        THE COURT:  I don't know which things you

8   didn't move.  I've got your entire book.

9        So why don't you write your list down, and then show

10:33:16 10   that to Mr. Ricotta.  And then when we -- just when we come

11   back before we start with the closing, you know, just give

12   me the list.  And if you've got an objection to one or two,

13   then tell me that.  But otherwise, it's a list, and I will

14   say it's admitted.

10:33:30 15        MR. RICOTTA:  I don't think I objected to

16   anything yet.

17        THE COURT:  I'll let them do it that way.

18        COURTROOM DEPUTY:  All right.  I'm going to

19   get that lapel mic off of Mr. Ricotta so he doesn't go

10:33:44 20   walking around with it.

21                           - - -

22        (Proceedings in recess at 10:33 a.m. )

23

24

25

1          (In Open Court - Jury Not Present)

2                      - - -

3          THE COURT:  You may be seated.

4      I just wanted counsel to tell me which exhibits

11:05:28  5  they're moving or how we should proceed there, and whether

6  there are any issues for the Court.

7          MR. BROWN:  Thank you, Your Honor.

8      Mr. Ricotta and I spoke, and we had agreed on all of

9  the exhibits which had been presented, which is Exhibits 1

11:05:45 10  through 6, 10 through 12, 14 through 26, 100 through 130,

11  200 through 203.  And that includes 201 -- or I'm sorry.

12  200A, 201A, and 202A, which are the transcripts that go

13  along with 200, 201, and 202.  And then Exhibits 206

14  through 233, those also have corresponding A sub exhibits,

11:06:17 15  which are transcripts.  Exhibits 301, and then Exhibits 303

16  through 311.

17          THE COURT:  All right.  So you're moving all

18  of those.  Although some of them have been admitted formerly

19  for sure, but just to be sure --

11:06:32 20          MR. BROWN:  Absolutely.

21          THE COURT:  -- you're moving all of those.

22      All right.  And, Mr. Ricotta, you've gone over that

23  with them, so you have no objections?

24          MR. RICOTTA:  I have no objection.  I reviewed

11:06:43 25  them.

```
 1                THE COURT:  Okay.  They shall be admitted.

 2           I don't know if you had any other exhibits,

 3    Mr. Ricotta, that you used?

 4                MR. RICOTTA:  No.  I didn't use anything.

 5                THE COURT:  Okay.  All right.  Then I think

 6    we'll -- we're ready to go.

 7                          (Jury in.)

 8                THE COURT:  You may be seated.

 9           So, ladies and gentlemen of the jury, we're going to

10    proceed now with closing arguments.  And let me just say a

11    couple of things before we start.

12           We've allocated about the same amount of time for both

13    sides in terms of the amount of time they have.  Because the

14    Government has the burden of proof, it's always done this

15    way.  They get to start out first and make a closing

16    argument, and then they get to come back after defendant has

17    made his closing argument.  And that's because they have the

18    burden of proof.  The amount of time is exactly the same.

19    The Government just gets to split their time in that regard

20    so that they can respond to any matters that have been

21    raised.

22           So I wanted you to understand the process as to why

23    the Government gets up first and the Government goes last.

24    It's because they have the burden of proof, and that's how

25    we do it.
```

11:06:51 (line 5)
11:07:54 (line 10)
11:08:16 (line 15)
11:08:38 (line 20)
11:08:51 (line 25)

Closing Statement - Brown

1          Let me just also say that some of you may have brought

2     your lunch, but we're busy ordering you some lunch so that

3     you don't have to go out if you -- if you haven't brought

4     your lunch.

11:09:07  5          So we'll go ahead with the closing arguments and with

6     the jury instructions probably, and then you get the case to

7     decide.

8          But we'll have some food there for you to make it more

9     convenient.  So that's the way we intend to do it.

11:09:25 10          We'll see as we go about the time, and I think we'll

11    go right through with the instructions, but let's see

12    whether we need to take a break or not.  I think we can go

13    forward.

14          So that's what you should expect.

11:09:41 15          So you'll hear from the lawyers first.  Then we'll

16    give you -- I'll give you instructions.  That's the last

17    thing that you'll get.  And I'll give you copies of those

18    instructions that you'll have if you want to refer to them,

19    but you don't have to.

11:09:56 20          So that's the process.

21          So, Mr. Brown, are you ready to proceed?

22               MR. BROWN:  Your Honor, may I use the podium?

23               THE COURT:  You may.

24               MR. BROWN:  Thank you.

11:10:13 25          "Like I said, I already made my damn peace with this

Closing Statement - Brown

294

1    shit.  Like there's a difference between being a murderer

2    and being -- I'm doing this for a reason.  I'm not doing

3    this just to get up in front of anybody and be all.  I don't

4    dare got to answer to anybody.  I have a damn reason."

11:10:31  5          Ladies and gentlemen of the jury, you'll be charged

6    soon by the Court on the law to apply to this case.  All of

7    the instructions are important.  All of the instructions are

8    to be followed and applied as you took an oath to do so.

9    The Government submits that in your charge, in addition to

11:10:50 10   the law and the legal standards, you are charged with using

11   your common sense in weighing evidence.

12          The Government asserts that your everyday experiences,

13   your day-to-day life, is a vital tool in the deliberations.

14   And the Government argues that looking at this case with

11:11:06 15   that common sense application of the laws given to you by

16   the Court, and the facts clearly beyond a reasonable doubt

17   establish that on and by May 28th [sic], 2020, from

18   March 21st, 2020, through May 8th, 2020, this defendant,

19   Christian Ferguson, committed the two acts of attempted

11:11:29 20   kidnapping.

21          Ladies and gentlemen of the jury, apply your common

22   sense.  Apply your common everyday sense.  That first meet,

23   face-to-face meet, April 18th, 2020, the Government argues,

24   was for the defendant to vet Guiness, who he wanted to be

11:11:48 25   his experienced soldier in the Spartans.  He vetted him

Closing Statement - Brown

1    through the group.  Look at Exhibits 110, 111, 112, 115.

2         And you might say, the Government submits, that

3    despite these silly names that he's vetting people

4    with -- Viagra, Overdrive, and SecretAgentRandyBeans -- or

11:12:13  5    given their various ages, those were the people this

6    defendant trusted.  Those were the people this defendant

7    picked and allowed to get into his private chat rooms and

8    that he discussed his plan with.  Those were his people.  He

9    picked those people.  He picked those people to trust.

11:12:32 10         So who cares what their names are online.  Those are

11    the people he wanted to surround himself with.  And with

12    these people the defendant planned -- he had somebody in the

13    National Guard; he had somebody he identified as also in

14    college like him.  Defense counsel might mock their names,

11:12:53 15    but these were the people the defendant trusted.

16         Now, at the second meet, 5-2, May 2nd, 2020, the

17    Government submits the defendant showed up with a loaded

18    rifle.  This loaded rifle, Exhibit 310.  He had a round in

19    the chamber.  And at that meeting, he met Guiness, he met

11:13:13 20    Steve; two members of the army he was creating.  And he

21    needed to tell them the plan.  He needed to get them on

22    board.  And he did, not once, but twice.

23         On the walk -- within 15 minutes, on the walk to the

24    tree line, he laid out the entire plan.  The Government

11:13:32 25    submits that is Exhibit 208, 209.  And, again, he drew a

Closing Statement - Brown

296

1    sand table.  He took the physical act to map out what he

2    wanted in a location and how to move through space, how to

3    move through that location in Exhibit 210.

4         You'll see on the exhibit, you'll see in the clip,

11:13:50  5    it's the defendant kneeling down.  It's the defendant

6    holding the stick casually like a cigarette as he drew in

7    the dirt.  And by the way, it's that same -- holding a stick

8    like a cigarette when he says, "And when we're done, I'll

9    light a cigarette, put it in the gas tank of the police

11:14:10  10   cruiser, and let me them burn."

11        The third meet, May 8th, 2020.  The defendant shows

12   up, not to plan, not to conject, not to hem and haw, he

13   showed up to finalize.  And review the evidence.  Use your

14   common sense.  Listen to how he is talking as he is walking

11:14:32  15   up to the location, up to 500 Truxell Road, in the Cuyahoga

16   Valley National Park.

17        He is finalizing site lines; he is finalizing

18   movements through space for his army.  He wants snipers in a

19   certain place.  He wants people in a house.  He wants a

11:14:47  20   female to make a call.  He wants people to do certain things

21   based on the specifics of that location.  This isn't mere

22   planning.  This isn't fantasy.  This isn't on the if/come.

23        Ladies and gentlemen of the jury, the Government

24   submits that these are substantial steps, and these are

11:15:07  25   substantial steps on May 8th based on the intent he is -- he

Closing Statement - Brown

297

1    had -- he had shown starting on March 21st, all the way up

2    through and including May 8th.  This is the culmination;

3    this is the expression of his intent.

4         I think the defense attorney in his opening argument

11:15:26  5    said, "You don't convict on mere thoughts.  He has to cross

6    a line."  He has crossed that line by May 8th.  He has

7    crossed that line, the Government would argue, by May 2nd.

8    He has crossed that line on April 28th, when he invited the

9    CHS to go to Vanguard.

11:15:40  10         And he -- in the Vanguard, he told the CHS, Guiness,

11    of his plot.  It's the same plot earlier in Vanguard without

12    the CHS that he shared with all of his other members of the

13    Spartans online.  He has crossed that line, the Government

14    submits, ladies and gentlemen.  He has crossed that line.

11:15:59  15         And the Government submits, too, that in those three

16    meetings, all throughout that time -- if you hear arguments

17    that the defendant was overwhelmed by these two CHSs, he was

18    overwhelmed by a 40-year-old and a 56-year-old.  Well, the

19    Government asks you again, apply your common sense.  Apply

11:16:21  20    your common sense to the facts as you heard them come in.

21         The CHS didn't go online until February 16th -- or not

22    February.  I apologize -- April 16th.  What had

23    happened -- what was going on online before the CHS

24    appeared?  The Government submits there are ample -- there

11:16:43  25    are ample texts between the defendant and other members of

Closing Statement - Brown
298

1    the organization, without the -- without Guiness present,

2    without the CHS present, that showed his intent.  He was not

3    overwhelmed, he was looking for the tools to complete his

4    crime.

11:16:57  5    Because on May 8th -- by May 8th, as you hear in

6    Government's Exhibit 226 --

7         And we can play it right now.

8              (Video played in open court.)

9         MR. BROWN:  The Government submits when you

11:17:42  10   listen to that, that's not a defendant who is overwhelmed.

11   The Government submits that that is a defendant who couldn't

12   confirm his participation fast enough.  He spoke over

13   Guiness.  Guiness couldn't finish his statements before the

14   defendant said, "I'm down with that.  I'm in.  I want in."

11:17:59  15   By May 8th the defendant was ready.  And what was he

16   ready to do?  As he described online -- as he described on

17   May 2nd, as he described on May 4th, he was ready to let

18   everyone know the Spartans are here and they're hunting

19   cops.

11:18:15  20   So ladies and gentlemen of the jury, look at all the

21   evidence.  Consider all the testimony.

22   You'll hear shortly the legal definition of attempted

23   kidnapping, and you'll get definitions for a lot of the

24   words.

11:18:28  25   What the Government would argue, when you're listening

1    to those instructions and when you're applying those

2    instructions to the evidence, when you're back in your

3    deliberation chamber, that the defendant intended to seize,

4    confine, inveigle, decoy, kidnap, abduct, or carry away in

11:18:46  5    the Cuyahoga Valley National Park -- that's Count 1.  Or he

6    intended to do those acts to a federal officer.  That's

7    Count Number 2.

8         And he did something that was substantial -- that was

9    a substantial step, or the Government arguments, he took

11:19:01 10    multiple substantial steps on, before, and through May 8th

11    to commit the crime, and that those steps strongly

12    corroborated the defendant's intent to commit the crime of

13    kidnapping.

14         You'll hear it must strongly confirm he intended to

11:19:19 15    commit the crime, but not everything to commit the crime,

16    right?  You'll hear that he didn't have to do everything but

17    the last step.  He just had to take steps, substantial

18    steps, that confirmed and corroborated his intent to carry

19    out the crime.

11:19:33 20         The standard isn't caught in the act.  It's not

21    red-handed.  It's not but for arrest.  The standard is

22    strongly corroborated the defendant's intent.

23         Now, you'll also get some definitions, and these are

24    very important as well because they talk about what is

11:19:50 25    kidnapping.  Kidnapping, you'll hear, is the -- you know,

1    for seizing, for confining, for abducting or carrying away,

2    is the physical holding or the physical restraint by force,

3    or without the person's consent.  It's the restraint by

4    physical force or without consent.

11:20:17    5    You'll also hear definitions for decoy and inveigle,

6    and those are to lure by fraud or trickery.  And we'll talk

7    about the luring and the fraud and the trickery, and the

8    holding and restraining by force shortly here.

9    And while you're applying those definitions, while

11:20:40   10    you're applying the instructions to the evidence you've

11    heard over the last two days, and the testimony and the

12    video clips, always be thinking about how did --

13    May 8th -- what -- did the steps that the defendant took on

14    May 8th, those substantial steps, corroborate the intent

11:20:57   15    that he took earlier; and, also, frankly, how did the steps

16    he took earlier on May 2nd, on May 4th corroborate his

17    intent that he had been displaying all along.

18    The Government would argue that there are multiple

19    substantial steps on May 8th that corroborate his intent,

11:21:15   20    and that he had been acting in a consistent pattern and

21    consistently moving substantial step by substantial step

22    since meeting the defendant on April 18th.

23    First of all, most obviously, on May 8th the defendant

24    showed up.  We're not talking about thought crimes.  We're

11:21:32   25    not talking about what happened in the chat room with

Closing Statement - Brown

1    SpecialAgentRandyBeans.  We're not talking about being a

2    keyboard warrior here.  The defendant showed up.  And he

3    showed up -- this is the third time he showed up.

4         He showed up on April 18th.  He showed up on May 2nd.

11:21:48  5    And by the way, on May 2nd there are two guys who showed up

6    to meet him.  And he still showed up on May 8th.  He knew

7    these guys by this point.  He had told them his plan.

8                   THE COURT REPORTER:  Can you slow down?

9                   MR. BROWN:  Oh, I'm sorry.

11:21:59 10                   THE COURT:  The court reporter has to get it

11   down.

12                   MR. BROWN:  I know.

13        He had told him -- he had told Guiness and Steve his

14   plan on May 2nd, and he still showed up.  Listen to 208.

11:22:13 15   Listen to 209.  Listen to 210.  He makes it very clear what

16   he expected of the two, what he expected the plan to be on

17   May 2nd, and he still -- he shows up.  He crosses that line,

18   the Government submits.

19        And how does that corroborate intent?  Defense

11:22:33 20   attorney will say, "Well, he just showed up.  Doesn't mean

21   anything."

22        Ladies and gentlemen of the jury, you can't kidnap

23   without a location for the police to respond to.  You can't

24   carry out the crime on a sand table.  On May 8th he moved

11:22:50 25   from the sand table to the real world.

Closing Statement - Brown

1          Listen to how he talks about the location when he's

2     there on May 8th.  In Exhibit 229 --

3          If you want to play that.

4               (Video played in open court.)

11:23:16  5          MR. BROWN:  Thank you.

6          This is perfect.  At this point they've gone into

7     the -- they've been walking around.  He sees the houses, he

8     sees the layout.  He talks about sniper angles.  He talks

9     about site lines.  He talks about having the high ground.

11:23:30 10   So if you want the damsel in distress in the valley, they'll

11    have the high ground.  He says, "This is perfect."  It's not

12    in the abstract.  It's not in the Internet.  He's not

13    looking at an overhead map.  He's there.  He's walking

14    around.

11:23:44 15        And by the way, you heard the testimony from Steve.

16    He led the hike.  He didn't have to be dragged up and down

17    the hills.  He led the hike to get to that location.

18          Government submits that that's a substantial step that

19    showed his intent to commit the crime.  But it didn't stop

11:24:04 20   there.

21          The defendant also planned not to get caught.  The

22    Government argues the fact that he didn't bring a rifle,

23    that he said he didn't want people to dress in body armor,

24    that shows intent because he didn't want to get caught at

11:24:19 25   this step.

Closing Statement - Brown

303

1     He wanted to go to the location.  He wanted to try it

2     out.  He wanted to do a dry run of his plan in realtime, in

3     real life, and he didn't want to get stopped.  He didn't

4     want to have to explain why they were carrying a rifle.  He

11:24:33  5     didn't want to explain why he had a helmet on, a plate

6     carrier on.  He wanted to be able to do this, not get

7     caught, so he could put the plan in final action once he

8     walked everything through, once he took the sand table on

9     May 2nd into the real world and he saw that the sand table

11:24:53 10     was proof of concept and he could do it.

11     And that's not all.  In Exhibit 125, screenshot,

12     May 4th, he talks about how he is becoming aware of his

13     actions and how they might affect carrying out the plan.  He

14     talks about -- the day before, May 3rd -- an interaction

11:25:18 15     with the police and how his initial thought was, "I want to

16     go get my gun" -- that gun in that box that was recovered

17     from his house -- "and come out firing."

18     But he was getting better at controlling that.  The

19     Government argues he wanted to control that because he knew

11:25:34 20     this plan was in action.  He knew this plan, his plan, the

21     plan he had been talking about since at least March 21st,

22     the plan he had been working on, both online and then in

23     person with Guiness and Steve, once he found them, he wanted

24     that plan to come to fruition because he saw, after May 2nd,

11:25:55 25     that that was going to happen.  He saw that he was starting

Closing Statement - Brown

1    to amass the tools he needed to make that plan happen.

2        He said, on May 8th, the defendant led the way.  And

3    this is consistent with everything he said online.  This is

4    consistent with how he talked with the two confidential

11:26:18  5    human sources on May -- on April 28th online and May 2nd in

6    person.  He was the leader.  He was the leader.  He's the

7    leader of the group.

8        And if you listen to the confession --

9        Can I see that for a minute, my note?

11:26:36 10    And you'll have the confession.  You'll have the whole

11    confession, by the way.

12        If you listen at about an hour and 12 minutes and

13    47 seconds to about an hour and 22 minutes and 13 seconds,

14    he says he's the leader.  He says Russ was leader too, but

11:26:53 15    he's the leader.

16        Now, you'll also hear on that confession, by the way,

17    about an hour and 50 minutes, every time he describes a part

18    of the plan, he says Guiness did it.

19        And you can watch that.  And then go back and watch

11:27:08 20    the May 2nd videos.  Watch the May 8th videos.  Look at the

21    screenshots from 3:21 up until Guiness comes online at about

22    4:16.  The plan is there.  It's not Guiness' doing, it's the

23    defendant's doing.  The defendant tried when he got caught,

24    in that confession video, to push things off until he

11:27:30 25    couldn't.  But he was the leader, the Government submits.

Closing Statement - Brown
305

1        On May 8th the defendant again confirms the location

2   is good.  It's perfect -- in 229 -- because of what that

3   location provides him to carry out the plan.

4        Listen to Exhibit 223.

11:27:52  5        If you want to pull that up.

6              (Video played in open court.)

7              MR. BROWN:  He's got the high ground.  This

8   position gives him the high ground.

9        They've got site lines he likes.

11:28:18 10        227, please.

11              (Video played in open court.)

12              MR. BROWN:  That's how they're going to use

13   the houses, that's how they're going to use the location.

14   They're going to use the houses to hide, to give them cover,

11:29:59 15   and then come out and use that cover to make sure that they

16   can put the police officers down.  Put one in the head, make

17   the others snap to, because there's another 29.

18        And ladies and gentlemen of the jury, the 1 and

19   the 29, that's 30.  And the Government submits that

11:30:15 20   that's 30 rounds of 223 ammunition that would be fired from

21   that rifle, 310, Exhibit 310.  That's what he's talking

22   about.

23        He talks about, extensively, where to put the bodies,

24   where to burn the bodies of the police officers.  He talks

11:30:28 25   about burning the houses down in 232.  And he talks about

Closing Statement - Brown

306

1    that as he is waiting and watching for the Government's

2    response, the rangers coming.

3        That's not plan.  That's not fantasy.  That's not

4    speculative planning.  That is, he is hiding behind a stump,

11:30:47  5    making sure that this location is going to work for the

6    response he wants, and he can understand and plan for that

7    response to ensure success of the plan.

8        You'll hear the distress call that was made, and

9    you'll hear the defendant talk about the distress call.

11:31:06 10   Like in the confession, he says, "Ah, that's Guiness' plan."

11        Ladies and gentlemen of the jury, the Government

12   submits that the defendant was talking about the distress

13   call, specifically a DV call.  He was talking about the

14   timing of the call being in the morning.  It was his idea to

11:31:20 15   make the call.  It was his idea to use a call.

16        And what was the purpose of that call?  The Government

17   submits it was a decoy.  It was an inveiglement.  It was an

18   attempt to lure, through fraud or trickery, federal officers

19   to respond to 500 Truxell Road, where they would be forcibly

11:31:42 20   held against their will, forcibly restrained, possibly

21   killed, stripped of their guns, stripped of their

22   ammunition, stripped of their plates, and then dealt with in

23   a certain way so everybody would know that the Spartans were

24   out hunting police.

11:31:56 25        And you can hear that in 231, 232, 233.  This

1    is -- and in 233, this is the confirmation of the plan that

2    works.

3            Can you play 233.

4                    (Video played in open court.)

11:32:14  5            MR. BROWN:  After the police respond, after

6    they retreat to -- back towards their cars, the defendant

7    confirms how many police he thought he saw, that they're

8    going to need more explosives, and that they're going to

9    have no choice but to kill them.  The defendant, at that

11:33:32  10   point, on May 8th, has confirmation that his plan as he

11   described on April 28th, on May 2nd, was going to work.

12           He tried it out.  He found his people.  He had his

13   tools.  He had his opportunities, and he had his location.

14   It was going to work.  He tried it out and it's going to

11:33:52  15   work.

16           Ladies and gentlemen of the jury, the Government

17   submits to you that those are substantial steps.  Everything

18   that's been talked about are substantial steps to the

19   completion of the crime.  It's not mere thought.  They're

11:34:06  20   substantial steps.  They show intent, and they show

21   substantial steps with intent to complete.

22           And it's supported completely, the Government submits,

23   by the evidence.  Their charts without -- or their chats

24   without Government CHSs, Exhibits 101 through about 121,

11:34:28  25   Guiness isn't there.  Look at those.  Those are all Discord

1    chats on the defendant's Discord channel with the

2    defendant's people he chose to invite on the Discord

3    channel.

4         There are recordings, and they're made by the CHSs.

11:34:46  5    Now, I'll -- the Government will argue the CHSs are who the

6    CHSs are.  They're people who the Government employed to

7    make recordings, and they made recordings.

8         Listen to those recordings.  Listen to what they were

9    in a position to hear.  Listen to what the recordings they

11:35:06 10    were able to make because they're in that position showed.

11         They will show the defendant's words.  They will show

12    the defendant's actions in support of those words

13    consistently and as they escalated and confirmed action

14    through May 2nd and up until May 8th.

11:35:24 15         And ask yourself, review, was Steve's testimony

16    consistent with the recordings?  That's in your discretion.

17    That's what you can look at as a jury.  And use your common

18    sense when you're doing that.

19         The Government argues, by using your common sense,

11:35:42 20    watch the videos, read the transcripts, look at the

21    evidence.  Look for the consistencies.  Same with the

22    physical evidence.  Ask yourself, where are they found?  In

23    whose control?

24         By the way, ask yourself, too, using your common

11:35:56 25    sense, why was the gun found on May 8th in the house?  Is

Closing Statement - Brown

309

1    the theory that it's consistent -- that the gun was found on

2    May 8th in the house so he didn't have the gun and wouldn't

3    get caught, is that consistent with the defendant's plans?

4    Is that consistent with taking substantial steps for the

11:36:13  5    completion of the plan?  The Government submits that it is.

6         And weigh the testimony of the agents as you would

7    anybody else.  Listen to and consider, review, Special Agent

8    Taylor's testimony.  He admitted that there was no recording

9    on April 18th.  The defense will also say, "Well, that's

11:36:33 10    just evidence that the FBI acted hasty, that they -- no pun

11    intended -- pulled the trigger too soon."

12         Review the evidence.  Weigh the evidence.  Use your

13    common sense.  The Government would argue that the testimony

14    was consistent, that Special Agent Taylor described the FBI

11:36:50 15    actions in such a way that showed that they weren't hasty,

16    that they didn't rush to judgment on February -- or May 8th;

17    that, in fact, they took deliberate, thoughtful, intentional

18    steps every step of the way, from getting the case -- or

19    from getting the tip to making assessments, to reviewing

11:37:10 20    assessments, to figuring out what it meant for the case on

21    April 18th that the defendant showed up in person to meet

22    and to vet Guiness.

23         What did it mean, on February 2nd, when the defendant

24    showed up and made all of those comments on the sand table,

11:37:27 25    when he said, "The mission is shoot to kill," when he said,

1    "If you betray me, I kill Judases"?

2        And what did it mean on February 4th when he came

3    online with Guiness and said, "My first intent, after the

4    run-in with the police, was to come out firing"?  And then

11:37:44  5    what did it mean on May 8th when he showed up yet again and

6    took all of those steps he did in the Cuyahoga Valley

7    National Park?

8        The Government thanks you for your service.  And as

9    you begin your deliberation and as you return -- and as you

11:38:03 10    begin your deliberations, I'll ask you to return the only

11    verdict supported by the law and the only verdict supported

12    by the evidence as presented in court, and that is guilty as

13    to Count 1, attempted kidnapping on a federal property; and

14    Count 2, guilty, for attempted kidnapping of federal

11:38:24 15    officers of the National Park Service park rangers.

16        Thank you very much.

17            THE COURT:  Thank you, Counsel.

18        Mr. Ricotta.

19            MR. RICOTTA:  Okay.  Thank you, Judge.

11:39:16 20        Okay.  Folks.  How are you this morning?

21            JURORS EN MASSE:  Good.

22            MR. RICOTTA:  Happy Cinco de Mayo Day.

23        Obviously, the Government and I have a different view

24    of the facts and the evidence.

11:39:34 25        I am stressing to you to concentrate on the May 8th

Closing Statement - Ricotta

311

1  date, May 8th, 2020, because that's the only day that the

2  two counts of attempted kidnapping occurred on federal

3  property, which is one of the elements of the offense, and

4  involved the two agents, purported agent 1 and agent 2, that

11:40:03  5  are the subject matter of the two counts of kidnapping.

6  Now, you have to remember that the burden of proof

7  beyond a reasonable doubt is on the Government.

8  I didn't choose how to charge this case, nor did the

9  defendant, Mr. Ferguson.  The Government chose to charge

11:40:23 10  them with -- not a state offense, but a federal offense of

11  attempted kidnapping.  That is, that the jurisdiction had to

12  be on federal grounds, one, and that the victims as charged

13  must be federal agents acting in their official duties.

14  Now, my recollection of the evidence, the only days

11:40:47 15  when those things actually happened are May 8th.  So I

16  suggest to you that if you review the evidence, the only day

17  that you can conclude that these events transpired would be

18  May 8th, 2020.

19  So that's the day you have to concentrate on, because

11:41:06 20  if they -- if they can't prevail on those two elements, the

21  verdict is not guilty.  They need to sustain those elements

22  of the offense of kidnapping.  All right?  That's number

23  one.

24  There was an old black defense attorney that --

11:41:25 25  Stan Toliver that used to use this on every one of his

Closing Statement - Ricotta
312

1      closing arguments, that the elements of a crime are like

2      baking a cake, and you need all the elements to make the

3      cake rise.  Okay?

4          Same thing here.  All right?  They need those elements

11:41:40  5      to sustain their conviction, otherwise all this is just talk

6      and chatter.  Okay?  They have to prove that it happened on

7      federal land.  They have to prove that those two agents were

8      in their official business.

9          And the third thing they have to prove is that

11:41:56  10      somebody was actually -- or at least that there was a

11      attempt to kidnap them.  Who was attempted to be held,

12      restrained, decoyed, held -- you know, all those elements of

13      kidnapping.

14          First you have to show the defendant intended to

11:42:13  15      seize, confine, inveigle, decoy, kidnap, abduct, carry away,

16      hold a federal officer against his will.  Where is the

17      evidence of that?  There's absolutely no evidence of that.

18      So how do they prevail beyond a reasonable doubt as to that?

19      These are elements of the offense they have to proof beyond

11:42:36  20      a reasonable doubt.

21          I asked the two individuals that were purportedly the

22      federal agents, right?  We have the Ranger Budd, remember

23      her?  That was the female that came in.  And I asked her,

24      "At any point when you showed up at that federal -- that

11:42:54  25      area where the three houses are" -- remember we talked about

Closing Statement - Ricotta
313

1    the three houses -- "did anyone attempt to hold you against

2    your will, confine you, kidnap you, or anything of

3    those" --

4        "No, nobody did.  Nobody even approach me.  Never even

11:43:10  5    saw Christian Ferguson."

6        Of course, then we have Special Agent Dirker, who is

7    portraying -- or who was assisting by coming out.  We'll say

8    he was in his official capacity.  Certainly was a federal

9    agent.  When I asked him the same question, again, nobody

11:43:28 10    did that to him when he was -- on that day in question,

11    which is May 8th, 2020.

12        So all this other ten hours of tape, okay, all this

13    other information that you had, that's all talk.  Okay?

14    It's all talk.  He's verbalizing things.  Certainly, you can

11:43:50 15    use that to formulate to see if he had an actual intent to

16    do so something.  Certainly within your purview.

17        But to actually do the attempted kidnapping, you have

18    to show that these elements were happening on May 8th.

19    Because mere preparation is not enough for this crime.  Mere

11:44:11 20    preparing to commit a crime is not a substantial step.

21    That's why the U.S. Attorney on his first opening spent so

22    much time talking about substantial step because he knows he

23    can't make it.  He knows he can't prove any other elements

24    except on earlier stuff that has nothing to do with the

11:44:29 25    May 8th crime.

Closing Statement - Ricotta
314

1      You can't have a crime every day of the week.  Now,

2  all that preliminary stuff that he wants to use as

3  substantial steps, that's merely preparing.  Okay?  And mere

4  preparation is not enough.  You're going to get that

11:44:46  5  instruction.

6      And I ask to God that you -- well, pray to God that

7  you listen to the instruction of law.  Because you can't use

8  your own judgment.  Okay?  You have to follow the

9  instruction of the law, and you have to go by what was

11:44:59 10  proven in the court by evidence.  All right?

11      You can have ill feelings about this young male, or

12  you can think all those things that he said were crazy and

13  insane, and you can have all these thoughts about him; but

14  the burden of proof beyond a reasonable doubt is on those

11:45:20 15  folks, not me.

16      And one thing the U.S. Attorney said that was correct

17  is, "I do believe that the Government reacted too early in

18  this case."  And I blame Special Agent Taylor in one

19  respect, but then I commend him on the other, because he's

11:45:38 20  got a tough job to do.  I understand that.  And he's trying

21  to keep us all safe.  I understand that.

22      But the fact that he uses a guy like Guiness, who we

23  don't even hear from, who's getting paid, you know, $3,000,

24  and 27,000 and 28,000, and nobody knows what he said on the

11:45:58 25  April 14th meet and greet -- we don't even know what was

Closing Statement - Ricotta

315

1    said on that date.  That's the key to all this other

2    conversation.  Because he might have said, "Yeah, I got this

3    kid all pumped up, pumped up.  Let's go training, let's do

4    this, let's do that."

11:46:13  5    And here you got a gullible young kid that's following

6    the lead of a 50-year-old and a 65-year-old or whatever the

7    hell -- how old Steve was.  And they're traipsing through

8    the woods and they're recording him.  It's all words.  We

9    don't convict people for words.  You need actions.  That's

11:46:33 10    what they call the substantial step.

11    Now, you can use all that stuff that the Government

12    has to try and say that was part of a plan, a plan.  Well,

13    the plan never happened because on May 8th, they can't make

14    the elements.  All right?

11:46:52 15    And quite frankly, I think this whole Discord and the

16    75th Spartans is a joke.  You got two 14-year-olds and a

17    15-year-old and they're chatting on Discord and talking all

18    kinds of crazy stuff.

19    Well, if that's the case, you know, we could probably

11:47:11 20    lock up half the juveniles in the country.  Okay?  They're

21    all doing crazy things.  Think about when you were 20 years

22    old, you know?  I mean, we don't act responsible.  We don't

23    act, sometimes, reasonably.  That doesn't mean that we're

24    federal convicted felons.  Okay?  The thing went out of

11:47:33 25    board -- way overboard.  You know, this is not the crime.

Closing Statement - Ricotta

316

1          But the bottom line is, no matter how he wants to

2     twist it, however -- whatever he wants to get up here and

3     say next, you try and anticipate what I would say in

4     rebuttal to that.  Because no matter how he wants to frame

11:47:55 5     it, he can't show that any of those other acts happened on

6     federal land.  He can't show any of those other acts were

7     with federal agents, or any of those other events, you know,

8     were the actual elements of kidnapping.

9          So having said that, when you go back, you know, take

11:48:20 10     your time, go over the evidence.  You'll have everything.

11     Okay?  If you noticed, I didn't object to any -- you've got

12     everything that the Government wanted to present.  That's

13     fine.  I want you to have the opportunity to listen to

14     everything.  You'll have the whole ten hours, not just, you

11:48:38 15     know, the clips that they thought were appropriate and the

16     ones they been playing you.  You know, you'll have it all.

17          So if you want, you'll have the transcripts.  You can

18     sort of put it in context, okay, instead of just hearing the

19     worst that he may have said in ten hours, right?  But the

11:48:59 20     fact of the matter is they parade the gun in here because

21     they want to, you know, get you all psyched up, get you

22     scared about it, really.  Nothing wrong with that gun.  He

23     had every legal right to have it or he would have been

24     charged with something.  He wasn't charged with anything.

11:49:16 25     He actually played these air gun games and all this other

1    stuff.  They're like paint ball or whatever.  That's what

2    all the equipments were.

3        You know, he's a young man that made some mistakes by

4    saying all this stuff.  But you'll have his confession.  I

11:49:38 5    want you to listen to that.  Because the first hour and 40

6    minutes of it, you know, he's telling you exactly what was

7    going on.  Okay?  And when you -- when you think about it,

8    the Government might be able to show that, you know, these

9    were mixed-up feelings and the -- things that he shouldn't

11:50:01 10    have said.

11        Well, we don't convict people for their words.  We

12    convict them for their actions.  That's what we call

13    substantial steps.  That means that you have to do some kind

14    of overt acts, actions, to put your thoughts into action to

11:50:19 15    commit the crime of the kidnapping.  They can't do that

16    here.  And so for that, I'm asking you to acquit the

17    defendant on both counts.

18        Thank you.

19                THE COURT:  Thank you, Counsel.

11:50:30 20                MR. BROWN:  Briefly.

21                THE COURT:  Go ahead.  Some brief rebuttal?

22    You may proceed, Mr. Brown.

23                MR. BROWN:  Thank you.

24        Ladies and gentlemen of the jury, we're not -- the

11:50:45 25    Government's not asking you to bake a cake, and I'm not

Rebuttal Closing Statement - Brown

318

1    quite sure about that analogy.  I don't want to use that

2    analogy because I think we've got eggs, I think we've got

3    flour, baking soda, whatever else you need to bake a cake.

4        The defense apparently will only say you baked a cake

11:51:03    5    after he ate it, and so I don't think that analogy -- the

6    Government does not believe that analogy is appropriate.

7    And it's certainly not -- even if we could strain it to its

8    logical ends, in this case, it just wouldn't be supported by

9    the evidence.

11:51:19    10    The defendant showed up.  Nobody else showed up.  He

11    showed up.  He took this seriously.  He took his words

12    seriously.  And he showed up and he kept showing up.

13        Ladies and gentlemen of the jury, you might

14    agree -- like the defense said, you might agree, you might

11:51:35    15    not with his beliefs, but he showed up in support of those

16    beliefs.  He showed up on the 18th to get his soldier.  He

17    showed up on the 2nd to confirm his plans, to draw out his

18    plans.  And on the 8th he showed up to make sure those plans

19    were going to be successful.

11:51:53    20    The substantial step is a step towards committing the

21    crime that strongly corroborates defendant's intent,

22    starting with Exhibit 101.  Starting back in March.  His

23    intent was to kill police, was to do raids, to get their

24    weapons.  His intent was to -- as you'll see in the chats

11:52:17    25    and you'll hear in his voice, to use his militia to bring

Rebuttal Closing Statement - Brown

1    the Government down.

2         Everything he did in person on February -- or on

3    April 18th, on May 2nd, on May 8th, was in furtherance of

4    bringing about that intended action.

11:52:40  5         The defense wants you to limit your analysis just to

6    May 8th.  That's not how it's charged, the Government

7    submits, and it doesn't show the full picture.  And that's

8    what the evidence supports.  The evidence is of the full

9    picture.  Because to understand the defendant's intent, you

11:52:59 10   have to see the defendant's words and how he acted on those

11   words.  And on May 2nd he acted.  On May 8th he acted.

12        The Government argues that those actions he took, the

13   bringing of the gun -- we didn't -- the Government did not

14   bring in the gun to scare people.  The Government brought in

11:53:17 15   the gun because it was found next to a loaded magazine in

16   the defendant's possession away from his dry run so it

17   wouldn't cause suspicion, on May 8th, and we brought it in

18   because he made reference to his gun -- actually, rifle --

19   with his magazine that holds 30 rounds; one for the head of

11:53:38 20   a police officer, and 29 others to make everybody else snap

21   to.

22        He made reference to his rifle in the plans, that

23   everybody has riffles that can shoot.  He made plans about

24   his rifle, upgrading his rifle.  We brought it in because it

11:53:56 25   is part of the crime.  It is a tool that he had to bring

1    about the successful completion of his plan.

2         The fact that he has it, the fact that he brought it

3    loaded on May 2nd, the fact that he kept it next to loaded

4    magazines, the Government would argue, is a substantial step

11:54:15  5    in the completion of his crime to detain, to seize, to

6    confine by force, and without the consent, to fulfill his

7    plan.

8         Just like the phone call that was made, the phone call

9    consistent with what he wanted the phone call to be on

11:54:37 10    May 2nd.  And as they were driving into the site -- and he

11    described it -- the phone call that he wanted was consistent

12    with the phone call that was made, and it was a decoy.  It

13    was a lure, it was a fraud, it was a trick to bring the

14    officers in.

11:54:53 15         Ladies and gentlemen of the jury, the Government

16    argues that the defendant had a plan.  On February -- or on

17    April 18th he met his soldier.  On April 28th he laid out

18    his plan on his secure server.  On 5-2 he drew out his plan

19    with his two Spartans.

11:55:15 20         On February -- or on May 3rd he got motivated.

21    May 4th, he talked about that motivation, and he talked

22    about how he could control that motivation until the right

23    time.  And then on May 8th he continued all of those

24    substantial steps that he began in person when he met with

11:55:31 25    Guiness, when he met with Guiness and Steve.

1          He tried out the physical location.  He said it was

2     perfect.  They tried out the call.  It worked.  The police

3     came.  They arrived.  He saw them arrive.  He timed them

4     arriving.  He observed their response.  He confirmed -- in

11:55:52  5     Exhibit 233 he confirmed what he needed to confirm, to make

6     sure -- to make sure all of those steps, those substantial

7     steps he just took, were a completion to the crime he

8     intended to commit.

9          And because of that, ladies and gentlemen of the jury,

11:56:09 10     again, I thank you, and I ask you to return the only verdict

11     that is supported by the evidence, the only verdict that is

12     supported by the testimony, and the only verdict that is

13     supported by the law you're about to receive, which is

14     guilty to Count 1, guilty to Count 2, two counts of

11:56:26 15     attempted kidnapping.

16          Thank you.

17               THE COURT:  Thank you, Counsel.

18          Members of the jury, I'm going to give you some copies

19     of jury instructions now.  We'll pass those out, and then

11:56:47 20     I'll begin to give my instructions.

21          You have those instructions, but let me say something

22     before we start.  These are the instructions I will be

23     giving.  You are not required to look at them or to try to

24     follow them as you -- in front of you through the reading of

11:58:00 25     those instructions.  But I just wanted to make it convenient

Charge to the Jury

1       for you, because I'm going to give these same

2       instructions -- I'm going to give them out loud.  But it

3       will give you a chance to have them now and also to have

4       them in the jury room.

11:58:16  5       But if you are going to be looking at the

6       instructions, let me just say this:  You shouldn't be

7       flipping through the instructions, because that's how you'll

8       get distracted.  So if you're going to follow the

9       instructions at all, in terms of looking at the document,

11:58:33 10      make sure that you do it at the same time -- the same pages

11      that I'm reading, not to go through the end of the document

12      and start reading there when I'm trying to give instructions

13      that are much earlier.  That could cause confusion.

14      But, again, why do I give you those instructions?  In

11:58:53 15      the old days judges wouldn't do it.  Some still don't.  Just

16      like I talked about notes before.  Old days, you know, it's,

17      like, you got the hear it and that's it.  You can't look at

18      notes.  You won't have any.

19      Just trying to be up to date in how people

11:59:11 20      communicate, how people learn, and to provide options.

21      That's why I'm giving them to you.

22      But, again, I will read all these instructions out

23      loud, and you will hear them.  If you don't read through

24      that document at all, that's perfectly fine.  But if you

11:59:29 25      choose to follow, follow along in the same way that I'm

Charge to the Jury

323

1    reading and not go back and forth in the document.  So I

2    just wanted to say that.

3        But now it's time for me to instruct you about the law

4    that you must follow in deciding this case.  I will start by

11:59:50  5    explaining your duties and the general rules that apply in

6    every criminal case.

7        Then I will explain the elements of parts of the

8    crimes that defendant is accused of committing.  Then I will

9    explain some rules that you must use in evaluating

12:00:04 10    particular testimony and evidence.

11        And then last, I will explain the rules that you must

12    follow during your deliberations in the jury room and the

13    possible verdicts that you may return.  Please listen very

14    carefully to everything I say.

12:00:21 15        You have two main duties as jurors.  The first one is

16    to decide what the facts are from the evidence that you saw

17    and heard here in court.  Deciding what the facts are is

18    your job, not mine, and nothing I have said or done during

19    this trial was meant to influence your decision about the

12:00:39 20    facts in any way.

21        Your second duty is to take the law that I give you,

22    apply it to the facts, and decide if the Government has

23    proved the defendant guilty beyond a reasonable doubt.

24        It is my job to instruct you about the law, and you're

12:00:56 25    bound by the oath that you took at the beginning of the

Case: 5:20-cr-00262-SO  Doc #: 79  Filed: 12/22/21  80 of 118.  PageID #: 1064
Charge to the Jury
324

1   trial to follow the instructions that I give you, even if

2   you personally disagree with them.  This includes the

3   instructions that I gave you before and during the trial,

4   and these instructions.  All the instructions are important,

12:01:14  5   and you should consider them together as a whole.

6       The lawyers have talked about the law to some extent

7   during your arguments.  But if what they said is different

8   from what I say, you must follow what I say.  What I say

9   about the law controls.

12:01:31  10       Perform these duties fairly.  Do not let any bias,

11   sympathy, or prejudice that you may feel toward one side or

12   the other influence your decision in any way.

13       As you know, the defendant, Christian Ferguson, has

14   pleaded not guilty to the crimes charged in the indictment.

12:01:50  15   The indictment is not any evidence at all of guilt.  It is

16   just a formal way that the Government tells a defendant what

17   crimes he's accused of committing.  It does not even raise

18   any suspicion of guilt.

19       Instead, the defendant starts the trial with a clean

12:02:09  20   slate, with no evidence at all against him.  And the law

21   presumes that he's innocent.  This presumption of innocence

22   stays with him unless the Government presents evidence here

23   in court that overcomes the presumption and convinces you

24   beyond a reasonable doubt that he is guilty.

12:02:27  25       This means the defendant has no obligation to present

Charge to the Jury

325

1    any evidence at all or to prove to you in any way that he is

2    innocent.  It's up to the Government to prove that he's

3    guilty, and this burden stays on the Government from start

4    to finish.  You must find the defendant not guilty unless

12:02:44 5    the Government convinces you beyond a reasonable doubt that

6    he is guilty.

7         The Government must prove every element of the crimes

8    charged beyond a reasonable doubt.  Proof beyond a

9    reasonable doubt does not mean proof beyond all possible

12:03:00 10   doubt.  Possible doubts, or doubts based purely on

11   speculation, are not reasonable doubts.  A reasonable doubt

12   is a doubt based on reason and common sense.  It may arise

13   from the evidence, the lack of evidence, or the nature of

14   the evidence.

12:03:17 15        Proof beyond a reasonable doubt means proof that is so

16   convincing that you would not hesitate to rely and act on it

17   in making the most important decisions in your own lives.

18   If you are convinced that the Government has proved the

19   defendant guilty beyond a reasonable doubt, say so by

12:03:35 20   returning guilty verdicts.  If you're not convinced, say so

21   by returning not guilty verdicts.

22        You must, as I said before, make your decision based

23   only on the evidence that you saw and heard here in there

24   court.  Do not let rumors, suspicions, or anything else that

12:03:54 25   you may have seen or heard outside of court influence your

Case: 5:20-cr-00262-SO  Doc #: 79  Filed: 12/22/21  82 of 118.  PageID #: 1066
Charge to the Jury
326

1    decision in any way.

2        The evidence in this case includes only what the

3    witnesses said while they were testifying under oath, the

4    exhibits that I allowed into evidence, and the stipulations

12:04:08  5    that the lawyers agreed to.

6        Nothing else is evidence.  The lawyers' statements and

7    arguments are not evidence.  Their questions and objections

8    are not evidence.  My legal rulings are not evidence.  And

9    my comments and questions are not evidence.

12:04:25 10        Now, this didn't happen often, but perhaps during the

11    trial I did not let you hear the answers to some of the

12    questions that the lawyers asked.  I also ruled that you

13    could not see some of the exhibits the lawyers wanted you to

14    see.  I'm not sure if I did that, or much of that.  If I

12:04:42 15    did, then you are to disregard the exhibit.  But if I didn't

16    do that, of course, then that speaks for itself.

17        And on one occasion, I know -- and if I did it more,

18    you should also remember that.  If I ordered you to

19    disregard things you saw or heard, or struck things from the

12:05:01 20    record, then you have to follow that instruction and you'd

21    have to completely ignore all of those things.

22        Do not think of anything if I said you should

23    disregard it.  Do not speculate about what a witness might

24    have said or what an exhibit might have shown.  These things

12:05:16 25    are not evidence, and you are bound by your oath not to let

1    them influence your decision in any way.

2        Make your decision based only on the evidence as I've

3    defined it here, nothing else.

4        You should use your common sense in weighing the

12:05:32  5    evidence.  Consider it in light of your everyday experience

6    with people and events, and give it whatever weight you

7    believe it deserves.  If your experience tells you that

8    certain evidence reasonably leads to a conclusion, you're

9    free to reach that conclusion.

12:05:49  10        Now, some of you may have heard the words or terms

11    "direct evidence" and "circumstantial evidence."

12        Direct evidence is simply evidence like the testimony

13    of an eyewitness, which, if you believe it, directly proves

14    a fact.  If a witness testified that he saw it raining

12:06:05  15    outside and you believed him, that would be direct evidence

16    that it was raining.

17        Circumstantial evidence is simply a chain of

18    circumstances that indirectly proves a fact.  If someone

19    walked into the courtroom wearing a raincoat covered with

12:06:20  20    drops of water and carrying a wet umbrella, that would be

21    circumstantial evidence from which you could conclude that

22    it was raining.

23        It is your job to decide how much weight to give the

24    direct and circumstantial evidence.  The law makes no

12:06:34  25    distinction between the weight that you should give to

Charge to the Jury

328

1    either one, or say that one is any better evidence than the

2    other.  You should consider all the evidence, both direct

3    and circumstantial, and give it whatever weight you believe

4    it deserves.

12:06:49   5    Now, another part of your job as jurors is to decide

6    how credible or believable each witness was.  This is your

7    job, not mine.  It's up to you to decide if a witness's

8    testimony was believable and how much weight you think it

9    deserves.  You are free to believe everything that a witness

12:07:08  10    said, only part of it, or none of it at all.  But you should

11    act reasonably and carefully in making these decisions.

12    Now, let me suggest some things for you to consider in

13    evaluating each witness's testimony.

14    Ask yourself if the witness was able to clearly see or

12:07:25  15    hear the events.  Sometimes even an honest witness may not

16    have been able to see or hear what was happening and may

17    make a mistake.

18    Ask yourself how good the witness's memory seemed to

19    be.  Did the witness seem able to accurately remember what

12:07:43  20    happened?

21    Ask yourself if there's anything else that may have

22    interfered with the witness's ability to perceive or

23    remember the events.

24    Ask yourself how the witness acted while testifying.

12:07:55  25    Did the witness appear honest, or did the witness appear to

1    be lying?

2         Ask yourself if the witness had any relationship to

3    the Government or the defendant, or anything to gain or lose

4    from the case that might influence the witness's testimony.

12:08:11  5         Ask yourself if the witness had any bias or

6    prejudices, or reason for testifying that might cause the

7    witness to lie or to slant the testimony in favor of one

8    side or the other.

9         Ask yourself if the witness testified inconsistently

12:08:27 10   while on the witness stand, or if the witness said or did

11   something or failed to say or do something at any other time

12   that is inconsistent with what the witness said while

13   testifying.  If you believe that the witness was

14   inconsistent, ask yourself if this makes the witness's

12:08:43 15   testimony less believable?  Sometimes it may; other times it

16   may not.

17         Consider whether the inconsistency was about something

18   important or about some unimportant detail.  Ask yourself if

19   it seemed like an innocent mistake or if it seemed

12:09:00 20   deliberate.

21         And ask yourself how believable the witness's

22   testimony was in light of all the other evidence.  Was the

23   witness's testimony supported or contradicted by other

24   evidence that you found believable?

12:09:15 25         If you believe that a witness's testimony was

1    contradicted by other evidence, remember that other -- I'm

2    sorry -- remember that people sometimes forget things, and

3    that even two honest people who witness the same event may

4    not describe it exactly the same way.

12:09:29  5         These are only some of the things you may consider in

6    deciding how believable each witness was.  You may also

7    consider other things that you think shed some light on the

8    witness's believability.

9         Use your common sense and your everyday experience in

12:09:46  10   dealing with other people, and then decide what testimony

11   you believe and how much weight you think it deserves.

12        Now, one more point about witnesses.  Sometimes jurors

13   wonder if the number of witnesses who testified make any

14   difference.

12:10:03  15        Do not make any decisions based only on the number of

16   the witnesses who testified.  What is more important is how

17   believable the witnesses were and how much weight you think

18   their testimony deserves.  Concentrate on that, not the

19   numbers.

12:10:19  20        Now, there's one more general subject that I want to

21   talk to you before I begin explaining the elements of the

22   crimes charged.

23        The lawyers for both sides objected, not very often,

24   to some of the things that were said or done during the

12:10:35  25   trial -- during the trial.  Do not hold that against either

1   side.  The lawyers have a duty to object whenever they think

2   that something is not permitted by the Rules of Evidence.

3   Those rules are designed to make sure that both sides

4   receive a fair trial.

12:10:50  5   And do not interpret my rulings on their objections as

6   any indication of how I think the case should be decided.

7   My rulings were based on the Rules of Evidence, not on how I

8   feel about the case.  Remember that your decision must be

9   based only on the evidence that you saw and heard here in

12:11:08  10   court.

11   Now, that concludes the part of my instructions

12   explaining your duties and the general rules that apply in

13   every criminal case.  In a moment, I will explain the

14   elements of the crimes that the defendant is accused of

12:11:25  15   committing.

16   But before I do that, I want to emphasize that

17   defendant is only on trial for the particular crimes charged

18   in the indictment.  Your job is limited to deciding whether

19   the Government has proved the crimes charged.

12:11:39  20   And, also, keep in mind, that whether anyone else

21   should be prosecuted, convicted for this crime is not a

22   proper matter for you to consider.  The possible guilt of

23   others is no defense to a criminal charge.  Your job is to

24   decide if the Government has proved the defendant guilty.

12:11:57  25   Do not let the possible guilt of others influence your

1    decision in any way.

2          Now, the defendant has been charged with two crimes.

3    There are two counts.  The number of charges is no evidence

4    of guilt, and this should not influence your decision in any

12:12:17  5    way.  It is your duty to separately consider the evidence

6    that relates to each charge and to return a separate verdict

7    for each one.

8          For each charge, you must decide whether the

9    Government has presented proof beyond a reasonable doubt

12:12:32  10   that defendant is guilty of that particular charge.  Your

11   decision on one charge, whether it's guilty or not guilty,

12   should not influence your decision on any of the other

13   charges.

14         Now, Count 1 of the indictment charges the defendant,

12:12:51  15   Christian Ferguson, with attempted kidnapping.

16   Specifically, Count 1 charges:

17         From on or about March 21st, 2020, to on or about

18   May 8th, 2020, in the Northern District of Ohio, Eastern

19   Division, and elsewhere, defendant Christian Ferguson did

12:13:12  20   attempt to unlawfully seize, confine, inveigle, kidnap, and

21   abduct federal officers of the National Park Service

22   rangers; said attempted seizure, confinement, inveigling,

23   kidnapping, and abduction having occurred within the special

24   maritime and territorial jurisdiction of the United States,

12:13:33  25   to wit, the Cuyahoga Valley National Park, in violation of

1       Title 18, United States Code, Section 1201(a)(2) and (d).

2           For you to find defendant guilty of this crime, you

3       must find the Government has proved each and every one of

4       the following elements beyond a reasonable doubt:

12:13:52   5       A, first, defendant intended to seize, confine,

6       inveigle, decoy, kidnap, abduct, carry away, and to hold

7       another person against his or her will within the special

8       maritime and territorial jurisdiction of the United States,

9       specifically, the Cuyahoga Valley National Park.

12:14:11  10       And, second, the defendant did something that was a

11      substantial step toward committing the crime and that

12      strongly corroborated defendant's intent to commit the

13      crime.

14          Merely preparing to commit a crime is not a

12:14:26  15      substantial step.  The defendant's conduct must be go beyond

16      mere preparation and must strongly confirm that he intended

17      to commit the crime.  But the Government does not have to

18      prove defendant did everything except the last act necessary

19      to complete the crime.  A substantial step beyond mere

12:14:44  20      preparation is enough.

21          Jurors do not need to agree unanimously as to which

22      particular act or actions constituted a substantial step

23      towards the commission of a crime.

24          Now, kidnap means to take and carry away a person by

12:15:00  25      force and against his or her will.  Seize, confine, abduct,

Case: 5:20-cr-00262-SO  Doc #: 79  Filed: 12/22/21  90 of 118.  PageID #: 1074
Charge to the Jury
334

1    and carry away all mean the physical or bodily taking and

2    carrying away of a person or the holding or restriction of

3    someone by force or without that person's consent.

4         Inveigle means enticement, cajoling, or tempting of a

12:15:24  5    victim, usually through some of the deceitful means such as

6    false promises or representations.

7         Decoy means the enticement or luring of a person by

8    means of some fraud, trick, or temptation.

9         Inveigling and decoying involve the non-forcible

12:15:42  10    takings of a victim by which a kidnapper lures or entices

11    the victim into accompanying him.

12         Finally, per the parties' stipulation, you must accept

13    that on May 8th, 2020, 500 Truxell Road, Peninsula, Ohio,

14    was federally controlled property under the jurisdiction of

12:16:00  15    the National Park Service.

16         If you're convinced that the Government has proved all

17    of these elements, say so by returning a guilty verdict.  If

18    you have a reasonable doubt about any one of these elements,

19    then you must find the defendant not guilty.

12:16:15  20         Count 2 of the indictment charges defendant Christian

21    Ferguson with attempted kidnapping.  Specifically, Count 2

22    charges:

23         From on or about March the 21st, 2020, to on or about

24    May 8th, 2020, in the Northern District of Ohio, Eastern

12:16:27  25    Division, and elsewhere, defendant Christian Ferguson did

1   attempt to unlawfully seize, confine, inveigle, kidnap, and

2   abduct federal officers of the National Park Service park

3   rangers while the officers were engaged in and on account of

4   the performance of their official duties in violation of

12:16:47  5   Title 18, United States Code, Section 1201(a)(5) and (d).

6          For you to find the defendant guilty of this crime,

7   you must find that the Government has proved each and every

8   one of the following elements beyond a reasonable doubt:

9          First, the defendant intended to seize, confine,

12:17:04  10   inveigle, decoy, kidnap, abduct, carry away, and hold a

11   federal officer or employee against his or her will on

12   account of or during the performance of his or her official

13   duties.

14          And, second, defendant did something that was a

12:17:21  15   substantial step toward committing the crime and that

16   strongly corroborated defendant's intent to commit the

17   crime.

18          Again, merely preparing to commit a crime is not a

19   substantial step.  Defendant's conduct must be go beyond

12:17:34  20   mere preparation and must strongly confirm that he intended

21   to commit the crime.

22          But the Government does not have to prove defendant

23   did everything except the last act necessary to complete the

24   crime.  A substantial step beyond mere preparation is

12:17:48  25   enough.

1      Jurors do not need to agree unanimously as to which

2   particular act or actions constituted a substantial step

3   toward the commission of a crime.

4      And, again, I go back to the definitions.  Kidnap

12:18:01  5   means to take and carry away a person by force and against

6   his or her will.  Seize, confine, abduct, and carry away all

7   mean the physical bodily taking and carrying away of a

8   person or the holding or restriction of someone by force or

9   without that person's consent.

12:18:19 10      Inveigle means enticement, cajoling, or tempting of a

11   person, usually through some deceitful means such as false

12   promises or representations.

13      Decoy means the enticement or luring of a victim by

14   some means of some fraud, trick, or temptation.

12:18:34 15      Inveigling and decoying involve the non-forcible

16   taking of a victim by which a kidnapper lures or entices a

17   victim into accompanying him.

18      Finally, per the parties' stipulation, you must accept

19   that on May 8th, 2020, one or more of the individuals

12:18:52 20   responding to 500 Truxell Road, Peninsula, Ohio, were

21   federal officers with the National Park Service rangers

22   carrying out their official duties.

23      If you are convinced that the Government has proven

24   all of these elements, say so by returning a guilty verdict.

12:19:06 25   If you have a reasonable doubt about any one of these

Charge to the Jury

337

1    elements, then you must find the defendant not guilty.

2         Now, next I want to say a word about the dates

3    mentioned in the indictment.

4         The indictment charges the crimes happened on or about

5    certain days.  The Government does not have to prove that

6    the crimes happened on those exact days, but the Government

7    must prove that the crimes happened reasonably close to that

8    date.

9         Now, next I want to explain something about proving a

10   defendant's state of mind.

11        Ordinarily, there is no way that a defendant's state

12   of mind can be proved directly, because no one can read

13   another person's mind and tell what that person is thinking.

14   But a defendant's state of mind can be proved indirectly

15   from the surrounding circumstances.  This includes things

16   like what the defendant said, what the defendant did, how

17   the defendant acted, and any other facts or circumstances in

18   evidence that show what was in the defendant's mind.

19        You may also consider the natural and probable results

20   of any acts the defendant knowingly did or did not do, and

21   whether it is reasonable to conclude the defendant intended

22   those results.

23        This, of course, is all for you to decide.

24        Although the indictment charges that the statute was

25   violated by acts that are connected by the word "and," it is

Case: 5:20-cr-00262-SO  Doc #: 79  Filed: 12/22/21  94 of 118.  PageID #: 1078
Charge to the Jury
338

1    sufficient if the evidence establishes a violation of the

2    statute by any one of the acts charged.  Of course, this

3    must be proved beyond a reasonable doubt.

4        Now, that concludes the portions of my instructions

12:20:46  5    explaining the elements of the crimes and the defendant's

6    position.  Next I will explain some rules that you must use

7    in considering some of the testimony and evidence.

8        A defendant has an absolute right not to testify or

9    present evidence.  The fact that he did not testify or

12:21:05 10    present any evidence cannot be considered by you in any way.

11    Do not even discuss it in your deliberations.

12        Remember that it is up to the Government to prove the

13    defendant guilty beyond a reasonable doubt.  It is not up to

14    the defendant to prove that he is innocent.

12:21:26 15        Now, you've heard some recorded conversations that

16    were received in evidence.  And there were some written

17    transcriptions that were prepared, and you've seen some of

18    that on screen.  And you'll have those things during your

19    deliberations.

12:21:42 20        But keep in mind that the transcripts are not

21    evidence.  They were given to you only as a guide to help

22    you follow what was being said.  The recordings themselves

23    are the evidence.  If you noticed any differences between

24    what you heard on the recordings and what you read in the

12:21:59 25    transcripts, or will read, you must rely on what you heard,

1    not what you read.  And if you could not hear or understand

2    certain parts of the recordings, you must ignore the

3    transcripts as far as those parts are concerned.

4         Now, that concludes the part of my instructions

12:22:19  5    explaining the rules for considering some of the testimony.

6    So let me finish up by explaining some things about your

7    deliberations in the jury room and your possible verdicts.

8         The first thing that you should do in the jury room is

9    chose someone to be your foreperson.  This person will help

12:22:41 10    to guide your discussions and will speak for you here in

11    court if it's necessary.

12         Once you started deliberating, do not talk to -- we

13    say here the jury officer; that means my courtroom deputy or

14    my law clerk or whoever, you know, will be attending you.

12:23:02 15    And you shouldn't talk to me about the case -- or anyone --

16    except each other about the case.

17         If you have any questions or messages -- and I'm not

18    suggesting you will, but you must write them down on a piece

19    of paper.  Have the foreperson sign that piece of paper, and

12:23:18 20    then give it to my staff.  And then my staff member will

21    give it to me, and then I will respond as soon as I can.

22         I may have to talk to the lawyers about what you've

23    asked, so it may take me a little bit of time to get back to

24    you.  But any questions or messages normally should be sent

12:23:37 25    to me through your foreperson.  So I emphasize that.

Charge to the Jury

340

1        If you want to see any of the exhibits that are

2   admitted in evidence, those exhibits will be provided to

3   you.

4        Now, one more things about messages.  Do not ever

12:23:53  5   write down or tell anyone, including me, how you stand on

6   your vote at a given time.  For example, do not write down

7   or tell anyone that "Right now we're split 6 to 6, or 8 to

8   4," or whatever your vote happens to be during a particular

9   portion of your deliberations.  That should stay secret

12:24:13 10   until you're finished.

11        Remember that you must make your decision based only

12   on the evidence that you saw and heard here in court.

13   During your deliberations, you must not communicate

14   with -- you must not communicate with or provide any

12:24:32 15   information to anyone by any means about this case.

16        Now, I'm going to be redundant here.  I told you in

17   the beginning that you may not use any electronic device or

18   media, such as a telephone, a cell phone, a smartphone,

19   iPhone, a BlackBerry, a computer, Internet, any Internet

12:24:50 20   service, or any text or instant messaging service, any

21   Internet chat room, blog, or website, such as Facebook,

22   Myspace, LinkedIn, YouTube or Twitter, to communicate to

23   anyone any information about this case or to conduct any

24   research about the case until I accept your verdict.

12:25:10 25        In other words, you cannot talk to anyone on the

Case: 5:20-cr-00262-SO  Doc #: 79  Filed: 12/22/21  97 of 118.  PageID #: 1081
Charge to the Jury
341

          1    phone, correspond with anyone, or electronically communicate

          2    with anyone about this case.  You can only discuss the case

          3    in the jury room with your fellow jurors during the

          4    deliberations.

12:25:24  5         And I do expect you to inform me as soon as possible

          6    if you become aware of any juror who's violating these

          7    instructions.

          8         Now, let me say one other thing that's not on this

          9    paper, but I want to say.

12:25:37 10         When you're deliberately, all 12 of you should be

         11    there.  So if someone has to step out to go to the restroom

         12    or whatever they have to do, then you should just stop

         13    deliberating, because everything that's being said by a

         14    juror should be heard by the others.  Everyone should have

12:25:59 15    that ability.

         16         So just deliberate among yourselves as 12, but not in

         17    smaller groups, two or three.  That's not appropriate.

         18         Now, these instructions are redundant, but I'm going

         19    to give them, because I think there's a reason for it.

12:26:21 20         You may not use electronic means to investigate or

         21    communicate about the case because it's important that you

         22    decide the case based solely on the evidence presented in

         23    the courtroom.  And information on the Internet or available

         24    through social media might be wrong, incomplete, or

12:26:39 25    inaccurate.

Charge to the Jury

342

1    You are only permitted to discuss the case with your

2  fellow jurors during the deliberations because they have

3  seen and heard the same evidence you have.

4    In our judicial system, it's important that you are

12:26:53  5  not influenced by anything or anyone outside the courtroom.

6  Can't overemphasize that.  Otherwise, your decision may be

7  based on information known only by you and not your fellow

8  jurors or the parties in the case.  This would unfairly and

9  adversely impact the judicial process.

12:27:13 10    A juror who violates these restrictions jeopardizes

11  the fairness of the proceedings, and a mistrial could

12  result, which would require the entire trial process to

13  start all over.

14    Now, your verdict, whether it's guilty or not guilty,

12:27:31 15  must be unanimous as to each count.  To find a defendant

16  guilty of a particular count, every one of you must agree

17  that the Government has overcome the presumption of

18  innocence with evidence that proves each of the elements of

19  the crime and the defendant's guilt beyond a reasonable

12:27:51 20  doubt.

21    To find defendant not guilty of a particular count,

22  every one of you must agree that the Government has failed

23  to convince you beyond a reasonable doubt.

24    Either way, guilty or not guilty, your verdict must be

12:28:02 25  unanimous as to each count.

Case: 5:20-cr-00262-SO  Doc #: 79  Filed: 12/22/21  99 of 118.  PageID #: 1083
Charge to the Jury
343

1    So now that all the evidence is in and the arguments

2    are completed, you are free to talk about the case in the

3    jury room.  In fact, it's your duty to talk with each other

4    about the evidence and to make every reasonable effort you

5    can to reach a unanimous agreement.

6        Talk with each other, listen carefully and

7    respectfully to each others' views, and keep an open mind as

8    you listen to what your fellow jurors have to say.  Try your

9    best to work out your differences.  Do not hesitate to

10   change your mind if you're convinced that the other jurors

11   are right and that your original position was wrong.

12       But do not ever change your mind just because other

13   jurors see things differently or just to get the case over

14   with.  In the end, your vote must be exactly that; your own

15   vote.  It's important for you to reach unanimous agreement,

16   but only if you can do honestly and in good conscious.

17       No one will be allowed to hear your discussions in the

18   jury room, and no record will be made of what you say, so

19   you should all feel free to speak your minds.

20       Listen carefully to what other jurors have to say, and

21   then decide for yourself if the Government has proved the

22   defendant guilty beyond a reasonable doubt.

23       Now, if you decide the Government has proved the

24   defendant guilty, then it will be my job to decide what the

25   appropriate punishment should be.

Case: 5:20-cr-00262-SO Doc #: 79 Filed: 12/22/21 100 of 118. PageID #: 1084
Charge to the Jury
344

1        Deciding what the punishment should be is my job, not

2    yours.  It would violate your oath as jurors to even

3    consider the possible punishment in deciding your verdict.

4        Your job is to look at the evidence and to decide if

12:29:47  5    the Government has proved the defendant guilty beyond a

6    reasonable doubt.

7        Now, I prepared verdict forms that you should use to

8    record your verdicts.  And we only need one of these -- I

9    mean, one set of verdict forms.  You'll have them all

12:30:05 10    attached to these jury instructions, but when you're ready

11    to render a verdict, the foreperson would just pull that one

12    copy of the form, and that's the form that you would all

13    sign.

14        So if you decide the Government has proved the charges

12:30:18 15    against defendant beyond a reasonable doubt, you would say

16    so by having your foreperson mark the appropriate place on

17    the forms.

18        If you decide the Government has not proved the

19    charges against defendant beyond a reasonable doubt, then

12:30:29 20    say so by having your foreperson mark the appropriate place

21    on the form also.  And then each of you would sign the forms

22    and it would be dated and returned to me.

23        Actually, I'd ask the foreperson to hold the form

24    until we come to the courtroom, and then I'll have the

12:30:46 25    foreperson turn the form over to me right here in the

1     courtroom.

2          Remember the defendant is only on trial for the

3     particular crimes charged in the indictment.  Your job is

4     limited to deciding whether the Government has proved the

12:30:58  5     crimes charged.

6          And, again, remember that whether anyone else should

7     be prosecuted and convicted of these crimes is not a proper

8     matter for you to consider.  The possible guilt of others is

9     no defense to a criminal charge.

12:31:11 10          Your job is to decide, again, if the defendant has

11    proved defendant guilty -- if the Government has proved the

12    defendant guilty.  Do not let the possible guilt of others

13    influence your decision in any way.

14          Just a word about juror notes.  Remember I allowed you

12:31:25 15    to take notes, but I told you you weren't required to take

16    them.  So remember that if you elected to take notes during

17    the trial, your notes should be used only as memory aids.

18    You should not give your notes greater weight than your

19    independent recollection of the evidence.

12:31:40 20          You should rely upon your own independent recollection

21    of evidence or lack of evidence, and you should not be

22    unduly influenced by the notes of other jurors.  Notes are

23    not entitled to any more weight than the memory or

24    impression of each juror.

12:31:52 25          Whether you took notes or not, each of you must form

        1    and express your own opinion as to the facts of the case.

        2         Now, I want you just to turn ahead before I give you

        3    very last instruction, to look at the verdict form.  Just

        4    one page ahead.  It says, "Count 1 Verdict Form."  You see

12:32:14 5    that there's a space for guilty or not guilty.  You see

        6    there's a space for a foreperson to sign.  There's a space

        7    for a date.  And all the rest of the jurors have a space

        8    that they can sign.

        9         And that's the case with both Counts 1 and 2.  So if

12:32:33 10   you look a those forms, you'll see those are the forms that

       11    you are to complete.

       12         Now, before I absolutely conclude, let me just look at

       13    the lawyers to see whether I've overlooked anything or if

       14    there's any problem.

12:32:51 15             MR. BROWN:  Very briefly, Your Honor.  On the

       16    verdict forms, it's dated May 2018.

       17             THE COURT:  It's not 2018, right?

       18             MR. BROWN:  No, Your Honor.

       19             THE COURT:  We can get a fresh verdict form.

12:33:15 20   That's very easy to do.

       21             MR. BROWN:  Thank you.

       22             THE COURT:  And that comes at the end of your

       23    duties.  So we can get that to you a little bit later.

       24         All right.  So, I think, other than that, apparently

12:33:30 25   there are no other issues.

1          So let me finish up by repeating something that I said

2     to you earlier.

3          Nothing that I have said or done during the trial was

4     meant to influence your verdict in any way.  You decide for

12:33:46  5     yourselves if the Government has proved defendant guilty

6     beyond a reasonable doubt.

7          So that concludes my instructions.  I know you're

8     probably getting hungry for lunch, but we didn't go so long.

9     12:30 is a reasonable lunch hour.

12:34:07 10          Earlier I was concerned that we might go beyond that

11     and whether it would be fair to hold you through lunch.  But

12     I feel pretty comfortable that letting you go for lunch at

13     12:30 isn't all that bad.

14          You're ready to deliberate as soon as you'd like now,

12:34:25 15     and you're free to go to the jury room.  And I'll have my

16     courtroom deputy let you know in regard to where things

17     stand in terms of possibility of getting some lunch.  All

18     right?

19          Thank you.

12:34:40 20          (The jury retired to deliberate at 12:34 p.m.)

21                         - - -

22

23

24

25

1          (In Open Court - Jury Not Present)

2            (Alternate Jurors Present)

3          THE COURT:  All right.  We'll go on the

4    record.

14:14:27  5    I have summoned the lawyers and the parties back to

6    the courtroom now after lunch so that we could formally

7    dismiss the alternate jurors in the case.

8          You may be seated.

9          I had indicated when we were picking the jury, and

14:14:48 10   also when we started the case, that only 12 jurors could

11   deliberate.  That's the law under the constitution, but we

12   always choose more than the 12 because we never know whether

13   we might lose a juror or two, even in a short trial.  And so

14   I made it clear that the alternate jurors had the same

14:15:17 15   responsibilities throughout the trial as the other jurors.

16         Now, we don't always order lunch for jurors, but today

17   because we didn't have the convenience of having a cafeteria

18   downstairs, and it's difficult getting over to Tower City

19   and getting back and getting a good meal, we ordered lunch.

14:15:39 20        And so when we finished up today, I allowed the

21   alternate jurors to go in with the other jurors to get

22   lunch.  I didn't instruct them fully and finally about their

23   responsibilities as alternate jurors, and so I wanted to

24   bring them back in to say that -- reiterate, now that you

14:16:04 25   got lunch and I think you're prepared to go, that you could

1      be called upon if we still lost a juror or two.

2          It doesn't happen very often, but it has happened some

3      in the past.  So I think the best thing for me to do is to

4      instruct you that you still shouldn't talk about the case to

14:16:31  5      anyone outside of the Court or anyone else.  But we will

6      give you our number -- I think you have it -- and we'll make

7      sure that you know when deliberations are concluded so that

8      you will know that you can begin to talk about your

9      experience.

14:16:51  10          So that's what I wanted to make sure.  So

11      don't -- still don't read about the case, don't look

12      anything up regarding the case or talk to anyone else about

13      the case, talk to anyone at all.

14          We don't know how long deliberations will take.

14:17:09  15      Sometimes it's short, sometimes a bit longer, but you won't

16      have to hold your peace forever.  But I should have given

17      you those instructions to go along with the rest of what I

18      said about your duties.  So I am going to dismiss you.

19          I told Sharon to have you come over, and I think one

14:17:36  20      of you actually made the suggestion that --  I told her to

21      come over to our jury deliberation room and sit there so the

22      other jurors could go ahead and deliberate.  And so we did

23      bring you over there so that they could deliberate and then

24      you could be ready to go after you got instructions from me.

14:17:56  25          So, let me ask counsel, is there anything you think

```
 1      I've overlooked on that?

 2                  MR. BROWN:  No, not at all.

 3          Thank you very much, Your Honor.

 4                  MR. RICOTTA:  No, Your Honor, not on behalf of

 5      defense.

 6                  THE COURT:  All right.  Sharon, are there he

 7      additional instructions we need to give them before they're

 8      allowed to go?

 9                  COURTROOM DEPUTY:  Only that one of the jurors

10      would like to stick around, and there's really no place for

11      them to stay, so I'm wondering where we can -- maybe in the

12      hallway.  There's nowhere to sit on 7 right now because

13      they're not allowed to sit in the cafeteria.  So she was

14      hoping to stick around in the event that they may have a

15      verdict today.

16                  THE COURT:  Well, we don't have very much --

17      because now, she shouldn't have any interaction with them at

18      all.

19                  COURTROOM DEPUTY:  Correct.

20                  THE COURT:  Of course, the lawyers shouldn't

21      have and none of us.

22                  COURTROOM DEPUTY:  Or perhaps down on 9A?  She

23      can wait in the overflow room if they're going to --

24                  THE COURT:  Are there people down there?

25                  COURTROOM DEPUTY:  They were for the trial.
```

1    I'm not sure if they -- they should probably have it on when

2    the verdict is returned.

3                    THE COURT:  I don't know whether one will be

4    returned or what.  But if there's a neutral place -- this is

14:19:10  5    a public building -- that she could spend time where she's

6    not conspicuous relative to the jurors.  The jurors will not

7    have to come in contact with her, then I think -- I think

8    that would be okay.  But we'd have to make sure that's the

9    case because the relationship right now is not intact.  She

14:19:32 10    shouldn't be involved at all in seeing or interacting with

11    the jurors.

12                    COURTROOM DEPUTY:  Understood.

13                    THE COURT:  So, you know, if there's

14    something --

14:19:41 15                    COURTROOM DEPUTY:  Okay.  I can check with the

16    clerk's office to see if they still have 9A open for

17    viewing.

18                    THE COURT:  Yeah.

19                    COURTROOM DEPUTY:  For the verdict.

14:19:53 20                    THE COURT:  And then you'd have to know how to

21    let her know, because if something happens, you know.  But

22    you can see what you can do on that.

23        But what I would say to the juror that you hear what

24    I'm saying.  The law is pretty strict in this regard, so we

14:20:15 25    can't compromise on that.  All right?

1        Other than that, Sharon, is there anything they need

2    to do with the jury department or anything like that?

3                 COURTROOM DEPUTY:  No, not that I -- they

4    don't need to do anything.  But what we would normally do is

14:20:34 5    send their certificates and pins and everything out later.

6                 THE COURT:  Okay.  So you will get a

7    certificate for your service.  We like to do that because,

8    as I said before, it's among the most important service that

9    we require of a citizen.  And I firmly believe that.

14:20:52 10        So you'll have a pin that shows United States District

11    Court, Northern District of Ohio, and then you will get a

12    certificate evidencing your surgery -- I mean, your service,

13    which I will sign.  And we'll get that to you.  So we'll

14    proceed that way.

14:21:11 15                 COURTROOM DEPUTY:  Oh, one other thing.

16        You were all already given your -- to get back to work

17    free cards?

18                 ALTERNATE JUROR:  I'm sorry?

19                 COURTROOM DEPUTY:  You were already given your

14:21:22 20    certificates?

21        Okay.  Yeah, they already took care of that.

22                 THE COURT:  All right.  So you're both free to

23    go, but if one of you said you wanted to be around

24    somewhere, Sharon would have to check to see if there's any

14:21:36 25    secure place where you're not -- will be seen, you know, by

1    the jurors or interact with them.  If that's the case, then

2    we'll be okay.

3                   ALTERNATE JUROR:  Thank you.

4                   THE COURT:  All right.  Okay.  That will be

14:21:51 5    all.

6                   COUNSEL EN MASSE:  Thank you, Your Honor.

7                   COURTROOM DEPUTY:  All rise.

8                               -  -  -

9             (Proceedings in recess at 2:23 p.m. )

14:21:54 10                             -  -  -

11            (Proceedings reconvened at 4:25 p.m.)

12         (In Open Court - Jury and Defendant Not Present)

13                   THE COURT:  Okay.  Can you hear me?

14                   MR. BROWN:  Yes, Your Honor.

16:25:34 15                   THE COURT:  Okay.  Mr. Ricotta was just

16    hanging out over here waiting, so he's in the room sitting

17    down, but I -- so he can hear me just like you are -- hear

18    what I have to say.

19         I worked on giving a response to these because I

16:25:53 20    thought I had to give it some thought, and I could tell that

21    you guys are probably not going to agree based on our

22    off-the-record conversation.

23                         JURY QUESTIONS

24      So I've got it typed out here, and it's not very long on

16:26:10 25      each of these questions, best I could a response to what

1    they were asking.  It's not always clear exactly what they

2     are asking.  But we'll go with the first one, which says:

3     "Please clarify, quote, on or about page 17, the last line

4    states, quote, reasonably close to that date, closed quote.

16:26:36  5        "Does a specific date have to be specified?"

6     So they're really maybe asking two questions, but I think

7                   the appropriate response is this:

8                   MR. BROWN:  Your Honor, can we come upstairs?

9          We can barely hear Mr. Ricotta.

16:26:56  10            THE COURT:  You say you can barely hear

11    Mr. Ricotta?

12                 MR. BROWN:  Whoever is speaking right now, we

13    can barely hear.

14                 THE COURT:  Tell them to come down.

16:27:05  15            COURTROOM DEPUTY:  Your Honor said to come

16    down, please.

17                 MR. BROWN:  Okay.  We'll be right up.

18                 MR. TERESINSKI:  Okay.  Thank you.

19                   (Pause in proceedings.)

16:31:12  20            THE COURT:  Okay.  Let me just tell you what

21    we're doing then.  We now have counsel for United States,

22    they've arrived downstairs, and counsel for the defendant is

23    already here.

24        We had three questions from the jurors.  I talked to

16:31:29  25    the counsel by telephone, but not on the record, regarding

1    these three questions to see if we could get some agreement

2    about what the response should be.

3         We were not able to reach an agreement in that

4    off-the-record conference.  So I told the lawyers that I

16:31:55  5    thought I needed to think about this a bit and try to write

6    up what I think would be the right response, and then give

7    them an opportunity to respond on the record before I send

8    the instructions into the jury.

9         I have had a chance to ponder these, to look at them

16:32:15  10    more closely, and to look at the jury instructions, so I put

11    together what I think is a fair response to the questions.

12         The process of responding to the jury questions is

13    always fraught with possible difficulties, and normally,

14    the -- and most questions, the response is, refer to the

16:32:36  15    jury instructions, and we try to do that as much as

16    possible, in my experience, is to keep directing them back

17    to the instructions.  Because when you start trying to

18    explain instructions and have more instructions on top of

19    instructions, that's a problem.

16:32:51  20         But on the other hand, we don't want the jury to be

21    unnecessarily confused.  They may be confused, but if

22    there's something we can do that doesn't bias or prejudice

23    either side, then we'll try to do that.

24         So the first question had to do with this on or about

16:33:10  25    issue, and I read that to the lawyers before.  They're

1    familiar with that instruction, which talks about when the

2    Government says that a crime is -- was committed on certain

3    dates, that there just has to be on or about.  It doesn't

4    have to be on the exact date specified.  That's what that

16:33:31  5    instruction is about, pure and simple.  It's not about

6    anything else or any hard questions they want answered by

7    the Court, and so --

8                    (Cellphone interruption.)

9                    MR. RICOTTA:  Sorry, Your Honor.  I thought it

16:33:43 10    was on vibrate, but --

11                    THE COURT:  So I concluded that we should go

12    back to the instruction first essentially, 14, and say the

13    following:

14          "Instruction 14 means that if the indictment specifies

16:34:01 15    that a crime occurred on or about a specific date, then the

16    crime must have occurred reasonably close to that date.

17          "Beyond this, the Court urges you to read the jury

18    instructions as a whole to answer any further questions you

19    have in this regard."

16:34:21 20          That's what I propose to send to them.

21                    MR. BROWN:  No objection from the Government,

22    Your Honor.

23                    MR. RICOTTA:  You know, Your Honor, at this

24    point, for the record, I already lodged an earlier objection

16:34:37 25    to the on or about.  I'll continue that objection, but since

1    they've already been instructed, I don't know how else you

2    can answer it.

3        So with that caveat in mind --

4            THE COURT:  Yeah.  We're not trying to become

16:34:53  5    the jury.  And if we aren't careful, they'll push us into

6    being the jurors.  They ask, "Does a specific date have to

7    be specified."  Well, that on or about says if there's a

8    date charged, that it has to be close to that.

9            MR. RICOTTA:  Well, all I'm saying is for

16:35:11  10    appellate review, I'm not waiving the right that I objected

11    to it earlier, but since they already were instructed, I

12    don't see how else you can answer it.

13        So I have no objection to your -- to the way -- the

14    manner in which you answered it.

16:35:24  15            THE COURT:  All right.  The other questions

16    they have are very difficult and many ways unclear.  But,

17    again, I'm trying to direct them back to the jury

18    instructions.

19        They say in the next note, "Count 1 specifically

16:35:52  20    states Christian Ferguson did attempt to unlawfully," and

21    then they go dot, dot, dot.  So they delete the rest of

22    that.  And then they say, "The explanation underneath

23    states, A, first, defendant intended to seize," and then

24    they go on further to say, "Our confusion is the sentence on

16:36:12  25    attempt versus intended.  Which should we be using?"

1      Well, the fact is that they should be using both, that

2      they have to show -- and I have it down here.  Here's what I

3      wrote:

4          "As instructions in 12 and 13 specify, the crime of

16:36:32  5    attempted kidnapping has two elements:  It requires both the

6      defendant intended to commit the crime of kidnapping, and B,

7      perform an act that constituted a substantial step toward

8      committing a crime of kidnapping."

9          That's the law.  Those are the two things.  And so

16:36:52 10   direct them back to what the law is.  That's what I would

11     do.

12               MR. RICOTTA:  I agree, Your Honor.

13               MR. BROWN:  Your Honor, I think the Government

14     agrees with you and Mr. Ricotta as well, that this is clear

16:37:07 15   and I think appropriate.

16               THE COURT:  And they're showing the same

17     confusion in the next note.

18          It says, "Does Count A and B of Count 1 have to be the

19     same."  And then they say, "Same for Count 2."  And then

16:37:23 20   they go on to say, "Guilty on both, or parts A and B, or not

21     guilty?  Can A be different from B?"

22          That's total confusion.  And so, again, you got

23     Count 1, which charges a crime, when the Government says on

24     or about certain things.

16:37:42 25        And then we say, in order to find that that happened,

1      you've got to find A, and you've got to find B.  And they're

2      saying, can it be one or both.

3                  MR. BROWN:  Yeah, Your Honor -- and I think

4      this might be -- and I'll blame Mr. Ricotta for doing food

5      analogies at this point -- you know, it's dinner and we're

6      having sandwiches, can it be turkey with mayo for one and

7      roast beef and ketchup for the second sandwich.  And, you

8      know, because you've got like four different cold cuts and

9      four different condiments, and -- or do they all have to be

10     the same sandwich with the same condiment.

11           And I think the answer is, you know, for Count 1, it

12     could be whatever verb you want from A with whatever

13     substantial step you want from B.  But the one you do for

14     Count 2 does not have to be the same verb or the same

15     substantial step necessarily.

16                  THE COURT:  Yeah.  But they're saying A and B.

17     They're two different kinds of requirements.

18                  MR. RICOTTA:  I think the Government's

19     explanation is even more confusing to me.  Those are two

20     elements that they both have to find.

21                  THE COURT:  So what I've done is, again,

22     repeat it, because they're saying can it be A, but not B.

23           It has to be A and B.  It's a very confusing question.

24     And so we go back to "Instruction 12(1)(A) states that the

25     crime of attempted kidnapping requires the defendant

```
 1    intended to commit the crime of kidnapping."
 2         Instruction 12(1)(B) states that the crime of
 3    attempted kidnapping also requires defendant performed an
 4    act that constituted a substantial step toward committing
16:39:18  5  the crime of kidnapping.  And the same is true for the other
 6    counts.
 7         I don't think we can do anything more than that.
 8    They're just going to have to work their way through it.
 9                   MR. BROWN:  And, again, and maybe this
16:39:34 10  is -- I'm just making a suggestion.  You can reject it
11    wholesale if you want.  This, but then say 12(A) and 13(A)
12    don't have to be the same, and 12(B) and 13(B) don't have to
13    be the same.  It just has to be 12(A) and (B)--
14                   MR. RICOTTA:  But they already know that each
16:39:53 15  case is distinct on its own.  They've already been
16    instructed to that, so you're already confusing them by
17    that.
18                   THE COURT:  I think they separated them out.
19                   MR. BROWN:  Okay.
16:39:59 20                   THE COURT:  They say, "Does Count A and B" --
21    meaning not count, but that's what they call it.
22         "Does Count A and B of Count 1 have to be the same?"
23         That's within Count 1.
24                   MR. BROWN:  Okay.  Then I think Your Honor's
16:40:12 25  answer is the best, and I'll -- I agree and don't want to
```

1    muddy the waters.

2                    THE COURT:  So we've had them waiting for a

3    while, but, you know, I can't think of any better way to try

4    to sit down and compose something, and then see if you had

16:40:32  5    objections to it, and then get it back to them.

6                    MR. BROWN:  No objections from the Government,

7    Your Honor.

8              Thank you very much.

9                    THE COURT:  All right.  Did you have any

16:40:39  10    trouble with the last one?

11                    MR. RICOTTA:  No.  I'm fine with that,

12    Your Honor.

13                    THE COURT:  All right.  So I'm going to mark

14    these -- I put -- I signed them, but I'm going to make the

16:40:48  15    one on or about the first one.  Let's call that note 1.

16              And then I'll call note 2 the one that starts out

17    Count 1 specifically states that "Christian Ferguson did

18    attempt to unlawfully" -- that one I'll call note 2.

19              And then the third note would be the one that starts

16:41:11  20    out, "Does Count A and B of Count 1 have to be the same?"

21              That's what I'll call 1, 2, and 3.  And I'll ask

22    Sharon to take those back to them.

23              Do you want to put this some -- if you've got some,

24    you can put -- put 1, 2, and 3 on them like that.

16:41:33  25              Okay.  That's all I have.

1              MR. RICOTTA:  All right.

2                   MR. BROWN:  Thank you very much, Your Honor.

3                   MR. TERESINSKI:  Thank you, Your Honor.

4              THE COURT:  All right.

16:41:39  5                   MR. RICOTTA:  They'll either be back quickly

6      or it will be a while.

7                              -  -  -

8              (Proceedings in recess at 4:41 p.m. )

9

10

11                      **C E R T I F I C A T E**

12

13          I certify that the foregoing is a correct transcript

14      from the record of proceedings in the above-entitled matter.

15

16      */s/ Donnalee Cotone _____ 22nd of December, 2021*
        DONNALEE COTONE, RMR, CRR, CRC                    DATE
17      Realtime Systems Administrator

18

19

20

21

22

23

24

25